UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE SATANIC TEMPLE, INC., | |
| Plaintiff, | CASE NO. ___-CV-_____ |
| v. | **COMPLAINT**<br>**WITH JURY DEMAND** |
| NEWSWEEK MAGAZINE LLC and<br>JULIA DUIN | |
| Defendants. | |

Plaintiff, The Satanic Temple, Inc. ("**TST**"), by and through its counsel, Reiss Sheppe LLP and Kezhaya Law PLC, and for its complaint alleges the following:

## INTRODUCTION

1. This lawsuit arises from a hit piece published by *Newsweek* on October 29, 2021 entitled "Orgies, Harassment, Fraud: Satanic Temple Rocked by Accusations, Lawsuit" by Julia Duin. See **EXHIBIT 1** (the article) (also available at https://www.newsweek.com/orgies-harassment-fraud-satanic-temple-rocked-accusations-lawsuit-1644042) (last visited on December 10, 2021).

2. The article is a textbook example of an "atrocity tale," a term of art in the sociological community for stories of flagrant violations of fundamental values, the purpose of which is to mobilize forces against a new religious movement, and which is circulated without regard to whether the story is true. Bromley, David, Anson D. Shupe, and Joseph C. Ventimiglia. 'Atrocity Tales, the Unification Church and the Social Construction of Evil.' *Journal of Communication* 29 (Summer), 1979: 42–53.

3. Among other provably-false assertions of facts which have a tendency to harm TST's reputation, the article claims that: TST has excommunicated "dozens" of members for asking for financial records, TST has a practice of harassing former members, TST has engaged in "cover-ups" of sexual abuse, and TST hosts "official orgies" and other sexually deviant

activities. Joe Laycock, a religious studies scholar and a source who was misquoted in the article, indicated that the only trope missing from the article is that TST is planning a mass suicide.

4. The article has caused TST severe reputational harm.

5. Despite due demand from TST, *Newsweek* refuses to retract the article.

## THE PARTIES

6. The Satanic Temple, Inc. ("**TST**"), Plaintiff, is an IRS-recognized atheistic religious corporation which is organized under the laws of Massachusetts and is headquartered in Salem, Massachusetts.

7. **Newsweek Magazine LLC**, a defendant, is a New York limited liability company whose membership are all believed to reside in New York. Newsweek publishes *Newsweek*, a publication of general circulation, and boasts to potential advertisers that it enjoys a monthly readership in excess of 72 million unique users per month and that "More than 1 in 5 Americans read us." **EXHIBIT 2** (press kit). Newsweek enjoys this readership because the public trusts that, when Newsweek asserts facts, those facts are true. Newsweek has this reputation because of its robust editorial guidelines that support the values of "accurate, independent, ethical and responsible journalism." **EXHIBIT 3** (Newsweek's Editorial Guidelines). Newsweek ignored its Editorial Guidelines when it published the article in the first place and continues to ignore them in failing to heed TST's retraction demand.

8. **Julia Duin**, a defendant, is an individual who resides in the Washington and is an employee of Newsweek. Duin wrote the article. To fuel the article, and in violation of the Editorial Guidelines, Duin passed on anonymous internet rumors from overtly-biased sources. She performed no independent verification into the facts asserted by her sources and, despite being in contact with TST, did not give TST a fair opportunity for comment on several salacious claims.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 USC § 1332 (diversity jurisdiction). There is complete diversity among the parties because TST is a Massachusetts corporation with its principal place of business in Massachusetts, and no defendant is a Massachusetts resident. TST asserts damages in excess of $75,000.

10. This Court has personal jurisdiction over the defendants pursuant to CPLR §301 because (1) Defendant Newsweek is headquartered in New York and regularly does business in New York; and (2) Defendant Duin is an employee of Newsweek and acted in concert with Newsweek in writing the article and utilized publication resources in New York to publish the article from New York, which create sufficient minimum contacts with New York so as not to offend traditional notions of fair play and substantial justice.

11. Venue properly lies in this Court pursuant to 28 USC § 1391(b)(1)-(2) because at least one Defendant resides in this district.

## FACTUAL BACKGROUND

**TST's Background**

12. TST venerates (but does not worship) the biblical adversary as a promethean icon against tyranny. TST draws inspiration from the Romantic Satanism literary movement which depicts the Satan as a revolutionary hero who stood up against impossible odds to seek justice and egalitarianism for himself and others in the pursuit of Enlightenment era ideals (particularly rationalism and personal liberty).

13. TST's organizational mission is to propagate the Seven Tenets:

(1)     One should strive to act with compassion and empathy toward all creatures in accordance with reason.

(2)     The struggle for justice is an ongoing and necessary pursuit that should prevail

over laws and institutions.

(3)      One's body is inviolable, subject to one's own will alone.

(4)      The freedoms of others should be respected, including the freedom to offend. To willfully and unjustly encroach upon the freedoms of another is to forgo one's own.

(5)      Beliefs should conform to one's best scientific understanding of the world. One should take care never to distort scientific facts to fit one's beliefs.

(6)      People are fallible. If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.

(7)      Every tenet is a guiding principle designed to inspire nobility in action and thought. The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.

https://thesatanictemple.com/pages/about-us (last visited December 10, 2021).

14. To that end, TST engages in various charitable activities (like donating women's hygiene products under its "Menustratin' with Satan" program), holds weekly services, has a structured ministry program, has a sobriety program, and offers after school childcare.

15. TST also advocates for the religious rights of its membership, and must sometimes take legal action to protect those rights. For example, TST has brought litigation over its members being excluded from "all-inclusive" governmental displays of religion and religious exemptions to laws that burden the membership's ideology. Although this advocacy tends to attract attention, TST has not achieved the household-name status required to be treated as a general purpose public figure. As a result, even though TST's allegations establish that the Defendants acted with actual malice, TST need not actually prove actual malice to support a judgment.

### *Newsweek* **Publishes the Defamatory Article**

16. On October 29, 2021, *Newsweek* published Duin's article about TST, entitled "Orgies, Harassment, Fraud: Satanic Temple Rocked by Accusations, Lawsuit." (the "**Article**").

**Exhibit 1**.

17. The article was broadcast to the "1 in 5 Americans" who read *Newsweek*. See https://www.newsweek.com/orgies-harassment-fraud-satanic-temple-rocked-accusations-lawsuit-1644042 (last visited December 10, 2021) and **Exhibit 2** (press kit).

18. Julia Duin also shared the article on Twitter and at least 31 people saw it:



(https://twitter.com/juliaduin/status/1454184994075594752) (last visited on December 10, 2021).

**1: The article Was False and Defamatory**

19. Ostensibly, the article was about TST's lawsuit against some former members who hacked two of TST's Facebook pages and directed false and defamatory statements about TST directly to TST's audience. See *United Federation of Churches LLC v. Johnson et al.*, No. 2:20-cv-509 (W.D. Wa. 2020). But, really, the article was just a megaphone for the *Johnson* defendants' false and defamatory claims.

20. The article's headline states: "Orgies, Harassment, Fraud: Satanic Temple Rocked by Accusations, Lawsuit." **Exhibit 1** at 1. The headline indexes the false and defamatory allegations ("Satanic Temple Rocked by Accusations") that TST engages in sexual misconduct ("Orgies," addressed at § 1.5), harasses its former members ("Harassment," addressed at § 1.3), and engages in financial fraud ("Fraud," addressed at §§ 1.1 and 1.2).

21. Taken as a whole, the article falsely asserts that TST engages in engages in financial fraud and then covers it up, defrauds the public about its business dealings, files fraudulent lawsuits, harasses former members, and hosts sexually deviant gatherings. These assertions are all provably false and have a tendency to diminish the public's willingness to associate with or donate to TST.

22. The headline also falsely asserts that TST has been sued ("Satanic Temple Rocked by … Lawsuit.") In fact, TST brought the litigation addressed in the article.

*1.1:    The article falsely charges TST with financial corruption.*

23. The article states: "In 2018, TST sued Twitter for temporarily suspending the account of co-founder Lucien Greaves." **Exhibit 1** at 7. This statement is false and defamatory as follows.

24. The statement is false on three fronts. First, TST did not "sue" Twitter. To say that TST "sued" Twitter falsely suggests that TST engaged in a formal judicial complaint process, which any layman knows to be very costly. A reasonable reader of this sentence would expect that the "suit" cost TST a lot of money. In truth, TST invited an administrative mediation process

through the Massachusetts Commission Against Discrimination. The matter was covered *pro bono* by Marc Randazza. No TST money was expended.

25. Second, TST began this process because Twitter permanently banned Greaves's account, whereas the article claimed it was because Twitter "temporarily" suspended Greaves's account. A reasonable reader would distinguish between a "permanent" ban and a "temporary one;" the former justifies legal action, the latter does not. Moreover, Twitter banned Greaves's account in retaliation for his seeking help from the public after Twitter declined to address an offending tweet. The offending tweet invited the general public to burn down TST's headquarters and going viral. Shortly after the tweet, a member of the public arrived at TST's headquarters, shouted threats, and caused property damage.

26. Third, the sentence falsely implies that, by TST raising this issue against Twitter, it inured to the sole personal benefit of Greaves. This is missing necessary context. Twitter suspended TST's account along with Greaves's account. Social media is critical to TST's ability to propagate its messaging, so TST had an obvious organizational interest in maintaining its own account. The same is true for Greaves's account. Greaves is TST's primary spokesperson. If he no longer has a Twitter account, his ability to perform his role for TST is diminished, causing harm to the organization.

27. Without the necessary context, the statement is defamatory. It charges TST with financial fraud in the form of expending TST funds to fuel a decisionmaker's "personal vendetta," see ¶ 32, below. This has a tendency to subject TST to public contempt and has a tendency to dissuade donations.

28. The article states: "He [Jinx Strange, aka Paul Millirons[1]] soon left the group, then was leaked material about 'leaders posing happily with major alt-right media figures,' he wrote." **Exhibit 1** at 16. This statement is part of a repeated and provably-false assertion that TST is secretly affiliated with the alt-right, which is a provably-false charge that TST defrauds the public about its organizational purposes. This charge of public fraud is defamatory *per se*; and is defamatory because it divides TST's donation base into political segments and drives away all but those who identify with the alt-right.

29. The article parrots Jinx Strange's charges of:

> "Accounts of sexual abuse being covered up in ways that were more than anecdotal. Dozens of people kicked out for asking for financial records from this alleged-non-profit organization."

**Exhibit 1** at 16. This statement asserts two provably-false allegations: (1) TST engages in sexual abuse and covers up the sexual abuse; and (2) TST engages in financial fraud and excommunicates members for inquiring into TST's financial fraud. Both are false and defamatory as follows.

30. The assertion that TST engages in sexual abuse and covers it up is false and defamatory. TST absolutely does not and has never engaged in sexual abuse in any form. This assertion is evocative of the Satanic Panic ritual abuse conspiracy theories of the 1980s-1990s. It is defamatory because no reasonable, respectable, right-thinking person could help but form an evil opinion of TST if they believed TST engages in sexual abuse or covers it up.

31. The implied assertion that TST engages in financial fraud and excommunicates members for inquiring into allegations of TST's financial fraud is also false and defamatory. TST

---

[1] Millirons is a former member of TST who now runs the "Luciferian Dominion", a rival Satanic sect, whose principal purpose seems to be to disparage TST.

absolutely does not and has never engaged in any form of financial fraud or retaliation against members for inquiring into allegations of financial fraud. This assertion is defamatory because it accuses TST of fraudulent financial dealings. That charge is defamatory *per se*.

32. The article states: "Salome DeMeur, a pseudonym for a former member based in Pensacola, Fla., [named Haley Fuller] said she got sidelined after asking Greaves why 'he was going to sue Twitter like it was personal vendetta, but then using TST money to do so.'" **Exhibit 1** at 18.

33. This statement repeats the provably-false assertion that TST used donated funds to sue Twitter. As previously addressed, a reasonable reader would draw a meaningful distinction between a "lawsuit," which is necessarily expensive, and an "administrative mediation proceeding," in which TST funds were not expended..

34. The claim also falsely asserts that Fuller (aka "Salome DeMeur") was retaliated against because she dissented from the Twitter dispute. In fact, Fuller was removed from her position of authority because: (1) she was the subject of numerous independent complaints about being dismissive, insulting, and bullying toward other chapter leaders; (2) she made defamatory and derogatory statements about Executive Ministry (TST's co-directors); (3) she disseminated personally identifying information of a member of Executive Ministry; and (4) she stated an intent to hold hostage, withhold, or destroy research material she gathered on behalf of TST for the Grey Faction initiative. Exhibit 4 (Fuller's removal letter).

35. The claim is defamatory because it falsely asserts that TST expends donations for the personal benefit of its co-directors. That falsely charges serious breaches of fiduciary duties on the part of TST's leadership. No right-thinking member of the public could help but hold TST in contempt if they believed this statement was true. It is defamatory *per se*.

36. The article states that "The Satanic Temple recently made some significant structural changes, apparently in an effort to appear more like a mainstream church." **Exhibit 1** at 18.

37. The claim that TST made structural changes "in an effort to appear more like a mainstream church" is false. In fact, the structural changes are designed to increase the membership's opportunity to participate in planning organizational activities, participate in organizational governance, and to provide ministerial services.

38. The statement is defamatory because it charges TST with fraud to the public about its organizational function and purposes. This statement diminishes the public's trust in TST's efforts and it undermines TST's membership and ministry. It is another flavor of financial fraud, which is defamatory *per se*.

1.2:   *The article falsely claims that TST defrauds the courts.*

39. In the context of addressing TST's religious reproductive rights litigation against Texas, the article states: "(It's not clear whether TST actually practices abortion as a religious ritual; the claim may be a legal tactic or political theatre.)" **Exhibit 1** at 7 (parenthetical in original). This statement is false and defamatory as follows.

40. The statement falsely suggests that TST defrauded the courts by filing a lawsuit which is predicated on misrepresenting TST's religious practices. In fact, it *is* clear that TST "actually practices abortion as a religious ritual." This is a matter of public record. See *Satanic Temple v. Young*, case no. 4:21-cv-387, doc. 26 at ¶¶ 47-58 (S.D. Tx. 2021).

41. The statement is defamatory because it has a tendency to undermine the judiciary's and the public's opinion of TST's credibility as a litigant and, therefore, harms TST's ability to successfully prosecute claims. It also dissuades donors from giving to TST because it injects a fear that the funds may be used on frivolous litigation.

*1.3:    The article falsely claims that TST harasses dissenters.*

42. The article states that, before the *Johnson* defendants[2] hacked TST's Facebook pages, "Bit by bit, items critical of TST showed up on its Seattle chapter's Facebook page." **Exhibit 1** at 11. And, "Then in March 2020, according to the lawsuit, the defendants went rogue." **Id.** This statement asserts that (1) the *Johnson* defendants were posting these "items critical of TST" before March of 2020; and (2) the *Johnson* defendants were removed from their advisory position because they were posting "items critical of TST."

43. Both assertions are false. First, the *Johnson* defendants did not post items "critical of TST" on the Washington Chapter Facebook page until after they stole the page in March of 2020. Rather than posting "items critical of TST," before then, they were posting inane endorsements of leftist politics when they were supposed to be endorsing Satanism. The endorsements of leftist politics created the false impression that TST is a leftist political organization. TST is a religious institution, not a political one. The *Johnson* defendants were dissuading membership from every other political walk of life.

44. Second, the statement falsely implies that "items critical of TST" had something to do with the removal of the *Johnson* defendants from their positions on the advisory council. In fact, they were removed because: (1) they were inflaming interpersonal conflicts within the advisory council; (2) they were repeatedly operating TST's social media to endorse leftist politics as opposed to Satanism, despite repeated reminders that this was unacceptable; (3) they failed to attend a particular meeting to address the issue of appropriate content to post on TST's social

---

[2] The *Johnson* defendants are the defendants in *United Federation of Churches LLC v. Johnson et al.*, No. 2:20-cv-509 (W.D. Wa. 2020), *i.e.*, David Alan Johnson, Leah Fishbaugh, Mickey Meeham (a/k/a Joshua Calavera), and Nathan Sullivan.

media; and (4) they failed to participate in publicity efforts on a matter of organizational significance.

45. The article states: "Meanwhile some members wondered why an organization like TST would go after four Seattleites with very modest means while it had bigger fish to fry elsewhere." **Exhibit 1** at 13. Together with the rest of the article, this statement implies that TST's lawsuit against the *Johnson* defendants is rooted in a greater policy to harass dissenters, to the exclusion of being rooted in a fiduciary obligation to safeguard TST's property. This statement and its implications are false and defamatory as follows.

46. It is false to assert that TST harasses dissenters, either as a general policy or specific to the *Johnson* defendants. The *Johnson* lawsuit would never have happened if they had simply returned TST's property upon demand.

47. The assertion is also defamatory. It urges the public to refrain from associating with TST for fear that they will be the next target of harassment and to refrain from donating to TST for fear that the funds will be wasted on a frivolous lawsuit.

48. The article states:

> "After leaving, it was basically Scientology-lite," she [Fuller (aka "Salome DeMeur")] told *Newsweek* in an email. "People were told not to talk to us. Members were trying to break up my relationship with my boyfriend. Several people were legally threatened. I know quite a few people who have refused to speak out at all because they fear legal action from TST."

**Exhibit 1** at 18.

49. This repeats the provably-false assertion that TST harasses its former members. In fact, TST did not try to break up Fuller's relationship with her then-boyfriend. Nor did TST legally threaten "several people." It is impossible to further show how the statement is false because

the article is unclear on what the threat was, who was being threatened, or why they were allegedly being threatened.

50. The statement is defamatory because it invites the public to conclude that TST has a practice of harassing dissenters, which diminishes the likelihood of the public joining TST or donating to TST.

51. The article states:

> "Once she [Fuller (aka "Salome DeMeur")] became known as a dissenter, she said, members of TST's national council threatened to out her to the Marine Corps, her employer, despite the Corps already being aware of DeMeur's religious activities."

**Exhibit 1** at 18.

52. This statement repeats the provably-false claim that TST has a practice of harassing dissenters. TST does not have a practice of harassing dissenters. The statement is also defamatory because it falsely asserts that TST engaged in a "cover-up" of the matter by ousting Fuller. This has a tendency to diminish TST's reputation because no right-thinking member of the public would want to associate with such a totalitarian organization. It is defamatory *per se*.

1.4:   *The article falsely reports on a legal proceeding.*

53. The headline falsely asserts that TST was sued ("Satanic Temple Rocked by … Lawsuit.") In fact, TST brought the litigation addressed in the article. See *United Federation of Churches LLC v. Johnson et al.*, No. 2:20-cv-509, doc. 1 (W.D. Wa. 2020).

54. TST notified Newsweek of this issue in a demand letter. **EXHIBIT 5** (demand for retraction).

55. Newsweek responded to the retraction demand. **EXHIBIT 6** (response to demand for retraction). In its response, Newsweek asserted that the article is a "fair index" of the

"substantially accurate" material in the article. **Exhibit 6** at 2, fn. 4. The problem is twofold. First, the headline does not fairly index the article. The headline falsely suggests that TST has been sued for something about orgies, harassment, and fraud, whereas TST brought the lawsuit and it was about the *Johnson* defendants' theft of intellectual property (specifically, TST's Facebook pages). Second, as detailed herein, the allegations of orgies (§ 1.5), harassment (§ 1.3), and fraud (§§ 1.1 and 1.2) are not substantially accurate.

56. The title is also defamatory. It republishes the sources' false "Accusations" that charge TST with financial corruption, corporate misconduct, public fraud, and sexually deviant behavior, all of which tend to alienate the public from TST and therefore tends to diminish TST's donor base.

57. The article states: "In a withering 14-page judgment, U.S. District Judge Richard A. Jones dismissed the lawsuit on Feb. 26, 2021, saying the plaintiffs got their facts wrong on the actual domain name of the Facebook page and that other claims made by TST were 'implausible.'" **Exhibit 1** at 14. This statement and its implications are false and defamatory as follows.

58. The assertion that Judge Jones's opinion states TST "got their facts wrong" is false. Judge Jones's opinion held that the Anticybersquatting Consumer Protection Act of 1999 (which prohibits trademark infringements in a statutorily-defined "domain name") does not apply to Facebook pages. *United Fed'n of Churches, LLC v. Johnson*, 522 F. Supp. 3d 842, 850–52 (W.D. Wash. 2021). This is a legal issue, not a factual one. Nowhere in the opinion does Judge Jones claim TST "got their facts wrong."

59. The assertion that "other claims made by TST were 'implausible'" is also false. Despite the use of quotes, the word "implausible" does not appear in Judge Jones's opinion. *United Fed'n of Churches, LLC v. Johnson*, 522 F. Supp. 3d 842 (W.D. Wash. 2021). It is also impossible,

given the stage of proceedings. The case is at motion-to-dismiss stage, at which stage the court does not assess the factual merit of claims.

60. This statement is defamatory because it suggests that TST was admonished by a sitting federal judge for presenting frivolous factual assertions. That has a tendency to diminish TST's donation base because it injects a fear that the donated funds will be spent on frivolous litigation.

61. The article states:

> "It was tossed out because they [TST[ claim to be a religion and you are allowed to criticize religions," Johnson said. "They like to say they are a business when it comes to competitor organizations forming or when someone is using their intellectual property. Otherwise, they claim to be a religion."

**Exhibit 1** at 14. In addition to the express assertions, this statement falsely implies that TST's lawsuit urged the court to find that it is above criticism. This statement and its implications are false and defamatory as follows.

62. The statement falsely asserts that the original complaint was dismissed because "you are allowed to criticize religions." No part of the order of dismissal turns on the notion that there is a Free Speech right to criticize religions. In fact, the defamation claim was dismissed based on the judicial abstention doctrine, under which civil courts are not allowed to resolve the truth or falsity of questions of religious doctrine. *United Fed'n of Churches*, 522 F. Supp. 3d at 855–56. The *Johnson* defendants had asserted that TST supports ableism, misogyny, racism, fascism, transphobia, and endorses of police brutality. *Id.* Judge Jones held that resolving whether those assertions are true would necessarily entail resolving doctrinal matters which was therefore barred by the Establishment Clause. *Id.*

63. This statement falsely implies that TST's lawsuit is premised on the claim that TST is above criticism. In fact, TST's lawsuit is premised on the claim that the *Johnson* defendants falsely ascribed extremist ideologies and affiliations to TST, that those statements had a tendency to cause TST reputational harm, that those statements were wrongfully channeled directly to TST's own hard-won audience by stealing TST's Facebook accounts, and that those statements caused TST economic harm. A reasonable reader would credit the distinguishment between "criticism" and "actionable defamation."

64. The statement also presents a false dichotomy by claiming that TST is "a business when it comes to competitor organizations … [o]therwise, they claim to be a religion." In fact, religious organizations have an equal right as secular organizations to protect their property rights.

65. These assertions are defamatory. The statements falsely assert that there is something untoward about TST protecting its property rights and falsely assert that TST considers itself beyond reproach. Each of these have a tendency to separate TST from the support of the community.

66. The article also claims that the *Johnson* defendants have "spent $80,000 defending themselves in court this past year," referring to *United Federation of Churches LLC v. Johnson et al.*, No. 2:20-cv-509 (W.D. Wa. 2020). **Exhibit 1** at 3. That claim is false and defamatory as follows.

67. Given the procedural posture of the case, it is impossible for the *Johnson* defendants to have spent this much money on the defense. As of the time of the article, the *Johnson* defendants have filed two motions to dismiss and a response to a motion for reconsideration. If they actually have spent that much money, it is because of some undisclosed fact which, if disclosed, would alter a reasonable reader's perception of the assertion. For example, the *Johnson* defendants may have unreasonably driven up their own costs.

68. The assertion that the Johnson defendants have expended $80,000 in legal defense fees is defamatory. It falsely implies that TST has engaged in abusive litigation practices to drive up the *Johnson* defendants' legal expenses. This assertion tends to subject TST to public contempt and tends to dissuade a donor from giving to TST because it implies that the funds will be wasted on abusive litigation practices. The article later makes the implication an explicit allegation. **Exhibit 1** at 19 (falsely claiming the lawsuit is "a way to bankrupt them [the *Johnson* defendants] for speaking out.")

69. The article claims that "[Joshua] Calavera [aka Mickey Meeham, one of the *Johnson* defendants] has since declared bankruptcy." **Exhibit 1** at 4. This statement is false and defamatory as follows.

70. This is a provably-false assertion of fact. A simple nationwide PACER search revealed that there are no bankruptcy filings by "Joshua Calavera" or "Mickey Meeham." **Exhibit 7** (there are no entries at all for "Joshua Calavera") and **Exhibit 8** (the only entry for "Mickey Meeham" is the *Johnson* lawsuit).

71. Similar to the false claims about the *Johnson* defendants spending $80,000 on their defense and that TST harasses its dissenters, this claim is defamatory because it tends to dissuade the public from associating with or giving to TST on the fear that the time or money will be wasted on efforts to harass former members.

*1.5:  The article falsely charges TST with sexual misconduct.*

72. The article states: "While digging up facts for their defense, they've [the *Johnson* defendants] run into other aggrieved Satanists around the country who have a litany of complaints about the organization, including allegations of sexually deviant gatherings … [including]

orgies.'" **Exhibit 1** at 4; see also **id.** at 17 (referencing an allegation that TST approves of "official orgies.") These statements are false and defamatory as follows.

73. This statement is false on three fronts. First, it falsely asserts that TST engages in "official orgies," which is a charge of sexual misconduct. Second, the memorandum constrains the kinds of sexual activities that happen at official events, whereas the article falsely claims it "approves" of official orgies. Third, it falsely asserts that there are a "litany" of complaints. The "litany of complaints" implies additional assertions of facts and invites the reader to use their imagination what other atrocities TST may have engaged in.

74. This statement is defamatory because it is a charge of sexual misconduct, which is defamatory *per se*. As addressed above, it also invites the reader to draw defamatory inferences for what the "litany" of complaints were about.

75. The claim of sexually deviant gatherings also must be taken together with the earlier charge that TST covers up sexual abuse. ¶ 29; **Exhibit 1** at 16 ("Accounts of sexual abuse being covered up in ways that were more than anecdotal.") Together, these assertions are defamatory because they charge TST with engaging in, and covering up, sexual abuse; and no right-thinking person would want to associate with that kind of organization. It is defamatory *per se*.

1.6:   *The article implies other unspeakably-terrible allegations.*

76. The article states:

> Of all the defendants, Johnson is the one who has spent the most time digging into TST's background. "Every time I think I've hit the bottom, there's another terrible thing comes out," he said. "People send us things we can't talk about because we can't substantiate them."

**Exhibit 1** at 15. This statement and its implications are false and defamatory as follows.

77. The statement falsely implies additional undisclosed facts that suggest TST has done many other things which are so "terrible" that they cannot even be talked about. This statement, when considered along with the rest of the article, invites the reader to use their imagination to determine what other "terrible" things TST has done.

78. The article states:

> "I [Johnson] can't really get press coverage, get attorneys general to audit [TST] but what I can do is work. I can find everything public that I possibly can; tie it together as best as I can and hope that someone looks at it and picks it up."

**Exhibit 1** at 19. This statement implies that TST has done something which would justify an "audit" or other legal action by a State's attorney general.

79. The implication that TST has engaged in some form of financial fraud or crime to justify an "audit" or other legal action by a State's attorney general is plainly false because, until the *Newsweek* article at issue, no member of the press and no attorney general credited the claims.

80. The implication of some kind of financial fraud or crime is defamatory *per se*. No right-minded person would associate with or donate funds to an organization which is deserving of legal scrutiny.

81. The article closes:

> "They continue to post their findings about TST on a website. 'We would appreciate any support you can offer,' they write in a concluding statement, 'as we struggle to survive this pursuit of justice in the worst year of our lives so far.'"

**Exhibit 1** at 19. This is a naked call to action which asks the *Newsweek* readership to financially support the *Johnson* defendants.

2:    **Defendants Were At Least Negligent About the article.**

*2.1:    TST is a private figure.*

82. TST is a private figure because it is not a household name.

83. The Defendants were at least negligent as to the fact that publishing the article would cause TST reputational harm. As more particularly detailed above, the article explicitly charges TST with corruption, financial fraud, sexual deviancy, and sexual abuse.

84. As more particularly detailed below, Defendants knew the sources were biased, knew that the source were levying charges based on anonymous internet rumors, and should have deduced from the complete absence of substantiating information that the charges were false. Defendants should reasonably have foreseen that these allegations would wrongfully cause harm to TST's reputation, but published the allegations anyway.

85. The Defendants intended to cause reputational harm to TST.

*2.2:    The sources are disgruntled former members*

86. Defendants knew or should have known that all of the sources for the article are former members of TST with varying personal grudges and financial incentives to disparage TST.

87. David Alan Johnson, Leah Fishbaugh, Mickey Meeham (aka "Joshua Calavera"), and Nathan Sullivan (the *Johnson* defendants) are all former members of TST. Notwithstanding that Fishbaugh found Satanism to be "cringy" (**Exhibit 1** at 8)–a fact that TST was unaware of until the article–all of these sources were formerly entrusted with social media management for TST's Washington Chapter. In March of 2020, these sources were removed from their positions for inflaming inter-Chapter personality conflicts and repeatedly posting inane political material when they were supposed to be posting religious material. They responded to their removal by stealing TST's Facebook pages and have held a personal grudge ever since.

88. In addition to their personal animosity for TST, the *Johnson* defendants have a financial one. They market atrocity tales to the public for the purpose of soliciting income under their common enterprise "Queer Satanic," a rival Satanic sect. **Exhibit 1** at 3 (referencing their Go-FundMe campaign) and 19 (seeking financial contributions from the *Newsweek* readership). They continue to use one of TST's Facebook pages to market their competitor merchandise.

89. Until her removal, Haley Fuller (aka "Salome DeMeur") was a leader of the West Florida Chapter. Fuller was removed for misconduct related to her leadership position (more fully detailed at ¶ 35 and **Exhibit 4**). She responded to her removal by obsessively spreading anti-TST rumors and has held a personal grudge against TST ever since. In addition to her personal animosity for TST, she has a financial one. Along with Paul Millirons (aka "Jinx Strange"), she created a competitor entity to TST and derives income from selling Satanic merchandise.

90. Scott Moul (aka "Scott Malphas") was briefly a leader of the Arizona Chapter. Moul became disaffected when TST put out a policy which established contours around permissible sexual conduct at events. Moul misunderstood the policy to mean that TST was going to start hosting "official orgies," anticipated that he would be excluded from the parties, and held a grudge ever since. Despite repeatedly explaining to Moul that there are no "official orgies," he continues to push the claim.

*2.3:   The publishers are Christian fanatics.*

91. For Newsweek and Duin, the desire to harm TST was rooted in Christian fanaticism. Recall, TST venerates the biblical adversary. That offends an ignorant class of Christians, which particularly includes Newsweek's management and Duin.

92. In September of 2018, IBT Media, then-owner of the rights to publish *Newsweek* (the magazine), formed Newsweek (the LLC). IBT Media is a closely held corporation, with two

publicly-known shareholders: Etienne Uzac and Johnathan Davis. Shortly later, Uzac and IBT Media were indicted for a multi-million dollar money laundering scheme which inured to the benefit of Olivet University, a Christian university with far-right political leanings. Uzac pleaded guilty to the scheme. The current owners of Newsweek includes Davis (who owned IBT Media) and Dev Pragad (who served in a management role over *Newsweek* for IBT Media). Davis still owns an interest in IBT Media with Uzac. Owing to fundamentalist Christian ties and its right-leaning political beliefs, those who control Newsweek have a religious and political aversion to TST. This aversion founds an ill intent, of the kind that would cause a willingness to publish unsupported allegations notwithstanding a subjective doubt about the veracity of the allegations.

93. Prior to joining *Newsweek*, Duin worked for *The Washington Times* and *GetReligion* and several other right-leaning publications. Duin has a background in ministry and she has written four books, all from the Christian perspective. Duin was offended at TST's ideology and this offense caused her willingness to publish unsupported allegations notwithstanding a subjective doubt about the veracity of the allegations.

*2.4:   The sources were at least negligent about falsity.*

94. Except for Fuller (aka "Salome DeMeur"), none of the sources claim to have personal knowledge about any of the "facts" they asserted in the article. Each, except Fuller, were simply spreading anonymous rumors they found on the Internet.

95. Any reasonable source would have performed an inquiry into the nature of their allegations before publicly charging an organization with fraud, sexual deviancy, sexual abuse, and financial corruption. The non-Fuller sources did not do that.

96. Fuller is unique among the sources in that she claimed to have personal knowledge of the "facts" she asserted, even though she knew full-well that she was lying to Duin.

*2.5: The publishers were at least negligent about falsity*

97. The personal biases of the sources were known to Newsweek and Duin when they set out to publish the article. Duin came in contact with the *Johnson* defendants through Twitter, where the *Johnson* defendants have been spreading their anonymous conspiracy theories about TST since they were removed from their advisory council positions.

98. Duin sought to sell the *Johnson* defendants' atrocity tales, not because she had any subjective belief that they were true, but because they had a tendency to harm TST.

99. She had no trouble convincing Newsweek's management to allow her to write the story because Newsweek's management shared her personal bias against TST.

100.      Duin and Newsweek both had to consciously disregard the *Newsweek* Editorial Guidelines in order to publish the story. **Exhibit 3**. These Editorial Guidelines prove that Newsweek and its journalists know how to research and write a credible story; they just chose not to have journalistic integrity when it came to writing about TST. The Editorial Guidelines form one potential predicate the "reasonable journalist" standard for negligence, and form the subjective standard for actual malice. Duin's failure to comply with the Editorial Guidelines, coupled with Newsweek's failure to ensure compliance with its own Editorial Guidelines, establishes both negligence and actual malice.

101.      Duin did not "Check every single fact" included in the story, as required by Newsweek's Editorial Guidelines. **Exhibit 3**. Had she done so, she would have easily discovered that:

(a)      Meeham/Calavera had no bankruptcy records;

(b)     TST did not "sue" Twitter;

(c)     TST did not use charitable funds in connection with the administrative mediation proceedings against Twitter;

(d)     Twitter did not "temporarily" ban Greaves's account, it was a permanent ban;

(e)     TST does, in fact, engage in a religious ceremony which involves the abortive act;

(f)     the *Johnson* defendants did not post items critical of TST before being removed from their advisory positions;

(g)     the "TST WA Allies" pages was named "Evergreen Memes for Queer Satanic Fiends" until the *Johnson* defendants hacked it, renamed it, and stole it;

(h)     Judge Jones's order of dismissal did not state that "plaintiffs got their facts wrong" or find that TST's claims were "implausible" and did not turn on the notion that "you are allowed to criticize religions;"

(i)     there have been no "accounts of sexual abuse" and no accounts of a cover up of alleged sexual abuse;"

(j)     nobody–much less "dozens of people"–has been kicked out of TST for asking for financial records;

(k)     Fuller (aka "Salome DeMeur") was not removed for asking about the Twitter controversy, nor was she threatened to be "outed" to the Marine Corps, nor did TST try to break up her relationship with her boyfriend;

(l)     TST's organizational changes are not an "effort to appear more like a mainstream church;" and

(m)    Johnson could not get press coverage or attorneys general to audit TST because his claims do not withstand even cursory scrutiny.

102.    Duin did not "Weigh the data and evidence impartially," as required. **Exhibit 3**; see also **id.** ("If in any doubt about the source of material, don't do the story.") If she had applied even minimal scrutiny, she would have found that the sources were all overtly biased against TST and could offer no substantiating proof of their salacious claims. She even inserted a quote that invited the reader to imagine what other unspeakably-terrible claims accusations are out in the ether, even though the *Johnson* defendants "can't substantiate them." **Exhibit 1** at 15.

103.    Duin did not "Reach out for comment and give parties time to respond," as required. **Exhibit 3**; see also **id.** ("If we are accusing a person or company of wrongdoing, we must include fair comment.") Particularly, and despite being in contact with TST, Duin offered no fair opportunity to comment on the claims that:

(a)    TST engages in and then covers up sexual abuse; and

(b)    TST engages in financial corruption and has kicked out "dozens of people" for asking for financial records.

(c)    TST does not actually participate in abortion as a religious exercise;

(d)    TST's structural changes are no more than an effort to appear like a mainstream religion;

(e)    TST used donated funds to sue Twitter because Greaves was temporarily banned; and

(f)    TST ousted Fuller (aka "Salome DeMeur") because she asked about the Twitter controversy, then harassed her, then tried to break up her relationship with her then-

boyfriend.

104.     Duin did not comply with the policy to refrain from aggregating "stories that rely on anonymous sources." **Exhibit 3**. Except for Fuller (aka "Salome DeMeur"), none of the sources claimed personal knowledge about any of the "facts" they were spinning. Even Fuller presented an aggregation of anonymous "people" who were allegedly legally threatened. **Exhibit 1** at 18 ("Several people were legally threatened.") The article is little more than an amalgam of anonymous internet rumors.

105.     Neither Duin nor Newsweek complied with the requirement that, "We make any needed corrections promptly and transparently." **Exhibit 3**. Between October 26 and October 29, Lucien Greaves (a co-director of TST and the spokesperson for TST) put Duin on notice of several false and defamatory assertions of facts in the article. **Exhibit 9** (Greaves's correspondence with Duin). Among other points, Greaves put Duin on notice that:

(a)     TST never mocked Moul (aka "Scott Malphas") for taking issue with the sex positivity guidelines (**Exhibit 9** at 2, email at 10:30 am Central Time) and does not direct that "such events [*i.e.*, what Moul termed 'official orgies'] must take place, but sets limits on such behavior" if engaged in (**Exhibit 9** at 2-3, email at 12:50 pm Central Time);

(b)     TST "never told anybody not to speak to former members" and TST has "very explicit rules against doxing" (**Exhibit 9** at 1-2, the email at 5:44 pm Central Time);

(c)     TST has not engaged in any form of "sexual abuse" and has not engaged in any form of "cover up" (**Exhibit 9** at 1, the email at 7:02 pm Central Time, *contra.* the assertions of the article addressed at ¶ 30, below);

(d)     TST has not engaged in any form of financial fraud (**Exhibit 9** at 1, the email at 7:02 pm Central Time, and **id.** at 4-5, the email at 12:59 pm);

(e)   The *Johnson* defendants have shopped their story to anyone who will listen and, upon investigation, have been uniformly found to be lacking in credibility for good reason. (**Exhibit 9** at 4-5, the email at 12:59 pm).

106.   On October 30, 2021, through counsel, TST issued a demand for retraction to Newsweek with a copy to Duin. **Exhibit 5** (demand for retraction).

107.   Newsweek responded through counsel with an incomplete defense of the article. See **Exhibit 6** (Newsweek's response). In response to the retraction demand, Newsweek asserted that it is entitled to report on the legal action between TST and the *Johnson* defendants. This disregards the point that Newsweek defamed TST by spreading false and defamatory rumors. And it misses the point that its reporting on the legal action was not "fair."

108.   At no point did Newsweek or Duin perform any fact-checking before passing on the internet rumors as factual. No fact checking was performed because, notwithstanding its reputation for journalistic integrity, Newsweek does not employ fact-checkers.

109.   Dr. Joe Laycock, a source who was misquoted in the article, found Duin to be biased in her reporting. He indicated that his conversation with Duin was "the most egregious example of confirmation bias" he had ever seen.

110.   Duin primarily asked Dr. Laycock leading questions about TST. For example: "They are not really a religion, are they?" and "Even Church of Satan [a rival sect of Satanism] is more of a religion than these people, right?" When he explained that, actually, TST is a *bona fide* religion; and he in fact wrote a whole book about it (*Speak of the Devil: How The Satanic Temple is Changing the Way We Talk about Religion*), "it didn't seem to register."

111.   Duin also misquoted Dr. Laycock. The article states:

> That switch [referring to TST's ministry program] won't
> make the group respectable in the eyes of the world, said

> Laycock, adding that TST's brand relies on increasing the
> shock value.

**Exhibit 1** at 18.

112.     But Dr. Laycock didn't talk with Duin about TST's organizational changes or its

ministry program. Quite the contrary, he explicitly declined to comment about TST's activities

which post-date 2019. **EXHIBIT 10** (Dr. Laycock's correspondence with Duin). TST's ministry

program was not unveiled until late-2020.

113.     Duin also informed Dr. Laycock that her deadline to provide the story to her

editor was in one hour from the time they talked. From this, Dr. Laycock concluded that Duin

intended to sell the *Johnson* defendants' narrative regardless of what he said and that she was

not performing a *bona fide* investigation of their claims.

114.     Any reasonable reporter would have doubted the sources' atrocity tales in the

first place. As detailed above, the stories were being told for the purpose of causing harm to

TST; all of the sources were infected by bias (personal, financial, or both); none of the sources

(save Fuller / Salome DeMeur) claimed personal knowledge of the events they alleged; and all

of the sources (including Fuller / Salome DeMeur) purported to "prove" their claims with

anonymous victims.

115.     Any reasonable reporter would have complied with the Editorial Guidelines and,

thereby, would not have published the article with the complained-of allegations. By publishing

the article with the complained-of allegations, despite failing to adhere to the Editorial Guide-

lines, Newsweek and Duin acted unreasonably.

116.     Upon being presented with notice that several assertions of facts in the article are

false and defamatory (**Exhibit 5**), any reasonable reporter would have taken down the article

and performed a minimally competent investigation to determine whether the sources' atrocity

tales are credit-worthy. Instead, in spite of receiving actual notice that the sources' atrocity tales were false and defamatory assertions of facts, Newsweek and Duin kept the article up and performed no investigation into the atrocity tales.

## CLAIMS

### Count 1

### (Libel *per se* and libel *per quod*)

117.     Plaintiff repeats and realleges all of the forgoing allegations of the Complaint as if set forth more fully herein.

118.     As described above, Defendants published false statements of fact of and concerning TST. In addition, and in the alternative, even if every statement in the article were literally true or were statements of opinion, when juxtaposed and arranged as Defendants did in the article, the article created the false impressions/gists that Plaintiff committed illegal behaviors, and that they engaged in both unethical business behaviors and amoral personal behaviors, all as detailed above. This includes without limitation: (1) that TST engages in sexual misconduct; (2) that TST covers up sexual abuse; (3) that TST engaged in abusive litigation practices to force former members into bankruptcy; (4) that TST filed a fraudulent federal lawsuit and lies about its religious rituals; (5) incorrect reporting on an existing lawsuit to suggest that the lawsuit is frivolous; (6) that TST defrauds the public about its organizational purposes by being secretly affiliated with the alt-right; (7) that TST threatens its members who voice opposing views; (8) that TST is a fake religion; and (9) that TST is engaged in financial fraud. The reasonable and ordinary reader of the article would have drawn the conclusions, impressions, and gists from the innuendo and juxtaposition of statements of fact and opinion in the article.

119.     There was no matter of public concern related to the statements, impressions, and gists. Defendants acted under no privilege in publishing the statements, impressions, and gists in the article and, to the extent there was any privilege available, it was abused by Defendants.

120.     This is because Defendants engaged in a sham "investigation" into the details of the article, waiting until the eleventh hour to verify details of the story with Plaintiff and then, after Plaintiff provided or offered to provide evidence rebutting Defendants' pre-conceived narrative, Defendants either outright lied or created impressions/gists that they knew were false. Moreover, when Defendants did not get the answers to the questions they wanted they simply falsely reported answers to questions they never asked, so as to ensure they would not have to publish the truth. This is a textbook example of purposefully avoiding the truth.

121.     Moreover, Defendants published their statements in a clear violation of Newsweek's own reporting requirements.

122.     Accordingly, and although not necessary to sustain the defamation claim because TST is a private figure, Defendants published their statements with actual malice as they knew their statements, gists, and impressions were false or, at minimum, in fact entertained serious doubts about their trust, as evidenced by Plaintiff's provision of information (or at least information that would make it incumbent on Defendants to inquire further), demonstrate a degree of malice/recklessness, in addition to ordinary negligence, in publishing the false statements, gists, and impressions in the article. This also supports punitive damages.

123.     The false statements, gists, and impressions in the article were defamatory *per se*, presumptively causing reputational injury to Plaintiff in an amount in excess of $75,000.00.

124.   As addressed in § 1, above, the false allegations that TST is financially corrupt, engages in sexual abuse, and is otherwise sexually depraved, are all defamatory *per se*.

125.   Additionally, the false statements, gists, and impressions in the article caused special damages to Plaintiff in the form of lost donations and has required TST to hire the services of a public relations expert to try to overcome the damage cause by the article.

126.   TST has suffered losses in donation because of the article. Shortly after the article was published, a member notified TST that they stopped a recurring donation because of the article. On information and belief, the article has caused and will continue to cause other quantifiable losses in donations, the full extent of which will be presented at trial.

127.   TST has also suffered demonstrable reputational harm. For example, two commenters in the article unfavorably compare TST to the Catholic Church (a reference to the Church's sex abuse scandals). **Exhibit 1** at 22. More generally, the internet reaction to this Article has been unfavorable toward TST. On information and belief, the article has caused and will continue to cause other quantifiable injury to TST's reputation, the full extent of which will be presented at trial.

128.   In an effort to quantify the reputational harm, consider that a one-page advertisement in Newsweek costs $151,650. The article is more harmful to TST than an advertisement because the public trusts facts asserted in a news publication more than facts asserted in an advertisement. This Article purports to be news, so it has an inverse effect as an advertisement, and therefore harms TST's reputation in an amount no less than $151,650.

129.   To overcome the effects of the article, TST has had to specially hire professional services by a public relations expert to overcome the reputational harm caused by the article. The costs of those services and associated advertising expenses would not have been incurred

but for the article. The full extent of TST's increased marketing expenses because of the article will be presented at trial.

## JURY DEMAND

130.     TST demands trial by jury on all issues so triable.

WHEREFORE TST prays this Court enter orders as follows:

(a) Finding that Defendants are liable, jointly and severally, for defaming TST;

(b) Awarding either special damages equaling the quantifiable losses to TST's donations, the quantifiable losses to TST's reputation, and the marketing expenses incurred in mitigating the harm caused by the article, (the sum of which is expected to exceed $75,000), or at least for nominal damages;

(c) Awarding punitive damages in a lawful amount;

(d) Awarding pre-judgment and post-judgment interest at lawful rates; and

(e) Awarding permanent injunctive relief that each Defendant shall refrain from re-peating or in any way furthering the publication of the defamatory statements.


Dated: New York, New York
         February 16, 2022


REISS SHEPPE LLP


By:     Matthew Sheppe

425 Madison Avenue, 19th Floor
New York, New York 10017
Tel: (212) 753-2424
Fax: (347) 348-0731
Email: msheppe@reisssheppe.com

*Attorneys for Plaintiffs*

Of counsel:

Matthew Kezhaya
Kezhaya Law PLC
300 N. Washington Ave, #300
Minneapolis, Minnesota 55401
Tel: (479) 431-6112
Email: matt@kezhaya.law