UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **The Satanic Temple, Inc.** ("**TST**"),<br><br>                Plaintiff,<br><br>*v.*<br><br>**Newsweek Magazine LLC** and **Julia Duin**,<br><br>            Defendants. | Case no. 1:22-cv-1343-MKV |

### TST'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS

**REISS SHEPPE LLP**

By:    Matthew Sheppe

425 Madison Avenue, 19th Floor
New York, New York 10017
Tel: (212) 753-2424
Fax: (347) 348-0731
Email: msheppe@reisssheppe.com

*Attorneys for Plaintiffs*

Of counsel:

Matthew Kezhaya
Kezhaya Law PLC
300 N. Washington Ave, #300
Minneapolis, Minnesota 55401
Tel: (479) 431-6112
Email: matt@kezhaya.law

## TABLE OF CONTENTS

TST's response in opposition to motion to dismiss ........................................................................... i

Table of contents .................................................................................................................................. ii

Table of authorities ............................................................................................................................ iii

Summary ............................................................................................................................................... 1

Argument ............................................................................................................................................... 2

    1: There is no "religious organization" exclusion to defamation liability. .............................. 2

    2: The complained-of statements are defamatory and not privileged. ...................................... 4

        2.1: The "personal vendetta" claim is a charge that TST countenances embezzlement. ...... 4

        2.2: The "secret alt-right ties" charge alienates TST from a substantial population. .......... 8

        2.3: The "structural changes" claim charges TST with public fraud. ............................... 12

        2.4: The article twice charges TST with defrauding the courts. ....................................... 13

        2.5: The article defames TST by charging it with harassing dissenters ........................... 16

        2.6: The article defames TST by charging it with sexual misconduct and cover-up. ........ 19

        2.7: The article defames TST by charging it with "other unspeakably-terrible" deeds. ..... 21

    3: Newsweek and Duin published this article with the requisite fault. ................................... 22

        3.1: TST is a private figure. ........................................................................................... 22

        3.2: The complaint pleads actual malice. ....................................................................... 24

TABLE OF AUTHORITIES

**Cases**

*Biro v. Conde Nast,*
    807 F.3d 541 (2d Cir. 2015) ........................................................................ 24

*Biro v. Conde Nast,*
    883 F. Supp. 2d 441 (S.D.N.Y. 2012) ........................................................... 6

*Biro v. Conde Nast,*
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) ......................................................... 23

*Bolduc v. Bailey,*
    586 F. Supp. 896 (D. Colo. 1984) ................................................................. 6

*Briggs & Stratton Corp. v. Nat'l Cath. Rep. Pub. Co.,*
    978 F. Supp. 1195 (E.D. Wis. 1997) ............................................................. 2

*Burns v. McGraw-Hill Broad. Co.,*
    659 P.2d 1351 (Colo. 1983) ......................................................................... 8

*Cantwell v. State of Connecticut,*
    310 U.S. 296 (1940) ................................................................................... 23

*Church of Scientology of California v. Siegelman,*
    475 F. Supp. 950 (S.D.N.Y. 1979) .......................................................... 3, 24

*Cianci v. New Times Pub. Co.,*
    639 F.2d 54 (2d Cir. 1980) ........................................................................... 7

*Coleman v. Grand,*
    No. 18CV5663ENVRLM, 2021 WL 768167 (E.D.N.Y. Feb. 26, 2021) ........... 22

*Contemp. Mission, Inc. v. New York Times Co.,*
    842 F.2d 612 (2d Cir. 1988) ....................................................................... 22

*Curtis v. Argus Co.,*
    171 A.D. 105, 156 N.Y.S. 813 (App. Div. 1916) ............................................ 6

*Doe v. Hartz,*
    52 F. Supp. 2d 1027 (N.D. Iowa 1999) ....................................................... 21

*Fairstein v. Netflix, Inc.,*
    553 F. Supp. 3d 48 (S.D.N.Y. 2021) ........................................................... 11

*Gregorio v. Hoover,*

238 F. Supp. 3d 37 (D.D.C. 2017) ........................................................................ 2

*Gross v. New York Times Co.*,
    623 N.E.2d 1163 (1993)................................................................................ passim

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ........................................................................................ 24

*Herbert v. Lando*,
    441 U.S. 153 (1979) ........................................................................................ 22

*Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*,
    399 N.E.2d 1185, 1188 (1979)......................................................................... 15

*Int'l Soc. For Krishna Consciousness, Inc. v. Barber*,
    650 F.2d 430 (2d Cir. 1981)............................................................................ 23

*Jhirad v. Ferrandina*,
    536 F.2d 478 (2d Cir. 1976)............................................................................... 5

*Kalimantano GmbH v. Motion in Time, Inc.*,
    939 F. Supp. 2d 392 (S.D.N.Y. 2013)........................................................... 5, 18

*Kehoe v. New York Trib.*,
    229 A.D. 220, 225, 241 N.Y.S. 676, 681 (App. Div. 1930)............................. 25

*Klagsbrun v. Va'ad Harabonim of Greater Monsey*,
    53 F. Supp. 2d 732 (D.N.J. 1999). ..................................................................... 3

*Larson v. Valente*,
    456 U.S. 228 (1982) .......................................................................................... 4

*Lasky v. Am. Broad. Companies, Inc.*,
    606 F. Supp. 934 (S.D.N.Y. 1985).................................................................. 12

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
    838 F.2d 1287 (D.C. Cir. 1988) ......................................................................... 7

*Long v. Marubeni Am. Corp.*,
    406 F. Supp. 2d 285 (S.D.N.Y. 2005).............................................................. 14

*Marcus v. Jewish Nat. Fund (Keren Kayemeth Leisrael), Inc.*,
    158 A.D.2d 101, 557 N.Y.S.2d 886 (1990) ..................................................... 10

*Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*,
    483 F. Supp. 3d 195 (S.D.N.Y. 2020)................................................................ 3

*Palin v. New York Times Co.*,
   940 F.3d 804 (2d Cir. 2019) ............................................................................. 24

*Rosenblatt v. Baer*,
   383 U.S. 75 (1966) ...................................................................................... 4, 23

*Sheindlin v. Brady*,
   No. 21-CV-1124 (LJL), 2022 WL 1063678 (S.D.N.Y. Apr. 7, 2022) ................... 24

*Shurtleff v. City of Bos., Massachusetts*,
   142 S. Ct. 1583, 1594 (2022) (Kavanaugh, J., concurring) ............................... 4, 23

*Sovik v. Healing Network*,
   244 A.D.2d 985, 987, 665 N.Y.S.2d 997, 1000 (1997) ........................................ 20

*United Fed'n of Churches, LLC v. Johnson*,
   No. C20-0509RAJ, 2022 WL 1128919 (W.D. Wash. Apr. 15, 2022) ............... 15, 19

*Vinas v. Chubb Corp.*,
   499 F. Supp. 2d 427 (S.D.N.Y. 2007) ................................................................ 6

*Wende C. v. United Methodist Church*,
   827 N.E.2d 265 (2005) ................................................................................. 21

*Wollersheim v. Church of Scientology of California*,
   6 Cal. Rptr. 2d 532 (Ct. App. 1992) ................................................................ 17

*Wollersheim v. Church of Scientology*,
   212 Cal. App. 3d 872, 895, 66 Cal. Rptr. 2d 1, 15 (Ct. App. 1989) ........... 16, 17, 19

*Zaidi v. United Bank Ltd.*,
   194 Misc. 2d 1, 9, 747 N.Y.S.2d 268, 276 (Sup. Ct. 2002) ................................. 24

*Zorach v. Clauson*,
   343 U.S. 306 (1952) ....................................................................................... 8

**Statutes**

N.Y. Civ. Rights Law § 74 ................................................................................. 7

N.Y. Penal Law § 155.05 ................................................................................... 5

**Other Authorities**

Andrew L. Seidel, *The Founding Myth: Why Christian Nationalism is Un-American* (Sterling

    Publishing, 2019) ......................................................................................................... 9

Bromley, David, Anson D. Shupe, and Joseph C. Ventimiglia. "Atrocity Tales, the Unification

    Church and the Social Construction of Evil." *Journal of Communication* 29 (Summer), 1979:

    42-53............................................................................................................................ 16

Chairman Martin R. Castro, U.S. Comm'n on Civil Rights, *Peaceful Coexistence: Reconciling*

    *Nondiscrimination Principles with Civil Liberties* ....................................................... 9

Jeannine Hill Fletcher, *The Sin of White Supremacy: Christianity, Racism, and Religious*

    *Diversity in America* (Cambridge Press, 2017).......................................................... 9

*Oxford University Press*, "Anecdotal".......................................................................... 20

*Oxford University Press*, "Fact" ................................................................................... 6

*Oxford University Press*, "Frank" ................................................................................ 18

*Oxford University Press*, "Honest".............................................................................. 18

*Oxford University Press*, "Jealous" ............................................................................. 10

*Oxford University Press*, "Leaked" ............................................................................. 11

*Oxford University Press*, "Posit" ................................................................................. 9

*Oxford University Press*, "Say" ................................................................................... 15

*Wikipedia* "Christian Nationalism"............................................................................. 9

**Treatises**

*Imputation of allegedly objectionable political or social beliefs or principles as defamation*,
    62 A.L.R.4th 314 ....................................................................................................... 12

*Law of Defamation* § 6:74 (2d ed.) ............................................................................. 3
*Law of Defamation* § 8:67 (2d ed.) ............................................................................. 7

*Religious Organizations and the Law* § 18:46 (2d) ..................................................... 17
*Religious Organizations and the Law* § 22:19 (2d) ..................................................... 20

*Religious Organizations and the Law* § 22:41 (2d) ........................................................ 5

*Restatement (Second) of Torts* § 526 (1977) ................................................................. 10
*Restatement (Second) of Torts* § 529, cmt. *b* (1977) .................................................. 10
*Restatement (Second) of Torts* § 551 (1977) ................................................................. 10
*Restatement (Second) of Torts* § 559, cmt. *e* (1976) .................................................... 8
*Restatement (Second) of Torts* § 561, cmt. *b* (1977) .................................................... 3
*Restatement (Second) of Torts* § 573, cmt. *e* (1977) ............................................. 12, 18
*Restatement (Second) of Torts* § 578, cmt. *b* (1977) .................................................... 6
*Restatement (Second) of Torts* § 611, cmt. *f* (1977) ........................................ 7, 14, 15, 19
Restatement (Second) of Torts § 611, cmt. *j* (1977) ...................................................... 20

## Constitutional Provisions

U.S. Const. Amend. I ........................................................................................................ 23

## SUMMARY

This is a defamation action arising from an article entitled "Orgies, Harassment, Fraud: Satanic Temple Rocked by Accusations, Lawsuit." The complaint asserts that, allegations in the article notwithstanding, TST does not actually host "official orgies" or "other sexually deviant gatherings," does not have a pattern of retaliatory harassment against former members, and does not defraud the public or the courts about its organizational purposes or activities.

The publishers, Newsweek and Duin move to dismiss the complaint in full. They contend that because TST is a religion, it is defamation proof. They are wrong. The First Amendment does not permit a State to give different, lesser, rights to religious corporations as a class. This case can and must be resolved according to neutral principles of law.

The article is plainly defamatory. It charges TST with various and sundry misdeeds, including countenancing embezzlement by its directors (§ 2.1), soliciting donations through public fraud (§ 2.2 and § 2.3), twice defrauding the courts (§ 2.4), retaining membership through coercion (§ 2.5), engaging in sexual abuse and covering up the same (§ 2.6), and "other deeds" which are too terrible to repeat but not so terrible as to preclude passing on (§ 2.7). The motion should be denied because the article presents these claims as "facts," not rhetorical devices.

The publishers also contend, without proof, that TST is a public figure. They assert that TST is so because it solicits funds, seeks equal access to the courts, and are the subject of public interest. The first two points describe every religious organization. As discussed, the First Amendment does not permit a State to give different, lesser, rights to religious corporations as a class. The last point asks the Court to find that TST is an involuntary public figure. To sustain that claim, the publishers needed to provide the Court with proof. They didn't. The complaint says TST is a private figure, so that is what controls at this stage.

Notwithstanding that TST is a private figure, TST will seek a punitive damages instruction which requires a showing of actual malice. Newsweek and Duin materially departed from their own Ethical Guidelines at least six times, a recognized ground to find actual malice. Something caused them to disregard their own journalistic standards. As pleaded, it was a religious and political bias, another recognized ground to find actual malice. Thus, TST pleads actual malice.

**ARGUMENT**

**1: There is no "religious organization" exclusion to defamation liability.**

The article opens with a question: "Can you defame a religion, especially one that doesn't believe in God, Satan or the supernatural?" Newsweek and Duin posit the answer is "no" because of the judicial abstention doctrine. Their argument, if true, would mean that no religion can ever recover for defamation, solely because it is a religion. Not so. The doctrine is grounded in a long line of cases that affirm the fundamental right of churches to decide for themselves, free from state interference, matters of church government, faith, and doctrine. *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 46 (D.D.C. 2017) . To that end, the doctrine precludes civil courts from resolving religious controversies "that incidentally affect civil rights." *Id.* (quoting *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710 (1976)).

Newsweek and Duin misapply the doctrine because they omit that the doctrine only precludes resolving issues that require application of religious law or polity. *Briggs & Stratton Corp. v. Nat'l Cath. Rep. Pub. Co.*, 978 F. Supp. 1195 (E.D. Wis. 1997). If the issue can be resolved by disregarding religion, then the doctrine does not apply. *Gregorio v. Hoover*, 238 F. Supp. 3d 37 (D.D.C. 2017). For example, no court can resolve a dispute over who the "real" leader of a particular church is; for the process of answering who the "real" leader is requires application of the religion's doctrine and polity rules. On the other hand, a court may resolve disputes if using "wholly secular

legal rules whose application to religious parties or disputes does not entail theological or doctrinal evaluations." *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195 (S.D.N.Y. 2020); *see also Klagsbrun v. Va'ad Harabonim of Greater Monsey*, 53 F. Supp. 2d 732, 738 (D.N.J. 1999). This is one such case. There is no uniquely "religious" question involved in, *e.g.*, whether TST countenances embezzlement (§ 2.1) or engages in and conceals sexual abuse (§ 2.6). In each case, the article charges TST with conduct which undermines public confidence, and therefore undermines donations toward its charitable purposes. Religious or not, that impedes TST's organizational purposes.

Simply put, there is no "religious organization" exemption to defamation. *Church of Scientology of California v. Siegelman*, 475 F. Supp. 950, 953 (S.D.N.Y. 1979) ("It does not follow that simply because a religious organization is a party to an action that that action should be immediately categorized as a theological dispute") (cleaned up);[1] *Restatement (Second) of Torts* § 561, cmt. *b* (1977) (recognizing that religious corporations can sue for defamation); *Law of Defamation* § 6:74 (2d ed.) (proffering that the Free Speech Clause protections for defamation defendants are "precisely the correct level of constitutional protection" because "statements that range into religious opinion" are subsumed by the preexisting opinion framework).

To hold–as Newsweek and Duin invite–that TST is barred from defamation recovery solely because it is a religious entity (or, perhaps, especially because it rejects the supernatural) would require disregarding the elementary premise that the Government must be neutral toward religion. See generally U.S. Const. Amend. I (the Religion Clauses). If TST is prohibited from recovery for

---

[1] Newsweek and Duin cite *Scientology* three times throughout their brief. Doc. 20, at 8, 21, and 29. It is incredible that they missed the explicit rejection of one of their recurring arguments.

defamation solely because TST is a religion then the Government has impermissibly delineated between "permissible" plaintiffs (secular entities, only) and "impermissible" ones (religious entities need not apply). *Shurtleff v. City of Bos., Massachusetts*, 142 S. Ct. 1583, 1594 (2022) (Kavanaugh, J., concurring) ("a government *violates* the Constitution when (as here) it *excludes* religious persons, organizations, or speech because of religion from public programs, benefits, facilities, and the like") (emphasis in original).

Likewise, if TST is prohibited from recovery for defamation solely because TST's ideology "doesn't believe in God, Satan, or the supernatural," as Newsweek and Duin contend, then the Government has impermissibly delineated between "permissible" plaintiffs (*i.e.*, only those religions which believe in God, Satan, or the supernatural) and "impermissible" plaintiffs (nobody else need apply). *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.")

In either event, the Court would be withholding equal access to society's "pervasive and strong interest in preventing and redressing attacks upon reputation" (*Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966)), solely because of TST's religious classification as an "atheistic religious corporation." Doc. 20, at 8 and 9 (scare quotes in original). The Court should find that the ecclesiastical abstention doctrine has nothing to say about this dispute. Newsweek and Duin *can* defame TST, even though TST is a religion which doesn't believe in God, Satan, or the supernatural. The motion to dismiss should be denied.

**2: The complained-of statements are defamatory and not privileged.**

*2.1: The "personal vendetta" claim is a charge that TST countenances embezzlement.*

One of the headlined "Accusations" of "Fraud" is a claim that "TST money" was used to pursue

a "personal vendetta" for its co-founder. The article implies this is part of a greater pattern of embezzlement, which TST conceals by ousting anyone who investigates the claim.

The charge is comprised of the following portions of the article:

- TST "sued Twitter" for "temporarily suspending" the account of co-founder Lucien Greaves (Article, at 7, 10, 18).

- Fuller / DeMeur was "sidelined after asking Greaves why he was going to sue Twitter like it was a personal vendetta, but then using TST money to do so." (Article, at 18).

- "Dozens of people" have been "kicked out" of TST "for asking for financial records" (Article, at 16).

### 2.1.1: The "personal vendetta" charge is defamatory.

In context of the article, the quoted language can only be read to mean that TST's co-founder is an embezzler, and that TST conceals this embezzlement by ousting anyone who investigates the claim. The article charges TST with a "serious crime." *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 419 (S.D.N.Y. 2013) (charges of a "serious crime" are defamatory *per se*). Embezzlement is punishable in New York as felony grand larceny. N.Y. Penal Law § 155.05; *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976). If "TST money" really was being embezzled by its co-director, TST would share liability in that felony. *Religious Organizations and the Law* § 22:41 (2d) (A religious corporation shares liability when a director diverts funds to personal use).

Newsweek and Duin disagree, of course. They assert there is "attenuation" between the above-quoted statements and the assertedly defamatory charge. They misapply the rule that alleged innuendo cannot "enlarge upon the meaning of words so as to convey a meaning that is not expressed."

*Biro v. Conde Nast*, 883 F. Supp. 2d 441, 466 (S.D.N.Y. 2012). As explained more fully in their own cited case, "no good" does not mean "cooking the books" because the latter interpretation does not match the words used. *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 436 (S.D.N.Y. 2007). Contrast the article at hand, which plainly charges that "TST money" was used to pursue a director's "personal vendetta." The charge is libelous. *Curtis v. Argus Co.*, 171 A.D. 105, 156 N.Y.S. 813 (App. Div. 1916) (upholding libel judgment where article charged pastor with diverting church funds to his personal use); *see also Bolduc v. Bailey*, 586 F. Supp. 896 (D. Colo. 1984) (charge that priest improperly transferred church property to himself was defamatory *per se*).

Newsweek and Duin also claim that no part of the complaint suggests they endorsed the "Accusations" of "Fraud." Doc. 20 at 15. Their own authority undermines the argument. An article "endorses" an insinuation when it presents the two statements together, as if they are linked. *Biro*, 883 F. Supp. 2d at 466. The article does just that when it presented this "personal vendetta" claim as one of the "facts" discovered by the *Johnson* defendants. Article, at 4. The word "fact" ordinarily means "a thing that is known or proved to be true." *Oxford University Press*, "Fact" (Available at https://www.lexico.com/en/definition/fact) (last visited August 13, 2022). TST stands ready to disprove this "fact."

Likewise, the article endorses the defamatory charge that TST conceals embezzlement by ousting the "dozens of members" for investigating the purported embezzlement. The article does so by presenting only one side of the story. *See Restatement (Second) of Torts* § 578, cmt. *b* (1977) ("a newspaper is subject to liability if it republishes a defamatory statement, although it names the author and another newspaper in which the statement first appeared.") Newsweek and Duin declined to publish a correction or retraction, Ex. 6, so TST's only lawful remedy is through the courts.

*2.1.2: The publishers lost the "fair report" privilege by offering the public unbalanced reporting.*

Newsweek and Duin assert the "fair report" privilege. Doc. 20, at 16; see also N.Y. Civ. Rights Law § 74. The rules on "fair report privilege" make more sense by prefacing that the privilege is a qualified exception to the common law republication rule. *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1299 (D.C. Cir. 1988); *see also Law of Defamation* § 8:67 (2d ed.) (collecting other authorities). The republication rule posits that "every repetition of the defamation is a publication in itself, even though the repeater states the source or makes clear that he does not believe the imputation." *Liberty Lobby*, 838 F.2d at 1298-99 (cleaned up). To ameliorate the republication rule's chilling effect on reporting of controversial matters of public interest, the common law recognizes a privilege for "fair" and "accurate" accounts of governmental proceedings. *Id.*, at 1299.

To be "fair," the report must be "balanced, not just of the statement itself, but of the debate on the controversy to which the statement is addressed." *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 69  (2d Cir. 1980) (cleaned up). The article is non-privileged as to the "lawsuit *vs.* mediation" dichotomy because Duin did not give TST an opportunity to present its side of the "debate," instead preferring to present only the charge of embezzlement. Ex. ¶ 103(e).

*2.1.3: The publishers lost the "fair report" privilege by imputing corrupt motives onto TST.*

Further, Newsweek and Duin are barred from the privilege because this charge imputes corrupt motives onto TST. *Restatement (Second) of Torts* § 611, cmt. *f* (1977) (The privilege may not be abused to "impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties.") The article is unprivileged because it impermissibly uses innuendo to suggest that TST is nothing more than a veneer of a charitable organization, whose purpose is in reality to enrich its directors with donations solicited through public fraud (§ 2.2 and § 2.3).

*2.2: The "secret alt-right ties" charge alienates TST from a substantial population.*

Another headlined "Accusation" of "Fraud" is that TST has secret dealings with the alt-right. This charge is implied by the alleged existence of "leaked material," but does not present the "material" for the readership to decide for themselves. In context, the charge is defamatory because it alienates TST from the "substantial and respectable minority" of the population (*i.e.*, that segment of its support base which holds the alt-right in contempt). *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1357 (Colo. 1983); *Restatement (Second) of Torts* § 559, cmt. *e* (1976).

*2.2.1: Broader societal context of the article.*

Before addressing the text of the article, the remarks will require some "broader social context" to understand why the reasonable reader is likely to understand the statements to assert a provable fact that harms TST's reputation. *Gross v. New York Times Co.*, 623 N.E.2d 1163, 1169 (1993). TST, like all citizens of America, functions in a society that at least ostensibly supports the elemental First Amendment principle that "Church and State should be separated." *Zorach v. Clauson*, 343 U.S. 306, 312 (1952). TST's membership relies on this notion because "this country ceases to be free for irreligion it will cease to be free for religion–except for the sect that can win political power." *Id.*, at 325 (Jackson, J., dissenting). There, "irreligion" refers to a group that "zealous sectarians entrusted with governmental power" have historically sought to "further their own causes" by seeking to "torture, maim and kill" those they "branded" as "heretics," "atheists," or "agnostics." *Id.*, at 319 (Black, J., dissenting). TST's membership falls within that historically oppressed minority. Compl. ¶ 12. Hence, TST is an "*atheistic* religious corporation." Doc. 20, at 8 and 9 (scare quoting compl. ¶ 6) (emphasis added).

Being within that historically oppressed group, being generally averse to getting tortured, maimed, or killed, and being generally aware of the omnipresent danger of being tortured, maimed,

or killed by extremists, TST pays keen attention whenever "zealous sectarians entrusted with governmental power" abuse that power in violation of TST's membership's well-established legal rights. Thus, TST "must sometimes take legal action to protect those rights." Compl. ¶ 15.

The foregoing sometimes puts TST in adversity with a different segment, one that calls itself the "religious right," the modern name for those same "zealous sectarians" which believe that our society should be governed only by those who subscribe to their religious viewpoint. *E.g.*, Jeannine Hill Fletcher, *The Sin of White Supremacy: Christianity, Racism, and Religious Diversity in America* (Cambridge Press, 2017); Andrew L. Seidel, *The Founding Myth: Why Christian Nationalism is Un-American* (Sterling Publishing, 2019); *Wikipedia* "Christian Nationalism" (https://en.wikipedia.org/wiki/Christian_nationalism) (last visited August 15, 2022); and Chairman Martin R. Castro, U.S. Comm'n on Civil Rights, *Peaceful Coexistence: Reconciling Nondiscrimination Principles with Civil Liberties*, at 29 (https://www.usccr.gov/pubs/docs/Peaceful-Coexistence-09-07-16.pdf); (Last Visited August 15, 2022) ("The phrases 'religious liberty' and 'religious freedom' will stand for nothing except hypocrisy so long as they remain code words for … Christian supremacy or any form of intolerance").

*2.2.2: The "secret alt-right ties" charge is defamatory.*

The article invokes the above broader societal context by stating that TST "posits itself as a counterweight to the Religious Right" and "jealously guards its reputation as a kick-ass religious-rights organization." Article, at 4 and 6. But the language "posits itself" and "jealously guards" plant seeds of doubt, that TST is not altogether upfront with the public about its organizational purposes. This is so because to "posit" means to "put forward as a basis of argument;" for TST to posit "itself" states that TST's position statement is self-appointed, suggesting that not is all what it appears. *Oxford University Press*, "Posit" (https://www.lexico.com/en/definition/posit) (Last

visited August 14, 2022). The article further connotes that TST's position is unsettled by stating that TST "jealously" guards its reputation. *Oxford University Press*, "Jealous" (https://www.lex-ico.com/en/definition/posit) (Last visited August 14, 2022) (*Jealous* means "fiercely protective of;" synonymous with *defensive*, "very anxious to challenge or avoid criticism.")

The article then reminds the reader of its prior charge that "TST money" was expended to pursue Greaves's "personal vendetta," a "lawsuit" against Twitter "for temporarily suspending" his account. ([§ 2.1](#)). The article attributes the "decision" to Greaves that TST "use[d] attorney Mar[c] Randazza to represent TST in the Twitter lawsuit," and explains that "Randazza is known for defending neo-Nazis as well as right-wing conspiracy theorist Alex Jones." Article, at 10. The article recites that this "decision" was met with internal division. Id. What "nettled" "many TST members nationwide" was a misperception that TST was "sympathetic to the alt right to use him." Id. Three chapters left over the perception that Randazza is "an agent of the alt-right." Id.

The quotes in the prior two paragraphs present the scienter element of a charge that TST de-frauds the public about its organizational purposes. See *Restatement (Second) of Torts* § 526 (1977). As a solicitor of donated funds, TST holds a recognized duty to use those donated funds in line with its stated organizational purposes. *Marcus v. Jewish Nat. Fund (Keren Kayemeth Leis-rael), Inc.*, 158 A.D.2d 101, 557 N.Y.S.2d 886 (1990). The quotes two paragraphs above recite TST's "statements" to the public. The quotes one paragraph above addresses that it is a "material fact" to a substantial segment of TST's support base that TST does *not* expend donated funds on an "agent of the alt-right." *Restatement (Second) of Torts* § 529, cmt. *b* (1977); Article, at 10. Under the circumstances, the reader is led to intuit, TST has a legal duty to disclose to the public any of its "alt-right ties." *Restatement (Second) of Torts* § 551 (1977); *see also Marcus*, above.

Next, the article implies undisclosed facts that TST has and conceals alt-right ties. Article, at

16. The article does so by stating that Millirons / Strange was "leaked material" about "leaders posing happily with major alt-right media figures." Id. The word "leaked" means "(of secret information) made public." *Oxford University Press*, "Leaked" (https://www.lexico.com/en/definition/leaked) (Last visited August 14, 2022). By implying undisclosed facts, the charge is actionable as a "mixed opinion." *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 66 (S.D.N.Y. 2021).[2] An opinion is only nonactionable if it presents, "fully and accurately," the "facts" on which it is based. *Gross*, 623 N.E.2d at 1169.

The article further bolsters the charge of "secret alt-right ties." It prefaces by noting TST's efforts to secure judicial recognition of a conscience-based right for its membership to terminate an unwanted pregnancy. Article, at 7. The article injects doubt into the reader's mind whether TST "actually" ("the truth or facts of a situation") considers this decision a matter of conscience by suggesting it is nothing more than a "legal tactic" ("an action or strategy carefully planned to achieve a specific end") or "political theatre" (a "superficial appeal that may not reflect a person's genuine ideology or political preferences.") Article, at 7. The plain and ordinary construction of these two sentences, presented back-to-back, is to reinforce the charge that TST secures donations from the public on the false pretense that it "actually" holds its stated organizational ideology. *Biro*, 883 F. Supp. 2d at 466.

When the article implied the existence of "leaked material" that purportedly evidence TST's "secret alt-right ties," it defamed TST. When the article suggest that TST's stated ideology This is

---

[2] Greaves contemporaneously inquired of Duin as to the nature of the undisclosed facts on which the article's charge is premised. Ex. 9, at 1. ("This claim about TST leaders in pictures with alt right leaders. I am unaware of these pictures. Did you see them? Where may I find them? Who exactly is in them?") She did not respond.

so because the article charges that TST solicits donations from a segment of the population, with knowledge that this segment holds the alt-right in contempt, and to facilitate those donations conceals that TST is a secret supporter of the alt-right. The article charges TST with organization-wide public fraud, which is actionable under the circumstances because the charge has a tendency to alienate TST from a substantial segment of its support base. That charge is "peculiarly harmful" to the public's continued willingness to entrust their funds to TST. *Restatement (Second) of Torts* § 573, cmt. *e* (1977).

### 2.2.3: A charge of objectionable political beliefs can be defamatory.

Newsweek and Duin contend it is "incapable of defamatory meaning" to ascribe a "political philosophy" to TST. Doc. 20 at 15 (quoting *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352 (3d Cir. 2020)). They are wrong. Not that long ago, this Court recognized a charge of Communism as "libelous," in its historical context, because it resulted in public contempt and loss of employment. *Lasky v. Am. Broad. Companies, Inc.*, 606 F. Supp. 934, 938 (S.D.N.Y. 1985). More broadly, it is well established that one *can* be "defamed" when falsely imputed with an allegedly objectionable political belief. *Imputation of allegedly objectionable political or social beliefs or principles as defamation*, 62 A.L.R.4th 314 (collecting authorities).

### 2.3: The "structural changes" claim charges TST with public fraud.

Another headlined "Accusation" of "Fraud" is that TST made "structural changes" to "appear more like a mainstream church." Article, at 18; see also id., at 16 (characterizing TST as an "alleged-non-profit organization."). As with the "personal vendetta" claim (§ 2.1) and the "secret alt-right ties" claim (§ 2.2), it is yet another charge of organization-wide public fraud. The reader is assured that the *Johnson* defendants have extensively been "digging into TST's background"

(Article, at 4 and 15), which has led to the discovery of "facts" (Article, at 4), and that these "facts" are sufficiently egregious that the *Johnson* defendants "feel responsible" for "disclosing" these "facts" by way of the subject article. Article, at 4. But the article does not proffer the "full recitation" of these spectral "facts." *Gross*, 623 N.E.2d at 1169. The charge is defamatory because it impinges on TST's reputation for honestly dealing with the public's donations and bolsters the article-wide implication that TST countenances embezzlement.

*2.4: The article twice charges TST with defrauding the courts.*

Two of the headlined "Accusations" of "Fraud" are  charges that TST has defrauded the courts. The article asserts that it is nothing more than "political theatre" that TST considers the right to abortion a matter of religious significance. Article, at 7. The article also claims that TST "got their facts wrong" in the *Johnson* complaint. Article, at 14. Each is defamatory for maligning TST's reputation for being honest in dealing with the courts. The charges are unprivileged for imputing corrupt motives onto TST.

*2.4.1: The "political theatre" charge implies undisclosed facts and imputes a corrupt motive.*

The "political theatre" charge implies undisclosed facts. It is part of the broader assurance that the *Johnson* defendants have been "digging into TST's background" (Article, at 4 and 15), which led to the discovery of "facts" (Article, at 4), and that those "facts" are sufficiently egregious that the *Johnson* defendants "feel responsible" for "disclosing" these "facts" by way of the subject article. Article, at 4. The article then recites the fact of TST's litigation, and then suggests that the litigation is predicated on the provably false assertion that TST's litigation is predicated on a materially false claim that TST "actually practices abortion as a religious ritual." Article, at 7.

The article does not proffer the "full recitation" of the implied "facts." *Gross*, 623 N.E.2d at

1169. What "facts" cause the publishers to doubt whether TST "actually practices abortion as a religious ritual" are undisclosed by this article. The charge is therefore an actionable mixed opinion. *See Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 297 (S.D.N.Y. 2005) ("We believe the lawsuit will prove unfounded" is an expression of opinion; "our position is that the plaintiff is a forger" is not).

Newsweek and Duin contend that their use of a parenthetical and wishy-washy language signals to the reader that the charge of defrauding the courts is "mere speculation." Doc. 20, at 19. That they published their own defamatory speculation makes the case worse for them, not better. *Restatement (Second) of Torts* § 611, cmt. *f* (1977) ("The reporter is not privileged to make additions of his own that would convey a defamatory impression.") Contrary to their position, one does not transform an actionable charge into a nonactionable opinion by merely couching it "in the form of an opinion." *Gross*, 623 N.E.2d 1169 (cleaned up). Nor did they assert a simple "rhetorical hyperbole." *Id.* They overtly and directly accused TST of presenting to a federal court a fraudulent claim of religiosity for the greater purpose of making a "superficial appeal that may not reflect a person's genuine ideology or political preferences." The charge is defamatory and unprivileged.

*2.4.2: The "got their facts wrong" charge misstates the "facts" and again imputes corruption.*

The "got their facts wrong" charges asserts that in a "withering 14-page judgment," the *Johnson* Court dismissed the lawsuit, "saying the plaintiffs got their facts wrong." Article, at 14. Again, the article charges TST with presenting provably false assertions of facts to a federal court. That is a charge of perjury, which is not a matter of pure opinion. *Long*, 406 F. Supp. 2d at 297; *Gross*, 623 N.E. at 1169.

*2.4.3: The publishers lost the privilege by misquoting the Johnson opinion.*

Newsweek and Duin again assert the fair report privilege on this matter. Doc. 20, at 23. The article misleads the reader into believing that the *Johnson* Court, in fact, published an opinion "saying" ("to utter words so as to convey information") that TST "got their facts wrong." *Oxford University Press*, "Say" (Available at https://www.lexico.com/en/definition/say) (last visited August 13, 2022). In fact, no part of the opinion charges TST with presenting false claims of fact. This is a substantial inaccuracy in light of the article's repetitious charge that TST presents provably false claims of fact to the public at to the courts. An article is "misleading," and is therefore unprivileged, when it misquotes the source material. *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 399 N.E.2d 1185, 1188 (1979). The article is not a "fair" report of the proceedings because it misleads the public as to what happened.

*2.4.4: The publishers also lost the privilege by failing to report on the subsequent proceedings.*

There is another problem with Newsweek's and Duin's reliance on the "fair report" privilege. The privilege does not apply when, after having reporting the derogatory parts of the proceedings, the reporter fails "to publish the further proceedings that tend to vindicate the person defamed." *Restatement (Second) of Torts* § 611, cmt. *f* (1977). Since the article, the subsequent proceedings have vindicated TST's claims against the *Johnson* defendants for tortious interference with business expectancy and trespass to chattels/conversion. *United Fed'n of Churches, LLC v. Johnson*, No. C20-0509RAJ, 2022 WL 1128919, at *13 (W.D. Wash. Apr. 15, 2022) (¶¶ 2 and 4). There is no follow-up report because the true purpose of this article was to indict TST's reputation before the "More than 1 in 5 Americans" who read *Newsweek*, not to give a "fair" report of some newsworthy litigation.

*2.5: The article defames TST by charging it with harassing dissenters.*

The article presents two headlined "Accusations" of "Harassment." Article, at 1. The first charges TST with a corrupt motive for engaging in the Johnson litigation and misleads as to the nature of the case. The second charges TST with engaging in retaliatory harassment against former members, for the greater purpose of coercing continued membership. Both charges are defamatory because they deter people from associating with TST, for fear of being the next target.

*2.5.1: The broader social context entailed in harassing dissenters makes it defamatory.*

Before addressing the text of the article, some "broader social context" is necessary to understand why a reasonable reader is likely to understand that the article asserts provably false claims of fact that harm TST's reputation. *Gross*, 623 N.E.2d at 1169. There is a public perception that new religious movements–Scientology included–will sometimes engage in coercive activities to retain membership against the membership's free will. Bromley, David, Anson D. Shupe, and Joseph C. Ventimiglia. "Atrocity Tales, the Unification Church and the Social Construction of Evil." *Journal of Communication* 29 (Summer), 1979: 42-53. This perception is founded on "atrocity tales," the purpose of which is to mobilize forces against the targeted new religious movement, and which is circulated without regard to whether the story is true. *Id.* The article is one of these.

Coercive activity is properly outside the protection of the Free Exercise Clause. *See Wollersheim v. Church of Scientology*, 212 Cal. App. 3d 872, 895, 66 Cal. Rptr. 2d 1, 15 (Ct. App. 1989) (subsequently vacated on the issue of punitive damages, but not on liability). There, a former member of Scientology suffered church retaliation for seeking to leave the organization. Particularly, the former member proved that under Scientology's "fair game" policy, "someone who threatened Scientology by leaving the church may be deprived of property or injured by any means by a Scientologist." *Id.*, 212 Cal. App. 3d at 895. Upon the former member's "defection," and

pursuant to that "fair game" policy, the former member's business was retaliated against. *Id.* They also suffered under the "bait and badger," wherein they suffered from verbal scare tactics. *Id.*, at 894. And "shunning," a practice of social ostracization in retaliation for leaving the church. *Id.*, at 898-99. Scientology also improperly disclosed the former member's confidential information, which the former member provided to the church under "an explicit or implicit promise the information would remain confidential." *Id.*, at 899-900.

For these actions, Scientology was held civilly liable, and rightly so. *Wollersheim v. Church of Scientology of California*, 6 Cal. Rptr. 2d 532, 546 (Ct. App. 1992) (subsequent history omitted). Scientology was ordered to pay $30,000,000 in compensatory and punitive damages, which was subsequently reduced by remittitur to $2,000,000. The broader social lesson is clear: a religious organization does not have a Free Exercise privilege to "force" religious expression on its membership "through emotional, economic, and physical coercion." *Id.* When an organization "directly conducts activity that is reprehensible or criminal," a punitive damage award is proper. *Religious Organizations and the Law* § 18:46 (2d) (citing, among others, *Wollersheim*).

### 2.5.2: The "Scientology-lite" charges alienate TST from the public.

The article invokes the reader's attention to Scientology's "reprehensible or criminal" activities by describing TST's purported harassment of Fuller / DeMeur as "basically Scientology-lite." Article, at 18. The article puts forward the provably false fact allegation that TST engages in the practice of shunning to coerce continued membership: "People were told not to talk to us" Id. The article also puts forward the provably false fact allegation that TST engages in a practice similar to Scientology's "fair game" policies: "Members were trying to break up my relationship with my boyfriend" and "Several people were legally threatened." Id. The article also puts forward the provably false fact allegation that "members of TST's national council threatened to out her to the

Marine Corps, her employer." Id.

This is one of the article's substantiating "facts" (Article, at 4) to justify calling TST a "cult-like group masquerading as a religion." Article, at 2. The charge is an actionable mixed opinion. The article is not using these fact assertions as a rhetorical device, speculation, or conjecture, it puts them forward as a provably false accusation that TST, in fact, engages in coercive activity to retain membership. The article is an actionable mixed opinion because it implies the existence of undisclosed facts without giving the "full" and "accurate" context. *Gross*, 623 N.E.2d at 1169.[3]

The "facts" put forward by Fuller have been heard, decided, and upheld, as "criminal or reprehensible" of the kind that (if true) would properly subject TST to punitive repercussions by our civil government. The charge is defamatory *per se* as a *"*serious crime" and one that is peculiarly harmful to the public's willingness to associate with TST. *Kalimantano*, 939 F. Supp. 2d at 419 (charges of a "serious crime" are defamatory *per se*); *Restatement (Second) of Torts* § 573, cmt. *e* (1977).

Newsweek and Duin disagree, of course. They proffer that their article goes no farther than a "frank discussion of a controversial religious movement." Doc. 20, at 21. They are wrong because a "frank" discussion must be "honest," *i.e.*, "free of deceit." *Oxford University Press*, "Frank" (Available at https://www.lexico.com/en/definition/frank) (last visited August 15, 2022); *Oxford University Press*, "Honest" (Available at https://www.lexico.com/en/definition/honest) (last visited August 15, 2022). The article crosses into defamatory territory by presenting allegations that

---

[3] Greaves contemporaneously inquired of Duin as to the nature of the undisclosed facts on which the article's charge is premised. Ex. 9, at 1. ("We've never told anybody not to speak to former members and we have very explicit rules against doxxing. Did she provide you emails? Anything to substatiate her claims? Did you even do the work of trying to determine if she was, in fact, a member of TST at all?") Duin did not respond.

would cause any reasonable reader "to understand the remark as an assertion of provable fact." *Gross*, 623 N.E.2d at 1169. TST stands ready to disprove the "facts" presented by this charge.

*2.5.3: The* Johnson *lawsuit is not a "meritless S.L.A.P.P.," the property claims proceed onward.*

The article next charges that TST's lawsuit against the *Johnson* defendants is a "meritless S.L.A.P.P." which is designed to "bankrupt them for speaking out" and presents the provably false "fact" that a specifically-named *Johnson* defendant declared bankruptcy because of the financial hardship. Article, at 4 and 19. Again, this is an actionable mixed opinion. When paired with the "Scientology-lite" claim (§ 2.5.2), the reader is invited to associate TST with Scientology's tactic of using financial coercion to retain membership. *Wollersheim*, 212 Cal. App. 3d at 893-900.

Nor is it "fair report" to assert that TST's lawsuit against the *Johnson* defendants was a "meritless S.L.A.P.P." Contrary to the assertions of the article, the suit was not "dismissed." Article, at 14. The apparently-newsworthy rule that "You can't hack Facebook pages and use those pages to cause harm to the owner" proceeds on the claims of tortious interference with a business expectancy and trespass/conversion. *See United Fed'n of Churches, LLC v. Johnson*, No. C20-0509RAJ, 2022 WL 1128919, at *13 (W.D. Wash. Apr. 15, 2022) (¶¶ 2 and 4). Not that the "More than 1 in 5 Americans" who follow *Newsweek* would have any occasion to learn TST's side of the "debate" was subsequently vindicated, other than by following the litigation for themselves. *Restatement (Second) of Torts* § 611, cmt. *f* (1977) (The reporter is not privileged to "fail to publish the further proceedings that tend to vindicate the person defamed). Newsweek's and Duin's failure to "fairly" report on the subsequent proceedings precludes application of the "fair report" privilege.

*2.6: The article defames TST by charging it with sexual misconduct and cover-up.*

The article also presents a trifecta "Accusation" of "Orgies," "Harassment," *and* "Fraud" in

the form of charges that TST engages in sexual harassment and covers it up, and both hosts (and conceals) "official orgies." These charge TST with sexual deviancy, which is defamatory *per se*. *Sovik v. Healing Network*, 244 A.D.2d 985, 987, 665 N.Y.S.2d 997, 1000 (1997). They also charge TST with organizational fraud, in the form of impliedly covering up the alleged sexual deviancy. That, too, is defamatory *per se* and precludes application of the "fair report" privilege. Restatement (Second) of Torts § 611, cmt. *j* (1977) (The reporter is not privileged "to indict expressly or by innuendo the veracity or integrity of any of the parties.")

2.6.1: *"Accounts of sexual abuse being covered up in ways that were more than anecdotal."*

The article defames TST by charging it with sexual abuse in the form of "Accounts of sexual abuse being covered up in ways that were more than anecdotal." Article, at 16. Again, this is mixed opinion. The article implies the existence of facts (which are omitted from the article) in that there are "accounts of sexual abuse," that they were "covered up," and that they are "more than anecdotal." The word "anecdotal" means (of an account) not necessarily true or reliable, because based on personal accounts rather than facts or research." *Oxford University Press*, "Anecdotal" (https://www.lexico.com/definition/anecdotal) (last visited August 15, 2022). As with the other statements, this is not a rhetorical device, speculation, or matter of pure opinion, it is a provably false charge that there are indeed "accounts of sexual harassment," which TST has "covered up" and that those accounts are "true or reliable" as based on something more than a "personal account" and instead based on "facts." The charge is plainly defamatory, and it affects TST as an organization. Same as any secular corporation, a religious corporation owes to its congregants a duty to ensure that its ministers are hired prudently, trained, and supervised responsibly, so as to protect the congregation from exploitative sexual activity, sexual assault, and abuse of authority. *Religious Organizations and the Law* § 22:19 (2d) (collecting authorities).

Newsweek and Duin move to dismiss because, they contend, the claim of sexual misconduct would require a determination of TST's religious doctrine. Doc. 20, at 26. They are wrong. *Doe v. Hartz*, 52 F. Supp. 2d 1027 (N.D. Iowa 1999) (parishioner's complaint stated an actionable sexual assault claim against priest and the church); *see also Wende C. v. United Methodist Church*, 827 N.E.2d 265 (2005) (Church saved from sex assault liability, not because of the Free Exercise Clause, but because there was "no proof" presented by the plaintiff that "render her consent impossible.") TST stands ready to disprove these "accounts of sexual harassment" that are ostensibly "more than anecdotal."

*2.6.2: "Official orgies"*

The article also charges TST with hosting "official orgies." Article, at 17. As grounds, the article implies the existence of two facts, neither of which are disclosed in the article. First, the article asserts the existence of a "TST memo" which ostensibly allows for "orgies, BDSM, fetish balls … ritual flogging, live ritual sex, burlesque show." Article, at 4. The article does not provide the alleged "TST memo." The article subsequently reminds the reader of the charge, adding that the undisclosed memo "approves" of "official orgies." Article, at 17. By overtly stating that TST engages in "sexually deviant activities," the details of which are left to the reader's imagination, the article is plainly defamatory. TST stands ready to prove that it hosts no "official orgies" and that it does not, in fact, otherwise host "sexually deviant gatherings."

*2.7: The article defames TST by charging it with "other unspeakably-terrible" deeds.*

Last, the article implies the existence of "other unspeakably-terrible deeds." Article, at 15. The article states that Johnson, "who has spent the most time digging into TST's background," routinely finds that "Every time I think I've hit the bottom, there's another terrible thing comes out."

Article, at 15. Again, this is mixed opinion. The article does not provide the "full" or "fair" context of the assertion presented, preferring instead to leave the details to the imagination of the reader. *Gross*, 623 N.E.2d at 1169. Given the foregoing charges, the reader is left to imagine something along the lines that TST: countenances embezzlement by its directors and conceals the same (§ 2.1), defrauds the public about its organizational purposes (§ 2.2 and § 2.3), on at least two occasions practiced fraud upon the courts (§ 2.4), generally practices unlawful and coercive tactics to retain membership against their will (§ 2.5), and engages in sexual misconduct and conceals the same (§ 2.6). Given the contours of the other charges in the article, this charge is sufficiently definite that a reader is properly left with an aversion to TST.

### 3: Newsweek and Duin published this article with the requisite fault.

*3.1: TST is a private figure.*

Next, Newsweek and Duin contend that TST is a public figure. They do not bother elucidating as to whether TST is a limited purpose public figure, or a general purpose one. *See Contemp. Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988) (addressing the distinction). They also conveniently omit that, in either case, they have the burden of proof to substantiate the classification. *Coleman v. Grand*, No. 18CV5663ENVRLM, 2021 WL 768167, at *5 (E.D.N.Y. Feb. 26, 2021); *see also Herbert v. Lando*, 441 U.S. 153 (1979) (a public figure defamation plaintiff is entitled to discovery to prove actual malice). Conspicuously absent from their motion is any show of proof that, allegations of the complaint notwithstanding, TST is a public figure. Compl. ¶ 15 ("TST has not achieved the household-name status required to be treated as a general purpose public figure")

Nor is it apparent from their discussion whether, in any of their cited cases, it was held that a plaintiff is necessarily a public figure on the force alone–as they argue–that the plaintiff (1) solicits

donations to continue its organizational purposes; (2) petitions the Government for a redress of grievances; or (3) or engages in activities that attract attention. Doc. 20, at 28.

It seems unlikely that either or both of the former would transform an otherwise private figure corporation into a "public figure." The right to solicit donations for religious purposes is plainly protected by the First Amendment. *Int'l Soc. For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 444 (2d Cir. 1981). So is the right to petition the Government for redress of grievances. U.S. Const. Amend. I. The right to solicit donations is particularly recognized as the primary means by which a religious corporation survives. *Cantwell v. State of Connecticut*, 310 U.S. 296, 307 (1940) ("to condition the solicitation of aid for the perpetuation of religious views upon a license … is to lay a forbidden burden on upon the exercise of liberty protected by the Constitution") If New York law of defamation is such that *all* religious entities must satisfy a greater evidentiary burden than a non-religious entity, just because it is a religion, then New York law has unlawfully laid a "forbidden burden" on that religion's equal access to society's "pervasive and strong interest in preventing and redressing attacks upon reputation." *Id.*; *Rosenblatt*, 383 U.S. at 86; *Shurtleff*, 142 S. Ct. at 1594 (2022) (Kavanaugh, J., concurring) ("a government *violates* the Constitution when (as here) it *excludes* religious persons, organizations, or speech because of religion from public programs, benefits, facilities, and the like") (emphasis in original).

That leaves only the third inquiry, whether a plaintiff may become an involuntary public figure. Their own case answers, simply, "no." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013) ("A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention.") (quoting *Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. 157, 167 (1979)).

The complaint pleads that TST has not achieved the household-name status required to be

deemed a general purpose public figure. Compl. ¶ 15; *Sheindlin v. Brady*, No. 21-CV-1124 (LJL), 2022 WL 1063678, at *10 (S.D.N.Y. Apr. 7, 2022). Unlike *Siegelman*, the publishers' only case worth mentioning, TST does not have "over five million adherents." *Siegelman*, 475 F. Supp. at 954 (S.D.N.Y. 1979). Nor does any part of the complaint suggest that TST "thrust itself into the forefront of a particular controversy in order to influence its resolution." *Sheindlin*, 2022 WL 1063678, at *13 (cleaned up). To the contrary, the article correctly notes that the *Johnson* lawsuit–the only subject the publishers contends justifies any public interest–has been "comparatively under wraps." Article, at 7.

*3.2: The complaint pleads actual malice.*

Even though TST is a private figure, the complaint pleads actual malice. This is because we will be seeking a punitive damages instruction. *Zaidi v. United Bank Ltd.*, 194 Misc. 2d 1, 9, 747 N.Y.S.2d 268, 276 (Sup. Ct. 2002) (Punitive damages requires a showing of common law malice, which is "hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another or the injurious effects of the defendant's conduct upon another.")

The publishers intentionally relied on anonymous and unreliable sources. Complaint ¶¶ 86-90; *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015). They intentionally relied on anonymous and unreliable sources, even though their own journalistic standards (the Editorial Guidelines) publicly forbid it. Complaint ¶¶ 97-99; *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667–68 (1989). They published this article despite that it required a total of six material departures from their own journalistic standards. Complaint ¶¶ 101-105, 111-116; *id.* They published this article in this way because they wanted to broadcast a pre-conceived narrative, one rooted in political or religious bias, more than they cared about the truth. Complaint ¶¶ 2, 91-93; *See Palin v. New York Times Co.*, 940 F.3d 804, 813  (2d Cir. 2019). And they consciously ignored two

takedown demands, each of which notified them of particular falsehoods in the article. Docs. 1-5, 1-6, and 1-9; *Kehoe v. New York Trib.*, 229 A.D. 220, 225, 241 N.Y.S. 676, 681 (App. Div. 1930) (a retraction could have negated actual malice). These are not "buzzwords," they are well-pleaded allegations of fact which plainly fit applicable the legal standard.

WHEREFORE TST prays this Court deny the motion to dismiss in its entirety.

REISS SHEPPE LLP

By:      Matthew Sheppe

425 Madison Avenue, 19th Floor
New York, New York 10017
Tel: (212) 753-2424
Fax: (347) 348-0731
Email: msheppe@reisssheppe.com

*Attorneys for Plaintiffs*

Of counsel:

Matthew Kezhaya
Kezhaya Law PLC
300 N. Washington Ave, #300
Minneapolis, Minnesota 55401
Tel: (479) 431-6112
Email: matt@kezhaya.law

## CERTIFICATE AND NOTICE OF SERVICE

NOTICE IS GIVEN that I, Matthew Sheppe, efiled the foregoing document by uploading it to the Court's CM/ECF system on August 15, 2022, which sends service to registered users, including all other counsel of record in this cause. s/ Matthew Sheppe