

**Moburg Reporting**
33400 9th Ave. South, Suite 207
Federal Way, WA 98003
(206) 622-3110
www.MoburgReporting.com



```
 1                UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3    --------------------------------------------------------
                                      )
 4    THE SATANIC TEMPLE, INC.,       )
                                      )
 5             Plaintiff,             )
                                      )
 6         vs.                        )NO. 1:22-CV-01343-MKV
                                      )
 7    NEWSWEEK DIGITAL, LLC,          )    COPY
                                      )
 8             Defendant.            )
                                      )
 9    --------------------------------------------------------

10       Videotaped Deposition Upon Oral Examination

11                          of

12                     JULIA DUIN

13    --------------------------------------------------------

14              Thursday, November 16, 2023

15                      9:37 a.m.

16            7900 Southeast 28th Street

17            Mercer Island, Washington

18

19

20

21

22

23

24    Cheryl Macdonald, CRR, RMR
      Court Reporter
25    License No. 2498
```



MOBURG REPORTING

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 2

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4                    MATT KEZHAYA
                      SONIA KEZHAYA
 5                    Attorneys at Law
                      KEZHAYA LAW PLC
 6                    150 South Fifth Street
                      Suite 1850
 7                    Minneapolis, Minnesota 55402
                      matt@kezhaya.law
 8                    sonia@kezhaya.law

 9

10    FOR THE DEFENDANT and THE WITNESS:

11                    SARA TESORIERO
                      CAMERON STRACHER (via Zoom)
12                    Attorneys at Law
                      STRACHER LAW
13                    51 Astor Place
                      9th Floor
14                    New York, New York 10003
                      sara@stracherlaw.com
15                    cam@stracherlaw.com

16

17    THE COURT REPORTER and VIDEOGRAPHER:

18                    CHERYL MACDONALD
                      KALIA HENDRICKS
19                    MOBURG REPORTING
                      33400 9th Avenue South
20                    Suite 207
                      Federal Way, Washington 98003
21                    info@moburgreporting.com

22

23    ALSO PRESENT:  LUCIAN GREAVES (via Zoom)

24

25
```



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 3

1                        I N D E X

2

3   EXAMINATION                                    PAGE

4   BY MR. KEZHAYA:   ..........................    5

5

6   EXHIBITS MARKED                                PAGE

7   No. 1          Bates-stamped Newsweek 025...   34

8   No. 2          Bates-stamped Newsweek 015,
                   16 and 17...................    59
9
    No. 3          Boston Globe "puff piece"...    74
10
    No. 4          GetReligion podcast 2018....    75
11
    No. 5          GetReligion podcast 2022....    75
12
    No. 6          GetReligion podcast
13                 referring to Boston Globe...    79

14  No. 7          Editorial guidelines........    80

15  No. 8          Newsweek article re orgies,
                   harassment, et cetera.......   100
16
    No. 9          E-mail string Bates-stamped
17                 Duin04-001 - 003............   112

18  No. 10         E-mail string Bates-stamped
                   Duin48-001 - 005............   117
19
    No. 11         E-mail string Bates-stamped
20                 Newsweek 032................   136

21  No. 12         E-mail string Bates-stamped
                   Newsweek 065 - 66...........   136
22
    No. 13         E-mail string Bates-stamped
23                 Cooper 51 - 53..............   177

24  Conference before Magistrate Judge Sarah L. Cave:

25  Pages 60 - 66



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 4

1           THE VIDEOGRAPHER:  Good morning.  We are

2    now on the record.  This is a Zoom -- this is an

3    in-person deposition of Julia Duin.  My name is Kalia

4    Hendricks.  I'm the videographer for Moburg Reporting,

5    located at 33400 9th Avenue South, Suite 207, Federal

6    Way, Washington 98003.  The court reporter today is

7    Cheryl Macdonald from Moburg Reporting.

8            This deposition is being recorded this 16th

9    day of November 2023, and the time is now 9:37 a.m.

10   We are in the law offices of Lybeck, Pedreira &

11   Justus, located at 7900 Southeast 28th Street, Suite

12   500, in Mercer Island, Washington.

13           This deposition is being recorded in the

14   matter of The Satanic Temple, Incorporated, vs.

15   Newsweek Digital, LLC, No. 1:22-CV-01343-MKV, in the

16   United States District Court for the Southern District

17   of New York.  This deposition was noticed by Matthew

18   Kezhaya.  Counsel and all present, please identify

19   yourselves for the record, and then the witness may be

20   sworn.

21           MR. KEZHAYA:  Matt Kezhaya, appearing on

22   behalf of plaintiff.  I'm joined by Sonia Kezhaya.

23           MS. TESORIERO:  Sara Tesoriero, appearing

24   on behalf of the witness and on behalf of the

25   defendant, Newsweek, and appearing remotely with me is

```
 1   Cameron Stracher.

 2              THE VIDEOGRAPHER:  The court reporter may

 3   now swear in the witness.

 4              THE WITNESS:  I'm Julia Duin.

 5   JULIA DUIN,   the witness herein, having been
                  placed under oath by the
 6                Certified Court Reporter,
                  deposed and said as follows:

 7

 8              MS. TESORIERO:  Matt, before we start, can

 9   I ask that if I make an objection to form that it be

10   considered preserved for the defendant as well as the

11   witness so we don't mess up the record?

12              MR. KEZHAYA:  So stipulated.

13              MS. TESORIERO:  Thank you.

14

15                      EXAMINATION

16   BY MR. KEZHAYA:

17       Q.    Please state your full name for the record.

18       A.    Julia Duin.

19       Q.    Have you ever been deposed before?

20       A.    No.

21       Q.    What did you do in preparation for today's

22   deposition?

23       A.    I consulted with counsel.

24       Q.    And when did that happen?

25       A.    This week.
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 6

1       Q.      How long did that consultation take place?

2       A.      Several hours.

3       Q.      Was that the only preparation you did for

4   this deposition?

5       A.      Yes.

6       Q.      Did you review any documents in preparation

7   for today's deposition?

8       A.      What do you mean by "documents"?

9       Q.      You don't know what a document is?

10      A.      Yes, I do.  What do you mean -- define what

11  you mean.  Meaning the article?  Or what do you mean

12  by "documents"?

13      Q.      Please give me your definition of

14  "documents."

15      A.      No.  I'm asking you to give me your

16  definition of what you -- you asked the question.

17      Q.      Julia, you are the witness.  I am the

18  interrogating attorney.  You do not ask questions, you

19  answer questions.  Let's try this again.  Please give

20  me your definition of a document.

21      A.      I don't know.

22      Q.      You don't know what a document is?  This is

23  your sworn testimony as a witness?

24      A.      Let's go back to your question of me.  Did

25  I review any documents?

Page 7

1      Q.    Julia, my question posed is whether you

2   have a definition for "documents."  You said yes.

3   What is the definition of documents?

4      A.    I don't know.

5      Q.    Your sworn testimony --

6      A.    I don't know.

7      Q.    -- under penalty of perjury --

8      A.    I don't know what you're talking about.

9      Q.    -- is that you do not know the definition

10   of documents.  Correct or incorrect?

11      A.    I know what a document is.  I don't know

12   what you're talking about.

13      Q.    Have you looked at any paper documents of

14   any sort in preparation for today's deposition?

15      A.    Paper documents.  Does that include -- may

16   I ask a definition?

17      Q.    Yes.

18      A.    Does it include online?

19      Q.    Yes.

20      A.    Okay.  Yes, then I have.

21      Q.    What documents did you review?

22      A.    The article.

23      Q.    Any other documents?

24      A.    Let's see.

25      Q.    Julia, do you suffer from any cognitive

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 8

1  defects?

2      A.    No.

3      Q.    Are you on any medications?

4      A.    No.

5      Q.    Any issues with your recollection?

6      A.    No.

7      Q.    Did you review any e-mails in preparation

8  for today's deposition?

9      A.    Yes.

10     Q.    What e-mails did you review?

11     A.    Let's see.  E-mails to my supervisors.

12     Q.    Who are your supervisors?

13     A.    My supervisors were -- there were three of

14  them: Nancy Cooper, Juliana -- I'm not pronouncing her

15  name very well -- Pignataro, and Dayan --

16          MR. STRACHER:  I'm sorry.  I think the

17  witness is muted.  I apologize.  I can't hear the

18  witness.

19          MS. TESORIERO:  Can you hear us now,

20  Cameron?

21          MS. STRACHER:  Yes.  Thank you.

22          THE REPORTER:  I'm sorry.  Did I get the

23  complete answer?

24          THE WITNESS:  Dayan Candappa, Nancy Cooper,

25  Juliana Pignataro.

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 9

1       Q.     What was the earliest e-mail that you

2   reviewed?

3              MS. TESORIERO:  Objection to form.  You can

4   answer.

5              THE WITNESS:  Oh, I can answer?

6       A.     I'm just trying to remember.  October 8th.

7       Q.     You did not review a September 30th e-mail?

8       A.     No.

9       Q.     Okay.  Other than e-mails and the article,

10  what documents did you review?

11      A.     Let's see.  Let's see.  Notes to counsel.

12      Q.     You said "notes to counsel"?

13      A.     Mm-hmm.

14      Q.     What were these notes?

15             MS. TESORIERO:  Objection to the extent it

16  asks for privileged information.

17      Q.     Without telling me the statements on the

18  notes, what were the subject matter of the notes?

19             MS. TESORIERO:  Again, objection.

20             MR. KEZHAYA:  Subject matter -- I

21  understand the objection.

22      Q.     Subject to the objection, without telling

23  me what the notes say, tell me what the notes were

24  about.

25             MS. TESORIERO:  I need a clarification.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 10

1   What do you mean?  How can she tell you what the notes

2   are about without telling you what they say?

3             MR. KEZHAYA:  The subject matter of the

4   notes; for example, this lawsuit, this article, my

5   recollection at the time.  I don't know.  I'm asking

6   her.

7             MS. TESORIERO:  To the extent it's like

8   counsel said, it doesn't get into specifics, you can

9   answer.

10      A.    The article.

11      Q.    Okay.  When did you review these documents?

12      A.    This week.

13      Q.    How long have you been a reporter?

14      A.    45 years, give or take a year or two.

15      Q.    What year did you start performing services

16   as a reporter?

17      A.    Part-time or full-time?

18      Q.    Part-time.

19      A.    I mean, starting in high school as a

20   freelancer?  I mean, how far back do you want to go?

21      Q.    I'm just trying to establish your history

22   as a reporter.

23      A.    Starting as a full-time reporter, a paid

24   salary reporter, that would start in 1979.

25      Q.    Okay.  But you did some kind of freelance

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 11

1    services during high school?

2        A.    Oh, yes.

3        Q.    What were these freelance services?

4        A.    I was a high school sports reporter for a

5    local paper.

6        Q.    Okay.  And about what year was that?

7        A.    1977-ish.

8        Q.    Your first job as a reporter came in 1979;

9    is that correct?

10       A.    Full-time job, yes.

11       Q.    And have you been a reporter since?

12       A.    Mm-hmm.

13       Q.    Have you received any awards for reporting?

14       A.    Many.

15       Q.    Which rewards have you received?

16       A.    I've received -- oh, my gosh.  Where do you

17   start?

18       Q.    Start with the earliest.

19       A.    Religion News Writer's Association,

20   multiple, multiple awards, I'd say.  I just received

21   several last year, which are -- detail on my blog,

22   which is publicly available.  Let's see.  Associated

23   Press, Mark Twain Award, Chesapeake.  My goodness.

24   Let's see.  Wilbur.  Where do we start?  Three time

25   Wilbur Award winner.  Wilbur is for rewards by the

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 12

```
 1    Religion Communicators Council.  This is a national

 2    award for excellent religion reporting, excellence in

 3    religion reporting.  So I'm a three-time winner there.

 4            Let's see.  Multiple -- other than the

 5    Associated Press and local -- local awards, I'd have

 6    to get my resume in front of me to detail ones that

 7    are out of the Washington D. C. area.  Anyway, how

 8    many?  I mean, 20, 25.  I don't know.  I don't have a

 9    number right in front of me.
```

**10            Q.    You mentioned that all of the awards are on**

**11    your blog; is that correct?**

```
12            A.    My latest one is on my blog, the Religion

13    News Writers, the three ones, the first and second

14    place awards that I won for the Religion News Writers

15    Association, which is a professional association of

16    the -- all the religion reporters in the country.

17    It's not really known outside of people who -- it's a

18    -- it's a -- how would I put it?  It's people who

19    cover religion.  Most people outside of the -- of the

20    occupation wouldn't know about it, but it pits the

21    best people in the business against each other.  So

22    I'm up against people from the New York Times, the

23    Washington Post, the Atlantic, I mean, you know.  And

24    I won for my work for the National Geographic,

25    Politico, and Newsweek.
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING
33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 13

1      Q.    I want to return to your earlier comment to

2    the effect of "I think they're on my blog"; is that

3    correct?

4      A.    Trying to -- all the -- the other ones are

5    not.  The latest one was announced on my blog.  As far

6    as -- the rest of them are on my resume.  I'm trying

7    to remember if my resume is publicly posted, and I

8    don't think it's publicly posted.

9      Q.    Okay.  I have just pulled up what I believe

10   to be your blog.  Is your blog @JuliaDuin.com?

11     A.    JuliaDuin.com.

12     Q.    Sorry.  Duin.  Would you mind just reading

13   this about -- well, before reading it aloud, just skim

14   over this and tell me if this appears to be both your

15   blog and an accurate resuscitation of, essentially,

16   about you.

17     A.    Yes.

18     Q.    Thank you.  There are a number of awards

19   mentioned in this text; is that correct?

20     A.    The Wilbur Award is mentioned.

21     Q.    Okay.  So the text provides -- said you are

22   a three-time Wilbur Award winner from the Religion

23   Communicators Council for your magazine and newspaper

24   features most recently in 2018; is that correct?

25     A.    '18, yeah.  It would have been '18.

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 14

1      Q.    And the Religion Communicator Council, I

2    understood your testimony to be, a professional

3    association of religion reporters; is that correct?

4      A.    Well, there's two different groups.

5    There's the Religion News Association.  That's a whole

6    different group.  Religion Communicators Council is

7    something else.  It's a -- that's something different.

8      Q.    Okay.  Please explain.

9      A.    I'm not a member of the Religion

10   Communicators Council.  I'm a member of the Religion

11   News Association.  I know less about the Religion

12   Communicators Council, and I've won many more rewards

13   for the Religion News Association.  I did not go into

14   that on my blog because, I mean, that would take much

15   more room.  The Wilbur Award is -- it involves more

16   disciplines, more broadcast, and a few more -- it's a

17   bit more wide-ranging than the Religion News

18   Association awards, I believe, but don't quote me on

19   that.

20     Q.    Why did you receive these Wilbur awards?

21     A.    Well, it's for excellence in religion

22   reporting.

23     Q.    Was it a particular piece?

24     A.    Yeah.  They were both for pieces on -- one

25   was on clergy.  Let's see.  One was back in 2002 about



1    the state of America's clergy.  Let's see.  I think

2    the next one was 2015, about a Lutheran clergy woman.

3    And then there was the 2018 award that I talk about on

4    this blog.

5        **Q.    I see also that you've published seven**

6    **books; is that correct?**

7        A.    Mm-hmm.  Yes, there would be seven.  That

8    should be listed on my blog.

9        **Q.    The text of the blog states you've**

10   **published seven books, the latest being "Finding Joy:**

11   A Mongolian Woman's Journey to Christ," the biography

12   -- well, a biography.  Before that you've published

13   "In the house of the Serpent Handler:  A Story of

14   Faith and Fleeting Fame in the Age of Social Media."

15           These are two books that you've written; is

16   that correct?

17       A.    Mm-hmm.

18       **Q.    You've written five other books, I deduced,**

19   **from the text.  Were they all about religion?**

20       A.    One was not all.  One was a collection of

21   Victorian fairy-tales.

22       **Q.    Okay.  And I see that you have served as a**

23   **visiting journalism professor at the University of**

24   **Alaska at Fairbanks; is that correct?**

25       A.    Mm-hmm.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1    Q.    Have you served as professor at any other

2    universities?

3    A.    I was at Union University in Jackson,

4    Tennessee.

5    Q.    Any others?

6    A.    I was an adjunct professor for one semester

7    at University of Maryland.  Also an adjunct -- oh, my

8    goodness.  What's the name of the place?  Patrick

9    Henry University in -- oh, my -- it's in Virginia,

10   Purcellville, Virginia.  P-U-R-C-E-L-L-V-I-L-L-E,

11   Purcellville, Virginia.

12   Q.    Have you served as professor or teacher of

13   journalism anywhere else?

14   A.    No.  This is my only -- those are the only

15   four places.

16   Q.    Excellent.  For how long did you serve as a

17   professor, cumulatively?

18   A.    Let's see.  Well, let's see.  Well, if you

19   count up, I guess, the adjunct, two and a half years.

20   I guess if you count up the adjunct and the full-time

21   experiences, about two and a half years.

22   Q.    Okay.  And in your role as professor, were

23   these all journalism professor roles or --

24   A.    Yes.

25   Q.    In the course of your teaching as

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 17

 1     professor, were these basic classes or more advanced?

 2          A.    First one was basic.  The second one was

 3     specialty -- religion reporting specialty class.

 4     Third one was more basic journalism.  Several feature

 5     writing, basic journalism classes.  Overseeing school

 6     yearbook-type and school newspaper classes.  And the

 7     fourth one were religion reporting and political

 8     reporting.

 9          Q.    What is the -- what are some of the

10     distinctions between religion reporting and other

11     reporting?

12          A.    Religion reporting is reporting on a

13     specific religious group.  People who believe in a --

14     who have defined beliefs, usually in some kind of --

15     usually a supreme being of some sort, religious dogma.

16          Q.    I'm asking more about the techniques.  Are

17     there special techniques?

18          A.    How I teach it?

19          Q.    Correct.

20          A.    I would have -- I would tell students the

21     basis of each religious group.  I would have a

22     practitioner of that religion come in and often tell

23     them from their point of view.  I thought it was best

24     to hear from the actual person rather than just me.  I

25     would also have them visit a house of worship



1  themselves.  So I made them go visit various mosques,

2  churches, temples, and to kind of open their mind to

3  different groups.  And that it's -- you know, so they

4  weren't afraid of actually meeting other people who

5  were different from them.

6  **Q.    Why was it -- why is it something that you**

7  **found it important to have it heard from the --**

8  **firsthand, so to speak, from the minister or whatever?**

9  A.    Because I'm not an expert on -- I mean, I'm

10  -- I think it's important that people see a -- let's

11  see -- that people hear from a practitioner, and as to

12  why they've embraced the faith, and what made them

13  decide to -- in a country with an overwhelmingly

14  Christian culture, why they decided to -- and this is

15  not true of the people who were from more the

16  Christian religions, but maybe from non-Christian

17  ones, why they decided to embrace that particular

18  faith.

19  **Q.    I understand that from the perspective of,**

20  **for example, a comparative religion standpoint, but**

21  **why in a reporting standpoint is that of importance?**

22             MS. TESORIERO:  Objection to form.

23  A.    I'm not -- can you rephrase the question?

24  **Q.    Sure.  You're teaching a reporting-about-**

25  **religion class.**

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

1        A.      Mm-hmm.

2        Q.      **Irrespective of whether it be beginning or**

3      **intermediate or whatever, you said it's of importance**

4      **that in the course of writing about religions, "I find**

5      **it important that they actually hear firsthand from**

6      **someone who ministers in that particular religion."**

7        A.      Mm-hmm.

8        Q.      **I understood the testimony from, for**

9      **example, a perspective of comparative religion, we're**

10     **teaching you about the various religions.  My question**

11     **to you is why, in the course of writing about the**

12     **religion, is it important that they hear from --**

13     **firsthand from the minister of that particular**

14     **religion.**

15               MS. TESORIERO:  Objection to form.

16       A.      Most American college students don't know

17     much about religion at all.  And they don't even know

18     much about the dominant religions in American, much

19     less the less dominant religions.  I think the more

20     they hear from anybody practicing any kind of

21     religion, the better.  So, yeah, I found that more

22     than just listening to me lecture to them, it kept

23     their attention better if they heard a different voice

24     than just my voice.

25               And, yeah, it was a different -- usually



Page 20

1    different practitioners just had a different way of

2    phrasing things.  They had different life experiences.

3    They had different ways of reaching the students.

4    Maybe they came from a different gender -- anyway.

5    Different ways of seeing God.  And I felt the students

6    needed to hear their experience.

7         **Q.   Did you, as professor, think that it would**

8    **aid them in their writing about religion to have a**

9    **more full understanding about the religion?**

10        A.   To hear from a practitioner, sure.

11        **Q.   And did you, in the course of aiding their**

12   **writing, did you think that that would aid the reader**

13   **in having a full and fair portrayal of whatever that**

14   **particular piece would be about?**

15             MS. TESORIERO:  Objection to form.

16        A.   Well, at the time they weren't writing

17   articles.  They were just learning.  I mean, it was

18   just part of the class.

19        **Q.   Correct.**

20        A.   We weren't -- they weren't writing anything

21   for publication.

22        **Q.   But they were learning how to write for**

23   **publications; correct?**

24        A.   I guess, eventually.  I mean, at the time I

25   was -- I'm trying to think because -- I'm trying to

Moburg Reporting
206-622-3110

MOBURG
REPORTING
33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 21

```
 1   remember in the class whether they actually wrote for

 2   publication or not or did any reporting.  Excuse me.

 3   I'm just trying to go back eight years.  Well, if

 4   they're reporting on the religion, yeah, it helps to

 5   hear from a practitioner.

 6        Q.    The question posed is whether that aids

 7   them in writing a more full, fair, and accurate piece.

 8              MS. TESORIERO:  Same objection.

 9              THE WITNESS:  Does that mean I --

10              MS. TESORIERO:  You may answer.

11              THE WITNESS:  I may answer?  All right.

12        A.    Yeah.  That would help them.

13        Q.    Earlier you indicated that you think

14   college students don't know much about religion.  Is

15   that a fair recharacterization of your testimony?

16        A.    The ones I've met -- well, in secular

17   universities, I would say it's true, yes.

18        Q.    You specified "secular universities."  Were

19   you serving as a professor at only secular

20   universities, or were they a mix of secular and

21   religious?

22        A.    They're a mix.

23        Q.    So more particularly, am I correct in my

24   understanding of your testimony that particularly

25   students at secular universities have a lesser
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1   understanding of religion, than, for example, at a

2   religious university?

3            MS. TESORIERO:  Objection to form.

4       A.   The ones I encountered tended to have a

5   lesser -- other than their own religion -- tended to

6   have a lesser understanding of religion.  Yes, that's

7   what I said.

8       Q.   **You said the ones that you encountered.**

9   **I'm asking is this generally applicable to secular and**

10  **religious schools, or is it particular to secular**

11  **schools?**

12           MS. TESORIERO:  Objection to form.

13      A.   I will say the ones I -- I'll say that out

14  of the ones I encountered at the secular schools.

15      Q.   **Okay.  Do you have a theory as to why that**

16  **is?**

17           MS. TESORIERO:  Objection to form.  I'm

18  just going to object here.  I'm not going to stop the

19  witness from answering or cut this off, but I think

20  we're getting a bit beyond the scope of the deposition

21  here.  Ms. Duin is here as a fact witness, not an

22  expert.  So, again, continue, but I'm just noting my

23  objection for the record.

24           MR. KEZHAYA:  I appreciate the objection.

25  For benefit of the record, it goes to intent.  It goes

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

 1    to what is her mind state, which is an element of the

 2    case.

 3              MS. TESORIERO:  She is no longer a party to

 4    the case.  So just to --

 5              MR. KEZHAYA:  Well, she's still the one who

 6    wrote the article, and Newsweek is still the one who

 7    published it.

 8              MS. TESORIERO:  I'm not stopping.  Just to

 9    the extent that we're getting here into what a

10    professor should teach reporting students.

11              MR. KEZHAYA:  Understood.  We'll trim it

12    down very quickly.  This is the extent of what I care.

13              MS. TESORIERO:  Thank you.

**14**       **Q.    Do you have a theory as to why that is?**

15       A.    Why students don't know much about religion

16    in secular universities?

**17**       **Q.    Correct.**

18       A.    Religious -- every single poll right now

19    shows that religious participation among Gen-Z is way,

20    way down.  It's just dropping by the ton.  It's

21    dropping like crazy.  Why that is, I am not -- I'll

22    say I don't know.  I mean, everyone is asking that

23    question.

**24**       **Q.    Do you think that religious journalism has**

**25**    **an important influence on perceptions about the**

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 24

1    religion outside of that particular religious group?

2              MS. TESORIERO:   Objection to form.

3       A.    Okay.  You mean reporting -- are you asking

4    me reporting on a -- if I'm reporting on a group, a

5    religious group -- I'm a little confused.  And by the

6    way, when you say "religious journalism," I think of

7    writing a for a religious publication like

8    "Christianity Today."  Religion reporting is writing

9    for secular, like Newsweek.  So are you talking --

10   okay.  So you're talking about perceptions of a group

11   outside of their own people?  Like, if I'm writing

12   about a Catholic, the perceptions of what Protestants

13   might have?

14      Q.    Correct.

15      A.    Okay.  So it's important what I write about

16   group A as to what group B might think about them?

17      Q.    When you say "I," do you mean generic "I"

18   or you in particular?

19      A.    Generic "I," but religion reporters in

20   general.

21      Q.    Yes, yes.

22      A.    I mean, yeah.  I mean, we have -- at our

23   annual meetings, I mean, we have entire workshops on

24   this.  I mean, people come to speak to school us in

25   how to, you know, have more -- let's just say more



Page 25

1    knowledgeable reporting about certain groups.  So we

2    can -- we can have an educated opinion to the general

3    public.

4         **Q.    And more particularly, is it true that the**

5    **general public needs these fairly stated pieces**

6    **because that's a large part of how they perceive the**

7    **particular religion?**

8              MS. TESORIERO:  Objection to form.

9         A.    The general public needs objective and

10   knowledgeable pieces about religion.  Okay?  I'll

11   state it that way.

12        **Q.    Why?**

13             MS. TESORIERO:  Objection to form.

14        A.    Well, that's going to be my -- that's my

15   answer.

16        **Q.    I understand that's your answer.  I'm**

17   **asking a different question, which is, why?**

18             MS. TESORIERO:  Objection to form.

19        A.    Religion is really the -- it's really at

20   the base of our civilization, and it is important that

21   people understand it.

22        **Q.    When did you begin work at Newsweek?**

23        A.    September 2021.

24        **Q.    Early or late?**

25        A.    Sorry?



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 26

1      Q.    Early September or late September?

2      A.    September 1st.

3      Q.    When was the hiring process?

4      A.    Just before that.

5      Q.    How long?

6      A.    A few weeks.

7      Q.    The hiring process was a few weeks before

8   September 1st?

9      A.    Mm-hmm.

10     Q.    How did you come to apply for the job at

11  Newsweek?

12     A.    I heard they were looking for someone.

13     Q.    How did you hear that?

14     A.    Through a mutual friend.

15     Q.    Whose?  Wait.  Mutual with --

16     A.    Someone who knew that there was an opening.

17     Q.    Okay, but who was that?

18           MS. TESORIERO:  Objection to form.

19     A.    Just a friend.  I don't have to reveal his

20  name.

21     Q.    I'm not asking for the name.  I'm asking

22  for the connection.

23     A.    A friend who knew one of the editors.

24     Q.    Okay.  Which editor did he know?

25     A.    He knew Dayan.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 27

1     Q.    You said that Dayan was an editor?

2     A.    Oh, yeah.  Dayan is the same person that I

3  mentioned his name before.  Dayan is the same person

4  that -- yeah, Dayan Candappa.

5     Q.    That was one of your supervisors; correct?

6     A.    Yes, that's right.

7     Q.    Do you recognize the name Nancy Cooper?

8     A.    Yes.

9     Q.    Was Nancy Cooper one of your supervisors?

10     A.    Yes.

11     Q.    Was this mutual friend a friend of Nancy

12  Cooper's?

13     A.    I have no idea.

14     Q.    So this mutual friend of yours was mutual

15  between you and Dayan; correct?

16     A.    Yes.

17     Q.    Was this a publicly posted job opportunity?

18           MS. TESORIERO:  Objection.  Calls for

19  speculation.

20     A.    I don't know.

21     Q.    Well, did you -- how did you go about

22  applying?

23     A.    I contacted Dayan.

24     Q.    So this mutual friend of yours gave you

25  Dayan's information directly; is that correct?

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 28

```
 1        A.    Mm-hmm, mm-hmm.

 2        Q.    And this was when?

 3        A.    Let's see.  It was summer of 2021.

 4        Q.    Was it in August of 2021?

 5        A.    I'm trying to remember.  Might have been.

 6   I think I -- when did I contact Dayan?  If I remember,

 7   July.  It might have been July.

 8        Q.    When did you hear about the job posting

 9   relative to you contacting Dayan?

10        A.    I think it was -- I might have heard it in

11   -- when did I hear?  June maybe.  Might have heard in

12   June.

13        Q.    So you heard about this job opportunity and

14   then a month later reached out to Dayan?

15        A.    I think so.

16        Q.    And then that was approximately July that

17   you reached out to Dayan; is that correct?

18        A.    I believe so.

19        Q.    And then the interview process began in

20   August; is that correct?

21        A.    I don't remember the exact date when it

22   began.

23        Q.    I'm not asking --

24        A.    It was July/August sometime.

25        Q.    Was there a lengthy delay between the
```

Page 29

```
 1      interview process and your start date?

 2              MS. TESORIERO:  Objection to form.

 3      A.    Not really.  I mean, we agreed on a start

 4  date, I mean, as of September 1st.

 5      Q.    Was your role full-time or part-time?

 6      A.    I was full-time.

 7      Q.    Were you paid -- how were you paid?  To

 8  expand on the question, were you paid salary?  Were

 9  you paid piece rate?

10      A.    Salary.  I'm salary.

11      Q.    What was the cadence with which you were

12  paid?

13      A.    Cadence?

14      Q.    Were you paid monthly?

15      A.    Monthly, monthly.

16      Q.    How much were you paid per month?

17      A.    I don't have to say that.

18      Q.    Yes, you do.

19              MS. TESORIERO:  Actually, I'm going to

20  object.

21      A.    No.  I don't have to say that.

22              MS. TESORIERO:  Hang on one second.  That

23  is not relevant to the case.

24              MR. KEZHAYA:  I disagree.

25              THE WITNESS:  No.
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 30

1              MS. TESORIERO:  You have not sent us any of

2      the information we requested showing why that's

3      relevant to the case.  If you want to go off the

4      record and discuss it, we can.

5              MR. KEZHAYA:  No.  I don't want to go off

6      the record.  I asked for the amount of money that she

7      was paid for the piece.  You-all have told me that she

8      was paid monthly.  You have not told me how much she

9      was paid.  I'm asking her how much she was paid.

10             MS. TESORIERO:  I'm instructing her not to

11     answer.

12             MR. KEZHAYA:  You're instructing her not to

13     answer?

14             MS. TESORIERO:  Yes.

15             MR. KEZHAYA:  On the basis of privilege?

16             MS. TESORIERO:  It's beyond the scope of

17     this deposition.  It's beyond the scope of this case.

18     It's not relevant.  The court has not ruled that it's

19     relevant.

20             MR. KEZHAYA:  I disagree.

21        Q.    **You were paid for the piece, were you not,**

22     **Julia?**

23             MS. TESORIERO:  Objection to form.

24             You can answer that question.

25             THE WITNESS:  I can or can't?

Page 31

```
 1              MS. TESORIERO:  You can answer whether or

 2    not -- restate the question.

 3         Q.    You were paid for the subject article?

 4         A.    I was paid to work for Newsweek.  I was

 5    working for Newsweek doing multiple pieces.

 6         Q.    Correct.  And one of the pieces was the

 7    piece that we're here for today; correct?

 8         A.    Yes.

 9         Q.    Were you specially paid for the article?

10         A.    Not specially.  I was working on multiple

11    pieces at the time.

12         Q.    So Newsweek didn't say, "This portion of

13    your salary is tethered to the article;" correct?

14         A.    No.

15         Q.    How many articles did you publish in

16    October of 2021 for Newsweek?

17         A.    There was a bunch.  I mean, there's

18    several.

19         Q.    I'll tell you there were three.  Does that

20    sound right?

21         A.    Oh, really?  Okay.  Which ones?  Do you

22    remember?

23         Q.    Pardon?

24         A.    Oh, you remember which ones?

25         Q.    I don't remember which ones.  I remember
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 32

1    that there were three.  I can pull up the Newsweek

2    thing.

3         A.    You have a better memory than I do.

4         Q.    Does that sound right, I'm asking you.

5         A.    Let's see.  There was Greenland, I believe.

6    Trying to remember.  What else would I have done in

7    October?  Trying to remember what else I had other

8    than Greenland.  Anyway, possibly, it might have been

9    three.

10        Q.    Let's see here.  Okay.  For benefit of the

11   record, I've gone to Newsweek.com/authors/Julia Duin.

12   I'm navigating to the subject article dated

13   10-29-2021.  Please read this article title and the

14   following, too, as well as the dates of publication.

15        A.    Okay.  So let's see.

16        Q.    I can bring it closer to you.

17        A.    Yeah.  I can't read -- right.  All right.

18   So that would be -- all right.  So there was three.

19        Q.    When did you begin working on this piece?

20             MS. TESORIERO:  Objection to form.  Which?

21             MR. KEZHAYA:  The orgies --

22        Q.    The subject article, "Orgies, Harassment,

23   Fraud:  Satanic Temple Rocked by Accusations,

24   Lawsuit," when did you begin working on that article?

25        A.    Sometime -- I don't have an exact date.



Page 33

1      Q.     I'm just asking --

2      A.     The beginning of the month somewhere.

3      Q.     The beginning of the month?

4      A.     Around there.

5      Q.     Do you recall seeing an e-mail on September

6   30th pitching the article?

7      A.     No.

8      Q.     Do you even --

9      A.     I don't remember a September 30th date.

10   I'm trying to remember.  The earliest I remember was

11   -- there was an October 8th one, but I don't recall

12   September 30th.

13     Q.     Do you deny that you sent a September 30th

14   article?

15     A.     I don't know.  I don't know.  I don't

16   remember.

17     Q.     Let me see if I can find it.  For the

18   benefit of the record, we are pulling Newsweek 25.

19   Please -- actually --

20            MS. TESORIERO:  Are we marking an exhibit?

21            MR. KEZHAYA:  Well, I wasn't planning on

22   making it an exhibit, but I think we have it on hand.

23            MS. KEZHAYA:  What are you looking for?

24            MR. KEZHAYA:  The bates stamp.  It says

25   Newsweek 17 here.  There should be one --

 1                 MS. KEZHAYA:  Here we go.

 2                 MR. KEZHAYA:  We're marking as deposition

 3     Exhibit 1...

 4                 THE WITNESS:  Can you hear me?

 5                 MR. STRACHER:  I can hear you.

 6                 (Exhibit No. 1 was marked for

 7                 identification.)

 8         **Q.     Have you seen this e-mail before?**

 9         A.     Okay.  September 30th.  Okay.  All right.

10     I thought it was October 4th.  Thanks for reminding

11     me.

12         **Q.     That's an exhibit.  My question posed is**

13     **please read the date of this e-mail.**

14         A.     September 30th.

15         **Q.     Okay.  Who wrote this e-mail?**

16         A.     Me.

17         **Q.     Who did you write this e-mail to?**

18         A.     Juliana.

19         **Q.     And please read the text.  There are two**

20     **blocks of redacted sections.  Please read the text in**

21     **between.**

22         A.     May I ask why?

23         **Q.     No.  Please read the text.**

24         A.     The "just in time" one?

25         **Q.     Correct.**

 1      A.    [As read] ████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

 9      **Q.    Was this the first pitch for the subject**

10   **article that you wrote?**

11      A.    I believe so.

12      **Q.    When did you begin working on this article?**

13      A.    Well, it would have been at the beginning

14   of October.

15      **Q.    I see that the date would be September**

16   **30th, so you clearly formulated the idea of the**

17   **article at some point before September 30th; correct?**

18      A.    Let's see.  Well, remember, I have to pitch

19   it first to make sure they approve it before I start

20   major work on a piece.

21      **Q.    I understand that that might be before you**

22   **start major work.  My question posed is when did you**

23   **start working on it, including minor work.**

24      A.    I don't remember.

25      **Q.    Was it before September 1st, 2020?**

1    A.    Before September 1st?

2    Q.    Correct.

3    A.    No.

4    Q.    Sorry.  September 1st, 2021.

5    A.    Before September 1st?

6    Q.    Correct.

7    A.    No.

8    Q.    So during the month of September 2021, you

9    began work on this article; correct?

10   A.    No.  I wasn't working during the month of

11   September.  I was overseas most of that month, or part

12   of that month.  So, no.

13   Q.    Your earlier testimony is that you began

14   working full-time at Newsweek in September of 2021; is

15   that correct?

16   A.    Yeah.  And I was also -- well, never mind.

17   Q.    You were overseas, correct?

18   A.    Doing articles for Newsweek, yes.

19   Q.    And this pitch is part of your work on this

20   article; correct?

21         MS. TESORIERO:  Objection to form.

22   A.    Not sure where you're going.

23   Q.    You don't have to know where I'm going.  My

24   question posed is whether this pitch was part of your

25   work for Newsweek creating the subject article.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

 1    Correct or incorrect?

 2              MS. TESORIERO:  Objection to form.

 3         A.   This pitch was the -- this would have been,

 4    really, the beginning of my work on this article.

 5         Q.   **This pitch was the very beginning of your**

 6    **work on this article; correct?**

 7              MS. TESORIERO:  Objection.

 8         A.   I would say yes.

 9         Q.   **That's your testimony?**

10              MS. TESORIERO:  Objection.

11         A.   Just a moment.  It depends on what you call

12    "work."

13         Q.   **What was entailed in drafting this pitch?**

14         A.   I had gotten -- I had gotten an idea for

15    this article and I drafted the pitch.

16         Q.   **Where did the idea come from?**

17         A.   I had -- someone suggested it to me.

18         Q.   **Who suggested it to you?**

19         A.   I had a -- another journalist.

20         Q.   **Another journalist suggested it to you?**

21         A.   Mm-hmm.

22         Q.   **Who was this journalist?**

23         A.   His name is Kevin.

24         Q.   **What is Kevin's last name?**

25         A.   Trying to remember.  My mind is blank right

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 38

```
 1    now.  I can't remember.
 2         Q.    How did you know Kevin?
 3         A.    Actually, I really didn't know him.
 4    Somehow he had heard of me.  I really didn't -- I
 5    really hardly knew the man.  I mean, I really didn't
 6    know him, actually.
 7         Q.    How did Kevin convey this idea for this
 8    article?
 9         A.    E-mail.
10         Q.    Did he write this pitch for you?
11         A.    Did he write the pitch?
12         Q.    Correct.
13         A.    I wrote the pitch.  He had some -- some of
14    this is -- some of this is pitch is taken from what he
15    wrote me.
16         Q.    When did he write you that?  Before or
17    after September 1st, 2021?
18         A.    When did he send me that e-mail?  Let's
19    see.  I'm trying to remember.  I know I had gotten an
20    e-mail, and I'm just trying to remember when.  Trying
21    to remember when he sent it to me.  And I -- I don't
22    remember.  I don't remember.  I really don't remember
23    when he sent it to me.
24         Q.    Did you provide your counsel approximately
25    26 pages of e-mails in the course of preparing for
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

```
 1   this deposition?
 2        A.    I don't know how many pages I provided
 3   them.
 4        Q.    We had an e-mail from you to
 5   ██████████████████  which has been recently
 6   provided to us in discovery.  Does Kevin Jones sound
 7   like the Kevin that you're referring to now?
 8        A.    What does the e-mail say?
 9        Q.    Let's see here.  I'll have you read it into
10   the record.  For benefit of the record, this is
11   Newsweek Bates stamp 467.
12              MS. TESORIERO:  Is this an exhibit or just
13   showing?
14              MR. KEZHAYA:  It's not printed off.  I'm
15   just showing it to her to refresh her recollection.
16              MS. TESORIERO:  Thank you.
17        A.    Okay.  That would have been the same
18   person, yes.
19        Q.    Okay.  I took note in the body of this
20   e-mail that you say that he had sent you something a
21   while back.  Do you see that?
22        A.    Yes.  And I don't know when it was.  I
23   can't remember when it was.
24        Q.    And he e-mailed it to you; correct?
25        A.    Mm-hmm.
```



Page 40

1      Q.    Okay.  And you don't recall when?

2      A.    No.

3      Q.    Would it refresh your recollection to

4    review the e-mail that he gave you?

5      A.    Do you have a copy of it?

6      Q.    I do not have a copy of it.  I'm asking you

7    if it would refresh your recollection to look at it.

8      A.    I don't know.  I mean, I don't...

9      Q.    Do you maintain e-mails going back to 2021?

10   Stated differently, do you, as a regular course,

11   delete your e-mails?

12     A.    Sometimes.

13     Q.    Sometimes as a regular course you delete

14   your e-mails.  Under what circumstances do you

15   regularly delete your e-mails?

16     A.    Depends if I want to keep them or not.

17     Q.    Did you delete any e-mails of relevance to

18   this case?

19           MS. TESORIERO:  Objection.  Calls for a

20   legal conclusion.

21     A.    I don't know.  I don't know if I deleted

22   that or not.  I don't know.

23     Q.    Do you have a smart phone?

24     A.    I have a smart phone.

25     Q.    Do you have it with you?

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 41

1       A.      Yes.

**2       Q.      Are you able to access your e-mails on your**

**3   smart phone?**

4       A.      Yes.

**5       Q.      Please --**

6               MS. TESORIERO:   Objection.   No.   She's not

7   pulling up documents now.   This is not a subpoena with

8   request for documents.   This is a subpoena for

9   testimony.

10              MR. KEZHAYA:   Sure it is.   Please pull up

11   your --

12              MS. TESORIERO:   No.   I'm instructing her

13   not to.

14              MR. KEZHAYA:   Is there a basis of

15   privilege?

16              MS. TESORIERO:   It's not a privilege

17   objection.   This is -- you have -- she is not a party

18   to this case.   You have to subpoena her for documents.

19   This is a subpoena for a deposition.

20              MR. KEZHAYA:   She has testified that it

21   would refresh her recollection.   She has the document

22   on hand.   Here we are.   We can go to the judge if you

23   would like.

24              MS. TESORIERO:   Yes.   We can go to the

25   judge.   You can send a subpoena.

1       Q.      Did Kevin send you any substantiating

2   information --

3               MS. TESORIERO:  Objection to form.

4       Q.      -- as pertains to this article?

5       A.      No.

6       Q.      Prior to drafting this pitch, did you

7   perform any fact investigation to the truth or falsity

8   of that pitch?

9       A.      Well, the whole idea is to -- the whole

10  idea -- the whole idea of looking into this was to see

11  if any of this was true.

12      Q.      That doesn't answer my question.  My

13  question is on September 30 you draft this pitch.

14  Before September 30, did you perform any fact

15  investigation into the truth or falsity of any part of

16  this pitch?

17              MS. TESORIERO:  Objection.  Asked and

18  answered.

19      A.      (No response.)

20      Q.      Yes or no.  It's a yes or no question.

21      A.      Wait a minute.  Just be patient.  I did not

22  do work on this article, including this pitch, before

23  that date.

24      Q.      That does not answer the question.  My

25  question is whether you performed any fact

Page 43

```
 1    investigation -- yes or no -- into the truth or

 2    falsity of any part of this pitch before September

 3    30th.

 4              MS. TESORIERO:  Objection.  She just gave

 5    you an answer.

 6       A.    That's my answer.

 7       Q.    Is it a yes or a no?

 8              MS. TESORIERO:  She does not have to answer

 9    yes or no.  Objection.  She's given you an answer.

10              MR. KEZHAYA:  It's a yes/no question.  Yes,

11    she does.

12              MS. TESORIERO:  She does not.

13       A.    That's my answer.

14       Q.    Earlier you testified that you contacted

15    Dayan in or around July of 2021.  Is that correct?

16       A.    I would have sent him an e-mail.

17       Q.    What followed from there which constituted

18    the hiring process?

19              MS. TESORIERO:  Objection to form.

20              You can answer.

21       A.    I don't know.  He would have set up an

22    interview.

23       Q.    Did you interview?

24       A.    Yes.  He would have interviewed me.

25       Q.    He interviewed you; is that correct?
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

1      A.     Yes.

2      Q.     **Did anyone else -- was anyone else party to**

3   **this interview?**

4      A.     Let me think.  Let me think.  No.  I don't

5   think so.  I don't think HR was involved.  It was

6   Dayan.

7      Q.     **Were there any other interviews other than**

8   **this one with Dayan?**

9      A.     Well, we talked more than once.

10     Q.     **Okay.  So you talked with Dayan more than**

11  **once; correct?**

12     A.     Right.

13     Q.     **Was your first contact with Dayan in July**

14  **of 2021?**

15     A.     I don't remember the exact date he and I

16  first talked.  You know, it was -- I don't think it

17  was June.  I believe it was July, but I don't know

18  exact date.  But it would have been around July.  And

19  we would have talked -- anyway.  It was -- the first

20  contact was around then.  Is that what you're asking?

21     Q.     **The question posed is whether there was one**

22  **or more than one interview after July of 2021.**

23     A.     Let me think.  I'm just trying to remember

24  if there was any in August or not.  Trying to

25  remember.  There might have been one in August.  I'm

Page 45

```
 1   not -- probably was one in August.

 2        Q.    Okay.  But the question I'm trying to get

 3   to is whether there was one or more than one

 4   interview.

 5        A.    There was probably more than one.  I don't

 6   remember how many there were.

 7        Q.    Was your first contact with Dayan in July,

 8   or did you know him before you e-mailed him?

 9        A.    My first one -- I've said before, I don't

10   remember the exact date.  It was -- I believe it was

11   July.

12        Q.    Before you sent this e-mail, did you

13   already know Dayan?

14        A.    No, I did not know him.

15        Q.    Thank you.  In the course of this hiring

16   process, did you send prior articles of yours?

17        A.    I'm trying to remember what I sent him.  I

18   don't recall what I sent him.  In terms of articles,

19   resume, I really don't recall what I sent him.

20        Q.    Okay.  Did you send him a resume?

21        A.    I don't recall.

22        Q.    Do you recall whether you sent him

23   anything?

24        A.    No.  No, I don't recall.

25        Q.    Did you disclose any conflicts of interest
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 46

1     in the course of your interview process?

2               MS. TESORIERO:  Objection to form.

3          A.   I didn't have conflicts of interest.

4          Q.   Okay.  So, no.  Correct?

5          A.   No.

6          Q.   Did they ask you about any potential

7     conflicts of interest?

8               MS. TESORIERO:  Objection to form.

9          A.   No.

10         Q.   Prior to working at Newsweek, were you

11    full-time employed?

12         A.   No.  I mean, in 2021?  No.

13         Q.   Correct, yeah.  Before working at

14    Newsweek --

15         A.   No.

16         Q.   -- were you --

17         A.   I was a freelance writer.

18         Q.   And what did that entail in terms of, like,

19    time in your week?

20         A.   Oh, my goodness.  I mean, I did several --

21    a number of things.  I wrote for several publications.

22    I was -- I did -- I was doing some substitute

23    teaching, you know, what one does to earn money during

24    the closing days of the pandemic.  Mostly freelance

25    writing and substitute teaching.

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 47

1     Q.     Were you -- summing up all of your various

2     -- well, would you describe doing what you were doing

3     as odd jobs?  Is that a fair description?

4            MS. TESORIERO:  Objection to form.

5     A.     I would not.  No, I wouldn't say "odd

6     jobs."

7     Q.     Were you functionally full-time amongst all

8     the things that you were doing prior to working at

9     Newsweek?

10    A.     No.  I wouldn't say I was full-time, no.

11    Q.     About how many hours per week did you --

12    prior to working at Newsweek, about how many hours per

13    week did you provide any form of services for and in

14    consideration of money?

15    A.     I don't know.  I mean, freelance writing is

16    a -- it's very hard to figure out hours.  It takes a

17    lot of time.  I wasn't marking my hours for writing

18    for Politico and writing for all these other

19    publications.  I wasn't -- they don't pay by the hour.

20    They paid by the piece.

21    Q.     What were the scope of services -- what

22    were your scope of services at Newsweek?

23    A.     Producing articles on religion.  There was

24    one exception.  There was one travel article, but

25    other than that, yeah, the rest of my beat had to do



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 48

1   with religion.

2       Q.   Your job title was "Contributing Editor."

3       A.   Yes.

4       Q.   Is that correct?

5       A.   That was the title they gave me.

6       Q.   What is a contributing editor?

7       A.   I was -- how would you explain?  That was

8   their choice of title, not mine.

9       Q.   I'm asking for a job description.

10      A.   I know.  I mean, it's the same as a --

11  basically, it's the same thing as a religion reporter,

12  in my mind.

13      Q.   How would you describe religion reporter in

14  terms of job description?

15      A.   This is -- let's see.  I would say covering

16  different religious groups.  I was not usually -- not

17  -- let's see.  Phrase.  Sometimes Supreme Court

18  decisions on various religious groups, trends.

19  Usually not breaking news.  Do you know what I mean by

20  "breaking news"?

21      Q.   Not really.

22      A.   Okay.  There were -- breaking news is

23  something that happened right away that I would have

24  to jump on within the hour.  I usually didn't do that

25  because I lived on the West Coast.  It's too much

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 49

```
 1   detail to go into that, but I was more trends,

 2   long-form stories on explanatory journalism.

 3   Narrative long-form pieces.  That's what they wanted.

 4        Q.    Did they explain why they wanted

 5   explanatory long-form pieces?

 6              MS. TESORIERO:  Objection to form.

 7        A.    Well, they were aware that I had many years

 8   of experience of religion reporting.  I had a master's

 9   degree in the topic.  And I was -- and, again, the

10   awards that we have discussed.  And that's why -- they

11   wanted someone who had a lot -- you know, who had some

12   deep knowledge of religion.  And that's -- who could

13   handle the longer, more complex, explanations, who

14   could do more than, like, a 600-word piece.  Who could

15   delve into more theological explanations of various

16   groups.  Reasons behind different religious beliefs.

17        Q.    I took note of an article that you wrote, I

18   think it was in September of 2021, about the Norse

19   pagan religion.  Was that one of the pieces that they

20   were interested in?

21              MS. TESORIERO:  Objection to form.

22        A.    The one about Thor?

23        Q.    Pardon?

24        A.    The Thor piece?

25        Q.    Correct.
```



1       A.    They were very interested in that, yes.

**2       Q.    They were very interested in that?**

3       A.    Mm-hmm.

**4       Q.    What is the pronunciation of the Norse**

**5    pagan religion?  Asatru?**

6       A.    I think -- well, depends -- I don't speak

7    Icelandic.  Oh, gosh.  Boy, it's been two years since

8    I've been there.  I was better at this two years ago.

9    Okay, we'll just mangle it.  We'll just say Asatru

10   right now, but that's not the right pronunciation.

**11      Q.    I didn't think so.  I didn't know it**

**12   either.**

13      A.    And I'm not an expert in pagan religions.

**14      Q.    And for benefit of the record, how do you**

**15   spell Asatru?**

16      A.    My goodness.  Without being able to check,

17   A-S -- okay.  The article had -- if you look up the

18   article --

**19      Q.    I'm attempting to do so.**

20      A.    A-S-A-T-R-U, and there's an accent mark in

21   there somewhere.

**22      Q.    Yeah.  We don't need to find the article.**

**23   That's -- here it is.  A-S-A-T-R-U, correct?**

24      A.    Probably.

**25      Q.    Accents on the A and the U.  Not that it**

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1   matters for benefit of the record.

2          Was Newsweek's interest in covering

3   non-Christian religions for these long piece --

4   long-form pieces?

5          MS. TESORIERO:  Objection.  Calls for

6   speculation.

7      Q.   Did they tell you is what I'm asking.

8      A.   No.  I mean, no.  No one gave me any

9   reasons.  They just -- I pitched the piece, and they

10  said they were interested.

11     Q.   Okay.  So that kind of gets to what I'm

12  trying to get at.  How did these pieces come to be?

13  Did they tell you, "We are interested in these kind of

14  pieces," or did you just pitch pieces and learned as

15  you went?

16     A.   No.  I happened to be -- I was in Iceland,

17  and I knew about this group, and I pitched it.

18     Q.   And as pertains to this particular article,

19  was it consistent with the general trend of you

20  basically just pitching articles that you thought

21  might be of interest and then they accept or reject?

22     A.   Mm-hmm.

23     Q.   Did they ever give you feedback on articles

24  which are or are not of interest, or did they just say

25  yes or no?

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 52

 1          A.     Let me think.  I'm trying to remember if

 2     they gave me feedback on stuff they didn't want.  I'm

 3     trying to just remember.  I mean, if they liked it,

 4     yeah, there was feedback.  If they didn't like it, I

 5     can't remember any -- if they didn't like it, I don't

 6     remember them giving whatever reasons there would be.

 7     I don't remember negative feedback.  I just don't

 8     remember.

 9          **Q.     Did they tell you the kinds of articles**

10     **that they were looking for?**

11          A.     Sometimes, yes, they did.

12          **Q.     As pertains to this particular piece, did**

13     **they indicate any interest in this particular piece,**

14     **or was that solely coming from you?**

15          A.     It was -- that came from me.

16          **Q.     Okay.**

17                 MS. TESORIERO:  Sorry.  Can we clarify?  We

18     were talking about the Thor article.  Could you please

19     clarify, when you say "this article," if we're

20     switching back to --

21                 MR. KEZHAYA:  Oh, I'm sorry.  Yeah, the

22     subject article, "Orgies, Harassment, Fraud."

23          A.     Oh, orgies.  We're talking orgies.  All

24     right.  Oh, oh, oh.  Oh, no, no.  Yeah, that came from

25     me.  That came from me.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 53

1    Q.    What I'm trying to get at is did you pitch
2    this article because it sounded like it was within the
3    contours of what they were looking for?
4    A.    Well, the major reason I pitched it is
5    because Halloween was coming.
6    Q.    I don't understand the connection.
7    A.    Halloween.
8    Q.    I know what Halloween is.
9    A.    Satanism, you know, Halloween.  Satanism
10   has a lot to do with Halloween.
11   Q.    It does?
12   A.    Yeah.
13   Q.    Please expand.
14   A.    Halloween is a Satanic holiday.
15   Q.    Let's back up a little bit.  You are
16   studied in religion; correct?
17   A.    Yeah.
18   Q.    It's my understanding that Halloween comes
19   from a Celtic tradition; is that correct?  Samhain?
20   A.    Allhallows Eve.  The actual name is from
21   Allhallows Eve.
22   Q.    What is Allhallows Eve?
23   A.    Allhallows Eve came before All Saints' Day.
24   The first holiday was All Saints' Day; Allhallows Eve
25   was the one before that.  Allhallows Eve is when the

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1    hallows, meaning the spirits of the departed dead,

2    supposedly when the -- the time the -- trying to

3    remember how to phrase this.  When the --

4        Q.    If it aids the expedition of matters, this

5    is a little bit askew from our purpose here today.

6        A.    It is, right.

7        Q.    Is it fair to characterize All Saints' Day

8    -- in the original concept, before All Saints' Day

9    took place, Halloween, which is the evening before All

10   Saints' Day -- is that correct?

11       A.    My understanding is All Saints' Day came

12   first, that Halloween came after that.

13       Q.    We're saying before and after, but there's

14   two constructions of this.  So there's the October

15   31st holiday and the November 1st holiday, which is

16   one construction, but then there's also the time

17   period construction of the Halloween, as we know it

18   today, versus a tradition, a religious tradition, that

19   preceded Halloween as we know it today.  I'm asking

20   you to please distinguish what you're referring to.

21       A.    I'm totally confused right now.

22       Q.    Let's back up.  There is a holiday on

23   October 31st; correct?

24       A.    Right.

25       Q.    And prior to today, in centuries past,

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1    there was a holiday that was also celebrated on

2    October 31st.  Also correct?

3         A.    Allhallows Eve?

4         Q.    Correct.  That's the name of the

5    centuries-past holiday?

6         A.    Mm-hmm.

7         Q.    Are you referring to that when you're

8    saying that there is a Satanic connection between

9    Halloween and, essentially, today?

10        A.    Allhallows Eve more had to do with the

11   dead.  The morphing of Allhallows Eve into Halloween

12   and its connection to Satanic connections, again, I'd

13   have to look that one up, but I don't -- it is not a

14   matter of debate whether Halloween is a Satanic

15   holiday or not.

16        Q.    Well, the trouble I have with it is this

17   notion of Satanism as you, I think, cover somewhat in

18   your article is there's not a primary Satanic church.

19   There's a smattering of Satanic churches; correct?

20        A.    Well, "smattering," let's see.  I didn't

21   really get into, I mean, the different Satanic groups

22   in the article.  I mean, I mainly dealt with TST.  I

23   didn't get into the Church of Satan, Levey's group.  I

24   didn't deal with the different ones.

25        Q.    Well, I mean, you mentioned at length

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

```
 1    QueerSatanic, which is not TST.  That's a Satanic

 2    group, correct?

 3              MS. TESORIERO:  Objection to form.

 4         A.    Well, it was a chapter of TST.

 5         Q.    Okay.  But as of the time that you wrote

 6    the article it was not; correct?

 7         A.    Well, they hadn't formed their own church.

 8    They were -- I mean, they were a part -- they were

 9    defendants in a lawsuit.

10         Q.    One second here.  So this text of this

11    pitch, "Major rift in the organization called The

12    Satanic Temple," you dispute that there is --

13    QueerSatanic considers itself a schism of the Satanic

14    temple?

15              MS. TESORIERO:  Objection to form.

16              MR. KEZHAYA:  I need the article, please.

17              MS. KEZHAYA:  Okay.

18         A.    Do they consider themselves a schism of The

19    Satanic Temple?

20         Q.    Well, "schism" is a definition of the major

21    rift.  So do they consider themselves a Satanic group

22    is my question.

23              MS. TESORIERO:  Objection.  Calls for

24    speculation.

25         A.    They consider themselves Satanists when I
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 57

```
 1   interviewed them.  I mean, they all considered

 2   themselves Satanists.

 3        Q.    They're an organization, correct?

 4             MS. TESORIERO:  Objection to form.

 5        A.    They're not a -- no.  I mean, they're not

 6   -- QueerSatanic is not like a corporation of some

 7   sort.  They're not like some sort of separate

 8   501(c)(3).

 9        Q.    I mean, do you dispute the notion that a

10   religious organization could be unincorporated?

11             MS. TESORIERO:  Objection to form.

12        A.    We're jumping all over the place here.

13   Let's see.  I would say something that's

14   uncorporated I would call a religious group.

15        Q.    As opposed to an organization?

16        A.    That would be my wording.

17        Q.    Okay.  Would you describe QueerSatanic as a

18   religious group?

19        A.    I gave them multiple descriptions in the

20   article.  Right now they're four individuals at this

21   point.  I mean, they're plaintiffs in a -- wait a

22   minute; sorry -- defendants in a lawsuit.

23        Q.    That's nonresponsive to my question.  My

24   question was would you describe them as a religious

25   group.
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 58

```
 1              MS. TESORIERO:  Objection to form.  Are you
 2   asking her currently or at the time of this e-mail or
 3   at the time of the article?
 4        Q.    As of the time of the article, would you
 5   have described them as a religious group?
 6        A.    "Religious group."  I'm trying to remember
 7   if I did so in the article.
 8        Q.    I'll just tell you, I don't think that it's
 9   in the article.  I'm just asking --
10        A.    Yeah.  They were part of a group, or they
11   were the -- I'm trying to think.  Part of a group.
12   Part of a group.  Just a second.  Just trying to think
13   here.  Yeah.  Okay.  I think that would be fair.
14        Q.    And to be clear, that would be distinct
15   from The Satanic Temple; correct?
16        A.    Oh, boy.  Let's see.  Let's see.  When I
17   interviewed them, well, yes, they were at the -- yeah.
18   They had been kicked out by that time.  So, yeah, they
19   were not part of The Satanic Temple.
20        Q.    Okay.  Do you recall speaking to someone
21   named Jinx Strange?  And by "speaking" I include
22   written correspondence as well.
23        A.    By e-mail.
24        Q.    Did you ever talk with him?
25        A.    No.
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1        Q.      Was the only communication through e-mail?

2        A.      I believe so.

3        Q.      As distinct, for example, from text

4    messages.

5        A.      I didn't -- let's see.  Did I text him?

6    No, I didn't text him.

7        Q.      Or social media-posted things.

8        A.      Right.  It was e-mail.

9        Q.      It was only e-mail; correct?

10       A.      I believe so.

11               MR. KEZHAYA:  We're going to mark this as

12   Exhibit 2.  For the benefit of the record, this is

13   Newsweek 15, 16 and 17.

14               MS. TESORIERO:  May I suggest a five-minute

15   break?  If now is not a good time --

16               MR. KEZHAYA:  Yeah.  Now is a good time.

17               THE VIDEOGRAPHER:  We are now going off the

18   record.  The time is 11:07 a.m.

19                       (Exhibit No. 2 was marked for

20                       identification.)

21                       (Off the video record.)

22

23

24

25

Page 60

1                    (The following telephonic conference

2                    was held before Magistrate Judge Hon.

3                    Sarah L. Cave.)

4           THE COURT:  I understand that the parties

5    in Satanic Temple vs. Newsweek have called the Court

6    with a deposition dispute.  Do we have the court

7    reporter transcribing at this moment?

8           MR. KEZHAYA:  Yes.

9           THE COURT:  Okay.  And if counsel could

10   please state their appearances starting with the

11   plaintiff.

12          MR. KEZHAYA:  This is Matt Kezhaya

13   appearing on behalf of plaintiff.  I'm joined by Sonia

14   Kezhaya, and I'll pass her the phone.

15          MS. TESORIERO:  Thank you.  This is Sara

16   Tesoriero appearing on behalf of the witness and the

17   defendant Newsweek, and appearing remotely, who can

18   also hear this conversation, is Cameron Stracher, also

19   for the witness and for Newsweek.

20          THE COURT:  And the witness is Ms. Duin?

21          THE WITNESS:  Hi.  I'm Julia Duin.

22          THE COURT:  Okay.  Thank you.  Sorry.  All

23   right.  Is there anyone else in the room besides the

24   court reporter?

25          MR. KEZHAYA:  We have a videographer as



1    well, although this portion of the proceedings we

2    don't have video recording going.

3              THE COURT:  Okay.  All right.  So I

4    understand that there are two disputes regarding the

5    witness's deposition.  Mr. Kezhaya, can you highlight

6    the first for me, please.

7              MR. KEZHAYA:  Yes, Your Honor.  The first

8    dispute is -- the question posed was how much were you

9    paid for -- how much were you paid per month.  Teeing

10   up this dispute, ECF No. 47, at paragraph 8, the Court

11   directed defendant, quote:  Defendant shall

12   investigate whether it made a payment to Ms. Duin for

13   writing the article, and if it did, produce to

14   plaintiff documents sufficient to show the amount of

15   that payment.

16             Subsequent to that defense counsel provided

17   us information that Ms. Duin was not specially paid

18   for the article; rather, she was paid a monthly

19   salary.  They did not tell us how much.  We

20   established the same through testimony.  We asked the

21   question "How much were you paid per month?"  And the

22   objection has been lodged, and instruction not to

23   answer the question has been given.

24             THE COURT:  Okay.  Ms. Tesoriero, what's

25   the basis of the objection?

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 62

```
 1              MS. TESORIERO:  Yes.  Thank you, Your

 2   Honor.  Defendant's position is that -- and the

 3   witness's position is that the court order has been

 4   complied with.  We investigated whether Ms. Duin was

 5   paid for the article in particular.  It has been

 6   established through testimony today she wrote at least

 7   three articles within the month of October.  And we

 8   informed counsel that she was not paid per article,

 9   and the monthly amount would not indicate how much she

10   was paid for a particular article, given that

11   background.

12              We have also asked counsel to provide us an

13   explanation as to why that information is likely to

14   lead to admissible evidence in this case.  And we, of

15   course, will let counsel speak for himself, but we

16   have not found any information to support why they

17   would need to know how much Ms. Duin, who is no longer

18   a party to this case, was paid per month.

19              THE COURT:  Well, she was paid for the

20   month in which the article was written; correct?

21              MS. TESORIERO:  Yes, Your Honor.

22              THE COURT:  Therefore, she was paid for

23   writing the article; right?

24              MS. TESORIERO:  Yes.  In that she was paid

25   for the month -- the article came out at the end of
```

Page 63

1    October, and she was paid monthly.  So she would have

2    been paid for the month of October.

3              THE COURT:  Okay.  And in the month of

4    October, the service that she provided to Newsweek

5    was, among other things, writing the article; correct?

6              MS. TESORIERO:  And two others, yes, Your

7    Honor.

8              THE COURT:  Okay.  All right.  So the

9    objection is overruled, and the witness can answer the

10   question as to the amount that she was paid for the

11   month of October in which the article was written.

12   But that is the only question that needs to be asked

13   and answered on this subject.

14             Mr. Kezhaya, is there another issue?

15             MR. KEZHAYA:  Your Honor, to expand briefly

16   on the first point, prior testimony has left it a

17   little bit ambiguous as to whether there was a bonus

18   structure for articles.  I would also like to ask the

19   witness whether she was paid any bonuses for writing

20   the subject article.

21             THE COURT:  You can ask if she was paid a

22   bonus, and if she says yes, then the amount, and

23   that's it.

24             MR. KEZHAYA:  Thank you, Your Honor.

25   Second issue arises, the idea for the article -- prior

Page 64

1   testimony was established that the idea for this

2   particular article was provided by someone who none of

3   us -- none of the lawyers had ever discussed before,

4   someone named Kevin Jones, who sent Ms. Duin the

5   article -- the best written discovery provides is --

6   some time ago.  I asked the question, "How was this

7   provided?"  She responded, "By e-mail."  We do not

8   have that e-mail.  I asked when was it provided.  She

9   says, "I don't recall."  I asked, "Would it refresh

10  your recollection to look at the e-mail?"  She said,

11  "Maybe."  I asked her to pull -- after establishing

12  sufficient testimony, asked her to pull out her smart

13  phone and look for the e-mail, to which again the

14  objection was lodged and instruction not to provide

15  that information.  All we're asking for is the date.

16          THE COURT:  The date on which Mr. Jones

17  notified Ms. Duin about the idea for the article?

18          MR. KEZHAYA:  Correct.  Yes, Your Honor.

19  And to lay a little bit further background, the

20  article was, near as we can tell, first pitched in

21  September 30th.  We believe, obviously, some time ago

22  was sometime before September 30th.  We're trying to

23  establish the timeline of when all this took place.

24          THE COURT:  Okay.  Ms. Tesoriero?

25          MS. TESORIERO:  Yes.  Thank you, Your

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1   Honor.  Our position is that this was a subpoena for

2   deposition.  There was no subpoena for documents.

3   There has been no subpoena for documents served on

4   Ms. Duin in this case, and therefore the request for

5   her to access documents during the deposition that counsel

6   has not had a chance to review for privilege, for

7   reporter's privilege issues, would be inappropriate.

8               THE COURT:  All right.  Well, I mean, the

9   risk is that she's going to have to come back, but --

10  so if you want to have her on a break -- I'm not going

11  to order that she do it while the record is running,

12  but if you want to have her look on the break and see

13  if she can discern the date that Mr. Jones sent her

14  the e-mail, then she can do so and testify how she

15  refreshed her recollection.  But otherwise, Mr.

16  Kezhaya, you will be authorized to serve Ms. Duin with

17  a subpoena solely limited to the e-mail from Mr. Jones

18  to her regarding the idea for the article.

19              MR. KEZHAYA:  Thank you, Your Honor.

20              MS. TESORIERO:  Thank you, Your Honor.

21              MR. KEZHAYA:  That resolves all disputes

22  unless there are any other issues?

23              MS. TESORIERO:  No.

24              MR. KEZHAYA:  That resolves all of our

25  disputes.  Thank you for your time.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

```
 1              THE COURT:  All right.  Very good.

 2              (Telephonic conference concluded.)

 3              MS. TESORIERO:  Matt, if you can agree that

 4    you're only asking about the date, over lunch Ms. Duin

 5    and I can discuss whether or not she can find it on

 6    her phone.

 7              MR. KEZHAYA:  Yeah.  Ask over lunch or over

 8    lunch you can determine?

 9              MS. TESORIERO:  I'm saying when we're on a

10    break, which I assume the next one will be lunch, and

11    when we come back we can let you know as to whether

12    she can testify as to the date.

13              MR. KEZHAYA:  Sounds good.

14              MS. TESORIERO:  Do we want to agree we want

15    to go for maybe another hour and then --

16              MR. KEZHAYA:  I mean --

17              MS. TESORIERO:  When you have a natural

18    stopping point.

19              MR. KEZHAYA:  Yeah.  I think we're going to

20    have a natural stopping point in advance of an hour.

21    We'll just look for the next organic one.  So we are

22    still on the record, but let's -- presuming everyone

23    is ready to go properly back on the video record.

24              MS. TESORIERO:  Yes, thank you.  Julia, are

25    you good?
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 67

```
 1                 THE WITNESS:  I'm fine.

 2                 THE VIDEOGRAPHER:  Please stand by.  We are

 3    now back on the video record.  The time is now 11:31

 4    a.m.

 5          Q.    (By Mr. Kezhaya) Julia, how much were you

 6    paid per month by Newsweek?

 7          A.    I don't have the exact figure.  I can give

 8    you an approximate figure.  Is that all right?

 9          Q.    That's fine.

10          A.    It was about $███-something.

11          Q.    So can we round it at ███?

12          A.    It was not $███ a month.

13          Q.    I asked if we can round it.  ███-and-

14    change rounds up to ███

15                 MS. TESORIERO:  Objection to form.

16          A.    No.  Please round it to $███.

17          Q.    Well, it's "and change."  So how much

18    change?  More or less than 50?

19          A.    That's what I'm trying to remember.  I'm

20    just trying to -- I prefer you round it to $███.

21          Q.    Okay.  Was tax taken out of your salary?

22          A.    No.

23          Q.    So you were paid $███-and-change as an

24    independent contractor?

25          A.    Yes.
```



1      Q.    Did you negotiate an annual salary?

2      A.    Yes.

3      Q.    Okay.  And was that annual salary divided

4      by 12 to constitute a monthly payment?

5            MS. TESORIERO:  Objection.  The judge just

6      said you can ask her what she was paid in October of

7      2021.  She has answered that question.

8            MR. KEZHAYA:  She has not.  She has said

9      it's something more than ███████ and her preference

10     would be to round it at $██████.  However, we don't

11     really know if that's the answer.  So I'm trying to

12     get to the answer with specificity.

13     A.    You lost me.

14           MS. TESORIERO:  Would you repeat the

15     question?

16     Q.    That was a colloquy between counsel.  Did

17     you negotiate an annual salary?

18     A.    Yes.  I negotiated an annual salary.

19     Q.    Was that annual salary to be paid monthly?

20     A.    Yes.

21     Q.    What was the annual salary?

22           THE WITNESS:  Do I have to answer that

23     question?

24           MS. TESORIERO:  She's given you an estimate

25     for the month.  That was the judge's order.  If you



1   wanted the annual salary, why didn't you bring it up

2   when we just had the judge on the phone?

3            MR. KEZHAYA:  Because I expected she would

4   give me a specific answer, not a rounded answer.  I

5   want to know the specific answer.

6       A.   I mean, what is it?  $█████.  I mean, you

7   know, multiply by 12.

8            MR. KEZHAYA:  Hold on.  There is a lawyer

9   colloquy going on here.  The question posed is, "How

10  much were you paid per month?"  That was authorized.

11  She could not give me a specific answer.  I want a

12  specific answer.  I don't want an estimated answer.  I

13  want the answer.  Hold on.  And since Newsweek has not

14  provided the document that could have answered this

15  question, I have to get it from her.

16           MS. TESORIERO:  Well, you brought it up

17  again in a deposition.  We had an ongoing dispute

18  about this that we could've brought up without the

19  judge for documents.  Now that the judge has ruled

20  this way, we will provide you the document with the

21  exact number.

22           MR. KEZHAYA:  That will do.

23      Q.   **Was this monthly payment the same every**

24  **month?**

25      A.   I'm trying to remember.  There might have



Page 70

```
 1    been a penny or two difference.

 2         Q.    Okay.  But --

 3         A.    Yeah, pretty much.

 4         Q.    In terms of whether it was front loaded or

 5    back loaded or anything, October 2021 would have been

 6    the same as September of 2021?

 7         A.    Yeah.

 8         Q.    What about bonuses?  Were you paid a bonus

 9    for this article?

10         A.    No, no.

11         Q.    Did Newsweek have a bonus structure at the

12    time that you wrote this article?

13              MS. TESORIERO:  Objection to form.

14    Objection to form.

15         A.    I mean, I don't -- I don't know what they

16    did with other reporters.

17         Q.    So in the course of your negotiations with

18    Newsweek, was bonuses a contemplated aspect of payment

19    that you might receive?

20         A.    There was no discussion of bonuses.

21              MR. KEZHAYA:  Okay.  And as addressed while

22    the video was off, we're going to find out the timing

23    that Kevin sent you the article idea at our next

24    break.

25              MS. TESORIERO:  Yes.  And we'll revisit
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 71

1    that after the break.

2         Q.    Okay.  I want to return to the testimony

3    that you indicated -- oh, were there any deductions

4    from your monthly salary?

5         A.    No.  I did the -- I did them.

6         Q.    Okay.  So were you paid 1099?

7         A.    1099?  I'm trying to remember.  I'm just

8    trying to remember the form.  Crap.

9         Q.    That's okay.

10        A.    Yeah.  I mean, as a contractor I had to do

11   all my own taxes and health.  I mean, does that answer

12   it?

13        Q.    Yeah.  I'm trying to get at were there any

14   withholdings --

15              (Cross talk.)

16        A.    No.  I mean, they withheld nothing.

17        Q.    So basically it's just whatever that

18   monthly amount times 12 --

19        A.    Right, right.

20              THE REPORTER:  Please don't cross talk.

21              MR. KEZHAYA:  I apologize.

22        Q.    For benefit of the record, I know it's very

23   natural to understand, but we really have to -- to

24   make a good record, we really have to wait until one

25   stops talking to start talking.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

 1          A.    Oh, excuse me.

 2          Q.    And since we're on the topic, it's also

 3    natural, "uh-huh, huh-uh," et cetera, it's preferred

 4    to say yes or no.  And if I feel like it's ambiguous,

 5    I'll raise that issue again.  Understood?

 6          A.    Mm-hmm.

 7                MS. TESORIERO:  Yes?

 8                THE WITNESS:  Yes.

 9          Q.    I want to return to your earlier testimony

10    that Halloween is a Satanic holiday.  What is your

11    basis for believing that Halloween is Satanic?

12                MS. TESORIERO:  Objection to form.

13          A.    Let's see.  Trying --

14          Q.    Would it aid you if I refined the question

15    through a series of smaller chunks?

16          A.    Sure.  Yes.

17          Q.    When you say "Satanic," could you please

18    expand on your understanding of "Satanic"?

19          A.    Let's see.  The -- before meeting up with

20    TST, my -- excuse me -- my reporting or the -- my

21    reporting had more bent on the Church of Satan or my

22    -- let's just say I was more familiar with the Satan

23    -- let's put it that way -- out of San Francisco, and

24    the Satanic Bible, I believe it's called.  So that was

25    -- that was more my understanding of Satanism that had



Page 73

1    an actual -- more of a belief system, and a -- so with

2    -- TST was different.  When you're asking my

3    understanding of Satanism, so there was before I met

4    TST, TST, and then after I met TST.

5         Q.    **When you say you met TST, when did you**

6    **first meet TST?**

7         A.    Well, when I -- when I began researching

8    this article I was not familiar with TST.

9         Q.    **In terms of month and year, when was that?**

10        A.    You know, so I would say October of 2021.

11        Q.    **So your research into this article began in**

12   **October of 2021?**

13        A.    Right.

14        Q.    **And it's my understanding of your testimony**

15   **that you were not familiar with The Satanic Temple**

16   **before October of 2021; is that correct?**

17        A.    Exactly, yes.

18        Q.    **Had you ever written about TST before this**

19   **article?**

20        A.    No, I had not.

21        Q.    **You had never written about TST before this**

22   **article?**

23        A.    Except I had in passing for some

24   GetReligion pieces.

25        Q.    **How many times had you written about The**

Page 74

```
 1   Satanic Temple before this article?

 2       A.    I had mentioned them in a 2016 GetReligion

 3   piece, in another -- I think 2018, but I'm not --

 4   2016, there was another one after that.  I think those

 5   were the only two times I had mentioned them before

 6   2021.

 7       Q.    What about after the subject article?

 8       A.    And then there was a 2022 GetReligion

 9   piece.

10       Q.    Let's mark -- you said 2016?

11       A.    I think the first one was 2016.

12             MR. KEZHAYA:  Okay.  Let's mark this as

13   Exhibit 3, please.  Puff piece, Satanic Temple puff

14   piece, that's going to be No. 3.

15             MS. TESORIERO:  The satanic Temple comes to

16   Boston?

17             MR. KEZHAYA:  I believe so, correct.  These

18   appear to be three different ones.

19             MS. TESORIERO:  And for the record, are

20   these highlights your own?

21             MR. KEZHAYA:  Correct.

22             (Exhibit No. 3 was marked for

23             identification.)

24       Q.    Okay.  Please review what we have marked as

25   Exhibit 3.  Is that the 2016 piece that you were
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 75

```
 1   referring to?

 2        A.    Yes.

 3        Q.    And there was a 2018 piece you mentioned as

 4   well?

 5        A.    I think it was 2018.  It was the Florida

 6   one?

 7              MR. KEZHAYA:  Let's see here.  We're going

 8   to mark this as Exhibit 4.

 9              (Exhibit No. 4 was marked for

10              identification.)

11              MS. TESORIERO:  Exhibit 5?

12              MR. KEZHAYA:  Yes.  That's going to be 5.

13              (Exhibit No. 5 was marked for

14              identification.)

15        Q.    Is that the approximately 2018 piece that

16   you had mentioned earlier?

17        A.    I think so.  Is that the one in Florida?

18        Q.    I believe so.

19        A.    Yeah.

20        Q.    And we have Exhibit 5.  I believe this is

21   your 2022 piece that you mentioned as well.  And that

22   would be your -- Julia?

23        A.    Mm-hmm?

24        Q.    This Exhibit 5, could you please review it

25   and confirm that that's your 2022 piece you mentioned
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 76

1    earlier as well.

2         A.    Yes.

3         Q.    Okay.  So those two pieces in 2016 and 2018

4    predate the article at issue.

5               Did you tell anyone at Newsweek that you

6    had written about The Satanic Temple before?

7               MS. TESORIERO:  Objection to form.

8         A.    These weren't -- okay.  I did not consider

9    these about The Satanic Temple.

10        Q.    What would you consider them?

11        A.    These are media critique pieces.

12        Q.    Could you please read the title of the 2016

13   piece?

14        A.    "The Satanic Temple comes to Salem and the

15   Boston Globe Does a Puff Piece."

16        Q.    And it's your testimony that this is not

17   about The Satanic Temple?

18        A.    It's about the Boston Globe.

19        Q.    Are you still at Newsweek?

20        A.    No.

21        Q.    Why not?

22              MS. TESORIERO:  Objection to form.

23        A.    Excuse me?

24        Q.    Why are you still not employed by

25   Newsweek?

Page 77

```
 1        A.    I was laid off.

 2        Q.    And what was the stated reason?

 3        A.    Finances.

 4        Q.    Did your layoff have anything to do with

 5   this article?

 6        A.    No.

 7        Q.    Did your layoff have anything to do with

 8   this lawsuit?

 9              MS. TESORIERO:  Objection.  Calls for

10   speculation.

11        A.    May I suggest you ask Nancy Cooper that?

12        Q.    Pardon?

13              MS. TESORIERO:  You can still answer his

14   question.

15        A.    I can answer?

16              MS. TESORIERO:  Can you restate the

17   question.

18        Q.    Did the lawsuit have anything to do with

19   you being laid off?

20        A.    No.

21        Q.    Do you have any contracts with Newsweek?

22        A.    Contracts?

23        Q.    Do you have any form of written agreement

24   with Newsweek, for example, a severance agreement?

25        A.    I don't believe so.
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

```
 1          Q.    And you said that they laid you off because
 2    of finances?
 3          A.    Yes.
 4          Q.    Could you please expand?
 5          A.    That's all I was told.
 6          Q.    Who told you that?
 7          A.    It was Dayan.
 8          Q.    And when did that conversation take place?
 9          A.    November of 2022.
10          Q.    Was it effective immediately or effective
11    at some future date?
12          A.    Future date.
13          Q.    What was the future date?
14          A.    February 2023.
15          Q.    So you were paid through February of 2023?
16          A.    Trying to remember.  Yes.
17          Q.    Your last article is dated January 1, 2023.
18          A.    Mm-hmm.
19          Q.    So you were paid for both January and
20    February of 2023 even though you didn't write any more
21    articles for Newsweek?
22                MS. TESORIERO:  Objection to form.
23          A.    Yes, sir.
24          Q.    Did you perform any services for Newsweek
25    in January or February of 2023?
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

```
 1       A.    Yes.

 2       Q.    What services did you perform?

 3       A.    I gave them articles.

 4             MR. KEZHAYA:  Okay.  I think now is a good

 5   time for a break.  Let's do lunch.  How long do y'all

 6   want?

 7             THE VIDEOGRAPHER:  We are now going off the

 8   record.  The time is now 11:50 a.m.

 9             (Lunch recess.)

10             THE VIDEOGRAPHER:  We are now back on the

11   record.  The time is now 12:35 p.m.

12       Q.    Julia, do you still have Exhibit 3 in front

13   of you?

14       A.    Yes, I do.

15       Q.    We're going to mark Exhibit 6, which I

16   believe to be another copy of the same article, just

17   with some additional information on it.  And -- well,

18   I'll wait for it to get marked.

19                   (Exhibit No. 6 was marked for

20                   identification.)

21       Q.    Do you recognize Exhibit 6?

22       A.    Looks like the same piece as No. 3.

23       Q.    Okay.  Could you please turn to page 4 of

24   Exhibit 6 and read the first tag.

25       A.    Starting with the Globe story?
```

Page 80

1        Q.     Does it say tag?  There should be a list of

2    tags on there.

3        A.     Oh, tags?

4        Q.     Yes.

5        A.     Oh, okay.  Tags.

6        Q.     Thank you.  Going back to your hiring

7    process at Newsweek, were you ever trained on

8    editorial guidelines?

9        A.     No.

10       Q.     Were you ever provided a copy of what we're

11   marking as Exhibit 7?

12              (Exhibit No. 7 was marked for

13              identification.)

14       A.     No.

15       Q.     You were never provided that?

16       A.     No.

17       Q.     And you were never trained on that?

18       A.     No.

19       Q.     Did anyone ever tell you that your pieces

20   were subject to the editorial guidelines?

21       A.     No.

22       Q.     Have you, prior to today, ever even heard

23   of these editorial guidelines?

24              MS. TESORIERO:  Objection to form.

25       A.     Yes.

 1       Q.      When did you first hear these?

 2       A.      When you brought them up.

 3       Q.      Prior to today?

 4       A.      Uh-huh.

 5       Q.      When was that?

 6       A.      In the -- when you first objected to my

 7   article, after publication.

 8       Q.      Okay.  Did you, thereafter, go look at the

 9   editorial guidelines?

10       A.      Yes, I believe I did.  I'm trying to

11   remember from two years back.  Yes.

12       Q.      And did you compare the article to the

13   editorial guidelines?

14       A.      At the time?

15       Q.      Correct.

16       A.      I can't remember.

17       Q.      Okay.  In the course of your services as

18   professor, did you teach your students about fact

19   checking?

20               MS. TESORIERO:  Objection to form.

21       A.      I can't remember.

22       Q.      Would you agree with me that fact checking

23   is an important part of credible journalism?

24               MS. TESORIERO:  Objection to form.

25       A.      It's important.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 82

```
 1        Q.    I want to turn your attention back to
 2   Halloween being a Satanic holiday.  You would agree
 3   with me that trick-or-treating is a common part of
 4   celebrating Halloween in contemporary times, would you
 5   not?
 6              MS. TESORIERO:  Objection to form.
 7        A.    Trick-or-treating is popular, yes.
 8        Q.    How would you describe trick-or-treating?
 9        A.    As children dressing up in costumes going
10   from door to door asking for candy.
11        Q.    And you testified earlier that Halloween is
12   a Satanic holiday.  Is it your testimony today that
13   trick-or-treating is Satanic?
14              MS. TESORIERO:  Objection to form.
15        A.    Some people believe it is.
16        Q.    Are you some of those people?
17              MS. TESORIERO:  Objection to form.
18        A.    I don't want to say my point of view.
19        Q.    I'm asking you.
20        A.    Well, I don't want to comment.
21        Q.    I don't care if you don't want to.  I'm
22   asking you and you have to answer.
23              MS. TESORIERO:  Matt, could you draw me a
24   picture as to how this line of questioning is related
25   to our case?
```

Page 83

1          MR. KEZHAYA:  Goes to the piece, which was

2    pitched just in time for Halloween.  She testified

3    that it's a Satanic holiday.  There's a very clear tie

4    to the article.  I don't see how it's not.

5          MS. TESORIERO:  The only remaining issue is

6    the article statement here.  Again, you're

7    questioning.  I'm just -- you know, scope of the

8    deposition is related to the article statement.

9          MR. KEZHAYA:  I can -- no, it's not limited

10   to the article statement.  That's tomorrow.  She is

11   the author of the piece.  She has provided the e-mail

12   in which she pitched the piece, and I can think of at

13   least three instances in the written discovery in

14   which she emphasized "just in time for Halloween."

15   Very clearly, there's a time in her mind from

16   Halloween to this article.  I'm trying to get to that

17   point.

18          MS. TESORIERO:  Okay.  Could you repeat the

19   question.

20      **Q.    In your opinion, is trick-or-treating a**

21   **Satanic practice?**

22      A.    No.

23      **Q.    So what makes Halloween Satanic?**

24          MS. TESORIERO:  Objection to form.

25      A.    Let's see.  Where do we start?  Some groups

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 84

 1    use Halloween to practice Satanic rituals.

 2        Q.    **Is that your full answer?**

 3        A.    Yes.

 4        Q.    **Which groups?**

 5        A.    Some Satanic groups.

 6        Q.    **Which groups?**

 7        A.    That's my answer.

 8        Q.    **Is that your full answer?**

 9        A.    Yes.

10        Q.    **Do you know more distinctly which groups**

11    **than Satanic groups?**

12        A.    That's my full answer.

13        Q.    **How many types of Satanic groups are there?**

14              MS. TESORIERO:  Objection to form.

15        A.    There are many Satanic groups.  How many?

16    I don't know.

17        Q.    **Please describe the Satanic rituals.**

18              MS. TESORIERO:  Objection to form.

19        A.    I mean -- okay.  One might be a black mass.

20        Q.    **Which groups, in your mind, are practicing**

21    **black mass on Halloween?**

22        A.    A Satanic group.

23        Q.    **Which ones?**

24        A.    I don't know which Satanic groups.  Some

25    Satanic --

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 85

1     Q.    Where are these black masses taking place?

2     A.    How am I supposed to know?

3     Q.    Well, it's your testimony, so clearly you

4   have some idea.

5     A.    I don't have to have an idea.

6     Q.    Oh, you don't?

7     A.    No, I don't.

8     Q.    So you just say things without having a

9   basis?

10          MS. TESORIERO:  Objection to form.

11    Q.    Yes or no.  Do you just say things

12  sometimes without having a basis?

13          MS. TESORIERO:  Objection to form.

14          MR. KEZHAYA:  I heard the objection.

15    A.    No.

16    Q.    Then what is your basis?

17    A.    Basis for what?

18    Q.    For testifying that some groups engage in

19  Satanic practices on Halloween.  You don't know which

20  groups.  You don't know where.

21    A.    Am I supposed to know every Satanic group

22  in the United States?

23    Q.    Well, yeah --

24    A.    No, no, I'm not.

25    Q.    -- if you're going to say --

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 86

1          A.     No.

2          Q.     **So you have some idea, then, it's happening**

3    **in Satanic --**

4          A.     Am I supposed to know all Satanic groups in

5    all 50 states?

6          Q.     **If that's going to be your testimony, yes,**

7    **I expect there to be some basis for your opinion.**

8          A.     I don't know how to answer this ridiculous

9    question.  So where do I go from here?

10         Q.     **How about this?  How do you know about**

11   **these rituals?**

12         A.     How do I know?

13         Q.     **Correct.**

14         A.     Let's see.  Give me a moment.  I had done

15   some prior reporting on, way back in the 1980s, on

16   Satanic groups, not TST.  So I read up on certain --

17   on various rituals, including black masses.

18         Q.     **Have you heard of the Satanic panic?**

19         A.     Yes.  I've heard of Satanic panic.

20         Q.     **Were your articles written during the**

21   **course of Satanic panic?**

22         A.     Can you tell me the years?

23         Q.     **Includes 1980s and into the 1990s.**

24         A.     Well, that's a large -- I mean, I worked

25   for the Houston Chronicle in the 1980s.  I mean, do

 1    you want to know when my articles were written?

 2         Q.    Yes.

 3         A.    My articles were written in the late 1980s.

 4         Q.    Were they for the Houston Chronicle?

 5         A.    Yes.

 6         Q.    Do you still have copies of these articles?

 7         A.    Yes.

 8         Q.    How do you store those articles?

 9         A.    I have hard copies.

10         Q.    How many articles have you written about

11    Satanic groups?

12         A.    I think -- two, I think.

13         Q.    And you have both of those as hard copies?

14         A.    I believe so.

15         Q.    Where are they stored?

16         A.    At my home.

17         Q.    In the course of researching these Satanic

18    groups that engage in Satanic practices, what research

19    did you do?

20         A.    I interviewed -- interviewed -- I'm trying

21    to remember.  We're going back 30 years.  Members of

22    the group.  Experts on -- academic experts.  That's

23    about as best as my memory can tell me.

24         Q.    Would the -- in the articles, did you cite

25    the members of the group or the academic professors?

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 88

```
 1        A.    I really can't remember.
 2        Q.    You are trained as a minister, are you not?
 3        A.    No, I'm not.
 4        Q.    You undertook some form of religious
 5   studies, did you not?
 6        A.    Yes.
 7        Q.    What were your religious studies?
 8        A.    It was a master's degree.
 9        Q.    It was a master's degree?
10        A.    Uh-huh.
11        Q.    What is the formal name of the degree?
12        A.    Master's degree in religion.
13        Q.    And where did you get that degree?
14        A.    At Trinity Episcopal school for ministry,
15   but it's not an MDF.
16        Q.    What is it if not an MDF?
17        A.    It's not -- it's a regular master's degree.
18   It's an academic degree.  It's not a ministerial
19   degree.
20        Q.    Okay.  So this Episcopal school had
21   separate programs for religion and ministerial
22   programs; is that correct?
23        A.    Mm-hmm.
24        Q.    What is the distinction?
25        A.    Well, master's degree in divinity is for
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1   people going into professional ministry.  That's a

2   three-year degree.  I took a two-year degree, which is

3   like a regular master's degree, like just an academic

4   master's degree.  A two-year degree.

5       **Q.    So there's not separate kinds of master's**

6   **degrees, then?  Like, for example, there's PhD,**

7   **there's medical doctorates, there's law doctorates.**

8   **There aren't different kinds of master's; is that**

9   **correct?**

10              MS. TESORIERO:  I'm sorry.  Are or are not?

11              MR. KEZHAYA:  Are not.

12              MS. TESORIERO:  There are not different

13   kinds of master's?

14              MR. KEZHAYA:  That's my understanding of

15   her testimony.  I'm trying to clarify.

16      A.    At this particular school?

17      **Q.    Well, generally, you're testifying --**

18      A.    You're saying in general are there

19   different kinds of master's degrees?  How the heck

20   would I know?

21      **Q.    Well, you said it's a normal master's --**

22      A.    Well, yeah.  I mean --

23      **Q.    Julia --**

24      A.    There's a master's in -- this is a -- let

25   me think.  No.  There's -- I'll stay with my original

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 90

```
 1   answers.  It's a master's degree in religion.  We'll

 2   keep it there.

 3        Q.    What did that study entail?

 4        A.    Theology, Old and New Testament.  Let's

 5   see.  There was Vatican II.  There was Anglican

 6   studies.  Ethics.

 7             THE REPORTER:  What studies?

 8             THE WITNESS:  Anglican studies.  It was

 9   Episcopal seminary.  So Anglican studies.

10             Ethics.  Let's see.  Trying to remember.

11   Hebrew.  Those are some.

12        Q.    Did it involve any study of religions other

13   than Christianity?

14        A.    No.

15        Q.    Could you please turn to Exhibit 2, the

16   Jinx Strange e-mail.  Okay.  About midway into this

17   first page it states, "Background on me.  I am Jinx

18   Strange, at present day the archlector of the

19   Luciferian Dominion."

20             Had you ever heard of the Luciferian

21   Dominion before October 24, 2021?

22        A.    No.

23        Q.    Do you know the true identity of Jinx

24   Strange?

25        A.    When you say "true identity," can you
```

Page 91

```
 1    explain what you mean by that?
 2         Q.    Jinx Strange is a pseudonym, is it not?
 3         A.    His Facebook page says Jinx Strange.
 4    Unlike other people I interviewed, he did not say he
 5    was using a pseudonym.
 6         Q.    How did you come to e-mail JInx Strange in
 7    the first place?
 8         A.    I was referred to him.
 9         Q.    By whom?
10         A.    Members of the defendants in the
11    QueerSatanic case.
12         Q.    When did they provide you that information?
13         A.    Where or when?
14         Q.    When.
15         A.    After I interviewed them in person.
16         Q.    When was that?
17         A.    What day did I interview them?  Let's see.
18    It was in -- it was in October 2021.  What day it was?
19         Q.    Early, mid, or late suffices for my
20    purposes.
21         A.    We'll say mid October.
22         Q.    Okay.  On September 30th, you had testified
23    that that was the first instance in which you pitched
24    the subject article.  Do you remember that?
25         A.    Right.
```



1      Q.     How long after that pitch did you get the

2    green light to start pursuing this article?

3      A.     Well, let me think.  I'm trying to

4    remember.  I can't remember.  I don't think it was

5    long after that.  However -- I don't think it was long

6    after that.

7      Q.     In terms of days?  Weeks?

8      A.     Probably within a week.

9      Q.     And to clarify, that was when you got the

10   green light to pursue the article; correct?

11     A.     Sure.  However -- yeah, I would say within

12   a week.

13     Q.     Okay.  And then how long after the green

14   light did you talk to the QueerSatanic?

15     A.     Well, I had to find them first.  Let's see.

16   It took some -- yeah.  I had to find them.  Talk them

17   into doing the interview.  That took a little while.

18   So that was at least another week.

19     Q.     You had to talk them into doing an

20   interview?

21     A.     Well, yeah.

22     Q.     What did that entail?

23     A.     Numerous -- a lot of messaging back and

24   forth.

25     Q.     There was a lot of messaging back and

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1    forth?

2        A.    Well, yeah.

3        Q.    **How did these messages take place?**

4        A.    We messaged -- let's see.  Messaged each

5    other on Twitter.

6        Q.    **Is that all of the messaging that took**

7    **place --**

8        A.    Yes.

9        Q.    **-- which constituted talking them into**

10   **doing the interview?**

11       A.    Mm-hmm, mm-hmm.

12       Q.    **During what time period did you have these**

13   **discussions?**

14       A.    It would have been early to mid October, up

15   until the time we met.

16       Q.    **Did you interface with personal Twitter**

17   **accounts or the QueerSatanic account?**

18       A.    I think QueerSatanic.  I believe it was

19   QueerSatanic.

20       Q.    **Was it only QueerSatanic, or did you also**

21   **interface with personal accounts?**

22       A.    I think it was only QueerSatanic -- I'm

23   trying to remember.  I don't remember.

24       Q.    **Would it refresh your --**

25       A.    I'm trying -- I just cannot.  What were you

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

 1   going to say?

 2        Q.    Would it refresh your recollection to

 3   review the messages?

 4        A.    Do you have them?

 5        Q.    I do not.  We'll have to subpoena them.

 6        A.    Just trying to remember.  Give me a moment.

 7   Well, I didn't have the personal name.  So I'll say

 8   the QueerSatanic account.

 9        Q.    Why did you have to talk them into doing an

10   interview with you?

11        A.    Well, they --

12              MS. TESORIERO:  Objection to form.

13        A.    I think they were frightened.

14        Q.    They were threatened by whom?

15        A.    Frightened.  Frightened.

16        Q.    Oh, frightened.  Why were they frightened?

17              MS. TESORIERO:  Objection.  Calls for

18   speculation.

19        A.    Well, they were being sued.  They were

20   being sued by you.

21        Q.    I don't understand the connection between

22   me suing them and their resistance to give you an

23   interview.  Could you please explain?

24        A.    They were not sure publicity would help

25   them or hurt them.

1      **Q.     And ultimately you persuaded them that it**

2  **would help them; correct?**

3            MS. TESORIERO:  Objection to form.

4      A.     I was able to do that.

5      **Q.     How did you go about persuading them of**

6  **that?**

7      A.     Let's see.  How did I?  I would have to

8  speculate.  I don't remember.

9      **Q.     Would it refresh your recollection to**

10  **review your social media messages with the**

11  **QueerSatanic account?**

12      A.     I don't have them right here with me.

13      **Q.     I understand that.  If you did have them**

14  **with you, would that refresh your recollection?**

15            MS. TESORIERO:  Objection to form.

16      A.     I'm sure it would.

17      **Q.     Do you still have the Jinx Strange e-mail**

18  **in front of you?**

19      A.     Yes.  It's right here.

20      **Q.     Could you please turn to the last page.  On**

21  **October 24, 2021, you write to Jinx Strange, quote,** ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

25      A.     Oh, here it is.  Right.



```
 1          Q.     Was that a contemporaneous -- I'll strike

 2    that and rephrase.

 3                 Did you write that sentence shortly after

 4    the interview, or was this many Tuesdays prior?

 5          A.     Okay.  If that was Sunday the 24th, then

 6    sounds like I interviewed them the Tuesday before.  So

 7    that would have been -- what? -- the 19th?  I don't

 8    have a calendar with me.

 9          Q.     19th sounds right.

10          A.     Okay.

11          Q.     So you e-mailed Jinx Strange.  Is it a

12    correct understanding that you e-mailed Jinx Strange

13    for the first time on October 24, 2021?

14          A.     Yes.

15          Q.     And then you see that he responds on the

16    same day; is that correct?

17          A.     Let's see here.  Yes, he did.

18          Q.     Did you receive any other information from

19    Jinx Strange than this e-mail?

20          A.     Well, he had some follow-ups after -- I

21    mean, he had a follow-up e-mail.  Just a second.  I

22    did get back to him later on, and then he had a

23    follow-up e-mail after that.

24          Q.     When was that relative to the piece being

25    published?
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

```
 1        A.    When was that?  Trying to remember.  I

 2   believe it was the day of.

 3        Q.    The day of the article being posted?

 4        A.    I think so.

 5        Q.    Before or after?

 6        A.    It would have been after.

 7        Q.    And to confirm my understanding, you were

 8   telling me that Jinx Strange e-mailed you the same day

 9   that the article came out with more information.

10   Correct?

11              MS. TESORIERO:  Objection to form.

12        A.    Excuse me.  I'm trying to remember.  I'll

13   say yes.

14              MR. KEZHAYA:  Let's go off record for a

15   second.

16              THE VIDEOGRAPHER:  We are now going off the

17   record.  The time is now 1:04 p.m.

18                  (Recess.)

19              THE VIDEOGRAPHER:  We are now back on the

20   record.  The time is now is 1:05 p.m.

21        Q.    Drawing attention to an e-mail that has

22   been Bates-stamped Duin 21, could you please read the

23   full body of the e-mail from Jinx to you, dated

24   October 29, which is right here.

25              MS. TESORIERO:  He's handing it to you.
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1    It's not there.

2                THE WITNESS:  Oh, here.  Full body.

3                MR. KEZHAYA:  The first e-mail.

4                MS. TESORIERO:  In the chain.  I'm sorry.

5    The top of the e-mail.

6         A.    Oh, the one paragraph?

**7         Q.    Yes, please.**

8         A.    [As read] ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

**16        Q.    Okay.  Other than this e-mail, did you**

**17   receive any other information from Jinx Strange?**

18        A.    I'm trying to -- wait.  The -- well --

**19        Q.    Correct?**

20        A.    I mean, if there were photos, he sent me

21   the photos.

**22        Q.    Correct, yes, but that was presumably**

**23   attached to this.**

24        A.    They should have been attached.

**25        Q.    That's fine.  I don't care about those**

Page 99

1    photos.

2         A.    All right.  No.  That was -- no, I did not.

3         **Q.    Did Jinx Strange ever give you any names of**

4    **individuals who have allegedly been sexually abused by**

5    **anyone in the course of TST services and then covered**

6    **up?**

7              MS. TESORIERO:  Objection to form.

8         A.    He said he was willing to, but I didn't ask

9    him.

10        **Q.    You did not ask him.  Why didn't you ask**

11   **him?**

12        A.    Because the article was mainly on the

13   lawsuit, and it was not on the -- it was not an

14   investigation into the sexual abuse or the finances or

15   the alt-right figures.  It wasn't on these various

16   permutations.  The article was on the QueerSatanic

17   people.

18        **Q.    Well, I mean, the article was about the**

19   **sexual abuse and cover-up plan, was it not?**

20             MS. TESORIERO:  Objection to form.

21        A.    No.  The article was on the lawsuit.

22        **Q.    Then why did you include the statement?**

23        A.    I included a lot of statements.

24        **Q.    Why didn't you include the subject**

25   **statement for which we are here today?**

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

```
 1        A.    Because it gave a general view of the
 2   various controversies surrounding The Satanic Temple.
 3        Q.    And you used the phrase -- well, let's --
 4              MR. KEZHAYA:  Are we on Exhibit 7 now?
 5              THE REPORTER:  8.
 6              MR. KEZHAYA:  I'm going to mark the subject
 7   article as Exhibit 8.  Did we already have it in here?
 8   I don't think so.
 9              Sara, do you already have a copy of the
10   article?
11              MS. TESORIERO:  Oh, a copy?  Yes, I'm
12   sorry.  I didn't know that was going to be an exhibit.
13   I have a copy of the article.  Is that Exhibit 8?  Do
14   you need it?
15              MR. KEZHAYA:  No.  I don't need it.
16              (Exhibit No. 8 was marked for
17              identification.)
18        Q.    Please review Exhibit 8.
19        A.    Yes.
20        Q.    Would you agree with me that that is a true
21   and correct copy of the article that you wrote?
22        A.    As far as I can tell.
23        Q.    At the top of page 8, you state [as read],
24   "He wrote, 'Accounts of sexual abuse being held up in
25   ways that were more than anecdotal.'"  And that's the
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 101

1     extent that I care about.

2           Do you see that?

3     A.    Yes, I do.

4     Q.    Why did you include that statement?

5     A.    It was part of a paragraph.  It was part of

6     a paragraph that had several statements in it.

7     Q.    There were many paragraphs that had many

8     statements in it by Jinx Strange.  Why --

9     A.    Yes.

10    Q.    -- did you include this particular

11    statement?

12    A.    Yes.  He gave me a very long e-mail.

13    Q.    Yes, he did.  And you went through that

14    e-mail, presumably, did you not?

15    A.    That's right.

16    Q.    And you found a choice selection from it;

17    correct?

18    A.    I selected several sentences and paragraphs

19    from it.

20    Q.    And why did you select those to the

21    exclusion of others?

22    A.    Well, Jinx had a lot of -- several of these

23    paragraphs -- all right.  I have to explain a little

24    bit about reporting.  A lot of things here, he had

25    references to many things that you would have to have

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 102

 1   additional explanations of who these people were and

 2   backgrounders.  And there was way too much background

 3   that you would have to explain what he was talking

 4   about on various people, various personalities.  And I

 5   was looking for more of -- paragraphs that explain

 6   more of a general feel of what -- his perception of

 7   what The Satanic Temple was about.  What he thought,

 8   what his experience was, what he was hearing from

 9   other people.  What I picked out was the best

10   sentences that he had that expressed his point of

11   view.

12       **Q.   Okay.  And earlier you testified that this**

13   **article was about the lawsuit; correct?**

14       A.   Yes.  It was about the lawsuit.  And --

15   yes, it was.

16       **Q.   Was that the only thing that this article**

17   **was about?**

18       A.   Well, obviously, also an explanation of the

19   Satanic -- parts of The Satanic Temple.

20       **Q.   Parts of the Satanic.  Please be more**

21   **particular.  What parts?**

22       A.   Let me explain to you.  Just a moment.

23   I'll get to it in just a moment.  Okay.  When Johnson

24   talks on page 7, he talks about TST's background.  So

25   I'm thinking, okay, background, and then I have -- you



1    know, is TST a religion?  Can you criticize it?

2    That's in the middle.  I quote "you" talking about the

3    defendants.  Then quote Johnson talking about the

4    background.  And so, okay, so what are people saying

5    about The Satanic Temple.  So, okay, what are people

6    saying.

7              So then I start asking other people, okay,

8    what are people saying.  I talked to the unofficial

9    biographer, Mr. Laycock.  Talked to him.  Talked to

10   Mr. Strange.  Talked to Ms. DeMeur.  Talked to Scott

11   Malphas.  These are the other two -- you know, we have

12   -- are not their true names, I know that.  Talked to

13   you.  Of course talked to Lucien.  And by that time it

14   was -- the article is running long enough.

15             So I wanted to kind of give a general

16   picture of what was more of a -- I wanted to give more

17   of a background of what was going on with The Satanic

18   Temple.  Kind of how it started.  The whole

19   mocumentary.  So I had to throw in a bit more details

20   about The Satanic Temple other than the lawsuit.  So

21   does that answer your question?

22        **Q.    How did you ascertain who you would talk to**

23   **and what degree of fact checking you were going to get**

24   **into?**

25             MS. TESORIERO:  Objection to form.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

 1      A.   Well, I believe it was Lucien who asked me

 2   to talk to Mr. Laycock, although I had heard of Mr.

 3   Laycock.  Obviously, you were the attorney, and

 4   Lucien.  Spent many hours talking about the view.

 5   Well, I spent some time talking -- I had several

 6   interactions with you, and a long interview with

 7   Mr. Greaves.  And a fairly decent interview with

 8   Mr. Laycock.  The Seattle -- talking person, the

 9   Seattle defendants, three out of the four.  The --

10   let's see.  Excuse me.  Okay.  And -- yeah.  And then

11   e-mailed two other people.  Oh, sorry.  Three other

12   people.

13           And then the second half of your question

14   was what?

15      Q.   How did you ascertain to what degree of

16   fact checking you were going to engage in?

17      A.   What degree of -- well, I mean, what degree

18   of fact checking?  I'm not sure what you mean by that.

19   Can you explain?

20      Q.   Do you have a definition in your mind of

21   what fact checking entails?

22      A.   I know what fact checking entails.

23      Q.   Please provide me your understanding of the

24   definition of --

25      A.   Well --



Page 105

```
 1              MS. TESORIERO:  Just make sure you let him

 2    finish his question.

 3        A.    Well, to make sure what the other person

 4    saying is true.  So, for instance, when interviewing

 5    Scott Malphas, I asked Mr. Greaves if what Mr. Malphas

 6    said was true.  So that was -- you know, I did

 7    contrast certain -- some people I checked against

 8    other people.  Others -- let's see.  There were times

 9    -- I mean, I would check -- some things I would check

10    on the internet to see if -- there were multiple

11    sources.  I did check various things to see if they

12    were -- like Mr. Laycock, if Mr. Laycock's book said

13    something versus -- unfortunately, Mr. Laycock's book

14    wasn't always correct.

15        Q.    Let me interject there.  What was incorrect

16    about Laycock's book?

17        A.    He had a date wrong.  Unfortunately, it

18    made it into the article.  That was one of the radio

19    podcasts.  I found that out later.  So...

20        Q.    Were there any other asserted factual

21    errors in Laycock's book?

22              MS. TESORIERO:  Objection to form.

23        A.    I have not been able to spend the time

24    looking.  That one I did find out later.  So, yes, I

25    thought Mr. Laycock's book was -- anyway, that was one
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 106

1    form of fact checking, because I did use his book as a

2    way of checking out some -- what people were telling

3    me, because I did trust it.

4           Let's see.  There were other articles

5    written about The Satanic Temple.  There was -- your

6    own website had much information on it, especially

7    about the beginnings of your -- of the movement.

8    And --

9      Q.    Interjecting.  My website?

10     A.    Excuse me.  The Satanic Temple website.  I

11   did also -- in terms of fact checking, I did spend a

12   lot of time trying to find out when I was -- for

13   instance, when I was questioning Mr. Greaves, like,

14   trying to get the year the movement started.

15   Sometimes it was very difficult in the literature of

16   the movement, when I was reading through it, to get

17   exact times and exact dates, whether it was 2013,

18   whether it was 2012.  That took a lot of time.  So I

19   spent quite a bit of time looking up things.  So, so,

20   yeah.  Compared various documents against each other.

21     Q.    Is that your full answer?

22     A.    It's enough.

23     Q.    Why did you ask Greaves about what Scott

24   Malphas had said?

25     A.    He had had a complaint about the orgies,



1    because I did ask about the whole -- I was curious

2    about the whole orgies/wolves event, or events.

3        **Q.    Please expand.  Why were you curious?**

4        A.    Well, one, did they really occur.  Was this

5    really true.  I mean -- and why would Mr. Malphas --

6    Mr. Malphas said that there was -- he told me that

7    there was some -- there was a case of statutory rape.

8    He also said that there was -- things had gotten so

9    out of hand that they had to give sex-positive

10   guidelines because things were -- various acts were

11   being committed that were against people's consent.

12           There were -- certain chapter heads were

13   being coerced into sexual against their will.  The

14   latter, I'm not saying that was during the orgies.

15   That was not during the orgies.  That was elsewhere.

16   Anyway, I was curious about -- anyway, the orgies was

17   -- I was curious about what happened during those.

18   Were they part of the religion?  Is this a Satanic

19   Temple thing?  Is it only The Satanic Temple that does

20   these?  What do roles have to do with it?  Is this

21   BDSM?  Is this made up?

22           And then so I got an actual invitation.

23   Like, where does this -- you know, I was -- and so he

24   explained, yeah, this was a thing.  And there was --

25   you know, we had quite a discussion about it.



Page 108

```
 1        Q.    Did Scott Malphas -- let me back up.  Did I

 2   understand you correctly that Scott Malphas alleged

 3   that rape had incurred inside of TST?

 4        A.    Yes.  That was part of his e-mail.

 5        Q.    That was part of his e-mail?

 6        A.    He mentioned statutory rape.

 7        Q.    He mentions what now?

 8        A.    He mentions -- I'm not pronouncing it real

 9   well -- statutory rape in his e-mail.

10        Q.    And did he give you any substantiating

11   information that in fact there was statutory rape?

12              MS. TESORIERO:  Objection to form.

13        A.    Did he what?  Say that again.

14        Q.    Did he give you any substantiating

15   information to prove up that, in fact, statutory rape

16   had occurred inside of TST?

17        A.    He didn't give me names or dates, no.

18        Q.    Didn't give you names, dates, witnesses.

19   Did he personally see it?

20              MS. TESORIERO:  Objection to form.

21        A.    I didn't ask him that question.

22        Q.    You asked no follow-up that he -- he levied

23   a serious allegation of rape occurring inside of an

24   organization and you ask no follow-up questions?

25              MS. TESORIERO:  Objection to form.
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1      Q.    Correct?

2      A.    He filed a complaint.

3      Q.    **Did you review the complaint?**

4      A.    Wait a minute.  I think he -- I believe he

5   sent me -- he sent me a copy of it.  I believe I --

6   wait a minute.  Trying to remember if I have a copy of

7   it or not.  I think -- yes.  He sent me a copy of it.

8   That should be in your documents.  Whether or not he

9   mentioned the rape part or not, I don't know.  I think

10   it might have been just about the orgies.

11               MR. KEZHAYA:  Can we go off the record,

12   please.

13               THE VIDEOGRAPHER:  We are now going off the

14   record.  The time is now 1:24 p.m.

15               (Recess.)

16               THE VIDEOGRAPHER:  We are now back on the

17   record.  The time is now 1:25 p.m.

18      Q.    **Do you still have a copy of this complaint?**

19      A.    Anything I have would have been in the

20   e-mails.

21      Q.    **Okay.  But you've made mention --**

22      A.    I made mention of it.  I thought it was in

23   the e-mails.  If it's not -- if she says it's not,

24   then it's not, but I'm just trying to remember.  God,

25   I thought he sent me a copy.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 110

 1                MS. TESORIERO:  Can we go back off the

 2    record for a second?

 3                MR. KEZHAYA:  Yes.

 4                THE VIDEOGRAPHER:  We are now going off the

 5    record.  The time is now 1:25 p.m.

 6                (Recess.)

 7                THE VIDEOGRAPHER:  We are now back on the

 8    record.  The time is now 1:26 p.m.

 **9        Q.    Did all of your communications with regard**

**10    to this article take place through your Newsweek**

**11    e-mail address?**

12        A.    The interviews with you and with Lucien

13    were on the phone.  Some of the -- well, they were

14    e-mail and on the phone.  I mean, the other ones were

15    e-mail interviews.  I mean -- yeah.  I did not -- I

16    was not on the phone.  I did not talk to the

17    Jinx/Scott/Salome on the phone.

**18        Q.    Let's back up a little bit.  You did not**

**19    talk to Scott Malphas on the phone; correct?**

20        A.    No.

**21        Q.    You did not talk to Jinx Strange on the**

**22    phone; correct?**

23        A.    No.

**24        Q.    You did not talk to Salome DeMeur on the**

**25    phone; correct?**

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 111

1      A.    No.

2      Q.    **You did talk to Lucien Greaves on the**

3   **phone; correct?**

4      A.    Yes.

5      Q.    **You did talk to me on the phone; correct?**

6      A.    Right.

7      Q.    **You did talk in person with the**

8   **QueerSatanic group; correct?**

9      A.    Yes.  And I talked with Mr. Laycock on the

10   phone.

11     Q.    **Did you talk to anyone else on the phone?**

12     A.    I'm trying to think who I talked with.  I

13   don't recall anyone else.

14     Q.    **Of the e-mail interviews, were they all**

15   **done through your Newsweek e-mail address?**

16     A.    Yes, they were.

17     Q.    **Did you receive this complaint through your**

18   **Newsweek e-mail address?**

19     A.    When you say "this complaint" --

20     Q.    **The Scott Malphas complaint that you**

21   **(inaudible) --**

22     A.    Yes.  It would have been through -- yes.  I

23   just thought if it's not in the documents that --

24   again, in the huge amount of documents submitted for

25   this case, then I -- then my memory is erroneous.  I

1    thought he sent me a copy, but if it's not in the

2    documents, then my memory is wrong then.

3         Q.    Okay.

4               MS. TESORIERO:  Matt, we can triple check

5    if we have the complaint.  I'm trying to confirm now,

6    but I don't want to interrupt the deposition, if it

7    was of one of the things that the judge did not order

8    us to produce after in camera.  So let me check.

9               MR. KEZHAYA:  Understanding her testimony

10   as stated, I think that's a very relevant document.

11              MS. TESORIERO:  I don't think -- I don't

12   know that we would object to producing it based on the

13   court order to, but let me go back.  Depends on what

14   attachments -- we received an attachment from you

15   after the last deposition.  So we'll check.

16              MR. KEZHAYA:  No problem.  For benefit of

17   the record, this is Duin4, 1 through 3.  We're going

18   to mark this as Exhibit 9.

19                   (Exhibit No. 9 was marked for

20                   identification.)

21        Q.    Could you please read the body of the

22   topmost -- well, let's back up a little bit.  The

23   topmost e-mail on this Exhibit 9, you wrote that

24   e-mail; correct?

25        A.    Yes.



1        Q.      Okay.  Please read the first sentence,

2    which includes a semicolon and second clause.

3        A.      Okay.  And can I explain it before I read

4    it?

5        Q.      First read it, please, and then explain it.

6        A.      ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

11       Q.      Please continue.

12       A.      She and I were editing it at the same time.

13   So there was a little bit of confusion.

14       Q.      I have a particular question about the

15   lead, but first, please continue on.  "However," et

16   cetera.

17       A.      Okay.

18                ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

22       Q.      Drawing attention to the statement, ██████████

███████████████████████████████████████████  What is a

24   lead?

25       A.      Oh, the lead sentence.  The first sentence



Page 114

```
 1    in the story is a lead sentence.
 2         Q.    And what is the importance of the lead?
 3               MS. TESORIERO:  Objection to form.
 4         A.    It is the sentence that draws in the reader
 5    to the story.
 6         Q.    And prior to you taking out the orgies
 7    mentioned, do you remember what it said?
 8               MS. TESORIERO:  Objection to form.
 9         A.    No.  This is two years ago.
10         Q.    The current first sentence is -- well, I
11    say "the current."  The ultimate first sentence should
12    be the first sentence on Exhibit 8; correct?
13         A.    Yes.  It would have been.
14         Q.    Could you please read it as it ended up
15    becoming?
16         A.    "Can you defame a religion, especially one
17    that doesn't believe in God, Satan, or the
18    supernatural?"
19         Q.    Okay.  So at some point prior to that, it
20    said something about orgies; is that correct?
21         A.    It must have.
22         Q.    And you took it out of the lead, but you,
23    later on, put it in somewhere later on down; is that
24    correct?
25         A.    Well, yeah.  It says here I added it back
```

Page 115

1    in a few graphs further down.

2        Q.    Drawing your attention back to page 8.

3    Near as I can find, first mention of the word -- well,

4    actually, let me back up here.  Strike that.

5            Drawing your attention to page 2, at the

6    very bottom of the first paragraph, it recites that --

7        A.    Page 2 of which document?

8        Q.    Page 2 of Exhibit 8.

9        A.    Oh, okay.

10       Q.    Please read -- at the end of the second

11   line begins "while digging."  Through the rest of the

12   paragraph, please read that sentence.

13       A.    Okay.  "While -- slowly, slowly.  "While

14   digging up facts for their defense, they've run into

15   other aggrieved Satanists around the country who have

16   a litany of complaints about the organization,

17   including allegations of sexually deviant gatherings

18   that, according to one TST memo, allow for 'orgies,

19   BDSM, fetish balls, ritual flogging, live ritual sex,

20   burlesque shows.'"

21       Q.    Now, drawing your attention to page 8,

22   under the bolded statements "Safe, sane and

23   consensual," you quote Scott Malphas and indicate that

24   -- drawing attention to the TST memo that you

25   mentioned just now, among the suggestions for its



Page 116

```
 1   observance was rituals with a mock sacrifice, orgies,

 2   BDSM asexual awareness, bodily autonomy and wolves.

 3   Correct?

 4       A.    Wait a minute.  Where are we?

 5       Q.    Page 8, three, four paragraphs down under

 6   "Safe, sane and consensual."

 7       A.    Okay.  Scott Malphas.

 8       Q.    Paragraph begins, "'Scott Malphas,'" and

 9   I'm quoting from the last sentence, "among the

10   suggestions," et cetera.

11       A.    Okay, okay.

12       Q.    You don't need to read that.  It's

13   adequately stated.

14       A.    And your question is?

15       Q.    That would be what you were mentioning

16   earlier when you --

17       A.    Right.

18       Q.    -- put it back down a few paragraphs below;

19   correct?

20       A.    Well, this is way -- no.  I mean, this is

21   way down.  This is the beginning of the story.  If I

22   had moved it down a few paragraphs, we're talking -- I

23   mean, page 2 would have been a few paragraphs, not

24   page 8.

25              MR. KEZHAYA:  Okay.  All right.  We've been
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1  going for a solid hour-and-change.  I think now is a

2  good time for a break.

3            THE VIDEOGRAPHER:  We are now going off the

4  record.  The time is now 1:37 p.m.

5            (Recess.)

6            THE VIDEOGRAPHER:  We are now back on the

7  record.  The time is now 1:45 p.m.

8            MR. KEZHAYA:  We are marking the next

9  exhibit.

10           (Exhibit No. 10 was marked for

11           identification.)

12      **Q.    Earlier, you made allegations of sexual**

13  **abuse and cover-up by Scott Malphas.  Do you remember**

14  **that?**

15           MS. TESORIERO:  Objection to form.

16      A.    Mm-hmm.

17      **Q.    Drawing your attention to page 2 of the**

18  **exhibit.**

19      A.    Oh, this one?

20      **Q.    Correct.  I believe you were making**

21  **reference to this paragraph a little bit more than**

22  **midway through, and the paragraph, "I had heard the**

23  **rumblings."  Is that paragraph what you were**

24  **mentioning earlier?**

25           MS. TESORIERO:  Page 2?

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 118

1                    MR. KEZHAYA:  Correct.

2        A.    You're asking if that's what I had in mind?

**3        Q.    Yes.**

4        A.    Actually, no.

**5        Q.    It was not?**

6        A.    No.  I wasn't even talking about Lucien's

7    private life.

**8        Q.    This is Scott Malphas.**

9        A.    I know Scott is talking about Lucien, but

10   you're asking what I was thinking?

**11       Q.    Correct.  You made mention that Scott**

**12   Malphas levied an accusation of coerced sexual**

**13   activity; correct?**

14       A.    I mean, he -- just a moment.  I don't think

15   he was -- I don't think he was referring to this

16   particular matter.

**17       Q.    Who is "he"?**

18       A.    Scott.  Just a moment.  Okay.  "I heard

19   rumblings."  Just a moment.  Just a moment.  Let me

20   make sure what paragraph.  Oh, okay, okay.  Wait a

21   minute.  Yes.  All right.  Okay.  Yes, it was that

22   paragraph, right.  You were going down about five

23   sentences, "the account of sexual assault, we're

24   looking into it."  All right.  This would be the

25   paragraph.

1      Q.    Okay.  And you don't know the details of

2   this alleged sexual assault; correct?

3      A.    No.

4      Q.    You did not ask any details about this

5   alleged sexual assault; correct?

6      A.    No.

7      Q.    The next sentence says, ███████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████   Do you see that?

11     A.    Oh, here it is.  Right.

12     Q.    You don't know who the individual is that

13  he's talking about; correct?

14     A.    No.

15     Q.    You don't have any information to expand

16  upon whatever this allegation is of this unknown

17  person using their authority to coerce potential

18  chapters leaders into having sex; correct?

19          MS. TESORIERO:  Objection to form.

20     A.    You're asking -- excuse me.  The question

21  is do I know?

22     Q.    Beyond the text of this paragraph, did you

23  perform any fact investigation into what Scott Malphas

24  is saying here?

25     A.    I didn't ask him to elaborate, no.



Page 120

1      Q.    And you don't know Scott Malphas's true

2   identity; correct?

3      A.    He didn't give it to me.

4      Q.    No one at Newsweek knows Scott Malphas's

5   true identity; right?

6            MS. TESORIERO:  Objection.  Calls for

7   speculation.

8      Q.    To the best of your knowledge, no one at

9   Newsweek knows Scott Malphas's true identity; correct?

10           MS. TESORIERO:  Same objection.

11     A.    That is correct.

12     Q.    To the best of your knowledge, no one at

13  Newsweek has any information as to the truth or

14  falsity about what he's alleging in this paragraph;

15  correct?

16           MS. TESORIERO:  Objection to form.  Calls

17  for speculation.

18     A.    Say that again, please.

19     Q.    To the best of your knowledge, no one at

20  Newsweek has any information about the truth or

21  falsity of the allegations in this paragraph; correct?

22           MS. TESORIERO:  Objection to form.

23     A.    I'll say no.

24     Q.    Not correct?  So you do have --

25     A.    No.  I didn't say I did.  I said --

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 121

1        Q.      Let's phrase the question --

2        A.      Yeah.  Let's phrase the question a

3    different way.

4        Q.      **Do you know of anyone at Newsweek who**

5    **performed any fact investigation into this paragraph?**

6        A.      No.  I don't know of anyone who performed a

7    fact investigation into this paragraph.

8        Q.      **Other than you, did anyone at Newsweek have**

9    **any contact with Scott Malphas?**

10               MS. TESORIERO:  Objection to form.

11       A.      No.

12       Q.      **You hesitate with "No."  Is there someone**

13   **else that you know of who has had --**

14       A.      No.  No.  There is no one else.

15       Q.      **Okay.  And likewise, for the allegation in**

16   **the Jinx Strange e-mail quoted in the article that**

17   **there are accounts of sexual abuse being covered up,**

18   **you personally did not investigate that at all;**

19   **correct?**

20               MS. TESORIERO:  Objection to form.

21       A.      Did I personally investigate it?

22       Q.      **Correct.**

23       A.      I found what he said inherently plausible

24   considering the account from the Seattle quartet, or

25   the interviews with the Seattle people that -- and the

Page 122

1  testimony -- well, not testimony -- the account from

2  Scott that there was of these -- the reason for the

3  sex-positive guidelines -- that what Jinx was saying

4  was true.

5       **Q.     You found it inherently plausible.  What**

6  **did you do to foreclose the possibility that he was**

7  **lying?**

8            MS. TESORIERO:  Objection to form.

9       A.    Why would he lie?

10      **Q.     What did you do to foreclose the**

11 **possibility that he was lying?**

12           MS. TESORIERO:  Objection to form.

13      A.    What did I do to foreclose?

14      **Q.     Stated another --**

15      A.    If someone is lying, you know, like, if you

16 think they're lying, for instance, like, their links

17 don't check out.  They don't exist.  First of all, you

18 check to make sure that they're a real person.  I

19 mean, everything checked out.  His -- what he's -- I

20 mean, I knew, for instance, what he was -- like, the

21 sentence before that there was some connections to the

22 alt-right or figures.  I certainly had heard many

23 complaints about that, even before the pictures showed

24 up after the article, which I did not go into for the

25 article.



November 16, 2023

THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 123

1           In terms of there were -- I knew there were

2    complaints about finances.  Even Doug Laycock -- we're

3    talking about the sentence afterwards.  Doug Laycock

4    went into that for his book.  So, you know, Jinx had

5    given kind of a general -- it was a general read of

6    The Satanic Temple.  And it was his -- it was how he

7    saw the state of the religion.  And from my other

8    interviews with people, I found it plausible he was

9    correct.

10        Q.    Did you ask Lucien Greaves about coerced

11   sexual activity and cover-up within The Satanic

12   Temple?

13        A.    I asked him -- I certainly asked him in

14   connection with the orgies, yes.

15        Q.    Not in connection with the orgies.  Did you

16   ask him specifically about Jinx Strange's comment?

17        A.    No.  I did not ask him about Jinx Strange's

18   comment.

19        Q.    Why not?

20        A.    Why not?  I didn't -- I felt I had asked

21   Lucien plenty of questions.  And right below that, I

22   had a quote from Lucien that basically denied all

23   these accusations.

24        Q.    Did you confront Lucien Greaves with the

25   allegation that there are accounts of sexual abuse and

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 124

1    cover-up within The Satanic Temple?

2             MS. TESORIERO:  Objection.  Asked and

3    answered.

4       A.    Did I confront him?  Did I confront him?

5    Trying to remember.  I don't believe I did.

6       Q.    So Lucien Greaves's comment in his e-mails

7    could not possibly have related to something that you

8    did not confront him with.  You would agree with me

9    there; correct?

10            MS. TESORIERO:  Objection to form.

11      A.    I disagree.

12      Q.    You disagree?

13      A.    I disagree.

14      Q.    Please explain your basis for disagreeing.

15      A.    His quote here -- his quote underneath, it

16   covered the -- all of Jinx's accusations.  He says,

17   "We are accused of all sorts of nefarious things."  I

18   covered it.  I covered what Jinx was saying.

19      Q.    Did you ever even mention the word Jinx

20   Strange -- the name "Jinx Strange" to Lucien Greaves?

21      A.    I believe I talked to -- I may have talked

22   to Jinx maybe after I talked to Lucien.

23      Q.    So you didn't even talk to Jinx Strange and

24   then talk to Lucien, and yet you're telling me that

25   Lucien's comment pertains to Jinx Strange's



Page 125

1     allegations, under oath?

2              MS. TESORIERO:  Objection to form.

3        A.    I don't know.

4        Q.    You don't know?

5        A.    I don't know.

6        Q.    You don't know what your testimony is?

7        A.    I know what my testimony is.

8        Q.    Please restate your testimony.

9              MS. TESORIERO:  What testimony are you

10   asking her to restate?

11             MR. KEZHAYA:  The subject testimony that

12   we're talking about.

13             MS. TESORIERO:  You've asked her several

14   questions.  Could you please just clarify for her what

15   you're asking her to restate, or generally.

16       Q.    Your testimony is that after you talked to

17   Lucien Greaves you talked to Jinx Strange, and Lucien

18   Greaves's commentary pertains to Jinx Strange?

19       A.    I think -- actually, I think Lucien

20   Greaves's commentary pertains to Jinx Strange's

21   accusations.

22       Q.    Based on what?

23       A.    Because -- what do you mean "based on

24   what"?

25       Q.    Well, seeing as how you didn't mention Jinx

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

 1    Strange or the allegations to Lucien Greaves, I find

 2    it very difficult to understand how Lucien Greaves's

 3    comment could have any pertinence to Jinx Strange's

 4    allegations.

 5         A.    I don't see how --

 6               THE REPORTER:  Please.  I need to hear the

 7    end of the question.

 8               MR. KEZHAYA:  Jinx Strange or Jinx

 9    Strange's allegation.

10               MS. TESORIERO:  Are you asking her a

11    question?

12               MR. KEZHAYA:  I'm asking her to explain

13    what she's -- where she's coming from with her

14    testimony.

15               MS. TESORIERO:  Objection.  Asked and

16    answered.

17         A.    The way -- the way I constructed the

18    article is that the -- okay.  Jinx gave -- Jinx had

19    several things to say about the organization, the

20    alt-right, the sexual abuse, the finances.  And I had

21    Lucien giving a general denial about -- a general

22    denial.  I did not feel he -- Lucien's general

23    statement had to address every single thing

24    specifically.

25         Q.    Why did you have him address anything in



1    particular then?

2              MS. TESORIERO:  Objection to form.

3        A.    Why did I have Lucien address anything in

4    particular?

5        Q.    **Why did you ask Lucien any particular**

6    **questions if you felt like a general denial of any**

7    **nefarious act is adequate for purposes of creating a**

8    **fair, balanced article?**

9        A.    I asked Lucien direct questions on other

10   matters.  I mean, he'd direct the answers to many

11   other questions, which he gave -- he had more than

12   enough -- I gave him more than enough space in the

13   article to give plenty of answers to my questions.

14   And he gave a fair defense of many things, for

15   instance -- and, again, more the whole orgies matter.

16   So I felt the paragraph was a defense of the -- that

17   matched the Jinx quote.  And I was -- that it was a

18   fair rebuttal.

19       Q.    **Even though you never talked to Lucien**

20   **Greaves after Jinx Strange; correct?**

21       A.    Yes.  I did feel it, yeah.

22       Q.    **And you constructed the article to make it**

23   **appear that way; correct?**

24             MS. TESORIERO:  Objection.  Form.  Appear

25   what way?

Page 128

```
 1        A.    Appear?
 2        Q.    You testified earlier:  I constructed the
 3   article to make it appear as if Lucien Greaves said --
 4        A.    No.
 5        Q.    -- generally denied everything that --
 6              (Cross talk.)
 7              MS. TESORIERO:  Objection.
 8   Mischaracterizes her testimony.
 9        A.    That's a lie.
10        Q.    Oh.  So then --
11        A.    That's not true.
12        Q.    -- you don't consider that general denial
13   to be applicable to Jinx Strange's testimony.
14        A.    It's applicable but --
15              MS. TESORIERO:  Wait.  Let him finish his
16   question.
17        A.    Okay.  You're putting words in my mouth
18   that aren't true.  Okay.  You can -- I'm trying to
19   think of how to word this.  Wait a minute.
20              In the newspaper article -- I feel I have
21   to explain how one puts together newspaper articles.
22   Okay.  You can have a person's quotes.  You can have
23   another person's quotes underneath them.  They don't
24   have to necessarily be, you know, like, directly --
25   like, you talked to person A, and then you directly
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 129

```
 1   talked to person B right afterwards.  You can have --
 2   you know, you can have them from separate
 3   conversations at different times.  So if I have a
 4   quote from Lucien that applies to various accusations
 5   that people make to The Satanic Temple, I have the
 6   right to put that in under a Jinx quote no matter when
 7   Lucien said it.
 8        Q.    Would you agree with me that the accusation
 9   that TST engages in sexual abuse and cover-up is
10   serious?
11             MS. TESORIERO:  Objection to form.
12        A.    Well, sure.  That's what kind of got the
13   Seattle people in trouble; right?
14        Q.    Would you agree with me that writing an
15   article that states TST engages in sexual abuse and
16   cover-up is a criminal allegation?
17             MS. TESORIERO:  Objection to form.  That
18   misrepresents the article and calls for a legal
19   conclusion.
20        A.    Okay.  Can you please restate that.
21        Q.    Is sex abuse a crime?
22        A.    I believe so.
23        Q.    Is covering up sex abuse also a crime?
24             MS. TESORIERO:  Objection.  Form.  She's
25   not a lawyer.
```



```
 1        A.    So what question do I have to answer?
 2        Q.    All of them, until you are instructed not
 3   to.
 4              MS. TESORIERO:  Repeat the question.
 5        A.    Yeah.  One second.
 6              MS. TESORIERO:  Let's get the pending
 7   question on the record.  Would you please repeat the
 8   question.
 9        Q.    Is covering up sexual abuse a crime?
10              MS. TESORIERO:  Objection.  Calls for a
11   legal conclusion.
12              You can answer.
13        A.    Is it a crime?  Is covering up sexual abuse
14   a crime?
15        Q.    Correct.
16        A.    I don't know.
17        Q.    But sex abuse is definitely a crime?
18        A.    Sex abuse is a crime.  Covering up, I don't
19   know.
20        Q.    So making the allegation that TST engages
21   in criminal activity is serious.  You agree with that;
22   correct?
23              MS. TESORIERO:  Objection to form.
24   Mischaracterizes prior testimony.
25        A.    Okay.  I do not -- where do I -- did I say
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1    TST was engaging in criminal activity?

2        **Q.    As a matter of fact, you did.  You wrote**

3    **the article, did you not?**

4            MS. TESORIERO:  Objection.

5    Mischaracterizes the article statement.

6        A.    I did not say that.

7        **Q.    Oh, you did not write the article?**

8            MS. TESORIERO:  Objection.

9        A.    I did write the article.

10       **Q.    You didn't include the quote in the**

11   **article?**

12           MS. TESORIERO:  Objection to form.  Give me

13   a second to object and then you can answer.

14       **Q.    The subject quote.**

15           MR. KEZHAYA:  You can just say "Object to

16   form" and it's taken subject to that.

17           MS. TESORIERO:  I understand, but even

18   "object to form" was getting it mixed in between.  I

19   just want to let the court reporter get "objection to

20   form."

21           I believe the last question was did -- you

22   state the last question.

23       **Q.    Please go to page 8.**

24       A.    Okay.

25       **Q.    First line, "He wrote," quote -- read the**

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1   first sentence?

2       A.      "'Accounts of sexual abuse being covered up

3   in ways that were more than anecdotal.'"

4       Q.      Did you write that sentence?

5       A.      Yes, I did.

6       Q.      Did you publish that sentence under

7   Newsweek?

8       A.      That's right.

9       Q.      So you would agree with me that you wrote,

10  in fact, TST engages in cover-up of sexual abuse?

11              MS. TESORIERO:  Objection.  That is not

12  what it says.

13              MR. KEZHAYA:  I'm not quoting it verbatim.

14      Q.      You would agree with me that that's what

15  the text is; correct?

16              MS. TESORIERO:  Objection.  You just had

17  said you weren't quoting verbatim and then asked her

18  to agree that's the text.

19      Q.      That's the substance of the accusation, is

20  it not?

21              MS. TESORIERO:  Objection.  What are -- do

22  you want her to read the quote?  Are you asking her if

23  she wrote it?  She's testified that she wrote it.

24              MR. KEZHAYA:  Well, actually, she's

25  testified both ways, so I'm trying to get --

Moburg Reporting
206-622-3110
MOBURG
REPORTING
33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 133

```
 1                    MS. TESORIERO:  No.  You tried to get her

 2     to say that it was a criminal activity, which is not

 3     the words in the article.

 4                    MR. KEZHAYA:  This is --

 5                    MS. TESORIERO:  You're harassing the

 6     witness.

 7                    MR. KEZHAYA:  This is not harassing.

 8                    MS. TESORIERO:  Yes.  It is harassing the

 9     witness.  This not the trial.  Ask her the question

10     again, let her give an answer, and stop badgering her

11     about it.

12                    MR. KEZHAYA:  This is not badgering.  I

13     disagree with that line of argument.

14         Q.    You wrote the quote.  You didn't look into

15     it.  Correct or incorrect?

16                    MS. TESORIERO:  Objection to form.  Are you

17     asking her if she wrote it or looked into it?

18                    MR. KEZHAYA:  Both.  Those are both true

19     statements.

20                    MS. TESORIERO:  It's a compound question.

21     Ask her one at a time.

22         Q.    You wrote the article; correct?

23         A.    I wrote the article.

24         Q.    That statement is in the article; correct?

25         A.    Yes.  That statement is in the article.
```

Page 134

```
 1       Q.    And that's not a rhetorical accusation.
 2   You are, in fact, accusing TST of sexual abuse and
 3   cover-up?
 4             MS. TESORIERO:  Objection.  Form.
 5       A.    I'm being put into a corner.  I'm getting
 6   --
 7       Q.    It's a yes/no question, Julia.
 8       A.    It doesn't sound like it to me.
 9       Q.    You can say "yes, because," or "no,
10   because," if it makes you feel better.
11       A.    You're asking me if I'm -- if I'm accusing
12   TST.  Wait a minute.  I am quoting someone.  I'm
13   quoting someone.
14       Q.    And yet --
15       A.    You're asking me if I'm accusing them.  I'm
16   not accusing anybody of anything.
17       Q.    You found it inherently plausible, you
18   testified earlier?
19       A.    I ran the quote because -- I wouldn't run
20   -- I wouldn't run a quote if someone said the sky was,
21   you know, orange or something.
22       Q.    Why not?
23       A.    I mean, I found the -- the witness was
24   inherently plausible.  I will -- but it was a claim.
25   So -- but I personally am not accusing TST of
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

```
 1   anything.
 2        Q.    It was a claim that you found inherently
 3   plausible and you uncritically published it in a
 4   publication that more than one in five Americans read;
 5   correct?
 6             MS. TESORIERO:  Objection to form.  There's
 7   like five questions in there.
 8        Q.    Did you critically publish it?
 9             MS. TESORIERO:  Objection to form.
10        Q.    Did you analyze whatever sexual abuse is
11   and whatever cover-up is?  Did you ask for
12   particulars?
13             MS. TESORIERO:  Objection to form.
14        A.    I'm going to stay with what I originally
15   said.  I'm going to stick with that.
16        Q.    I don't care what you're sticking with.
17   Did you or did you not ask for any particulars about
18   what sexual abuse is?
19        A.    I did not ask -- did I ask him?
20        Q.    Did you ask anyone?
21        A.    What do you mean did I ask anyone?
22        Q.    Did you ask anyone what particular sexual
23   --
24        A.    I think the best way --
25             MS. TESORIERO:  Let him finish his
```



Page 136

1    question.

2        Q.    Julia, I know things are getting heated,

3    but you need to led me finish the question.

4            MS. TESORIERO:  You need to let her finish

5    her answers, too.

6            MR. KEZHAYA:  Fair.

7        A.    Did I ask anyone?  Anyone to be 7 billion

8    people?  I mean --

9        Q.    Well, did you ask anyone on the face of the

10   planet what sexual abuse and cover-up means in the

11   context of this here quote?

12           MS. TESORIERO:  Objection to form.

13       A.    Okay.  I'll say no to that one.  All right?

14       Q.    Thank you.

15           (Exhibit Nos. 11 and 12 were marked for

16            identification.)

17       A.    There's two here.

18       Q.    There's two, Exhibit 11 and Exhibit 12.

19       A.    Is one of them 10?

20       Q.    I believe 10 was previously introduced.

21           MS. TESORIERO:  I think 10 might have been

22   just sitting in front of you.

23           THE WITNESS:  All right.

24       Q.    Do you have Exhibit 11 in front of you?

25       A.    Yes, I do.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 137

1      Q.    At the bottom right there's a Bates stamp.

2    Would you please read that into the record?

3      A.    Are you talking the date?

4      Q.    The Bates stamp.  The text at the very

5    bottom.

6      A.    Newsweek 032?  Are you talking about that?

7      Q.    Okay.  So for benefit of clarity, Exhibit

8    11 is Newsweek 032; correct?

9      A.    Yes.

10     Q.    Exhibit 12, please read the first Bates

11   stamp on that.

12     A.    Newsweek 065.

13           MR. KEZHAYA:  I don't think I have it in

14   here, which is surprising.  Bear with me just a second

15   as I find it.

16     Q.    On Exhibit 11 Lucien Greaves poses a series

17   of questions to you, does he not?

18     A.    The one with "I find it remarkable"?

19     Q.    Yes.

20     A.    Yes.  Wait a minute.  Actually, actually,

21   wait a minute.  The series of questions was more on

22   Exhibit 12.

23           MR. KEZHAYA:  Let's go off the record for a

24   second.

25           THE VIDEOGRAPHER:  We are now going off the

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 138

1    record.  The time is now 2:13 p.m.

2                 (Recess.)

3                 THE VIDEOGRAPHER:  We are now back on the

4    record.  The time is now 2:15 p.m.

5         Q.    Drawing your attention to Exhibit 11,

6    Lucien Greaves states, "Nor is there any truth to the

7    claim that we've covered up sexual abuse."

8                 Do you see that?

9         A.    Mm-hmm.

10        Q.    Did you add that statement into the article

11   at any point?

12        A.    Wait a minute.  Well, that was after the

13   article ran.

14        Q.    And you are capable of adding an article

15   after the fact; correct?

16                MS. TESORIERO:  Objection to form.

17        A.    If I add something I have to go through --

18   if I change the article in any way, I have to go

19   through the -- some -- I have to okay that through

20   Nancy or a supervisor.  That means if I'm making a

21   correction or making an addition and the -- nothing

22   was touched in the article.

23        Q.    Nothing was touched in the article?

24        A.    I mean, there was -- in other words, there

25   wasn't -- there was no quotes added to it.  Okay.



Page 139

1    You're asking me why I didn't add this as, like, a

2    clarification of some sort?

3        **Q.    I'm asking "whether" to start.  Whether you**

4    **added any clarification.**

5        A.    I didn't add this to the article, no.

6        **Q.    Why not?**

7        A.    Why not?  There was -- let's see.  I'm

8    trying to remember.  Excuse me.  I am trying to

9    remember back.  I think he wanted to contact -- he

10   asked about contacting my editor.  And I'm trying to

11   remember if I e-mailed -- no.  I don't think I

12   e-mailed him back.  I'm trying to remember what

13   happened here.  Excuse me.  Give me one more moment.

14          So you're asking -- okay.  You're asking me

15   why we did not run a correction or a clarification?

16       **Q.    Why did you not run an addition that**

17   **specifically took issue with the subject statement**

18   **upon which we are all here today?**

19          MS. TESORIERO:  And I'm not -- I'm just

20   going to object to privilege.

21          You can answer, but don't disclose any

22   conversations you had with counsel.

23          THE WITNESS:  Right.

24       A.    I would say that was a decision that was --

25   that was something way higher up than me.  And let's

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 140

 1    just say it was a decision that -- I'm trying -- I'm

 2    trying to remember what the interior discussions were,

 3    excuse me, or if there were -- what they were and if

 4    they were.  Excuse me.  And I just can't remember.

 5    I'm sorry, I don't remember.  But anyway, I know we

 6    didn't.

 7        **Q.    I know that you didn't.  You've already**

 8    **testified to that.  I'm asking why not.**

 9            MS. TESORIERO:  Objection.  Asked and

10    answered.

11    **    Q.    Let's unpack it slightly.  Did you suggest**

12    **that it be added?**

13        A.    I did not suggest this be added, no, not

14    specifically.

15    **    Q.    And when you say "this," we're particularly**

16    **talking about the specific denial of the specific**

17    **statement upon which we're all here today; correct?**

18        A.    Right, right.  Although, I mean -- I mean,

19    he had a whole raft of objections.  I mean, he sent me

20    quite a long letter.

21    **    Q.    Who made the decision to not include it?**

22    **You said it was made up -- way higher up than you.**

23            MS. TESORIERO:  Objection.  Calls for

24    speculation.

25        A.    I'm trying to think.  I'd say Nancy.



Page 141

1      Q.     Nancy made that decision?

2      A.     I believe so.

3      Q.     Did you have any discussions with Nancy

4   about Greaves's objections to the article?

5      A.     Oh, there was -- everything got -- wait a

6   minute.  I -- I'm trying to remember.  Just a moment.

7             MS. TESORIERO:  I want to caution you not

8   to discuss anything that involved discussions with

9   counsel.

10             THE WITNESS:  Right.  I understand that.

11   And I believe everything, quite frankly, from then on

12   was CC'd to counsel.  So I'm going to have to -- I am

13   going to have to not answer that question.

14      Q.     Okay.  Without telling me what was said,

15   when did these discussions take place?

16      A.     I mean, they would have been after the

17   publication of the article.

18      Q.     Who all were involved in the discussions?

19   Again, do not tell me anything that was said.

20             MS. TESORIERO:  You can answer to the best

21   of your recollection.

22      A.     Let me think.  Probably -- other than

23   Nancy, yeah.  I'd -- and CC'd -- I can't remember

24   anyone else other than Nancy.

25      Q.     It was only Nancy?

Page 142

```
 1        A.    No.  I can't remember -- no, no.  But I
 2   can't remember anybody else other than Nancy.  I'm
 3   just trying to remember.
 4        Q.    I'm not hearing that there were any lawyers
 5   CC'd on here.  So this does not sound like it's
 6   attorney-client privileged.
 7        A.    No.  Okay.  I -- okay.  Most reporters
 8   aren't told who the lawyers are.  Okay?  But we can CC
 9   things to legal counsel.  That is our -- I mean, but
10   we don't have to know the actual name of the lawyer.
11   Okay?
12        Q.    You have not testified that lawyers were
13   CC'd.
14        A.    Yes.  I just say -- I said counsel.  Wait a
15   minute.  You're tricking me, and I don't like that.
16   We can CC counsel.  All right?
17        Q.    What is the e-mail address for counsel?
18              MS. TESORIERO:  Objection to form.
19        A.    I don't have to answer that.
20        Q.    I actually do want to know this because if
21   you're CC'g counsel --
22        A.    No.  I don't have to --
23              MS. TESORIERO:  How does -- she doesn't
24   have to answer.  She doesn't know the counsel.  She's
25   testified that counsel was on there.  I'm representing
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 143

1    to you that there were privileged communications.

2            MR. KEZHAYA:  We have not been provided a

3    privilege log that details the "when" and the "who"

4    and the "what" was described.  So it sounds like

5    there's some information that has not been provided.

6            MS. TESORIERO:  No.  This is after the

7    article had been published.  This was --

8            MR. KEZHAYA:  I did not put time

9    limitations of up until the article was published with

10   regard to the statements about TST.

11           MS. TESORIERO:  Do you want to stay on the

12   record?

13           MR. KEZHAYA:  Yes.

14           MS. TESORIERO:  The statement about -- I

15   mean, anything after the article was published

16   couldn't possibly have gone to background, state of

17   mind, anything for the article statement.  This is

18   after it was published.  Counsel was involved.  This

19   was preparation for litigation.  How is that relevant

20   to the factual research, possible bias, or any of

21   those topics, as the article was written and

22   published?

23           MR. KEZHAYA:  I cited in the motion to

24   dismiss the case that a refusal to correct is

25   intendancy to prove actual malice.  Actual malice is a



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 144

1    defense in this case.

2            MS. TESORIERO:  But the article had already

3    been published.

4            MR. KEZHAYA:  Correct.  A correction could

5    happen after the fact.  She just testified that that's

6    the case.

7            MS. TESORIERO:  You sent a demand letter

8    the next day.

9            MR. KEZHAYA:  Yeah.  Well, that was timely.

10   What do you want from me?  I mean, this was a big deal

11   to the client.

12           MS. TESORIERO:  No, of course.  I'm saying,

13   but then of course counsel got involved.  So at that

14   point it was no longer a -- it was no longer an

15   editorial decision.  Legal was involved.

16           MR. KEZHAYA:  I want her to testify to

17   that.

18           MS. TESORIERO:  Okay.  But I'm pointing out

19   that just because she can't remember the counsel

20   e-mail, that's not grounds for challenging her to

21   answer questions that are privileged.

22           MR. KEZHAYA:  To be clear, I'm trying to

23   establish the privilege because until she says legal

24   was CC'd --

25           MS. TESORIERO:  She said legal was CC'd.



Page 145

```
1              MR. KEZHAYA:  I didn't hear any names.

2              MS. TESORIERO:  She said "counsel."  You

3    don't need to identify specific names.

4              MR. KEZHAYA:  I mean, that's pretty

5    ordinary for a privilege log is the who all --

6              MS. TESORIERO:  She doesn't produce the

7    privilege log.  We produce a privilege log.

8              MR. KEZHAYA:  And you didn't produce a

9    privilege log.

10             MS. TESORIERO:  Because none of the --

11   we've objected to producing anything that does not go

12   to state of mind or factual background to the article

13   statement.

14             MR. KEZHAYA:  Okay.  This is going a little

15   bit outside the scope of the dep, but we can address

16   this in subsequent --

17             MS. TESORIERO:  Sure.  It sounds like this

18   is about documents.

19             MR. KEZHAYA:  Well, I'm trying to figure

20   out what-all documents might still be out there.
```

**21     Q.    (By Mr. Kezhaya) Drawing your attention**

**22   back to the demand for a correction you posted by**

**23   Lucien.**

```
24      A.    Back on record?
```

**25     Q.    We've been on the record.**

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 146

```
 1        A.    Oh, we've been on the record.
 2        Q.    Drawing your attention back to that.  There
 3   were discussions that took place after the article was
 4   posted; correct?
 5        A.    Just a minute.  I was in Seattle.  They're
 6   in New York.  Yeah.  There was some discussions, yes.
 7        Q.    Were these discussions telephonic?  In
 8   Person?  E-mail?  Or a mix of the above?
 9        A.    I believe they were -- I believe they were
10   e-mail.
11        Q.    Okay.  Were they done through Slack at all?
12              THE REPORTER:  Slack, et al.?
13              MR. KEZHAYA:  "Slack at all."
14        A.    No.
15        Q.    Did you ever use Slack?
16        A.    Not in connection with this.  Not to -- not
17   to discuss this article.
18        Q.    But you used Slack otherwise?
19        A.    All employees.  We -- Slack was an employee
20   method of communication for a time at Newsweek, and
21   then they changed it to another employee -- they
22   changed it to Microsoft or something.
23        Q.    So during the month of September and
24   October 2021, you used Slack; correct?
25        A.    Yes, I used Slack.
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 147

1       Q.      And your testimony is you did not use Slack

2    to talk about this article at all; correct?

3       A.      No, I did not.

4       Q.      You did not use Slack to talk about The

5    Satanic Temple at all; correct?

6       A.      No, I did not.

7       Q.      Why not?

8              MS. TESORIERO:  Objection to form.

9       A.      Well, one, okay, it's a generational thing.

10   I don't like using Slack.  Okay?  It's -- I don't like

11   it.  I don't use Slack very often.  I use e-mail.

12      Q.      But you did use Slack?

13      A.      When I had -- if someone -- rarely.  If

14   someone communicated with me, but I usually used

15   e-mail to communicate with other employees, but I

16   rarely -- if I used -- there was certain things that

17   would come over on various topics.

18      Q.      But especially not this one?

19      A.      This one I wasn't usually really

20   communicating.  I mean, you've got all the

21   communications that we used.  They were via e-mail,

22   not Slack.

23      Q.      What is special about this article that you

24   talked about Slack about everything else except for

25   this?

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 148

```
 1              MS. TESORIERO:  Objection.  That's not what
 2    he said.
 3         A.   No, I didn't.  No, I didn't.  I didn't use
 4    Slack.  I didn't use Slack via -- I didn't tend to use
 5    Slack on any articles.
 6         Q.   What did you use Slack for then?
 7         A.   Slack is usually -- it's like a chitchat
 8    between employees on -- I don't remember.  It's been
 9    two years ago.  You know, "What are you eating for
10    lunch?"
11         Q.   Well, you're testifying that you definitely
12    did not use it, and now you're testifying that you
13    don't recall.  Those are two mutually exclusive
14    answers.
15              MS. TESORIERO:  Objection to form.
16         A.   This is ridiculous.
17         Q.   So which is it?  Did you not use it or --
18    you recall that you did not use it, or you don't
19    recall whether you used it?  Those are two very
20    different answers.
21              MS. TESORIERO:  Objection.  Asked and
22    answered.
23              MR. KEZHAYA:  It's not asked and answered.
24              MS. TESORIERO:  You asked her if she used
25    it for the article.  Yes, she used it generally.
```

1    She's answered your question.  You're badgering the

2    witness again.

3              MR. KEZHAYA:  This is not badgering.

4              MS. TESORIERO:  It is.  You're repeating

5    the question several times.  It's the definition of

6    badgering the witness.

7         A.   I did not --

8              MR. KEZHAYA:  When she gives me two

9    different mutually exclusive answers, of course --

10             MS. TESORIERO:  They aren't mutually

11   exclusive.  You said do you use it generally.  She

12   said yes.  You said did you use it with this article.

13   She said no.  Move on.

14        A.   I said no.  I did not use it for this

15   article.

16             MR. KEZHAYA:  Because she says I don't

17   recall, and then she says no.

18             MS. TESORIERO:  You asked her what do you

19   talk about in chitchat.  She said I don't recall the

20   chitchat.

21        A.   I repeat.  I did not use it for this

22   article.

23        **Q.   You definitely recall that you did not use**

24   **it for this article?**

25        A.   No.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 150

1      **Q.     But you don't recall when you used it**

2   **otherwise.   That's your testimony; right?**

3            MS. TESORIERO:   Objection to form.

4      A.     God in heaven.   No.   I don't recall.   I

5   mean, I rarely used it.   And I told you, it was like

6   -- I mean, no.   I'm just going to say I don't recall.

7   I'm sick and tired of this.   I mean, it is harassing

8   me.

9      **Q.     This is not harassment.**

10     A.     Yes, it is.

11     **Q.     You-all can take it to the judge if you**

12  **think this is harassment, but when you I definitely**

13  **did not and also "I don't recall," I'm just telling**

14  **you right now this is (inaudible) --**

15           MS. TESORIERO:   Please don't talk to my

16  witness.   Ask her a question and let's move on.

17           MR. KEZHAYA:   Fair.

18     **Q.     Earlier you testified that you had how many**

19  **supervisors?**

20     A.     Juliana was my direct supervisor at the

21  time.

22     **Q.     How many supervisors did you testify you**

23  **had before?**

24     A.     Well, there was a direct one, and then

25  there was one over her and then one over him.   So

Moburg Reporting
206-622-3110
MOBURG
REPORTING
33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1  there was a direct one.  Add them all up, I guess.

2  You could call -- you know, there was one direct one.

3  There were three -- I guess you could say three were

4  involved with me.

5       **Q.**    **And those three were Nancy Cooper, Dayan,**

6  **and Juliana; correct?**

7       A.    Nancy, Dayan, and Juliana, right.

8       **Q.**    **Juliana was your direct supervisor;**

9  **correct?**

10      A.    Yes.

11      **Q.**    **Did she have any involvement in the writing**

12  **of this article?**

13      A.    She was listening -- no, not really.  No.

14  She was involved in the e-mails in the first week or

15  two, but then she did not do any of the editing.

16      **Q.**    **Was she involved in the pitching of this**

17  **article?**

18      A.    Well, yeah.  I mean, she received my pitch.

19      **Q.**    **Did she green light this article?**

20      A.    Let's see.  The article was discussed in a

21  meeting, and she would have been one of three people.

22  All three people would have green lighted it.  I'm

23  trying to remember.  I mean, it was a four-way

24  discussion.  I cannot remember what Juliana personally

25  said during those discussions.  She did not really say



 1    much.

 2         Q.    You had a weekly meeting with your three

 3    supervisors --

 4               Correct?

 5         A.    Right.

 6         Q.    -- about --

 7         A.    Various things.

 8         Q.    -- the course of your employment

 9    activities; correct?

10         A.    Mm-hmm.

11         Q.    Juliana was in these meetings; correct?

12         A.    Right.

13         Q.    And these meetings were weekly; right?

14         A.    That's correct.

15         Q.    They were on Mondays, if I remember

16    correctly?

17         A.    Usually.

18         Q.    And when did those meetings start relative

19    to September 30?  Before or after?

20         A.    Let's see.  Because I was overseas up until

21    about -- let me think.  It took a little while to get

22    them started.  I mean, I don't have a calendar in

23    front of me.  I don't know.  Okay.  It was either the

24    first or second Monday in October.  It was whenever

25    that day was.  I think -- and I think you have one of

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 153

1    the e-mails that says we'll start -- we'll start them

2    on Mondays.  Let's start October -- whatever the date

3    was.  I think you have that e-mail.

4        Q.    Let's see if we can find it.

5        A.    It's somewhere in there.  It would have

6    been after the 4th or the 12th.  One of them.

7        Q.    I see on October 12, Juliana writes to you,

8    "Hi, Julia.  We'd like to start a meeting once a week

9    to discuss more story ideas."

10              So does that refresh your recollection?

11       A.    Yeah.  I think we started a meeting.  I

12   thought our Monday meetings were -- okay.  Sure.

13   Yeah.  So October 12th.

14       Q.    I see also a Google Meet invite.  It says

15   weekly from 2:00 to 3:00 p.m. on Monday, Eastern Time,

16   and it's attached to an e-mail dated October 12, which

17   is a Tuesday.

18       A.    Oh.

19       Q.    Does that refresh your recollection?

20       A.    Okay.  Okay.  They were eventually moved to

21   Mondays.

22       Q.    Okay.  So Tuesday, October 12.  Did you

23   have -- did you have a meeting that week of October

24   12, or would it have started the next week?  Do you

25   recall?



```
 1       A.    I thought we had a meeting that week, but I
 2   -- geez.  I'd have to check my calendar.  I don't
 3   recall.  I think we did.  I'll say -- again, I would
 4   have to check my calendar.  I think we did.
 5       Q.    When you say you'd have to check your
 6   calendar --
 7       A.    Well, I don't calculate.  I don't know.  I
 8   mean, this is two years ago.  I think we were talking
 9   once a week, but if I had to swear on a stack of
10   Bibles that we definitely did, I'm 99 percent positive
11   we had a meeting that week.
12       Q.    This one is not a trick question.  I'm
13   trying to ascertain what the calendar was so that we
14   can subpoena it so that we can look at it and
15   understand what the timeline is here.
16             Did you maintain a calendar?
17       A.    I mean, do you want me to check it?
18       Q.    Pardon?
19             MS. TESORIERO:  He's just asking.
20             THE WITNESS:  Did I maintain a calendar.
21             MS. TESORIERO:  If you had a calendar at
22   that time.  Not anything that you would look at right
23   now.
24       A.    Oh, oh, oh.  Oh, God.  Shoot.  I'm trying
25   to remember did I mark when the times were?  I think I
```



 1    did.  Yeah, I maintained a calendar.

 2         Q.    You're several steps ahead of me.  My first

 3    question, you said, "I'd have to check my calendar"?

 4         A.    Yeah.  Okay.  So you're asking me did we

 5    have weekly meetings.  We had weekly -- we did have

 6    weekly meetings.  Okay.  Your next question?

 7         Q.    My question to you is you said "I would

 8    have to check my calendar."  I'm trying to ascertain

 9    the nature of the document that might refresh your

10    recollection.  Where is this calendar?  How did you

11    maintain it?  Things of that -- that's what we're

12    leading to.  Not there yet.

13         A.    It would be my personal calendar.

14         Q.    So you maintained a personal calendar;

15    correct?

16         A.    Mm-hmm.

17         Q.    What was the form of this personal

18    calendar?  Was it paper?  Online?

19         A.    No.  Just online.

20         Q.    Was it separate from your Newsweek e-mail

21    address's calendar?

22         A.    Yeah.

23         Q.    Do you still have this calendar?

24         A.    Yes.

25         Q.    Would these meetings likely be on that

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 156

1   calendar?

2      A.   I believe so.

3      Q.   Okay.  Is it your Gmail calendar, your

4   personal Gmail calendar?

5      A.   I don't know if you call it -- I don't know

6   if you call it a Gmail calendar.  What's -- whatever

7   you call the calendars that's on a Mac.

8      Q.   Okay.

9      A.   What do you call those?

10     Q.   I don't know.

11      MS. TESORIERO:  The iCalendar?

12     A.   The iCalendar.  It's an iCalendar.

13     Q.   Okay.  So you're going to have to bear with

14   me because I've never used a Mac.

15     A.   You don't use Mac?

16     Q.   I'm a Microsoft kind of guy.

17     A.   Oh, God.

18     Q.   The law operates for many reasons.  So

19   let's just back up.

20     A.   It's an iCalendar.  It's an iCalendar.

21     Q.   So this is a piece of software --

22     A.   Yeah.

23     Q.   -- that's done through a Mac.  Is it

24   associated with an e-mail address, or is it, like,

25   just on your computer?

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 157

```
 1        A.    You're asking a non-techy here.

 2        Q.    That's okay.  I think we have enough

 3   information that if I ask you for your calendar, will

 4   you know what I'm talking about?

 5        A.    Yeah, yeah, yeah, yeah.  I mean, it's -- it

 6   comes with every Mac, you know.

 7        Q.    And it's called an iMac calendar?

 8        A.    ICalendar.  Small I, capital C, calendar.

 9              MR. KEZHAYA:  All right.  Is November the

10   next month after October?

11              MS. TESORIERO:  I think so.

12        Q.    Did you ever read Laycock's book?

13        A.    I read part -- I didn't get through the

14   whole thing, but I did read part of it.  And as much

15   -- anyway, I read part of it.

16        Q.    Earlier you mentioned that there was a

17   particular date that was misstated in the book.

18        A.    Yes.

19        Q.    Do you remember that?  What was the date

20   stated?  What was the event -- well, let's start with

21   that.  What was the date stated in the book?

22        A.    Wait a minute.  If I can find -- I guess it

23   was -- okay, because he stated -- okay.  All right

24   (inaudible).  Okay.  Because it showed up in the

25   article.  Just a moment.  I'm looking, I'm looking,
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 158

1    I'm looking.  Because I got criticized for it.  Not by

2    you guys, but other people said -- wait a minute.

3    Looking, looking, looking.  Okay.  All right.  We're

4    getting there.  Give me a moment.  2015, '14.  We're

5    getting there.  Give me a moment, please.  I got to go

6    through eight pages.  Just a moment.

7              MS. TESORIERO:  Matt, do you have any

8    objection to me directing her to some date?

9              MR. KEZHAYA:  I do not.

10              MS. TESORIERO:  Check out the bottom of

11    page 4, Seattleites (inaudible) two years in there, if

12    that's what you're talking about.

13              THE WITNESS:  2018.  It's not that.

14              MR. KEZHAYA:  Hold on.

15         **Q.    Maybe it would help us find it if we know**

16    **what the date it was associated with.**

17         A.    I thought it was earlier in the history of

18    The Satanic Temple, but I am trying -- I am not seeing

19    -- just a moment.  I thought it was earlier in the

20    article, too.  So that's why I'm a little peeved at

21    myself that I'm not finding it.

22              MS. TESORIERO:  What about the bottom of

23    page 2?

24              THE WITNESS:  2014.  No.  The 2014 is

25    right, and then 2013 is the TST.

Page 159

1      Q.    Let me just interject here.  What is the

2   date associated with?  Presumably there's an event.

3   Yes?

4      A.    Yeah.  There was an event.  Yeah, I know,

5   and I'm trying to find it.

6      Q.    So you don't remember the event?

7      A.    Yeah.  And, again, this -- we're not trying

8   Mr. Laycock here, but there was -- wait a minute.  Oh,

9   shoot.  I know I'm going to leave here and then I'm

10  going to figure it out.

11          MS. TESORIERO:  If you don't recall and you

12  can't find it, you need to refresh your recollection,

13  you can say you don't recall.

14     Q.    Yeah.  "I don't recall" is fine.  I'm just

15  trying to get to an understanding of what was of

16  relevance to you, and/or whoever was criticizing you.

17  We're going to get through it.

18     A.    Yeah.  And it would take up too much time.

19     Q.    Well, no, I don't care.  So who criticized

20  this date?

21     A.    Oh.  I mean, you know, the -- I mean,

22  plenty of people.  I mean, hey, QueerSatanic wrote a

23  whole thing.  I mean, obviously The Satanic Temple had

24  plenty of criticisms.  I certainly got a huge letter

25  the following day or a day later.  The QueerSatanic



Page 160

```
 1    had some issues with it which went on Medium.

 2             MS. TESORIERO:  I don't think that's the

 3    pending question.

 4        Q.   My question was specific to date.

 5        A.   Oh, I'm sorry.  I'm sorry.  What was the

 6    question again?

 7        Q.   Let's reorient you.  I'm asking you about

 8    Laycock's book.

 9        A.   Yes.

10        Q.   You said you read it?

11        A.   I read parts of it.

12        Q.   And within your reading of it, from earlier

13    testimony, I gathered that there was a date in it.

14    Correct?

15        A.   Right.

16        Q.   And that date was misstated in the article;

17    correct?

18        A.   Because I was quoting him.  That's true.

19        Q.   I don't care about that.  My question posed

20    is who criticized or corrected the date?

21        A.   That would -- the people -- the Queer --

22    let's see.  Let me think.  I think the QueerSatanic

23    people pointed out that I was mistaken.  They showed

24    me some material, and I -- I said, wait a minute.  But

25    this was in Laycock's book.  Laycock said X, and
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 161

1    you're saying Y, and they said no, no, no.  You need

2    to look at this.  And I figured that Mr. Laycock was

3    wrong.

4        **Q.    Do you remember what the "this" was?**

5        A.    And I'm trying to find out what this was.

6    I'd have to obviously -- I'm sorry.  I'm not finding

7    it right now.

8        **Q.    That's fine.  You don't have to find the**

9    **article.  If you don't recall offhand, "I don't**

10   **recall" is --**

11       A.    It had to do with a podcast.  And I am just

12   not finding it right here.  So I could come up with

13   it.  I just don't have it -- I'm not running into it

14   right this second.

15       **Q.    As pertains to the date, you never issued**

16   **any form of correction to the article; correct?**

17       A.    No, I did not.

18       **Q.    Why not?**

19       A.    Well, my -- pretty early on, The Satanic

20   Temple was threatening legal action against me.  And

21   if anyone is threatening me with a lawsuit, everything

22   is frozen.  And so that -- I'm not going to touch the

23   story even if it's going to be -- and that was mainly

24   the instructions I got, not to touch it.

25       **Q.    So you knowingly kept misinformation posted**



1   on the internet because legal action was threatened?

2           MS. TESORIERO:  Objection to form.

3           You can answer.  I just needed to get my

4   objection in.

5           THE WITNESS:  Sure.

6       A.   Well, that decision was made over my head.

7           MR. KEZHAYA:  I think now is a good time

8   for a break.

9           THE VIDEOGRAPHER:  We are now going off the

10  record.  The time is now 2:47 p.m.

11              (Recess.)

12          THE VIDEOGRAPHER:  We are now back on the

13  record.  The time is 3:06 p.m.

14      Q.   I would like to draw your attention back to

15  an earlier statement that you made that this is not an

16  investigative piece.  Do you remember that?

17      A.   No.

18      Q.   You do not remember that.  Would you

19  describe this as an investigative piece?

20      A.   I'm not sure what --

21      Q.   How would you describe -- how would you

22  define an investigative piece?

23      A.   Investigative pieces usually have more than

24  one reporter, like a team of reporters, and take,

25  like, several months to work on, and, like, multi-part

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 163

1    stories.  And I wouldn't -- not sure I recall that --

2    this was not a team of reporters.  This did not -- I

3    did not take multi months to work on this.  So -- so,

4    no, I wouldn't say investigative.

5         Q.    Okay.  How would you describe the piece?

6               MS. TESORIERO:  Objection to form.

7         A.    Explanatory.

8         Q.    Sorry?

9         A.    Explanatory.

10        Q.    An explanatory piece?

11        A.    Explanatory.  Feature.  I'll say it's

12   feature.

13        Q.    How would you define a feature piece?

14        A.    Let's see.  I would say a feature piece is

15   shorter and takes less time.  It can be done more by

16   one or two reporters and less sources.  And sometimes

17   features are -- like this one had to do with a -- near

18   a related holiday.  It's a feature -- spotlights a

19   particular item and capitals [sic] and explains --

20   kind of goes into details, and maybe goes into some

21   history.

22        Q.    What was the subject of explanation in this

23   piece?

24        A.    The main subject was the -- the main

25   subject was the lawsuit.  The secondary was the

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1   religion that this lawsuit involved.

2       Q.    Which religion was that?

3       A.    Well, The Satanic Temple, which identifies

4   as a church and is a religion, according to my

5   interview with Mr. Greaves.

6       Q.    You interviewed Professor Laycock about the

7   religiosity of TST as well, did you not?

8       A.    I talked to him about a lot of things.

9       Q.    Yes or no.  Did you ever --

10      A.    I don't recall if I asked him about the

11  religiosity of -- I seem to remember talking to Lucien

12  more about that.  I asked Mr. Laycock -- I don't think

13  I asked him about -- I don't recall asking him about

14  the religiosity of The Satanic Temple.

15      Q.    Earlier you testified that you read parts

16  of Laycock's book.  Do you remember that?

17      A.    Right.

18      Q.    Which parts did you read?

19      A.    I read several chapters.  I read about the

20  schism.  The 2018 schism was one.  Again, this was two

21  years ago.  I'm trying to remember which chapters they

22  were.  I read several chapters.  I do not recall which

23  chapters they were.

24      Q.    Do you recall reading anywhere in Laycock's

25  book anything about sexual abuse and cover-up?



Page 165

 1              MS. TESORIERO:  Objection to form.

 2        A.    No, I don't recall.

 3        **Q.    Earlier you testified about the**

 4   **QueerSatanic people said something to you which caused**

 5   **you to believe that Jinx Strange's accusation was**

 6   **inherently plausible.  Do you remember that testimony?**

 7        A.    Well, they were telling me about a sexual

 8   harassment complaint that they were dealing with in

 9   the Seattle chapter.

10        **Q.    Okay.  And did they tell you what the**

11   **sexual harassment was?**

12        A.    They did not go into details.  It had to do

13   with a member.  No.  They did not go into details

14   about it.

15        **Q.    Did you ask them any details about what**

16   **this alleged sexual harassment was?**

17        A.    I'm trying to remember.  I believe -- I

18   think you all have copies of that interview.  I do not

19   -- so did I ask them?  I'm trying to remember the

20   interview.

21        **Q.    Would it refresh your recollection for me**

22   **to play the clip that we have?**

23        A.    Well, the clip you had if -- you're welcome

24   to.

25              MR. KEZHAYA:  Hopefully, this actually

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 166

1    makes noise.  Okay.  For benefit of the record, we are

2    about to play as loud as I can -- if you'll tell me if

3    it's too loud, please -- is a four-minute-and-three-

4    second clip.  It has been provided to us as Bates

5    stamp Newsweek 390.  As I understand it, this is the

6    only part of your interview with the QueerSatanics

7    that had anything to do with the subject article

8    statement.  Okay?

9            THE WITNESS:  Mm-hmm.

10            (Tape played.)

11            MR. KEZHAYA:  I'm pausing here at 22

12    seconds in.

13        **Q.    We've so far heard two voices.  The first**

14    **voice appeared to be a female.  Do you know the name**

15    **of the female?**

16        A.    Leah Fishbaugh, F-I-S-H-B-A-U-G-H.

17        **Q.    And as we've established earlier, this was**

18    **written, if memory serves, or this interview took**

19    **place within one week prior to October 24th?**

20        A.    It would have been October 19th, we think.

21        **Q.    Okay.  Where did this interview take place?**

22        A.    It was at a restaurant on Capitol Hill, the

23    Capitol Hill section of Seattle.

24        **Q.    Okay.  So we've identified the female**

25    **voice, obviously the one that's not you, as Leah**

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 167

1    Fishbaugh.  The second one?

2         A.    Would be me.  Oh, wait a minute.  Just a

3    second.  That is me.  I'm sorry.  There's two females

4    here.

5              MS. TESORIERO:  Make sure you let him

6    finish his question.  I think he was about to ask you

7    about --

8         Q.    **There was a male voice that I'm asking you**

9    **about.  Please identify who the male voice is.**

10        A.    One of them -- I'm not sure which one is

11   David.

12        Q.    **Let's just hear the voice again, and then**

13   **tell me if you can remember who it is.  And we're**

14   **going to rewind back to 12 seconds in.**

15             (Tape played.)

16        Q.    **Okay.  The person who said "we were kicked**

17   **out for being witnesses to," who is talking there?**

18        A.    I have it in my notes, which I turned over,

19   but I don't have that right here on me.  In my notes

20   it identifies who was speaking.

21        Q.    **So you have notes about this particular**

22   **clip that you have provided to Sara and Cam; is that**

23   **correct?**

24        A.    Mm-hmm.

25             MR. KEZHAYA:  Sara and Cam, I believe that

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1    these would be responsive to some of the discovery

2    requests that we've --

3              MS. TESORIERO:  You have not subpoenaed

4    Julie Duin for documents.  Those are not in Newsweek's

5    possession.

6              MR. KEZHAYA:  If she provided them to you,

7    I believe they are within Newsweek's possession.

8              MS. TESORIERO:  We are her counsel in

9    addition to Newsweek's counsel.  Newsweek did not have

10   them in their possession, custody or control.  We

11   can't break confidence with this client and produce

12   them on behalf of Newsweek.  If you want to subpoena

13   us, we are happy to comply with the subpoena, but we

14   need it to be subject to any objections, depending on

15   how you word it, but we just need to follow the

16   correct process for our ethical representation

17   purposes as well.

18       **Q.    Okay.  Resuming from 22 seconds in.**

19       A.    So, yes, the first --

20       **Q.    Pardon?**

21       A.    Sorry.  The first female voice would be me.

22       **Q.    Yes, yes.  I deduced that.  But we're now**

23   **listening to an unknown speaker.  One of the QS**

24   **people.  Resuming from 23 seconds in.**

25              (Tape played.)



Page 169

1          Q.    Pausing at 36 seconds in.  Someone is
2     talking about "I will be back if I can."  Was that one
3     of the four?
4          A.    That was Leah.
5          Q.    Oh, okay.
6          A.    That was Leah saying she had to leave.
7     That was the other female.
8               MR. KEZHAYA:  Okay.  Resuming at 36
9     seconds.
10              (Tape played.)
11         Q.    Pausing at a minute-five.  They have made
12    reference to some form of sexual harassment complaint.
13         A.    Mm-hmm.
14         Q.    They have not identified who the
15    complainant was, what the sexual harassment was, and
16    who the alleged perpetrator was.  Would you agree with
17    those three statements?
18         A.    Mm-hmm.
19              MS. TESORIERO:  Make sure you say yes.
20         A.    Oh, yes.
21         Q.    And you did not ask any clarifying details;
22    correct?
23         A.    No.  I was listening to them.
24         Q.    At any point did they provide you this
25    alleged complaint?

Page 170

1              MS. TESORIERO:  Objection to form.

2       A.   Did they -- like a copy of a written

3   document of something?

4       **Q.   They are referencing a written document.**

5   **Did they provide you the written --**

6              MS. TESORIERO:  Objection.  Sorry.

7       A.   They did not say it was in written form.

8       **Q.   They specifically said that it was e-mailed**

9   **to chapter leadership.**

10      A.   All right.  Granted.  They did not provide

11  me with a copy, no.

12      **Q.   Did you ask for a copy of it?**

13      A.   No.

14             MR. KEZHAYA:  Resuming from a minute-five.

15                 (Tape played.)

16      **Q.   Pausing at a minute-13.  They have levied**

17  **an accusation that TST called it a "coup" because**

18  **these four individuals were listed as witnesses to a**

19  **complaint.  Do you recall that section of the audio**

20  **recording?**

21      A.   Yes.

22      **Q.   Did they give any further details about who**

23  **the "they" is that called it a coup?**

24      A.   I really -- I'm lost at this point.  Okay.

25  Because I -- okay.  All right.  I am really having a



Page 171

 1    hard time following this.  And I -- just a minute.

 2    Because I had this all written down, which is much

 3    easier for me to follow than -- okay, you're going to

 4    have to go back.  If you want to grill me on this

 5    four-minute-long thing, you're going to have to go

 6    back and replay it.

 7        **Q.    We're only a minute-13 in.  Did you forget**

 8    **that they said that they called it a coup?**

 9            MS. TESORIERO:  Objection to form.

10    A.    I repeat my request.

11        **Q.    I heard your request.**

12            MS. TESORIERO:  Are you refusing to play it

13    for her again so she can hear what they said?

14            MR. KEZHAYA:  Yeah.  I want to get her on

15    record saying "I don't remember the clip" that was

16    just played before you paused it and asked me about

17    the clip.

18            MS. TESORIERO:  She says she -- you asked

19    her a specific question about it.  She's asking you to

20    play it again so she can hear it.  You have to ask the

21    court reporter to repeat a question back to you

22    sometimes.

23            MR. KEZHAYA:  We are skipping back 10

24    seconds.  We are now playing from one-minute-three.

25            (Tape played.)

Page 172

1       Q.      Have you now refreshed your recollection

2       that the four individuals who you were interviewing

3       told you that they called it a coup?

4       A.      The "they" -- all right.  The way you're

5       doing this is -- it's super confusing for me to follow

6       the line of who is saying what in 10-minute -- 10-

7       second audio segments.  The way it sounds to me is the

8       "they" that they are referring to is TST, or people

9       affiliated with TST, from what I can make of this

10      clip.

11      Q.      I understand what they said.  I'm not

12      asking you what they said.  I'm asking if at any point

13      after this clip -- strike that.

14              I'm asking at any point after this

15      interview, did they ever give you names as to who the

16      "they" were?

17      A.      Oh, after the interview?  "They" meaning

18      the people asked -- the sexually abused person or the

19      person filing the complaint?  No, they did not.

20      Q.      That's not what I'm asking you.  I'm asking

21      you this statement.  They called it a coup.  You heard

22      them say this twice now.  Do you remember this?

23      A.      (No response.)

24      Q.      Do you remember this?

25      A.      Okay.  I do remember the statement.  You're

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 173

1  asking me if I circled back after this hour-long --

2  hour-and-a-half-long interview and asked them about

3  something, this particular statement, who the "they"

4  was?

5      **Q.    I'm trying to ascertain if you performed**

6  **any form of fact investigation on anything that these**

7  **people had to say.**

8          MS. TESORIERO:  Objection to form.

9      A.    I performed -- look, yes, I did check out

10  stuff, but you're asking about one sentence.

11      **Q.    When you say you checked out stuff, did you**

12  **find any individuals who was actually sexually**

13  **harassed in TST?**

14          MS. TESORIERO:  Objection to form.

15      A.    Shall we say -- okay.  I found people who

16  said they knew people who were sexually harassed.  How

17  about that?

18      **Q.    No, not how about that.  Did you actually**

19  **talk to any individuals who were actually sexually**

20  **harassed by TST?**

21          MS. TESORIERO:  Objection to form.

22      **Q.    Yes or no.**

23      A.    Did I talk to -- no, I did not.

24      **Q.    Of the people who claim that they know**

25  **people who were sexually harassed by TST, did you ask**



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 174

```
 1    even names or contact information who theoretically

 2    could be followed up with?

 3        A.    No.

 4        Q.    You have been a journalist for 45 years;

 5    correct?

 6        A.    Yes.

 7        Q.    You have been a professor of journalism for

 8    approximately two and a half years; correct?

 9        A.    Mm-hmm.

10        Q.    Do you consider yourself a serious

11    journalist?

12              MS. TESORIERO:  Objection to form.

13        A.    Yes, I do.

14        Q.    Did you consider this piece of work to be a

15    credible, serious, and fair statement about sexual

16    abuse and cover-up?

17        A.    My article was fair, yes.

18        Q.    I'm asking you about the statement.

19        A.    About your statement?

20        Q.    Your statement.  The one that you put in

21    the article.

22        A.    Yes, I did.  It was fair.  And, yes, if I

23    hadn't believed that there wasn't sexual abuse going

24    on, I would not have put that into the article.

25        Q.    And what was your basis to believe there
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

 1    was actually --

 2         A.    Because there were plenty of people who

 3    were saying it.

 4              MS. TESORIERO:  Let him finish.

 5         Q.    **Let me finish.  There were plenty of people**

 6    **who say it, but all of these were biased and**

 7    **disgruntled former members.**

 8              MS. TESORIERO:  Objection to form.

 9         Q.    **Correct?**

10              MS. TESORIERO:  Objection to form.

11         Q.    **Correct?**

12              MS. TESORIERO:  Objection to form.

13              MR. KEZHAYA:  I hear your objection.

14         Q.    **Correct?**

15         A.    Not correct.

16         Q.    **Not correct.  They were not biased?**

17         A.    No.  They were not biased.

18         Q.    **Which one of them was not biased?**

19         A.    Scott wasn't biased.

20         Q.    **He wasn't?**

21         A.    No.

22         Q.    **How do you know he wasn't biased?**

23              MS. TESORIERO:  Objection to form.

24         A.    Because he was a true believer when he came

25    in, and so was Jinx.  And they were all true

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1   believers, and they saw stuff they didn't like, and

2   they left.  They all -- they all wanted to believe.

3   They all came in, and they believed in the

4   organization, and they left not believing in it.

5   Let's put it that way.

6        **Q.    Did you talk to them while they were**

7   **members of the organization?**

8        A.    I didn't have that opportunity.

9        **Q.    Did you talk to them after they left the**

10  **organization?**

11       A.    Of course.

12       **Q.    Did you describe all of them as disgruntled**

13  **former members?**

14       A.    No.

15       **Q.    You have never described these sources as**

16  **disgruntled former members.  That's your testimony**

17  **today; correct?**

18       A.    I described them as former members.

19       **Q.    You never described them as disgruntled;**

20  **correct?**

21            MS. TESORIERO:  Objection to form.

22       A.    No.  I did not describe them as

23  disgruntled.

24            MR. KEZHAYA:  Could you please get the

25  October 25th pitch?  It would've been in Cooper's

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1  exhibits.  Let's go off the record.

2              THE VIDEOGRAPHER:  We're now going off the

3  record.  The time is now 3:30 p.m.

4                  (Recess.)

5              THE VIDEOGRAPHER:  We are now back on the

6  record.  The time is now 3:39 p.m.

7              MR. KEZHAYA:  We're going to mark Exhibit

8  13, which will go into the record as Bates stamp

9  Cooper 51.

10                  (Exhibit No. 13 was marked for

11                  identification.)

12     **Q.    Do you have Exhibit 13 in front of you?**

13     A.    Yes.

14     **Q.    Please turn to page 2.  Please take note of**

15  **the e-mail dated October 25, 2021.  Who wrote this**

16  **e-mail?**

17     A.    Me.

18     **Q.    Please read the e-mail starting with "Hi**

19  **all," and ending with "that is" -- actually, ending**

20  **with "bigger story."**

21     A.    "Am sending," beginning with that?

22     **Q.    Pardon?**

23     A.    "Am sending a memo" --

24     **Q.    Correct.**

25     A.    ████████████████████████████████████



1 ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████

8      Q.    These are disgruntled former members who

9  were your sole sources for the claim that there was

10  actually sexual abuse and cover-up.  Correct?

11          MS. TESORIERO:  Objection to form.

12    A.    That's what I call them here.

13    Q.    That's what you called them; correct?

14    A.    There.

15    Q.    And they are, in fact, disgruntled former

16  members; correct?

17          MS. TESORIERO:  Objection to form.

18    A.    Yes.

19    Q.    Do you feel you have an ethical obligation

20  to convey both sides of a serious allegation?

21    A.    I did.

22    Q.    Did you?

23    A.    Yes.

24    Q.    Where did you ask Lucien Greaves about

25  sexual abuse and cover-up?


MOBURG
REPORTING

Page 179

```
 1                MS. TESORIERO:  Objection.  Asked and

 2     answered.

 3        Q.    Not in the article.  Where did you do that?

 4                MS. TESORIERO:  Objection.  Asked and

 5     answered.

 6                THE WITNESS:  I'm sorry?

 7                MS. TESORIERO:  You can answer again.

 8                THE WITNESS:  Oh, I can answer again.  All

 9     right.  All right.  I wasn't sure.

10        A.    I feel we've already gone over this.

11        Q.    Where?

12        A.    We've already gone over this.

13        Q.    Where did you ask Lucien Greaves about

14     sexual abuse and cover-up?

15                MS. TESORIERO:  Objection.  This is

16     harassment.  You have asked her several times this

17     question.  She has answered it several times.  There's

18     no jury here.  She's given you an answer.  Please move

19     on.

20                MR. KEZHAYA:  No.

21        Q.    Answer the question.

22        A.    What do I do?  Because I agree with my

23     lawyer.  Can I refuse?

24        Q.    You may not.  Answer the question.

25        A.    No.  I mean, this is ridiculous.  You are
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 180

```
1    asking me the same question multiple times.

2              MS. TESORIERO:  Are you asking her --

3         A.   How long are we going to be here?  Until

4    midnight?

5         Q.   Well, we got about three hours left, so if

6    needs be, we'll be here for at least three more hours

7    record time.

8              MS. TESORIERO:  Are you asking her again

9    whether she asked Lucien Greaves about allegations of

10   sexual abuse?

11             MR. KEZHAYA:  She said that she did.  I'm

12   asking her to tell me where she did it.

13             MS. TESORIERO:  Where in her testimony did

14   she say she did?

15             MR. KEZHAYA:  Literally just now.  She

16   said, "I have an ethical obligation to convey both

17   sides of a serious allegation."

18             MS. TESORIERO:  You are misrepresenting her

19   testimony.  You are putting words in her mouth.  She

20   did not mention Lucien's name until you asked her the

21   question again.

22             MR. KEZHAYA:  She didn't talk to anyone

23   else at TST.

24             MS. TESORIERO:  She spoke with you.

25   Correct?
```

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 181

```
 1        Q.    Let's back up, then.  You agree with me

 2    that you have an ethical obligation to convey both

 3    sides of a serious allegation; correct?

 4        A.    Okay.  State it again.  I have an ethical

 5    obligation to convey both sides of the --

 6        Q.    An allegation.  Correct?

 7        A.    Of an allegation?

 8        Q.    Correct.

 9        A.    Just a minute.

10              MS. TESORIERO:  You should answer, but I'm

11    going to object to form.

12              THE WITNESS:  I'm sorry?

13              MS. TESORIERO:  You should answer, but I'm

14    going to object to form.

15              THE WITNESS:  I know.  I understand.  I

16    understand.

17        A.    Just -- I'm -- I get this.  I'm just --

18    just give me a moment.

19        Q.    Julia, you're not going to stutter for

20    three hours.  All right?  You're going to have to

21    answer the question.

22              MS. TESORIERO:  Matt, knock it off.

23        A.    Okay, yeah.  Just give me a moment, Matt,

24    because I know where you're going on this, and I'm not

25    going to get trapped.
```

Page 182

 1              MS. TESORIERO:  I would ask you to

 2   apologize to the witness.  That was incredibly rude.

 3              MR. KEZHAYA:  No.

 4              MS. TESORIERO:  If you're going to speak to

 5   her this way, we're going to end the deposition.

 6              MR. STRACHER:  You know what?  Matt, you

 7   keep talking to her like that and we're going to go to

 8   the judge and we're going to get you sanctioned again.

 9   So I would watch yourself if I were you.

10              MS. TESORIERO:  I was asking you --

11              MR. KEZHAYA:  First of all, I have not been

12   sanctioned.  Second of all --

13              MS. TESORIERO:  We're going to ask you to

14   be professional to the witness.  I'm asking you to be

15   professional to the witness.

16              MR. STRACHER:  Don't talk to a witness like

17   that.  You know what?  We're going to end this

18   deposition right now.  Right now we're going to end

19   this deposition, and we're going to seek sanctions

20   against you if you continue to talk to the witness

21   like that.  Do you understand?

22              MR. KEZHAYA:  I hear you, Cameron.

23              MS. KEZHAYA:  What did you say?

24              MR. KEZHAYA:  I think I said that she's not

25   going to stutter for the next three hours.  She's

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 183

1    going to eventually have to answer the question.

2            MS. KEZHAYA:  Well, we can move on from

3    that.

4            MR. KEZHAYA:  Moving on.  Withdrawn.

5        Q.    **Julia, you've been a professor of religious**

6    **journalism; correct?**

7        A.    Journalism.  A journalism professor, not

8    just religion.  Not just a -- I've taught general

9    journalism and religion reporting.

10       Q.    **Okay.  You've been serving as a journalist**

11   **for 45 years; correct?**

12       A.    Right.

13       Q.    **You don't know your own ethical**

14   **obligations?**

15           MS. TESORIERO:  Objection to form.

16       A.    Of course I know my own ethical

17   obligations.

18       Q.    **Do your ethical obligations include a**

19   **requirement that you convey both sides of a serious**

20   **allegation?**

21           MS. TESORIERO:  Objection to form, but

22   answer.

23           THE WITNESS:  Right.

24       A.    I -- yes, of course.

25       Q.    **Would you have felt comfortable publishing**

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 184

1  a claim that TST kills children?

2          MS. TESORIERO:  Objection to form.

3      A.   No.

4      Q.   **Why not?**

5      A.   Why not?

6      Q.   **Mm-hmm.**

7          MS. TESORIERO:  Objection to form.

8      A.   Where do you start on this one?  Because

9  it's obviously not true.

10     Q.   **Okay.  What causes you to say it is**

11 **obviously not true?**

12     A.   Okay.  I don't know -- no one has told me

13 that TSt is killing children.

14     Q.   **Hypothetically, if the same sources told**

15 **you that TST kills children, would you have felt**

16 **comfortable publishing that claim?**

17          MS. TESORIERO:  Objection to form.

18     A.   I would have asked them to prove that.  I

19 would have asked them to offer some -- okay.  I would

20 have asked them to prove it.  Prove that TST was

21 killing children.

22     Q.   **And yet you didn't ask for any proof about**

23 **this serious allegation; correct?**

24          MS. TESORIERO:  Objection to form.

25     A.   Okay.  You're saying on the part of Jinx or

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 185

```
 1   the part of the Seattle people?  You're asking Scott?

 2   I mean, there's several people involved here who are

 3   all making the same allegation.

 4        Q.    Sexual abuse that's being covered up.

 5        A.    I mean, we --

 6        Q.    The quote from Jinx Strange, you remember

 7   this; right?  You remember you put this in the

 8   article.

 9        A.    Right, right.

10              MS. TESORIERO:  Objection to form.

11        Q.    Okay.  You would agree with me that sexual

12   abuse and cover-up is a criminal allegation; correct?

13              MS. TESORIERO:  Objection to form.  Asked

14   and answered.  We have been here.

15              MR. KEZHAYA:  Well, she clearly needs me to

16   guide her through the testimony.

17              MS. TESORIERO:  No.  You're being rude and

18   confrontational.

19              MR. KEZHAYA:  This is not rude and

20   confrontational.

21              MS. TESORIERO:  It's both.  She has

22   answered that question.  Please move on.

23              MR. KEZHAYA:  I'm asking her to delineate

24   why she would ask someone to say, "TST kills children;

25   I want some explanatory details" versus "There's
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1  sexual abuse and cover-up.  Sounds great.  I'm going

2  to take it at face value."

3            MS. TESORIERO:  That is misrepresenting the

4  testimony.  She has testified as to what she did to

5  look into those allegations.  She just testified that

6  several people reported the same statements to her.

7  If you want to ask about this allegation, ask about

8  it, but the criminal question she has already

9  answered.

10       Q.    **What delineates the difference between**

11  **hearing the rumor "TST kills children" versus hearing**

12  **the rumor "TST engages in sexual abuse and cover-up,"**

13  **such that you would ask for explanatory details about**

14  **the former but not the latter?**

15       A.    Well, there's already been people talking

16  about TST having multiple instances of sexual abuse,

17  harassment.  I mean, it's with a -- I mean, this has

18  been -- okay.  There's been multi -- once again, as

19  I'm saying for the third or fourth time now, there

20  have been multiple reports among disgruntled, if you

21  like the word, former members, of sexual

22  abuse/harassment slash by -- whether it's from Scott

23  or from the Seattle members or from Jinx.

24            In fact, wasn't there something from Jex

25  Blackmore about -- I'm trying to remember some other

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 187

1   public things that have been said.  You know, there's
2   been things said about sexual -- anyway, there's been
3   talk of this being a part of some of the culture at
4   the TST.  So, with multiple people, and talking about
5   sexual harassment, a sexual harassment complaint being
6   covered up.
7          And, wait, there's one more thing I'm going
8   to add.  Excuse me.  My mind went off.  Give me a
9   moment.  I'm sorry.  I was going to add something, and
10  it just went out the door.  I want to go back to what
11  I did ask -- you -- you've asked -- okay.  The culture
12  of -- okay.  I'll leave it there.  I'll stop there.
13      Q.   **You did not answer the question.**
14      A.   I did answer the question.
15      Q.   **The question posed is if you had heard the**
16  **same sources say that TST kills children, why would**
17  **you ask for explanatory details about that but not any**
18  **explanatory details about this sexual abuse and**
19  **cover-up claim?**
20      A.   Do I have to answer a hypothetical?
21      Q.   **Yes.**
22          MS. TESORIERO:  Objection.  Calls for
23  speculation, but yes, you can give an answer.
24      A.   Yeah.  Because you're losing me.  Just a
25  moment.  Okay.  If I would ask about details on why --



Page 188

```
 1   I'm thinking of -- keep on giving the same answer, and

 2   if we're here until 9:00 at night, I'm just going to

 3   keep on giving you the same one.

 4          There was not multiple people giving --

 5   there's not multiple people talking to me about deaths

 6   of children.

 7      Q.    Interjecting there.  The hypothetical posed

 8   is that multiple people have told you that there's --

 9   that TST kills children.  You're exiting the

10   hypothetical.

11      A.    No.  No, we're not going to go down that.

12          (Cross talk.)

13      Q.    (Inaudible) the hypothetical.  No, we are

14   going down that.

15      A.    No, I'm not.

16          MS. TESORIERO:  Objection.  Objection to

17   form.  She does not -- that is not the facts.  She's a

18   fact witness.  That is not the factual situation in

19   this case.  She does not have to answer every

20   hypothetical you come up with.  She has answered your

21   question about why she asked what she did about the

22   sexual abuse allegations.

23          MR. KEZHAYA:  I will remind you that

24   Newsweek has lodged an actual malice defense.  This

25   goes to actual malice.
```

Page 189

1                    MS. TESORIERO:  She is not a defendant.

2                    MR. KEZHAYA:  She wrote the article.

3                    MS. TESORIERO:  Yes, but her actual malice

4    would have nothing to do with the question remaining

5    in this case.

6                    MR. KEZHAYA:  I'll remind you of Nancy

7    Cooper's testimony:  "We had faith in Duin."

8                    MS. TESORIERO:  Okay.  Then ask --

9                    MR. KEZHAYA:  "We had absolute faith in

10   Duin."

11                   MS. TESORIERO:  Then ask what she spoke to

12   Newsweek about.

13                   MR. KEZHAYA:  No.  I want to know if she

14   would have written that article, because I already

15   know that Newsweek would have rubber stamped it.

16                   MS. TESORIERO:  And I'm telling you she

17   doesn't have to answer it.  And if you want to get the

18   judge again, call her.

19                   MR. KEZHAYA:  I do.

20                   MS. TESORIERO:  Okay.

21                   MS. KEZHAYA:  I think they're likely not

22   there.

23                   MS. TESORIERO:  It's after hours.  Do you

24   want to end the deposition?

25                   MR. KEZHAYA:  We'll pause this, and I'm

```
 1   going to assert -- not pause.  We are pausing this

 2   aspect of the questioning.  I don't know if you took

 3   note of the order that's already come out, but I'm

 4   entitled to re-examine her about the e-mail from the

 5   -- Jones.

 6           MS. TESORIERO:  Yeah.  You can ask her the

 7   date.

 8           MR. KEZHAYA:  No, no.  In the order the

 9   judge says that we can reopen the depo as pertains to

10   that.  So my proposal is we take this issue to the

11   judge in a more orderly fashion.  Judge will tell us

12   whether or not we can resume this line of questioning.

13           MS. TESORIERO:  If you would like to.

14   Again, you can ask her about the date.  We sorted that

15   out over lunch.  But if you -- I mean, we're going to

16   -- if we're bringing -- yes.  We can take this to the

17   judge if you'd like to take this to the judge.

18           MR. KEZHAYA:  I insist.

19           MS. TESORIERO:  Okay.

20       Q.   (By Mr. Kezhaya) Speaking of the Jones

21   e-mail, what was the date of the Jones e-mail?

22       A.   September 29th.

23       Q.   Of?

24       A.   2021.

25       Q.   Did you look at the e-mail to ascertain
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 191

1  that?

2      A.    Yes.

3      Q.    What was the "from" of that?

4      A.    Mr. Jones.

5      Q.    The same Gmail that we saw earlier?

6      A.    Yeah.

7      Q.    What did you know about TST before writing

8  this piece?

9      A.    Nothing.

10      Q.    Well, clearly you knew something about --

11      A.    Excuse me.  I mean, again, you've already

12  asked me this.  I've already told you, almost nothing.

13  I referred to it briefly in two media critique pieces

14  in 2016 and 2018.  Other than that, no, I did not -- I

15  was not familiar with TST.

16          MR. KEZHAYA:  I think now is a good time

17  for a break.

18          THE VIDEOGRAPHER:  We are now going off the

19  record.  The time is now 3:57 p.m.

20          (Recess.)

21          THE VIDEOGRAPHER:  We are now back on the

22  record.  The time is now 4:04 p.m.

23      Q.    You admit that Scott Malphas is a

24  pseudonym; correct?

25      A.    Yes.



Page 192

```
 1          Q.    Do you know Scott Malphas's true identity?

 2          A.    Is who?

 3          Q.    Scott Malphas, do you know his true

 4    identity?

 5          A.    No.

 6          Q.    If you were to find him, how would you go

 7    about doing that?

 8          A.    Okay.  Other than trying to contact him and

 9    asking him -- other than --

10          Q.    Presuming he ignores your e-mail, how would

11    you go about finding him?

12          A.    Well, let's see.  I'd go back to my sources

13    at the Seattle folks and see if they have any good

14    ideas on how to find him.  I know he's located in

15    Arizona.  So -- and how would I go about it?  Let's

16    see.  Anyway, I would start with the Seattle group.

17          Q.    Okay.  What about Jinx Strange?  Do you

18    admit that that's also a pseudonym?

19          A.    No, I don't.

20          Q.    You deny that.  What's his true identity?

21          MS. TESORIERO:  Objection to form.

22          Q.    So his identity is Jinx Strange.  That is

23    his true name?

24          MS. TESORIERO:  Objection to form.

25          A.    As far as I know, yeah.  I have no reason
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 193

1    to believe it's not his true name.  He did not say it

2    was -- his name was a pseudonym.

3        Q.    Did you ask?

4        A.    No.

5        Q.    If you were to go about trying to find Jinx

6    Strange and he ignored your e-mail, how would you go

7    about finding him?

8        A.    Fly to Wisconsin and walk into his tea

9    shop.

10       Q.    I'm sorry.  What?

11       A.    He's got a tea shop, yeah.

12       Q.    What is the name of this tea shop?

13       A.    It's the -- you would ask.  Okay.  Go to

14   his Facebook page.  Okay.  It's like "The Dirge."  I

15   think it's called the -- wait a minute, because I know

16   you're trying to find him.  "The Dirge."

17       Q.    The Dirge?

18       A.    I think it's called -- look on his Facebook

19   page.

20       Q.    Well --

21       A.    Okay.  I think -- don't take me to court on

22   this.  I think it's called -- he has it on his actual

23   Facebook page.  It's part of his shop.

24       Q.    Did you look at his Facebook page?

25       A.    Yes, I did.



1    Q.    Is this his profile (indicating)?

2    A.    Oh, wait a minute.  Go back.  There's --

3    that's the picture on it.

4    Q.    That's the question.  Is that his profile

5    picture?

6    A.    That's his profile picture, but the page

7    looks a bit different than that.

8    Q.    I can only give you what I'm able to find.

9    A.    What I called up was something different.

10   He has an actual -- if my life depended on having to

11   find him I'd fly to -- yeah, anyway.

12   Q.    Homefire Tea & Botanicals, does that sound

13   like his tea shop?

14   A.    I'm sorry.  What tea and botanicals?

15   Q.    Homefire Tea & Botanicals.  Does that sound

16   like his gift shop?

17   A.    Is that on his website?

18   Q.    It's the only thing that I can find that's

19   a tea that has anything to do with the Facebook page

20   that I showed you.

21   A.    Yeah.  I mean, that's where I would start.

22   Q.    Okay.  Have you seen this image before?

23   A.    That's what was on his -- yes, I have seen

24   that image.

25   Q.    Is it your testimony that that is Jinx

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 195

1   Strange?

2       A.   Wait a minute.  I'm trying to recall if

3   that's the same one he e-mailed to me.  I can't

4   remember if that's the same one on the e-mail to me or

5   not.  I'm sorry.  I can't remember.

6       **Q.   You testified that you can't remember if**

7   **that was on the e-mail to you.  Did he send you a**

8   **photograph of himself?**

9       A.   There was a photograph of him on the e-mail

10  to me, yes.  I think, though, he was bald on the

11  e-mail to me.  I don't think he was wearing that cap.

12      **Q.   Is this Jinx Strange (indicating)?**

13      A.    No.  I don't know if it's Jinx -- I have no

14  idea.  I know that's on his Facebook page.  Whether

15  it's Jinx Strange or not, I have no idea.  But there's

16  another photo.

17      **Q.   I have navigated to the photo section of**

18  **Facebook.com/JinxStrange.  Please point to the**

19  **photograph that you are referring to.**

20           MS. TESORIERO:  Objection to form.

21      A.   The one that was on his e-mail is not one

22  of those photos.

23      **Q.   Okay.  You say "the e-mail."  Was it sent**

24  **to your Newsweek e-mail?**

25      A.   Yes.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 196

1        Q.     Was this a profile photo?

2        A.     I don't know what you'd call it.  It was

3    attached to the e-mail.

4        Q.     So he literally sent you a photograph of

5    himself; correct?

6        A.     Yes.  Yes.  Yes.  I'll say yes.  It was

7    attached to the e-mail.

8        Q.     And to be very precise, we are talking

9    about an independent file attachment; correct?

10       A.     No.  I don't know what else to call it.  It

11   was a small -- I don't know if -- I don't know if it

12   was a profile photo.  It was not an attachment.  It

13   was like a -- whether it would be -- I'm trying to

14   remember if you'd call it a profile photo.  I don't

15   have my computer with me.  Sorry.  I would not call it

16   -- he didn't sent it as an attachment.  It came with

17   -- it came as part of his signature.  No.  Wait.  Not

18   even signature.  That's not even correct.  It came at

19   the top of his e-mail.  That's the best answer I can

20   give you.

21       Q.     You indicated that you would go to his tea

22   shop.  Is that a physical location, or is it an

23   online-only shop?

24       A.     The Facebook page indicates it's an actual

25   physical location.

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

1       Q.    Well, you can understand my frustration

2    here because we don't even know if that's his Facebook

3    page.

4              MS. TESORIERO:  Is that a question?

5       A.    It has the name Jinx Strange attached to

6    it.

7       Q.    Well, yeah, but unfortunately --

8              MS. TESORIERO:  Wait until counsel asks a

9    question.

10      Q.    Well, this is the best -- can you tell me

11   if anyone at Newsweek has knowledge of where Jinx

12   Strange's tea shop is?

13             MS. TESORIERO:  Objection to form.

14      A.    No.

15      Q.    Can anyone at Newsweek, to the best of your

16   knowledge, tell me where Jinx Strange can be found?

17             MS. TESORIERO:  Objection to form.

18      A.    Now?  At this moment?

19      Q.    Correct.

20      A.    No.

21      Q.    Did you tell Nancy Cooper, "This is how I

22   can find Jinx Strange"?

23      A.    No.

24      Q.    Okay.  Did you tell Juliana, your immediate

25   supervisor, "This is how I can find Jinx Strange"?

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 198

```
 1       A.    No.

 2       Q.    Did you tell Dayan, "This is how I can find

 3   Jinx Strange"?

 4       A.    No.

 5       Q.    Did anyone else at Newsweek have any

 6   understanding of this article before it was published?

 7             MS. TESORIERO:  Objection to form.

 8       A.    Wait.  Did anyone at Newsweek have any

 9   understanding of this article?

10       Q.    Correct.  Was anyone else at Newsweek other

11   than the aforementioned names and you involved in this

12   article in any way?

13             MS. TESORIERO:  Objection to form.

14       A.    No.

15       Q.    Did you put any of your sources for this

16   article under oath to tell the truth when they give

17   you information?

18             MS. TESORIERO:  Objection to form.

19       A.    No.  Reporters don't do that.

20             MR. KEZHAYA:  Pass the witness.

21             MS. TESORIERO:  I have no questions.

22             THE VIDEOGRAPHER:  We are now going off the

23   record.  This marks the end of the deposition of Julia

24   Duin.  The time is now 4:14 p.m.

25             THE REPORTER:  Is signature reserved?
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 199

1                MS. TESORIERO:  Yes.

2                THE REPORTER:  Orders, Counsel?

3                MR. KEZHAYA:  PDF only for us.  We also

4    want the video.

5                THE REPORTER:  Counsel, copy?

6                MS. TESORIERO:  Yes.  She needs to review

7    the transcript.

8                (Deposition adjourned at 4:15 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 200

```
 1                 C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON        )

 4                              ) ss.

 5   COUNTY OF KING             )

 6

 7        I, the undersigned Washington Certified Court

 8   Reporter, pursuant to RCW 5.28.010, authorized to

 9   administer oaths and affirmations in and for the State

10   of Washington, do hereby certify:

11        That the annexed and foregoing deposition

12   consisting of Page 1 through 199 was taken

13   stenographically before me and reduced to a typed

14   format under my direction;

15        I further certify that according to CR 30(e) the

16   witness was given the opportunity to examine, read and

17   sign after the same was transcribed, unless indicated

18   in the record that the review was waived;

19        I further certify that all objections made at the

20   time of said examination to my qualifications or the

21   manner of taking the deposition, or to the conduct of

22   any party, have been noted by me upon said deposition;

23        I further certify that I am not a relative or

24   employee of any such attorney or counsel, and that I

25   am not financially interested in said action or the
```



1    outcome thereof;

2        I further certify that the witness before

3    examination was by me duly sworn to testify to the

4    truth, the whole truth, and nothing but the truth;

5        I further certify that the deposition, as

6    transcribed, is a full, true and correct transcript of

7    the testimony, including questions and answers, and

8    all objections, motions, and exceptions of counsel

9    made and taken at the time of foregoing examination

10   and was prepared pursuant to Washington Administrative

11   Code 308-14-135, the transcript preparation format

12   guideline;

13       I further certify that I am sealing the

14   deposition in an envelope with the title of the above

15   cause and the name of the witness visible, and I am

16   delivering the same to the appropriate authority;

17

18       IN WITNESS WHEREOF, I have hereunto set my hand,

19   and affixed my official seal this 22nd day of

20   November 2023.

21                            _____

22                            Cheryl Macdonald, CCR

23                            Washington State Certified

24                            Court Reporter

25                            License No. 2498



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 202

```
 1                D E C L A R A T I O N

 2

 3

 4

 5        I declare under penalty of perjury that I

 6   have read my within deposition, and the same is true

 7   and accurate, save and except for changes and/or

 8   corrections, if any, as indicated by me on the

 9   correction sheet hereof.

10

11

12                              _____

13                              JULIA DUIN

14

15

16

17

18

19        Dated this_____day of_____,

20   2023.

21

22

23

24

25   CHERYL MACDONALD, Court Reporter
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 203

1

2    MOBURG REPORTING
     COURT REPORTERS & LEGAL VIDEO
     33400 9th Avenue South
3    Suite 207
     Federal Way, WA 98003
4    206-622-3110

5    _____
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
6    SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS
     SHEET, SIGN THE ACCOMPANYING SIGNATURE SHEET AND
7    RETURN AS PER INSTRUCTIONS IN COVER LETTER.

8    _____
     PAGE          LINE              CORRECTION AND REASON
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                   _____
                                     (SIGNATURE)
24

25
     REPORTER: CHERYL MACDONALD



```
 1
                      MOBURG REPORTING
 2             Court Reporters & Legal Video
            33400 9th Avenue South, Suite 207
 3               Federal Way, WA 98003
             (206) 622-3110  FAX (206) 343-2272
 4            E-mail: info@moburgreporting.com


 5


 6   TO:   Sara Tesoriero              November 22, 2023
           51 Astor Place
 7         New York, New York 10003


 8

     IN RE:  The Satanic Temple v. Newsweek
 9
     DEPOSITION(S) OF: Julia Duin
10
     DATE OF DEPOSITION: November 16, 2023
11

12   A copy of the deposition transcript of the above-named
     is provided via E-transcript.  Please have the
13   deponent read the deposition, sign the correction
     sheet and declaration.  The signed correction sheet
14   and declaration should then, within 30 (thirty) days,
     be forwarded to:
15
                      CHERYL MACDONALD
16
                      33400 9th Ave. So.  #207
17
                      Federal Way, Washington 98003
18
     who will then enclose them in the original transcript,
19   seal it, and forward it to Mr. Kezhaya for retention
     until the time of trial.
20
          If you have any questions, feel free to contact
21   me at the number listed above.

22
     Sincerely,
23


24   CHERYL MACDONALD, CCR

25   CC: M. Kezhaya
```



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Page 205

```
 1                Certification of Court Rule and WAC Compliance

 2                     The Satanic Temple v. Newsweek

 3         I, VALERIE SEATON, am an authorized representative of
 4    MOBURG REPORTING and do hereby, under penalty of perjury,
      certify that Moburg Reporting and all court reporters
 5    providing services in the above-captioned case on MOBURG
      REPORTING'S behalf will fully comply with all applicable
 6    rules and regulations governing the provision of court
      reporting services, including, where applicable,
 7    Washington Superior Court Rule 28(c)-(e) and WAC
      308-14-130(1).*
 8
                                             11/22/23
 9    _____        _____
      Valerie L. Seaton                         Date
10    President
      Moburg Reporting
11

12         *28(c)  Disqualification for Interest.  No deposition
      shall be taken before a person who is a relative or
13    employee or attorney or counsel of any of the parties, or
      is a relative or employee of such attorney or counsel, or
14    is financially interested in the action.
      28(d)  Equal Terms Required.  Any arrangement concerning
15    court reporting services or fees in a case shall be
      offered to all parties on equal terms.  This rule applies
16    to any arrangement or agreement between the person before
      whom a deposition is taken or a court reporting firm,
17    consortium, or other organization providing a court
      reporter, and any party or any person arranging or paying
18    for court reporting services in the case, including any
      attorney, law firm, person or entity with a financial
19    interest in the outcome of the litigation, or person or
      entity paying for court reporting services in the case.
20    28(e)  Final Certification of the Transcript.  The court
      reporter reporting a deposition shall not certify the
21    deposition transcript until after he or she has reviewed
      the final version of the formatted transcript.  A court
22    reporting firm, consortium, or other organization
      transmitting a court reporter's certified transcript
23    shall not alter the format, layout, or content of the
      transcript after it has been certified.
24         *308-14-130(1)  Offer arrangements on a case
      concerning court reporting services or fees to all parties
25    on equal terms.
```





November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL



November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL

