# EXHIBIT 3





**Moburg Reporting**

33400 9th Ave. South, Suite 207

Federal Way, WA 98003

(206) 622-3110

www.MoburgReporting.com

1    services during high school?

2         A.    Oh, yes.

3         **Q.    What were these freelance services?**

4         A.    I was a high school sports reporter for a

5    local paper.

6         **Q.    Okay.  And about what year was that?**

7         A.    1977-ish.

8         **Q.    Your first job as a reporter came in 1979;**

9    **is that correct?**

10        A.    Full-time job, yes.

11        **Q.    And have you been a reporter since?**

12        A.    Mm-hmm.

13        **Q.    Have you received any awards for reporting?**

14        A.    Many.

15        **Q.    Which rewards have you received?**

16        A.    I've received -- oh, my gosh.  Where do you

17    start?

18        **Q.    Start with the earliest.**

19        A.    Religion News Writer's Association,

20    multiple, multiple awards, I'd say.  I just received

21    several last year, which are -- detail on my blog,

22    which is publicly available.  Let's see.  Associated

23    Press, Mark Twain Award, Chesapeake.  My goodness.

24    Let's see.  Wilbur.  Where do we start?  Three time

25    Wilbur Award winner.  Wilbur is for rewards by the



1   Religion Communicators Council.  This is a national

2   award for excellent religion reporting, excellence in

3   religion reporting.  So I'm a three-time winner there.

4           Let's see.  Multiple -- other than the

5   Associated Press and local -- local awards, I'd have

6   to get my resume in front of me to detail ones that

7   are out of the Washington D. C. area.  Anyway, how

8   many?  I mean, 20, 25.  I don't know.  I don't have a

9   number right in front of me.

10          **Q.    You mentioned that all of the awards are on**

11   **your blog; is that correct?**

12          A.    My latest one is on my blog, the Religion

13   News Writers, the three ones, the first and second

14   place awards that I won for the Religion News Writers

15   Association, which is a professional association of

16   the -- all the religion reporters in the country.

17   It's not really known outside of people who -- it's a

18   -- it's a -- how would I put it?  It's people who

19   cover religion.  Most people outside of the -- of the

20   occupation wouldn't know about it, but it pits the

21   best people in the business against each other.  So

22   I'm up against people from the New York Times, the

23   Washington Post, the Atlantic, I mean, you know.  And

24   I won for my work for the National Geographic,

25   Politico, and Newsweek.



1        Q.     And the Religion Communicator Council, I

2   understood your testimony to be, a professional

3   association of religion reporters; is that correct?

4        A.     Well, there's two different groups.

5   There's the Religion News Association.  That's a whole

6   different group.  Religion Communicators Council is

7   something else.  It's a -- that's something different.

8        Q.     Okay.  Please explain.

9        A.     I'm not a member of the Religion

10  Communicators Council.  I'm a member of the Religion

11  News Association.  I know less about the Religion

12  Communicators Council, and I've won many more rewards

13  for the Religion News Association.  I did not go into

14  that on my blog because, I mean, that would take much

15  more room.  The Wilbur Award is -- it involves more

16  disciplines, more broadcast, and a few more -- it's a

17  bit more wide-ranging than the Religion News

18  Association awards, I believe, but don't quote me on

19  that.

20       Q.     Why did you receive these Wilbur awards?

21       A.     Well, it's for excellence in religion

22  reporting.

23       Q.     Was it a particular piece?

24       A.     Yeah.  They were both for pieces on -- one

25  was on clergy.  Let's see.  One was back in 2002 about

1    the state of America's clergy.  Let's see.  I think

2    the next one was 2015, about a Lutheran clergy woman.

3    And then there was the 2018 award that I talk about on

4    this blog.

5         **Q.    I see also that you've published seven**

6    **books; is that correct?**

7         A.    Mm-hmm.  Yes, there would be seven.  That

8    should be listed on my blog.

9         **Q.    The text of the blog states you've**

10   **published seven books, the latest being "Finding Joy:**

11   A Mongolian Woman's Journey to Christ," the biography

12   -- well, a biography.  Before that you've published

13   "In the house of the Serpent Handler:  A Story of

14   Faith and Fleeting Fame in the Age of Social Media."

15          These are two books that you've written; is

16   that correct?

17        A.    Mm-hmm.

18        **Q.    You've written five other books, I deduced,**

19   **from the text.  Were they all about religion?**

20        A.    One was not all.  One was a collection of

21   Victorian fairy-tales.

22        **Q.    Okay.  And I see that you have served as a**

23   **visiting journalism professor at the University of**

24   **Alaska at Fairbanks; is that correct?**

25        A.    Mm-hmm.



1    Q.    Have you served as professor at any other

2    universities?

3    A.    I was at Union University in Jackson,

4    Tennessee.

5    Q.    Any others?

6    A.    I was an adjunct professor for one semester

7    at University of Maryland.  Also an adjunct -- oh, my

8    goodness.  What's the name of the place?  Patrick

9    Henry University in -- oh, my -- it's in Virginia,

10   Purcellville, Virginia.  P-U-R-C-E-L-L-V-I-L-L-E,

11   Purcellville, Virginia.

12   Q.    Have you served as professor or teacher of

13   journalism anywhere else?

14   A.    No.  This is my only -- those are the only

15   four places.

16   Q.    Excellent.  For how long did you serve as a

17   professor, cumulatively?

18   A.    Let's see.  Well, let's see.  Well, if you

19   count up, I guess, the adjunct, two and a half years.

20   I guess if you count up the adjunct and the full-time

21   experiences, about two and a half years.

22   Q.    Okay.  And in your role as professor, were

23   these all journalism professor roles or --

24   A.    Yes.

25   Q.    In the course of your teaching as



1    Correct or incorrect?

2              MS. TESORIERO:  Objection to form.

3        A.    This pitch was the -- this would have been,

4    really, the beginning of my work on this article.

5        Q.    **This pitch was the very beginning of your**

6    **work on this article; correct?**

7              MS. TESORIERO:  Objection.

8        A.    I would say yes.

9        Q.    **That's your testimony?**

10             MS. TESORIERO:  Objection.

11       A.    Just a moment.  It depends on what you call

12   "work."

13       Q.    **What was entailed in drafting this pitch?**

14       A.    I had gotten -- I had gotten an idea for

15   this article and I drafted the pitch.

16       Q.    **Where did the idea come from?**

17       A.    I had -- someone suggested it to me.

18       Q.    **Who suggested it to you?**

19       A.    I had a -- another journalist.

20       Q.    **Another journalist suggested it to you?**

21       A.    Mm-hmm.

22       Q.    **Who was this journalist?**

23       A.    His name is Kevin.

24       Q.    **What is Kevin's last name?**

25       A.    Trying to remember.  My mind is blank right



1   now.  I can't remember.

**2**      Q.    How did you know Kevin?

3      A.    Actually, I really didn't know him.

4   Somehow he had heard of me.  I really didn't -- I

5   really hardly knew the man.  I mean, I really didn't

6   know him, actually.

**7**      Q.    How did Kevin convey this idea for this

**8**   article?

9      A.    E-mail.

**10**     Q.    Did he write this pitch for you?

11     A.    Did he write the pitch?

**12**     Q.    Correct.

13     A.    I wrote the pitch.  He had some -- some of

14   this is -- some of this is pitch is taken from what he

15   wrote me.

**16**     Q.    When did he write you that?  Before or

**17**   after September 1st, 2021?

18     A.    When did he send me that e-mail?  Let's

19   see.  I'm trying to remember.  I know I had gotten an

20   e-mail, and I'm just trying to remember when.  Trying

21   to remember when he sent it to me.  And I -- I don't

22   remember.  I don't remember.  I really don't remember

23   when he sent it to me.

**24**     Q.    Did you provide your counsel approximately

**25**   26 pages of e-mails in the course of preparing for



```
 1        A.    I was laid off.
 2        Q.    And what was the stated reason?
 3        A.    Finances.
 4        Q.    Did your layoff have anything to do with
 5   this article?
 6        A.    No.
 7        Q.    Did your layoff have anything to do with
 8   this lawsuit?
 9              MS. TESORIERO:  Objection.  Calls for
10   speculation.
11        A.    May I suggest you ask Nancy Cooper that?
12        Q.    Pardon?
13              MS. TESORIERO:  You can still answer his
14   question.
15        A.    I can answer?
16              MS. TESORIERO:  Can you restate the
17   question.
18        Q.    Did the lawsuit have anything to do with
19   you being laid off?
20        A.    No.
21        Q.    Do you have any contracts with Newsweek?
22        A.    Contracts?
23        Q.    Do you have any form of written agreement
24   with Newsweek, for example, a severance agreement?
25        A.    I don't believe so.
```



1      Q.    And you said that they laid you off because

2  of finances?

3      A.    Yes.

4      Q.    Could you please expand?

5      A.    That's all I was told.

6      Q.    Who told you that?

7      A.    It was Dayan.

8      Q.    And when did that conversation take place?

9      A.    November of 2022.

10     Q.    Was it effective immediately or effective

11  at some future date?

12     A.    Future date.

13     Q.    What was the future date?

14     A.    February 2023.

15     Q.    So you were paid through February of 2023?

16     A.    Trying to remember.  Yes.

17     Q.    Your last article is dated January 1, 2023.

18     A.    Mm-hmm.

19     Q.    So you were paid for both January and

20  February of 2023 even though you didn't write any more

21  articles for Newsweek?

22           MS. TESORIERO:  Objection to form.

23     A.    Yes, sir.

24     Q.    Did you perform any services for Newsweek

25  in January or February of 2023?



Page 88

```
 1        A.    I really can't remember.
 2        Q.    You are trained as a minister, are you not?
 3        A.    No, I'm not.
 4        Q.    You undertook some form of religious
 5   studies, did you not?
 6        A.    Yes.
 7        Q.    What were your religious studies?
 8        A.    It was a master's degree.
 9        Q.    It was a master's degree?
10        A.    Uh-huh.
11        Q.    What is the formal name of the degree?
12        A.    Master's degree in religion.
13        Q.    And where did you get that degree?
14        A.    At Trinity Episcopal school for ministry,
15   but it's not an MDF.
16        Q.    What is it if not an MDF?
17        A.    It's not -- it's a regular master's degree.
18   It's an academic degree.  It's not a ministerial
19   degree.
20        Q.    Okay.  So this Episcopal school had
21   separate programs for religion and ministerial
22   programs; is that correct?
23        A.    Mm-hmm.
24        Q.    What is the distinction?
25        A.    Well, master's degree in divinity is for
```



1    explain what you mean by that?

2         **Q.    Jinx Strange is a pseudonym, is it not?**

3         A.    His Facebook page says Jinx Strange.

4    Unlike other people I interviewed, he did not say he

5    was using a pseudonym.

6         **Q.    How did you come to e-mail JInx Strange in**

7    **the first place?**

8         A.    I was referred to him.

9         **Q.    By whom?**

10        A.    Members of the defendants in the

11   QueerSatanic case.

12        **Q.    When did they provide you that information?**

13        A.    Where or when?

14        **Q.    When.**

15        A.    After I interviewed them in person.

16        **Q.    When was that?**

17        A.    What day did I interview them?  Let's see.

18   It was in -- it was in October 2021.  What day it was?

19        **Q.    Early, mid, or late suffices for my**

20   **purposes.**

21        A.    We'll say mid October.

22        **Q.    Okay.  On September 30th, you had testified**

23   **that that was the first instance in which you pitched**

24   **the subject article.  Do you remember that?**

25        A.    Right.

1      Q.    How long after that pitch did you get the

2  green light to start pursuing this article?

3      A.    Well, let me think.  I'm trying to

4  remember.  I can't remember.  I don't think it was

5  long after that.  However -- I don't think it was long

6  after that.

7      Q.    In terms of days?  Weeks?

8      A.    Probably within a week.

9      Q.    And to clarify, that was when you got the

10  green light to pursue the article; correct?

11      A.    Sure.  However -- yeah, I would say within

12  a week.

13      Q.    Okay.  And then how long after the green

14  light did you talk to the QueerSatanic?

15      A.    Well, I had to find them first.  Let's see.

16  It took some -- yeah.  I had to find them.  Talk them

17  into doing the interview.  That took a little while.

18  So that was at least another week.

19      Q.    You had to talk them into doing an

20  interview?

21      A.    Well, yeah.

22      Q.    What did that entail?

23      A.    Numerous -- a lot of messaging back and

24  forth.

25      Q.    There was a lot of messaging back and

 1   forth?

 2       A.    Well, yeah.

 3       Q.    **How did these messages take place?**

 4       A.    We messaged -- let's see.  Messaged each

 5   other on Twitter.

 6       Q.    **Is that all of the messaging that took**

 7   **place --**

 8       A.    Yes.

 9       Q.    **-- which constituted talking them into**

10   **doing the interview?**

11       A.    Mm-hmm, mm-hmm.

12       Q.    **During what time period did you have these**

13   **discussions?**

14       A.    It would have been early to mid October, up

15   until the time we met.

16       Q.    **Did you interface with personal Twitter**

17   **accounts or the QueerSatanic account?**

18       A.    I think QueerSatanic.  I believe it was

19   QueerSatanic.

20       Q.    **Was it only QueerSatanic, or did you also**

21   **interface with personal accounts?**

22       A.    I think it was only QueerSatanic -- I'm

23   trying to remember.  I don't remember.

24       Q.    **Would it refresh your --**

25       A.    I'm trying -- I just cannot.  What were you



1    photos.

2         A.    All right.  No.  That was -- no, I did not.

3         **Q.    Did Jinx Strange ever give you any names of**

4    **individuals who have allegedly been sexually abused by**

5    **anyone in the course of TST services and then covered**

6    **up?**

7              MS. TESORIERO:  Objection to form.

8         A.    He said he was willing to, but I didn't ask

9    him.

10        **Q.    You did not ask him.  Why didn't you ask**

11   **him?**

12        A.    Because the article was mainly on the

13   lawsuit, and it was not on the -- it was not an

14   investigation into the sexual abuse or the finances or

15   the alt-right figures.  It wasn't on these various

16   permutations.  The article was on the QueerSatanic

17   people.

18        **Q.    Well, I mean, the article was about the**

19   **sexual abuse and cover-up plan, was it not?**

20             MS. TESORIERO:  Objection to form.

21        A.    No.  The article was on the lawsuit.

22        **Q.    Then why did you include the statement?**

23        A.    I included a lot of statements.

24        **Q.    Why didn't you include the subject**

25   **statement for which we are here today?**



1      A.    Because it gave a general view of the

2  various controversies surrounding The Satanic Temple.

3      **Q.    And you used the phrase -- well, let's --**

4            MR. KEZHAYA:  Are we on Exhibit 7 now?

5            THE REPORTER:  8.

6            MR. KEZHAYA:  I'm going to mark the subject

7  article as Exhibit 8.  Did we already have it in here?

8  I don't think so.

9            Sara, do you already have a copy of the

10  article?

11            MS. TESORIERO:  Oh, a copy?  Yes, I'm

12  sorry.  I didn't know that was going to be an exhibit.

13  I have a copy of the article.  Is that Exhibit 8?  Do

14  you need it?

15            MR. KEZHAYA:  No.  I don't need it.

16            (Exhibit No. 8 was marked for

17            identification.)

18      **Q.    Please review Exhibit 8.**

19      A.    Yes.

20      **Q.    Would you agree with me that that is a true**

21  **and correct copy of the article that you wrote?**

22      A.    As far as I can tell.

23      **Q.    At the top of page 8, you state [as read],**

24  **"He wrote, 'Accounts of sexual abuse being held up in**

25  **ways that were more than anecdotal.'"  And that's the**



1    extent that I care about.

2              Do you see that?

3         A.    Yes, I do.

4         Q.    Why did you include that statement?

5         A.    It was part of a paragraph.  It was part of

6    a paragraph that had several statements in it.

7         Q.    There were many paragraphs that had many

8    statements in it by Jinx Strange.  Why --

9         A.    Yes.

10        Q.    -- did you include this particular

11   statement?

12        A.    Yes.  He gave me a very long e-mail.

13        Q.    Yes, he did.  And you went through that

14   e-mail, presumably, did you not?

15        A.    That's right.

16        Q.    And you found a choice selection from it;

17   correct?

18        A.    I selected several sentences and paragraphs

19   from it.

20        Q.    And why did you select those to the

21   exclusion of others?

22        A.    Well, Jinx had a lot of -- several of these

23   paragraphs -- all right.  I have to explain a little

24   bit about reporting.  A lot of things here, he had

25   references to many things that you would have to have

1   additional explanations of who these people were and

2   backgrounders.  And there was way too much background

3   that you would have to explain what he was talking

4   about on various people, various personalities.  And I

5   was looking for more of -- paragraphs that explain

6   more of a general feel of what -- his perception of

7   what The Satanic Temple was about.  What he thought,

8   what his experience was, what he was hearing from

9   other people.  What I picked out was the best

10   sentences that he had that expressed his point of

11   view.

12   **Q.    Okay.  And earlier you testified that this**

13   **article was about the lawsuit; correct?**

14   A.    Yes.  It was about the lawsuit.  And --

15   yes, it was.

16   **Q.    Was that the only thing that this article**

17   **was about?**

18   A.    Well, obviously, also an explanation of the

19   Satanic -- parts of The Satanic Temple.

20   **Q.    Parts of the Satanic.  Please be more**

21   **particular.  What parts?**

22   A.    Let me explain to you.  Just a moment.

23   I'll get to it in just a moment.  Okay.  When Johnson

24   talks on page 7, he talks about TST's background.  So

25   I'm thinking, okay, background, and then I have -- you



1   know, is TST a religion?  Can you criticize it?

2   That's in the middle.  I quote "you" talking about the

3   defendants.  Then quote Johnson talking about the

4   background.  And so, okay, so what are people saying

5   about The Satanic Temple.  So, okay, what are people

6   saying.

7           So then I start asking other people, okay,

8   what are people saying.  I talked to the unofficial

9   biographer, Mr. Laycock.  Talked to him.  Talked to

10  Mr. Strange.  Talked to Ms. DeMeur.  Talked to Scott

11  Malphas.  These are the other two -- you know, we have

12  -- are not their true names, I know that.  Talked to

13  you.  Of course talked to Lucien.  And by that time it

14  was -- the article is running long enough.

15          So I wanted to kind of give a general

16  picture of what was more of a -- I wanted to give more

17  of a background of what was going on with The Satanic

18  Temple.  Kind of how it started.  The whole

19  mocumentary.  So I had to throw in a bit more details

20  about The Satanic Temple other than the lawsuit.  So

21  does that answer your question?

22      **Q.    How did you ascertain who you would talk to**

23  **and what degree of fact checking you were going to get**

24  **into?**

25          MS. TESORIERO:  Objection to form.



1      A.    Well, I believe it was Lucien who asked me

2  to talk to Mr. Laycock, although I had heard of Mr.

3  Laycock.  Obviously, you were the attorney, and

4  Lucien.  Spent many hours talking about the view.

5  Well, I spent some time talking -- I had several

6  interactions with you, and a long interview with

7  Mr. Greaves.  And a fairly decent interview with

8  Mr. Laycock.  The Seattle -- talking person, the

9  Seattle defendants, three out of the four.  The --

10  let's see.  Excuse me.  Okay.  And -- yeah.  And then

11  e-mailed two other people.  Oh, sorry.  Three other

12  people.

13            And then the second half of your question

14  was what?

15      Q.    How did you ascertain to what degree of

16  fact checking you were going to engage in?

17      A.    What degree of -- well, I mean, what degree

18  of fact checking?  I'm not sure what you mean by that.

19  Can you explain?

20      Q.    Do you have a definition in your mind of

21  what fact checking entails?

22      A.    I know what fact checking entails.

23      Q.    Please provide me your understanding of the

24  definition of --

25      A.    Well --


MOBURG
REPORTING

1      Q.      Let's phrase the question --

2      A.      Yeah.  Let's phrase the question a

3   different way.

4      Q.      **Do you know of anyone at Newsweek who**

5   **performed any fact investigation into this paragraph?**

6      A.      No.  I don't know of anyone who performed a

7   fact investigation into this paragraph.

8      Q.      **Other than you, did anyone at Newsweek have**

9   **any contact with Scott Malphas?**

10             MS. TESORIERO:  Objection to form.

11     A.      No.

12     Q.      **You hesitate with "No."  Is there someone**

13   **else that you know of who has had --**

14     A.      No.  No.  There is no one else.

15     Q.      **Okay.  And likewise, for the allegation in**

16   **the Jinx Strange e-mail quoted in the article that**

17   **there are accounts of sexual abuse being covered up,**

18   **you personally did not investigate that at all;**

19   **correct?**

20             MS. TESORIERO:  Objection to form.

21     A.      Did I personally investigate it?

22     Q.      **Correct.**

23     A.      I found what he said inherently plausible

24   considering the account from the Seattle quartet, or

25   the interviews with the Seattle people that -- and the



1   testimony -- well, not testimony -- the account from

2   Scott that there was of these -- the reason for the

3   sex-positive guidelines -- that what Jinx was saying

4   was true.

5        **Q.    You found it inherently plausible.  What**

6   **did you do to foreclose the possibility that he was**

7   **lying?**

8              MS. TESORIERO:  Objection to form.

9        A.    Why would he lie?

10       **Q.    What did you do to foreclose the**

11  **possibility that he was lying?**

12             MS. TESORIERO:  Objection to form.

13       A.    What did I do to foreclose?

14       **Q.    Stated another --**

15       A.    If someone is lying, you know, like, if you

16  think they're lying, for instance, like, their links

17  don't check out.  They don't exist.  First of all, you

18  check to make sure that they're a real person.  I

19  mean, everything checked out.  His -- what he's -- I

20  mean, I knew, for instance, what he was -- like, the

21  sentence before that there was some connections to the

22  alt-right or figures.  I certainly had heard many

23  complaints about that, even before the pictures showed

24  up after the article, which I did not go into for the

25  article.



```
 1              In terms of there were -- I knew there were
 2    complaints about finances.  Even Doug Laycock -- we're
 3    talking about the sentence afterwards.  Doug Laycock
 4    went into that for his book.  So, you know, Jinx had
 5    given kind of a general -- it was a general read of
 6    The Satanic Temple.  And it was his -- it was how he
 7    saw the state of the religion.  And from my other
 8    interviews with people, I found it plausible he was
 9    correct.
10         Q.    Did you ask Lucien Greaves about coerced
11    sexual activity and cover-up within The Satanic
12    Temple?
13         A.    I asked him -- I certainly asked him in
14    connection with the orgies, yes.
15         Q.    Not in connection with the orgies.  Did you
16    ask him specifically about Jinx Strange's comment?
17         A.    No.  I did not ask him about Jinx Strange's
18    comment.
19         Q.    Why not?
20         A.    Why not?  I didn't -- I felt I had asked
21    Lucien plenty of questions.  And right below that, I
22    had a quote from Lucien that basically denied all
23    these accusations.
24         Q.    Did you confront Lucien Greaves with the
25    allegation that there are accounts of sexual abuse and
```

1    cover-up within The Satanic Temple?

2           MS. TESORIERO:  Objection.  Asked and

3    answered.

4       A.    Did I confront him?  Did I confront him?

5    Trying to remember.  I don't believe I did.

6       Q.    So Lucien Greaves's comment in his e-mails

7    could not possibly have related to something that you

8    did not confront him with.  You would agree with me

9    there; correct?

10          MS. TESORIERO:  Objection to form.

11      A.    I disagree.

12      Q.    You disagree?

13      A.    I disagree.

14      Q.    Please explain your basis for disagreeing.

15      A.    His quote here -- his quote underneath, it

16   covered the -- all of Jinx's accusations.  He says,

17   "We are accused of all sorts of nefarious things."  I

18   covered it.  I covered what Jinx was saying.

19      Q.    Did you ever even mention the word Jinx

20   Strange -- the name "Jinx Strange" to Lucien Greaves?

21      A.    I believe I talked to -- I may have talked

22   to Jinx maybe after I talked to Lucien.

23      Q.    So you didn't even talk to Jinx Strange and

24   then talk to Lucien, and yet you're telling me that

25   Lucien's comment pertains to Jinx Strange's



1   allegations, under oath?

2           MS. TESORIERO:  Objection to form.

3      A.   I don't know.

4      Q.   You don't know?

5      A.   I don't know.

6      Q.   You don't know what your testimony is?

7      A.   I know what my testimony is.

8      Q.   Please restate your testimony.

9           MS. TESORIERO:  What testimony are you

10  asking her to restate?

11          MR. KEZHAYA:  The subject testimony that

12  we're talking about.

13          MS. TESORIERO:  You've asked her several

14  questions.  Could you please just clarify for her what

15  you're asking her to restate, or generally.

16     Q.   Your testimony is that after you talked to

17  Lucien Greaves you talked to Jinx Strange, and Lucien

18  Greaves's commentary pertains to Jinx Strange?

19     A.   I think -- actually, I think Lucien

20  Greaves's commentary pertains to Jinx Strange's

21  accusations.

22     Q.   Based on what?

23     A.   Because -- what do you mean "based on

24  what"?

25     Q.   Well, seeing as how you didn't mention Jinx



 1  **Strange or the allegations to Lucien Greaves, I find**

 2  **it very difficult to understand how Lucien Greaves's**

 3  **comment could have any pertinence to Jinx Strange's**

 4  **allegations.**

 5       A.    I don't see how --

 6            THE REPORTER:  Please.  I need to hear the

 7  end of the question.

 8            MR. KEZHAYA:  Jinx Strange or Jinx

 9  Strange's allegation.

10            MS. TESORIERO:  Are you asking her a

11  question?

12            MR. KEZHAYA:  I'm asking her to explain

13  what she's -- where she's coming from with her

14  testimony.

15            MS. TESORIERO:  Objection.  Asked and

16  answered.

17       A.    The way -- the way I constructed the

18  article is that the -- okay.  Jinx gave -- Jinx had

19  several things to say about the organization, the

20  alt-right, the sexual abuse, the finances.  And I had

21  Lucien giving a general denial about -- a general

22  denial.  I did not feel he -- Lucien's general

23  statement had to address every single thing

24  specifically.

25       **Q.    Why did you have him address anything in**



1   particular then?

2              MS. TESORIERO:  Objection to form.

3       A.    Why did I have Lucien address anything in

4   particular?

5       **Q.    Why did you ask Lucien any particular**

6   **questions if you felt like a general denial of any**

7   **nefarious act is adequate for purposes of creating a**

8   **fair, balanced article?**

9       A.    I asked Lucien direct questions on other

10  matters.  I mean, he'd direct the answers to many

11  other questions, which he gave -- he had more than

12  enough -- I gave him more than enough space in the

13  article to give plenty of answers to my questions.

14  And he gave a fair defense of many things, for

15  instance -- and, again, more the whole orgies matter.

16  So I felt the paragraph was a defense of the -- that

17  matched the Jinx quote.  And I was -- that it was a

18  fair rebuttal.

19      **Q.    Even though you never talked to Lucien**

20  **Greaves after Jinx Strange; correct?**

21      A.    Yes.  I did feel it, yeah.

22      **Q.    And you constructed the article to make it**

23  **appear that way; correct?**

24             MS. TESORIERO:  Objection.  Form.  Appear

25  what way?


MOBURG
REPORTING

```
 1        A.    Appear?
 2        Q.    You testified earlier:  I constructed the
 3   article to make it appear as if Lucien Greaves said --
 4        A.    No.
 5        Q.    -- generally denied everything that --
 6              (Cross talk.)
 7              MS. TESORIERO:  Objection.
 8   Mischaracterizes her testimony.
 9        A.    That's a lie.
10        Q.    Oh.  So then --
11        A.    That's not true.
12        Q.    -- you don't consider that general denial
13   to be applicable to Jinx Strange's testimony.
14        A.    It's applicable but --
15              MS. TESORIERO:  Wait.  Let him finish his
16   question.
17        A.    Okay.  You're putting words in my mouth
18   that aren't true.  Okay.  You can -- I'm trying to
19   think of how to word this.  Wait a minute.
20              In the newspaper article -- I feel I have
21   to explain how one puts together newspaper articles.
22   Okay.  You can have a person's quotes.  You can have
23   another person's quotes underneath them.  They don't
24   have to necessarily be, you know, like, directly --
25   like, you talked to person A, and then you directly
```



1   talked to person B right afterwards.  You can have --

2   you know, you can have them from separate

3   conversations at different times.  So if I have a

4   quote from Lucien that applies to various accusations

5   that people make to The Satanic Temple, I have the

6   right to put that in under a Jinx quote no matter when

7   Lucien said it.

8       **Q.    Would you agree with me that the accusation**

9   **that TST engages in sexual abuse and cover-up is**

10  **serious?**

11          MS. TESORIERO:  Objection to form.

12      A.    Well, sure.  That's what kind of got the

13  Seattle people in trouble; right?

14      **Q.    Would you agree with me that writing an**

15  **article that states TST engages in sexual abuse and**

16  **cover-up is a criminal allegation?**

17          MS. TESORIERO:  Objection to form.  That

18  misrepresents the article and calls for a legal

19  conclusion.

20      A.    Okay.  Can you please restate that.

21      **Q.    Is sex abuse a crime?**

22      A.    I believe so.

23      **Q.    Is covering up sex abuse also a crime?**

24          MS. TESORIERO:  Objection.  Form.  She's

25  not a lawyer.



```
 1        Q.     And that's not a rhetorical accusation.
 2   You are, in fact, accusing TST of sexual abuse and
 3   cover-up?
 4              MS. TESORIERO:  Objection.  Form.
 5        A.     I'm being put into a corner.  I'm getting
 6   --
 7        Q.     It's a yes/no question, Julia.
 8        A.     It doesn't sound like it to me.
 9        Q.     You can say "yes, because," or "no,
10   because," if it makes you feel better.
11        A.     You're asking me if I'm -- if I'm accusing
12   TST.  Wait a minute.  I am quoting someone.  I'm
13   quoting someone.
14        Q.     And yet --
15        A.     You're asking me if I'm accusing them.  I'm
16   not accusing anybody of anything.
17        Q.     You found it inherently plausible, you
18   testified earlier?
19        A.     I ran the quote because -- I wouldn't run
20   -- I wouldn't run a quote if someone said the sky was,
21   you know, orange or something.
22        Q.     Why not?
23        A.     I mean, I found the -- the witness was
24   inherently plausible.  I will -- but it was a claim.
25   So -- but I personally am not accusing TST of
```



```
 1   anything.
 2      Q.    It was a claim that you found inherently
 3   plausible and you uncritically published it in a
 4   publication that more than one in five Americans read;
 5   correct?
 6            MS. TESORIERO:  Objection to form.  There's
 7   like five questions in there.
 8      Q.    Did you critically publish it?
 9            MS. TESORIERO:  Objection to form.
10      Q.    Did you analyze whatever sexual abuse is
11   and whatever cover-up is?  Did you ask for
12   particulars?
13            MS. TESORIERO:  Objection to form.
14      A.    I'm going to stay with what I originally
15   said.  I'm going to stick with that.
16      Q.    I don't care what you're sticking with.
17   Did you or did you not ask for any particulars about
18   what sexual abuse is?
19      A.    I did not ask -- did I ask him?
20      Q.    Did you ask anyone?
21      A.    What do you mean did I ask anyone?
22      Q.    Did you ask anyone what particular sexual
23   --
24      A.    I think the best way --
25            MS. TESORIERO:  Let him finish his
```



1       A.    You're asking a non-techy here.

2       Q.    **That's okay.  I think we have enough**

3  **information that if I ask you for your calendar, will**

4  **you know what I'm talking about?**

5       A.    Yeah, yeah, yeah, yeah.  I mean, it's -- it

6  comes with every Mac, you know.

7       Q.    **And it's called an iMac calendar?**

8       A.    ICalendar.  Small I, capital C, calendar.

9             MR. KEZHAYA:  All right.  Is November the

10  next month after October?

11             MS. TESORIERO:  I think so.

12       Q.    **Did you ever read Laycock's book?**

13       A.    I read part -- I didn't get through the

14  whole thing, but I did read part of it.  And as much

15  -- anyway, I read part of it.

16       Q.    **Earlier you mentioned that there was a**

17  **particular date that was misstated in the book.**

18       A.    Yes.

19       Q.    **Do you remember that?  What was the date**

20  **stated?  What was the event -- well, let's start with**

21  **that.  What was the date stated in the book?**

22       A.    Wait a minute.  If I can find -- I guess it

23  was -- okay, because he stated -- okay.  All right

24  (inaudible).  Okay.  Because it showed up in the

25  article.  Just a moment.  I'm looking, I'm looking,



1   even names or contact information who theoretically

2   could be followed up with?

3       A.   No.

4       Q.   You have been a journalist for 45 years;

5   correct?

6       A.   Yes.

7       Q.   You have been a professor of journalism for

8   approximately two and a half years; correct?

9       A.   Mm-hmm.

10      Q.   Do you consider yourself a serious

11  journalist?

12           MS. TESORIERO:  Objection to form.

13      A.   Yes, I do.

14      Q.   Did you consider this piece of work to be a

15  credible, serious, and fair statement about sexual

16  abuse and cover-up?

17      A.   My article was fair, yes.

18      Q.   I'm asking you about the statement.

19      A.   About your statement?

20      Q.   Your statement.  The one that you put in

21  the article.

22      A.   Yes, I did.  It was fair.  And, yes, if I

23  hadn't believed that there wasn't sexual abuse going

24  on, I would not have put that into the article.

25      Q.   And what was your basis to believe there

1    was actually --

2         A.    Because there were plenty of people who

3    were saying it.

4               MS. TESORIERO:  Let him finish.

5         Q.    **Let me finish.  There were plenty of people**

6    **who say it, but all of these were biased and**

7    **disgruntled former members.**

8               MS. TESORIERO:  Objection to form.

9         Q.    **Correct?**

10              MS. TESORIERO:  Objection to form.

11        Q.    **Correct?**

12              MS. TESORIERO:  Objection to form.

13              MR. KEZHAYA:  I hear your objection.

14        Q.    **Correct?**

15        A.    Not correct.

16        Q.    **Not correct.  They were not biased?**

17        A.    No.  They were not biased.

18        Q.    **Which one of them was not biased?**

19        A.    Scott wasn't biased.

20        Q.    **He wasn't?**

21        A.    No.

22        Q.    **How do you know he wasn't biased?**

23              MS. TESORIERO:  Objection to form.

24        A.    Because he was a true believer when he came

25    in, and so was Jinx.  And they were all true



1  believers, and they saw stuff they didn't like, and

2  they left.  They all -- they all wanted to believe.

3  They all came in, and they believed in the

4  organization, and they left not believing in it.

5  Let's put it that way.

6      **Q.    Did you talk to them while they were**

7  **members of the organization?**

8      A.    I didn't have that opportunity.

9      **Q.    Did you talk to them after they left the**

10  **organization?**

11      A.    Of course.

12      **Q.    Did you describe all of them as disgruntled**

13  **former members?**

14      A.    No.

15      **Q.    You have never described these sources as**

16  **disgruntled former members.  That's your testimony**

17  **today; correct?**

18      A.    I described them as former members.

19      **Q.    You never described them as disgruntled;**

20  **correct?**

21          MS. TESORIERO:  Objection to form.

22      A.    No.  I did not describe them as

23  disgruntled.

24          MR. KEZHAYA:  Could you please get the

25  October 25th pitch?  It would've been in Cooper's



1    going to eventually have to answer the question.

2               MS. KEZHAYA:  Well, we can move on from

3    that.

4               MR. KEZHAYA:  Moving on.  Withdrawn.

5         **Q.    Julia, you've been a professor of religious**

6    **journalism; correct?**

7         A.    Journalism.  A journalism professor, not

8    just religion.  Not just a -- I've taught general

9    journalism and religion reporting.

10        **Q.    Okay.  You've been serving as a journalist**

11   **for 45 years; correct?**

12        A.    Right.

13        **Q.    You don't know your own ethical**

14   **obligations?**

15             MS. TESORIERO:  Objection to form.

16        A.    Of course I know my own ethical

17   obligations.

18        **Q.    Do your ethical obligations include a**

19   **requirement that you convey both sides of a serious**

20   **allegation?**

21             MS. TESORIERO:  Objection to form, but

22   answer.

23             THE WITNESS:  Right.

24        A.    I -- yes, of course.

25        **Q.    Would you have felt comfortable publishing**

1  sexual abuse and cover-up.  Sounds great.  I'm going

2  to take it at face value."

3          MS. TESORIERO:  That is misrepresenting the

4  testimony.  She has testified as to what she did to

5  look into those allegations.  She just testified that

6  several people reported the same statements to her.

7  If you want to ask about this allegation, ask about

8  it, but the criminal question she has already

9  answered.

10      Q.   **What delineates the difference between**

11  **hearing the rumor "TST kills children" versus hearing**

12  **the rumor "TST engages in sexual abuse and cover-up,"**

13  **such that you would ask for explanatory details about**

14  **the former but not the latter?**

15      A.   Well, there's already been people talking

16  about TST having multiple instances of sexual abuse,

17  harassment.  I mean, it's with a -- I mean, this has

18  been -- okay.  There's been multi -- once again, as

19  I'm saying for the third or fourth time now, there

20  have been multiple reports among disgruntled, if you

21  like the word, former members, of sexual

22  abuse/harassment slash by -- whether it's from Scott

23  or from the Seattle members or from Jinx.

24          In fact, wasn't there something from Jex

25  Blackmore about -- I'm trying to remember some other



1   public things that have been said.  You know, there's
2   been things said about sexual -- anyway, there's been
3   talk of this being a part of some of the culture at
4   the TST.  So, with multiple people, and talking about
5   sexual harassment, a sexual harassment complaint being
6   covered up.
7           And, wait, there's one more thing I'm going
8   to add.  Excuse me.  My mind went off.  Give me a
9   moment.  I'm sorry.  I was going to add something, and
10  it just went out the door.  I want to go back to what
11  I did ask -- you -- you've asked -- okay.  The culture
12  of -- okay.  I'll leave it there.  I'll stop there.
13      **Q.    You did not answer the question.**
14      A.    I did answer the question.
15      **Q.    The question posed is if you had heard the**
16  **same sources say that TST kills children, why would**
17  **you ask for explanatory details about that but not any**
18  **explanatory details about this sexual abuse and**
19  **cover-up claim?**
20      A.    Do I have to answer a hypothetical?
21      **Q.    Yes.**
22           MS. TESORIERO:  Objection.  Calls for
23  speculation, but yes, you can give an answer.
24      A.    Yeah.  Because you're losing me.  Just a
25  moment.  Okay.  If I would ask about details on why --

