# EXHIBIT 13

```
1                          Cooper
2    called as a witness and testified as follows:
3    EXAMINATION BY MR. KEZHAYA:
4          Q.    Please state your name for the
5    record.
6          A.    Nancy Cooper.
7          Q.    Nancy, have you ever been deposed
8    before?
9          A.    About six or seven years ago.
10         Q.    Okay.  What was that attendant to?
11         A.    It was something in which we were not
12   a direct something or another, We were a witness,
13   and it was literally about some bracelets that we
14   had written about.
15         Q.    Okay.  Was it a defamation lawsuit?
16         A.    I don't remember.
17         Q.    Okay.  Have you ever been a witness
18   or a defendant in a defamation lawsuit before?
19         A.    No.
20         Q.    Okay.  What is your current role at
21   Newsweek?
22         A.    I'm the global editor-in-chief.
23         Q.    What does that entail?
24         A.    I set the standard for what Newsweek
25   does or doesn't do.  I'm in meetings to discuss,
```



```
 1                     Cooper
 2          A.    Just terms of employment.
 3          Q.    But more particularly why would you
 4   use an independent contractor as opposed to
 5   bringing them on as an employee?
 6          A.    I think sometimes people have
 7   different needs.  I have never actually thought
 8   about that.  So I don't know the answer.
 9   Sometimes people want to have more freedom.  They
10   also want to freelance for somebody else, a
11   different media organization.  Sometimes.  I
12   don't know.
13          Q.    Are you in charge of hiring and
14   firing independent contractors?
15          A.    Some of them, yeah.
16          Q.    Are you in charge of hiring and
17   firing Duin?
18               MR. STRACHER:  I'm sorry.  Julia
19          Duin?
20               MR. KEZHAYA:  Correct.  Yeah.
21          Q.    Well, let me back up.  Is that how
22   you pronounce her name?
23          A.    I think it's -- I don't know.  I
24   think it's Duin, but I don't know either.
25          Q.    Okay.  Duin.  Were you in charge of
```


ESQUIRE
DEPOSITION SOLUTIONS

```
 1                        Cooper
 2   hiring or firing Duin?
 3          A.   Hiring her, yes, yes, and laying her
 4   off.  She wasn't fired for cause.  Her contract
 5   was not renewed.
 6          Q.   Okay.  Let's start with hiring her.
 7   Why her in particular?
 8          A.   She was -- she had not just a
 9   reputation.  She was an experienced religion
10   reporter.  That was her beat.  I believe she had
11   won some awards.  She's interested in the topic
12   and knew about it, and that's something that we
13   thought we should be covering.
14          Q.   Did you begin with the need that we
15   need a religion beat reporter, or did you begin
16   with this person needs a job here?
17          A.   Oh, no.  We were looking for a
18   religion reporter.
19          Q.   Okay.  Did you have any dealings with
20   Duin before interviewing her or hiring her or
21   anything like that?
22          A.   No.
23          Q.   When did you first meet Duin?
24          A.   Whenever the first interview was.  I
25   don't know.
```



```
1                        Cooper
2   Guidelines?
3          A.   Yes.  I thought it was still called
4   Editorial Guidelines.  I don't know when that
5   changed.
6          Q.   Absent publishing desk performing a
7   fact investigation, would anyone at Newsweek have
8   reviewed an article for factual accuracy from
9   Duin?  Yes or no.
10             MR. STRACHER:  Ever?
11             MR. KEZHAYA:  From Duin.  So I mean
12         there's a very limited time period that
13         could have been.
14             MR. STRACHER:  Okay.
15         A.   I mean anyone other than me or other
16   than Juliana?
17         Q.   Well, it depends.  Were you and
18   Juliana publishing desk?
19         A.   No, sorry.
20             MR. STRACHER:  You said absent
21         publishing desk.
22             MR. KEZHAYA:  Correct.
23         Q.   Absent publishing desk.
24         A.   Oh, I'm sorry.  Can you please ask me
25   again.
```



```
 1                        Cooper
 2          Q.   I'll rephrase the question.
 3          A.   Yes.
 4          Q.   Julia Duin wrote articles for
 5   Newsweek, correct?
 6          A.   Yes.
 7          Q.   Did you fact-check anything in the
 8   articles?
 9          A.   No.  I raised questions to her, but I
10   didn't personally fact-check things.
11          Q.   Did Juliana fact-check anything?
12          A.   I don't believe so.
13          Q.   And we're not talking just this
14   article.  We're talking overall.
15          A.   As I recall, yes, to what you're
16   saying.
17          Q.   Did anyone else over Julia Duin's
18   entire career at Newsweek fact-check any of her
19   articles?
20          A.   I don't believe so.
21          Q.   Okay.  So you relied, you Newsweek,
22   relied on Julia Duin to fact-check her articles,
23   correct?
24          A.   Yes.
25          Q.   And if something slipped through the
```



```
 1                        Cooper
 2                   Afternoon Session
 3                      1:47 p.m.
 4            THE VIDEOGRAPHER:  We are back on the
 5       record.  The time is 1:47 p.m.
 6  N A N C Y   C O O P E R, having been previously
 7  duly sworn, was examined and testified further as
 8  follows:
 9  EXAMINATION (Continued)
10  BY MR. KEZHAYA:
11       Q.   Please state your name for the
12  record.
13       A.   Oh.  It's Nancy Cooper.
14            MR. KEZHAYA:  Actually can we go off
15       the record.
16            THE VIDEOGRAPHER:  We are off the
17       record.  The time is 1:47 p.m.
18            (Recess taken)
19            THE VIDEOGRAPHER:  We are back on the
20       record at 1:48 p.m.
21  BY MR. KEZHAYA:
22       Q.   What did you know about TST before
23  Duin pitched this particular article?
24       A.   Nothing.
25       Q.   Did you know about TST?
```



```
 1                     Cooper
 2          A.   No.
 3          Q.   Were you aware of TST's existence in
 4     the first place?
 5          A.   No.
 6          Q.   Do you remember when Duin pitched the
 7     article?
 8          A.   I don't remember, but I saw the
 9     e-mail where it was among the stories she
10     pitched.
11          Q.   Were those the first stories that she
12     pitched?
13          A.   I'm not sure.  I don't know.
14          Q.   Prior to that e-mail, was there a
15     meeting between you and Duin about this article?
16          A.   No.
17          Q.   After the e-mail, was there a meeting
18     of the participants including you and Duin about
19     this article?
20          A.   A meeting?  No.  No.
21          Q.   Okay.
22          A.   I mean --
23          Q.   Let's draw your attention to the
24     confidential Exhibit Cooper 52, which we are
25     marking as Plaintiff's 9.
```



```
 1                         Cooper
 2   meeting?
 3         A.   These were people who were part of
 4   the church or had been part of the church, if
 5   that's the right word, temple, who were alienated
 6   or angry with it.
 7         Q.   Would you describe disgruntled former
 8   members of a particular religious organization as
 9   particularly credible sources?
10         A.   They can be.
11         Q.   Would you describe these disgruntled
12   members as particularly credible sources?
13              MR. STRACHER:  Objection to the form.
14         A.   I don't know these specific people
15   who contacted her.  The story that we ran is
16   accurate, so.
17         Q.   You personally edited this article,
18   did you not?
19         A.   Yes.
20         Q.   Did you personally talk to any of
21   Julia Duin's contacts?
22         A.   No.  That's not my role.
23         Q.   Did Julia Duin speak with any of the
24   contacts?
25         A.   Yes.  Clearly.
```



```
 1                     Cooper
 2   circumstances.  It's not obviously best practice.
 3   Did you do any research on The Satanic Temple
 4   since this article has come up?
 5        A.   No.
 6        Q.   What is your level of familiarity
 7   with The Satanic Temple today?
 8        A.   Virtually nothing.
 9        Q.   Is it fair to say that the only thing
10   you know about The Satanic Temple is information
11   that you received from Julia Duin in the course
12   of editing this article?
13        A.   I suppose so.
14        Q.   Did Julia Duin provide you any notes
15   substantiating how she came to write the article?
16        A.   No, but that would not be unusual.
17   We would have had a discussion about where is
18   this from, the source is on the record, and I
19   have two anonymous sources.  She's not, you know,
20   a newbie.  She is a very experienced senior
21   person who was hired to be on this beat who knows
22   this beat, and I don't re-report stories.  That's
23   not an editor's role.
24        Q.   What is an editor's role?
25        A.   As I said, you spot a story either by
```



```
 1                      Cooper
 2   yourself or, you know, your reporter spots
 3   something.  You say that's a great idea, or you
 4   listen to your reporter, and you go I don't think
 5   this is a great idea, but this other thing you
 6   said is a great idea, and you talk to them about
 7   how you would shape the story and how you see the
 8   story, and, you know, these are sometimes split
 9   into different jobs, but overall then you read it
10   and you think about it and talk to the reporter
11   and you suggest fixes, and sometimes you overrule
12   people and make fixes, and then it gets
13   published.
14        Q.   What are the nature of the fixes that
15   you would make?
16        A.   Would make?
17        Q.   Um-hum, as an editor.
18        A.   It could be anything from a typo to
19   like, no, the person is not a suspect.  They're a
20   person of interest, you know, catching something
21   like that.
22        Q.   Okay.  Why wasn't Juliana the editor
23   on this particular article?
24        A.   Because I'm a much more experienced
25   editor, and she was probably swamped with her
```



```
 1                    Cooper
 2   day-to-day news people.  So I just dealt with
 3   that myself, which is not unusual.
 4        Q.   It was not unusual for the head of
 5   the organization to edit the article?
 6        A.   Yes.  There are still certain
 7   reporters that I work with directly.
 8        Q.   Which are those reporters in terms of
 9   hierarchy in the system, not names?
10        A.   The national security reporter, some
11   of the others, I don't want -- now that we have
12   this publishing desk, they take these people,
13   these senior people directly, most of them.
14        Q.   So is it fair to state that you are
15   in direct contact with the most important
16   reporters?
17        A.   No, yes, no.  I don't know how to
18   answer that.  I don't want to say the most
19   important, but some of the most senior.  Let's
20   say that.
21        Q.   Okay.  Most trusted.  Is that a fair
22   comment?
23        A.   No.  I trust all my reporters.
24        Q.   Did you review any of the
25   communications between Julia Duin and any of the
```



```
 1                      Cooper
 2        A.   I don't know what else she may have
 3   done, but she clearly talked to Greaves about it.
 4        Q.   Why is it clear that she talked to
 5   Greaves about it?
 6        A.   Greaves said no sexual activities
 7   were compulsory.
 8             THE WITNESS:  Can we take a break?
 9             MR. STRACHER:  Sure.  Let's take a
10        break.  Can we take a break?
11             THE VIDEOGRAPHER:  We are going off
12        the record.  The time is 2:27 p.m.
13             (Recess taken)
14             THE VIDEOGRAPHER:  We are back on the
15        record.  The time is 2:36 p.m.
16   BY MR. KEZHAYA:
17        Q.   Earlier you testified that your basis
18   to believe that Julia Duin looked into this
19   matter is a response from Greaves that no sexual
20   activities were compulsory.  Is that correct?
21        A.   Yes.
22        Q.   Are there any other bases to believe
23   that Julia Duin looked into this particular
24   article statement?
25        A.   There's also, excuse me, I'm sorry,
```



```
 1                    Cooper
 2   somewhere in the story that he says, Greaves says
 3   something like people say crap about us all the
 4   time.  So it led me to believe that she had said
 5   people make all these accusations about you, and
 6   he had had a chance to respond.
 7          Q.   Are there any other bases for your
 8   belief that she looked into -- strike that.  Let
 9   me rephrase.  Are there any other bases that led
10   you to believe that she engaged in any
11   fact-checking on this particular article
12   statement?
13          A.   On that particular article statement,
14   no, nothing specific, but her general statement
15   like I fact-checked this until my eyes were
16   bleary, it's somewhere in the e-mails, gave me a
17   feeling of confidence.
18          Q.   Did she detail to you what was
19   entailed in fact-checking until she was bug-eyed?
20          A.   No, I don't believe so.
21          Q.   As you sit here today, do you have a
22   factual basis in your mind as to any instances of
23   sexual abuse and coverup by The Satanic Temple?
24          A.   Do I have any what?
25          Q.   Do you have any factual predicate, as
```



```
 1                         Cooper
 2   you sit here today, as to whether in The Satanic
 3   Temple there were accounts of sexual abuse being
 4   covered up in ways that were more than anecdotal?
 5                   MR. STRACHER:  Can you define what
 6           you mean by factual predicate?
 7                   THE WITNESS:  Yeah.
 8                   MR. STRACHER:  I object to the term
 9           "factual predicate."  I just don't want
10           the witness to be tripped up by that.
11           Q.   As you sit here today, do you stand
12   by the statement that there are accounts of
13   sexual abuse being covered up in ways that were
14   more than anecdotal?
15                   MR. STRACHER:  I object to the form
16           of the question.
17           Q.   Do you assert that statement is true?
18           A.   I believe that it is.
19           Q.   Okay.  Why do you believe that it is?
20           A.   Because I think that she reported it
21   out and that that is correct.
22           Q.   So you take Julia Duin at face value
23   when she says this is the case, correct?
24           A.   It's beyond face value.  She reported
25   it and got what I believe is a response to those
```



```
 1                      Cooper
 2          area, I'm going to object, but I'm not
 3          going to prevent the witness from
 4          answering, but let me just note we're
 5          getting pretty far afield.
 6              MR. KEZHAYA:  I'm delineating the
 7          difference as pertains to the editorial
 8          guidelines as to the difference between
 9          criminal sexual abuse and non-criminal
10          sexual abuse.  She said it could be.
11              MR. STRACHER:  Okay.
12              MR. KEZHAYA:  I would like you to
13          answer the delineating question.
14              MR. STRACHER:  But the word you used
15          was "systemic sexual abuse."  Where do you
16          find that phrase?
17          Q.   Nancy, you edited this article,
18     correct?
19          A.   Yeah.
20          Q.   Was this article not about TST as an
21     organization?
22          A.   It was about a lawsuit about TST.
23          Q.   Was the subject of this article TST?
24          A.   The subject of the article was this
25     lawsuit.  We didn't just like say here's the
```



```
1                       Cooper
2    thing, TST.  We said here is this interesting
3    suit.  That's a different story.
4          Q.   Your testimony today is that your
5    understanding of this article was that it's about
6    the lawsuit, not about the organization, correct?
7          A.   Yes.
8          Q.   Please read the first line of the
9    article.
10         A.   "Can you defame a religion,
11   especially one that doesn't believe in God, Satan
12   or the supernatural?"
13         Q.   Is this what's known as a lead in the
14   industry?
15         A.   Yeah.
16         Q.   What is a lead?
17         A.   It's how you get into a story, the
18   top, the first sentence of this paragraph.
19         Q.   Who wrote the lead?
20         A.   Probably she did.  It's possible that
21   I did.
22         Q.   Is it your best recollection today
23   that she wrote the lead?
24         A.   I don't know.
25         Q.   You must have knowledge as to your
```



```
 1                     Cooper
 2        When you say sources, who do you mean?
 3             MR. KEZHAYA:  The individuals, in
 4        this particular case we're talking about
 5        Jinx Strange.  The individuals who are
 6        levying serious accusations on the one
 7        hand and on the other hand Greaves.
 8        Basically I'm examining her full
 9        understanding as between Duin and any of
10        the people that resulted in the article.
11        A.   What's the question?  Sorry.  What's
12   the actual question?
13        Q.   Did you perform any inquiry into what
14   Julia Duin did in the course of writing this
15   article?
16        A.   No.
17        Q.   And you didn't have any special
18   assurances that Julia Duin was a competent
19   reporter through experience, did you?
20             MR. STRACHER:  I object to the form
21        of the question.
22        Q.   I'll rephrase.  Your experience with
23   Julia Duin was at a short tenure at this time,
24   correct?
25        A.   I believe so.  I don't remember.  I
```



```
 1                     Cooper
 2   don't remember.  I don't believe this was her
 3   first story for Newsweek, but I don't remember
 4   how many other stories she had done already.
 5           Q.   Do you recall how many months she had
 6   been working at Newsweek previously?
 7           A.   No.
 8           Q.   Did you have a sense that you
 9   particularly trusted Julia Duin based off of some
10   longstanding relationship between you all?
11           A.   It wasn't a longstanding
12   relationship, but she clearly knew what she was
13   talking about.  She was an experienced reporter.
14           Q.   What was her experience?
15           A.   What was her?
16           Q.   What was her experience?
17           A.   Oh.  She had been I don't remember
18   where, but she had been a reporter for other news
19   outlets and covered religion for them.
20           Q.   Do you recall whether these were
21   credible news outlets?
22           A.   I don't recall, but I imagine they
23   were.  Otherwise we wouldn't have hired her.
24           Q.   During the course of this interview
25   process, did anyone review her prior publications
```



```
 1                         Cooper
 2         Q.   What was the sexual abuse?
 3         A.   I don't know.  Sorry.
 4         Q.   What was the coverup?
 5         A.   Again, I don't know.
 6         Q.   And, once again, it's your testimony
 7    as the person in charge of enforcing these
 8    guidelines and the person --
 9              MR. STRACHER:  I object to the form.
10         She did not say enforcing.  Right?  She
11         didn't use the word "enforcing."
12         Q.   Were you in charge of enforcing these
13    guidelines?
14         A.   Yes.
15         Q.   Okay.  As the person who was in
16    charge of enforcing these guidelines, as the
17    global editor in chief, and as the person who
18    edited this particular article, it's your
19    testimony that this statement is complete,
20    correct?
21         A.   Yes.
22         Q.   And specific as well, correct?
23         A.   Yes.
24         Q.   Please read the last sentence in the
25    same bullet point.
```



```
 1                    Cooper
 2        A.   "Use language such as 'allegedly' or
 3   'accused of' or 'arrested in connection with,'
 4   not 'arrested for,' which implies guilt."
 5        Q.   Would you agree with me that this
 6   sentence implies guilt?
 7        A.   That the article statement says?
 8        Q.   Correct.
 9        A.   No.
10        Q.   Why not?
11        A.   Because it says this is something
12   people talk about.  It's talking about as a thing
13   that people say rather than saying there's a, you
14   know, a legal allegation.
15        Q.   Earlier you testified that it's your
16   position that the article statement is true,
17   correct?
18        A.   Yes.
19        Q.   Is it your testimony today that Julia
20   Duin weighed the evidence impartially?
21        A.   Yes.
22        Q.   Why is that?
23        A.   Because I believe, as I've said, she
24   gave Greaves a fair chance to respond.
25        Q.   And you would agree with me that that
```



```
1                        Cooper
2    second sentence into the record.
3          A.    "It's really a story about a lawsuit
4    more than it is about religion."
5          Q.    Okay, to which Julia Duin responds at
6    2:02 p.m., "Not quite.  TST is a religion (sounds
7    crazy, I know)."  Do you see that?
8          A.    Yes.
9          Q.    Then the next sentence is "The main
10   question here is if you can defame a religion."
11   Correct?
12         A.    Yes.
13         Q.    Okay.  How do you synthesize those
14   two sentences to mean that this story is about
15   the lawsuit?
16              MR. STRACHER:  I object to the form.
17        You're mischaracterizing the e-mail.
18         A.    To me, it's clearly this is what it
19   is saying.  The main question is if you can
20   defame a religion.  That's what the suit is
21   about.  The suit is testing the question of
22   whether you can defame a religion, and that's
23   interesting.  So that's what the story was.
24         Q.    Okay.  What does this parenthetical
25   "Sounds crazy I know that TST is a religion,"
```



```
 1                         Cooper
 2    what does that mean to you?
 3           A.   Oh.  That is from Julia, not from me.
 4    It doesn't sound like a religion.  It's whatever,
 5    you know, but it is a religion.
 6           Q.   Did you interpret that to be an
 7    assertion of bias on her part?
 8           A.   No.
 9           Q.   Did you interpret that to be evidence
10    of bias on her part?
11           A.   No.
12           Q.   Did you engage in any level of
13    investigation into Julia Duin's bias at any
14    point?
15                MR. STRACHER:  I object to the form.
16           A.   I had no -- there was no evidence of
17    any bias.
18           Q.   Earlier you testified that this is
19    not an investigative article.  Is that correct?
20           A.   It's not a scientific term.  You know
21    what I mean?  That's an opinion term.  Is that
22    the right word?  I don't know.
23           Q.   I'm unclear.
24           A.   I just mean there's not like for me,
25    as far as I know, there is no legal standard of
```



```
 1                        Cooper
 2        Q.   How does the article statement
 3   provide context to the Johnson litigation?
 4        A.   It is part of the issue of whether
 5   you can defame a religion.
 6        Q.   Is it Newsweek's intent to defame The
 7   Satanic Temple?
 8        A.   No.
 9        Q.   Help me understand how including this
10   article statement as pertains to the litigation
11   answers whether you can defame a religion?
12             MR. STRACHER:  I object to the form.
13        A.   It's part of the context around what
14   is being said about the temple, religion, church.
15        Q.   Does the Johnson lawsuit take issue
16   with sex abuse going on and then getting covered
17   up within The Satanic Temple?
18             MR. STRACHER:  I object to the form.
19        That's the sixth time it has been
20        answered.
21             MR. KEZHAYA:  And she hasn't given me
22        a yes or no.
23             MR. STRACHER:  Well, listen, because
24        she can't give you the answer you want, it
25        doesn't mean that she's not giving you an
```



```
 1                      Cooper
 2         of the statement.
 3         Q.    Yes or no?
 4         A.    I have faith in Julia's reporting,
 5    yes.
 6         Q.    You have faith in that, correct?
 7         A.    Yes.
 8              MR. KEZHAYA:  I pass the witness.
 9              MR. STRACHER:  No questions.
10              MR. KEZHAYA:  Okay.
11              THE WITNESS:  Are we done?
12              MR. KEZHAYA:  We are done.
13              THE WITNESS:  Okay.  Thank you.
14              THE VIDEOGRAPHER:  This is the end of
15         the deposition of Nancy Cooper.  The time
16         is 4:05 p.m.  Thank you.
17              THE WITNESS:  Thank you.
18              MR. STRACHER:  Thank you.
19              (Time noted:  4:05 p.m.)
20                              _____
21
22    Subscribed and sworn to
23    before me this____day of_____, 2023.
24    _____
25
```

