UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Satanic Temple, Inc. | 1:22-cv-1343 (MKV) |
| *Plaintiff* | |
| *v.* | **MEMORANDUM OF LAW** |
| | **FOR THE SATANIC TEMPLE'S** |
| Newsweek Digital LLC | **MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| *Defendant.* | **AS TO LIABILITY** |

Respectfully submitted on May 17, 2024,

By:   */s/ Matt Kezhaya*

Matt Kezhaya (# 0402193) (*phv*)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:   (479) 431-6112
 email:   matt@kezhaya.law

# TABLE OF CONTENTS

Table of contents ........................................................................................................... ii

Table of authorities ....................................................................................................... iii

Statement of facts ........................................................................................................... 1

Argument ......................................................................................................................... 4

   1: The statement is provably false ............................................................................ 6

      1.1: The Article Statement is a falsifiable claim of fact. ............................... 7

      1.2: The Temple does not engage in sexual abuse or cover-up. ................... 9

      1.3: Newsweek has no competent evidence to support a truth defense. ..................... 11

   2: The statement was made without privilege or authorization. .................................... 12

   3: Newsweek is at least negligent with respect to the claim. ......................................... 13

      3.1: The Temple is a private figure. ......................................................... 13

      3.2: At issue is a matter of private concern. ............................................ 17

      3.3: The objective indicia give rise to an inference of actual malice. ......................... 18

   4: The statement is defamatory *per se* and caused special harm. .................................... 24

      4.1: The statement is defamatory per se. .................................................. 24

      4.2: The Temple suffered special damages. ............................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Biro v. Conde Nast*,
  807 F.3d 541 (2d Cir. 2015) ...................................................................... 19

*Biro v. Conde Nast*,
  883 F. Supp. 2d 441 (S.D.N.Y. 2012) ......................................................... 7

*Burnett v. Nat'l Enquirer, Inc.*,
  144 Cal. App. 3d 991 (Cal. Ct. App. 1983) ............................................... 23

*Chapadeau v. Utica Observer-Dispatch*,
  38 N.Y.2d 196 (1975) ........................................................................... 14, 17

*Cimontubo - Tubagens E Soldadura, LDA v. Petroleos De Venezuela, S.A.*,
  No. 20 CIV. 5382 (GBD), 2021 WL 827133 (S.D.N.Y. Mar. 4, 2021) ......................... 5

*Coleman v. Grand*,
  No. 18CV5663ENVRLM, 2021 WL 768167 (E.D.N.Y. Feb. 26, 2021) ..................... 13

*Contemp. Mission, Inc. v. New York Times Co.*,
  842 F.2d 612 (2d Cir. 1988) ...................................................................... 13

*Crane v. Arizona Republic*,
  972 F.2d 1511 (9th Cir. 1992) .................................................................... 22

*Fairley v. Peekskill Star Corp.*,
  83 A.D.2d 294 (N.Y. App. Div. 1981) .................................................... 13, 15

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ................................................................................ 6, 7

*Gil v. Pizzarotti, LLC*,
  No. 1:19-CV-03497-MKV, 2021 WL 1178027 (S.D.N.Y. Mar. 29, 2021) ................... 11

*Greenberg v. Spitzer*,
  155 A.D.3d 27 (N.Y. App. Div. 2017) ........................................................ 12

*Gross v. New York Times Co.*,
  82 N.Y.2d 146 (1993) ........................................................................ 6, 7, 9

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989) ................................................................................ 19

*Huggins v. Moore*,
  94 N.Y.2d 296 (1999) ................................................................... 13, 17, 18

*Johnson v. Wendy's Corp.*,
  No. 1:19-CV-8157-MKV, 2021 WL 243055 (S.D.N.Y. Jan. 25, 2021) ........................ 11

*Kamchi v. Weissman*,
  125 A.D.3d 142 (2d Dep't 2014) ................................................................. 4

*Khan v. New York Times Co.*,
  269 A.D.2d 74 (N.Y. App. Div. 2000) ...................................................... 19

*Krauss v. Globe Int'l, Inc.*,
  251 A.D.2d 191 (N.Y. App. Div. 1998) ................................... 13, 15, 17, 18

*Lerman v. Flynt Distrib. Co.*,
  745 F.2d 123 (2d Cir. 1984) ..................................................................... 14

*Meloff v. New York Life Ins. Co.*,
  240 F.3d 138 (2d Cir. 2001) ..................................................................... 24

*Morales v. Quintel Entm't, Inc.*,
  249 F.3d 115 (2d Cir. 2001) ..................................................................... 6

*Naantaanbuu v. Abernathy*,
  816 F. Supp. 218 (S.D.N.Y. 1993) ........................................................ 15

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .......................................................................... 6, 18

*Palin v. New York Times Co.*,
  940 F.3d 804 (2d Cir. 2019) ................................................................. 23

*Palmtag v. Republican Party of Nebraska*,
  315 Neb. 679 (2024) .......................................................................... 21

*Park v. Lewis*,
  139 A.D.2d 961 (N.Y. App. Div. 1988) ................................................. 12

*Rejent v. Liberation Publications, Inc.*,
  197 A.D.2d 240 (N.Y. App. Div. 1994) ................................................. 24

*Rosenblatt v. Baer*,
  383 U.S. 75 (1966) ............................................................................ 13

*Saleh v. New York Post*,
  78 A.D.3d 1149 (N.Y. App. Div. 2010) ................................................. 12

*Scacchetti v. Gannett Co.*,
90 A.D.2d 985 (N.Y. App. Div. 1982) ....................................................... 12

*Sheindlin v. Brady*,
597 F. Supp. 3d 607 (S.D.N.Y. 2022)....................................................... 14

*St. Amant v. Thompson*,
390 U.S. 727 (1968)................................................................... 20, 22

*Steinhilber v. Alphonse*,
68 N.Y.2d 283 (1986) ....................................................................... 6

*Sweeney v. Prisoners' Legal Servs. of New York, Inc.*,
84 N.Y.2d 786 (1995) ...................................................................... 21

*Time, Inc. v. Firestone*,
424 U.S. 448 (1976)................................................................... 16, 18

*Walz v. Tax Comm'n of City of New York*,
397 U.S. 664 (1970) ....................................................................... 16

*Wausau Underwriters Ins. Co. v. Old Republic Gen. Ins. Co.*,
122 F. Supp. 3d 44 (S.D.N.Y. 2015) ........................................................ 6

## Other Authorities

James Madison, *Memorial and Remonstrance Against Religious Assessments* ............................ 17

*Merriam-Webster Online Dictionary*, Cover-up ...................................................... 8

*Merriam-Webster Online Dictionary*, Sexual Abuse.................................................. 8

*Merriam-Webster Online Dictionary*, Sexual harassment ..................................... 10

N.Y. Pattern Jury Instr.--Civil 3:28 .................................................................. 18

N.Y. Pattern Jury Instr.--Civil 3:28B ................................................................ 18

N.Y. Pattern Jury Instr.--Civil 3:29A................................................................ 25

## Rules

FRCP 26 ............................................................................................ 9

FRCP 30 ............................................................................................ 8

FRCP 34 ............................................................................................ 9

FRCP 56 .................................................................................................................passim

FRE 801 ........................................................................................................................ 11

FRE 802 ........................................................................................................................ 11

FRE 803 ........................................................................................................................ 11

*Individual Rules of Practice in Civil Cases*, Rule 5(C) ............................................... 10

**Treatises**

1 *Law of Defamation* § 2:26 (2d ed.) ......................................................................... 15

1 *Law of Defamation* § 3:117 (2d ed.) ....................................................................... 24

1 *Law of Defamation* § 3:45 (2d ed.) ......................................................................... 19

1 *Law of Defamation* § 5:29 (2d ed.) .......................................................................7, 8

31A *C.J.S. Evidence* § 188 .......................................................................................... 10

# STATEMENT OF FACTS

At issue is a single count of defamation arising from a rumor that Plaintiff The Satanic Temple engages in sexual abuse and cover-up in ways that are more than anecdotal. 56.1 ¶ 9. The rumor connotes criminality. 56.1 ¶¶ 59-60. The rumor is false. 56.1 ¶ 107.

Defendant Newsweek published the rumor to its readership of "more than one in five Americans." 56.1 ¶¶ 4, 7. Around 10-15 years ago, Newsweek enjoyed a reputation as one of the "Big Three," the biggest and most credible names in the news industry. 56.1 ¶¶ 5-6.

Julia Duin wrote the article. 56.1 ¶ 11. Duin is a religion reporter who was hired through ties to its chief strategy and content officer. 56.1 ¶¶ 18-23. Duin has been in the journalism business since at least 1987 and has taught at four separate colleges. 56.1 ¶¶ 31-36. She subjectively understands that claims about a religion should be heard from the religion firsthand. 56.1 ¶ 34. She also subjectively understands that charges of criminality should be questioned. 56.1 ¶ 93. While at Newsweek, Duin regularly met with the highest levels of Newsweek's management, including Global Editor in Chief Nancy Cooper. 56.1 ¶¶ 20-30.

Prior to this article, Duin has written about Satanism a total of seven times, four of which were at the height of the Satanic Panic. 56.1 ¶¶ 35-43. Of her prior anti-Satanic writings, two fixated on the Temple: one decried the Temple's equal access to zoning rights and the other decried the Temple's equal access to tax-exempt status. 56.1 ¶¶ 42-43.

Nancy Cooper edited and contributed to the article. 56.1 ¶¶ 12, 15-16, 113-115. She also wrote Newsweek's Editorial Guidelines, sets the standard for Newsweek's organizational practices, and determines for Newsweek what is "newsworthy." 56.1 ¶¶ 26-27, 56. Cooper reports directly to Newsweek's CEO. 56.1 ¶ 24. The Editorial Guidelines set the "highest professional standards" for all Newsweek reporters. 56.1 ¶ 55. Four requirements from the

Editorial Guidelines are salient to this litigation. *First*, a charge of criminal wrongdoing be both "specific" and "complete." 56.1 ¶ 58. *Second*, there must be an opportunity to respond, especially when "we are accusing a person or company of wrongdoing." 56.1 ¶ 57. *Third*, reporters must use only "credible" sources. 56.1 ¶ 65. *Fourth*, a claim of sexual abuse and cover-up must be fact-checked before publishing. 56.1 ¶ 66.

About one month before publishing, the idea for this article was first provided to Duin by a reporter for the Catholic News Agency. 56.1 ¶ 7, 44-46. The Catholic News Agency's reporter passed on an unverified claim that there were "some allegations of TST leadership sexually exploiting members or failing to respond to harassment / sex assault allegations against chapter heads." 56.1 ¶ 46.

The next day, Duin pitched the article as one that would entail "NDAs being used to hide wrongdoing" and "sexual harassment." 56.1 ¶¶ 47, 50. These claims were sourced from "disgruntled former members." 56.1 ¶ 69. As pitched, the article would arrive "Just in time for Halloween." 56.1 ¶ 48. Duin considers Halloween to be a Satanic holiday. 56.1 ¶ 49. Two of her prior anti-Satanism articles, written during the height of the Satanic Panic, were published around Halloween. 56.1 ¶¶ 35-38. Cooper took special interest in Duin's pitch. 56.1 ¶ 52. Although Duin ordinarily reported to U.S. Editor Juliana Pignataro (56.1 ¶¶ 28-29), Duin worked with Cooper for this one. 56.1 ¶ 12-14. Within one week of the pitch, all three of Newsweek's top management greenlit the article. 56.1 ¶¶ 53-54.

Shortly later, Duin met with two of the "disgruntled former members:" David Alan Johnson and Nathan Sullivan. 56.1 ¶¶ 68-69. Neither claimed to have any personal knowledge that the Temple engages in sexual abuse and cover-up. 56.1 ¶ 70. Under oath, both affirmatively denied having any personal knowledge of these claims. 56.1 ¶¶ 97-98. After the meeting,

Sullivan provided Duin with contact information for Jinx Strange. 56.1 ¶ 71. Jinx Strange is a pseudonym. 56.1 ¶ 72.

Five days before publishing, upon Duin's inquiry, Strange wrote a three-page email with his comments about the Temple. 56.1 ¶ 73. Midway into page two is the article statement. Id. His email does not suggest that he has personal knowledge of sexual abuse or cover-up. Id. But he opens with an offer to Duin of "information, receipts, screenshots, etc., of things that range from probably-illegal malfeasance to covering up and protecting men accused of sexual misconduct." Id. Duin asked no follow-up questions and didn't accept his offer. 56.1 ¶ 80.

Four days before publishing, Duin talked to Lucien Greaves. 56.1 ¶ 81. The next day, she asked Greaves follow-up questions on other topics. 56.1 ¶ 82. She never asked him about Strange's rumor. 56.1 ¶ 83. Two days before publishing, Duin talked to Dr. Joe Laycock, who she considered to be the "unofficial biographer" of the Temple. 56.1 ¶¶ 84-85. She did not ask Dr. Laycock about Strange's rumor. 56.1 ¶ 86. She never talked to anyone who claimed to have been subjected to sexual abuse or cover-up. 56.1 ¶ 88. She did not ask "anyone on the face of the planet what sexual abuse or cover-up means" in context of the article statement. 56.1 ¶ 87. This is because, to her, the article was not an investigation into sexual abuse. 56.1 ¶ 89. She included Strange's rumor because it was a "delicious quote."  56.1 ¶ 91.

Prior to this article, Cooper was unaware of the Temple. 56.1 ¶ 136. Cooper did not perform any investigation and did not inquire into Duin's investigation into the article. 56.1 ¶¶ 116-118. But she still insisted on editorializing in an assertion that the Temple falsifies its religious practices over Duin's objection that they had no basis to make the claim. 56.1 ¶¶ 113-115. Cooper approved of the article for publishing and praised it three times. 56.1 ¶ 121. Duin reported to the Catholic News Agency that "The Newsweek folks love it." 56.1 ¶ 122.

Upon publishing, Greaves immediately took issue with the article statement. 56.1 ¶ 123. The next day, undersigned counsel issued a demand for retraction which asserted that the article statement was false. 56.1 ¶ 124. Newsweek never issued a retraction. 56.1 ¶ 125.

The article's comment section immediately drew unfavorable comparisons between the Catholic Church and the Temple. 56.1 ¶ 126. People canceled their recurring donations because of the article. 56.1 ¶ 127. Others pointed to the article as proof of the truth of the matters asserted within it. 56.1 ¶ 128. As a result, the Temple hired out public relations assistance. 56.1 ¶¶ 129-130. The Temple expended a sum of $43,350 in remediation costs. 56.1 ¶ 131.

## ARGUMENT

"Can you defame a religion, especially one that doesn't believe in God, Satan or the supernatural?" Yes, publishing a false accusation of criminal behavior without so much as asking the accused for a comment will incur defamation liability. Newsweek defamed the Temple when it published a rumor that "leaked material" shows the Temple "sexually abuse[s]" its membership and "cover[s] up" the same in ways that are "more than anecdotal."

At issue is a defamation claim, which requires a plaintiff to prove: (1) a false statement, (2) which was published without privilege or authorization to a third party, (3) through fault amounting to at least negligence on the part of the publisher, (4) that either caused special harm or constitutes defamation *per se*. *See Kamchi v. Weissman*, 125 A.D.3d 142, 157 (2d Dep't 2014) (internal quotation marks omitted).

The rumor is false. The Temple does not engage in any form of "sexual abuse" and directs complainants to make a police report. Newsweek has issued notice to rely on six witnesses, each of whom deny any personal knowledge of sexual abuse and cover-up.

– 4 –

The rumor is not defensible as privileged or authorized. Newsweek has only proffered the fair report privilege, which does not attach to statements collateral to the judicial proceeding reported on. No part of the Washington lawsuit involved this rumor, so it is unprivileged.

Newsweek republished the rumor with at least negligence. The Temple is a private figure because it has done nothing to inject itself into any controversies surrounding sexual abuse or cover-up. At issue is blatant gossip-mongering, which is the definition of private concern. Still, the overwhelming weight of evidence shows that Newsweek republished the rumor in conscious disregard of its own Editorial Guidelines. On these facts, the Editorial Guidelines serve as both the objective standard of care (applicable to the negligence inquiry) and the subjective standard of care (applicable to the actual malice inquiry).

Last, the rumor is defamatory *per se* as both an accusation of criminality and an accusation of sexual misconduct. Still, the facts show that the Temple incurred special damages to remediate the harm caused by the article statement. For the foregoing reasons, the Temple is entitled to a summary judgment as to liability. The Court should set a jury trial on damages.

## Legal standard

A movant seeking summary judgment must identify each claim upon which summary judgment is sought, that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law. FRCP 56(a). A fact is "material" when it "might affect the outcome of the suit under the governing law." *Cimontubo - Tubagens E Soldadura, LDA v. Petroleos De Venezuela, S.A.*, No. 20 CIV. 5382 (GBD), 2021 WL 827133, at *5 (S.D.N.Y. Mar. 4, 2021), *aff'd*, No. 21-875-CV, 2022 WL 2155285 (2d Cir. June 15, 2022). There is a "genuine issue" of material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

– 5 –

To ascertain whether there is a genuine issue of material fact, courts review the record in the light most favorable to the non-moving party. *Wausau Underwriters Ins. Co. v. Old Republic Gen. Ins. Co.*, 122 F. Supp. 3d 44, 48 (S.D.N.Y. 2015). Under such review, courts "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Id.* The standard is not altered when, as here, the parties file cross-motions for summary judgment. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Each motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration. *Id.* Even when both parties move for summary judgment, a court need not enter judgment for either party. *Id.*

## 1: The statement is provably false.

The first element of a defamation claim requires a plaintiff to prove that the statement is provably false, *i.e.*, pertains to facts as opposed to an unfalsifiable opinion. *Gross v. New York Times Co.*, 82 N.Y.2d 146, 152-53 (1993); *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 286 (1986). The distinction sounds in law, not fact, and is tethered to the judiciary's role as guardian of the First Amendment. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–42 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 284-85 (1964).

Under the First Amendment, there is no such thing as a false idea. *Gertz*, 418 U.S. at 339. But there is no constitutional value in false statements of fact. *Id.* Neither the intentional lie nor the careless error materially advances society's interest in an "uninhibited, robust, and wide-open debate on public issues." *Id.* (quoting *Sullivan*, 376 U.S. at 270). Both the intentional lie and the careless error play "no essential part of any exposition of ideas," and any

social value they may further are "clearly outweighed by the social interest in order and morality." *Id.* (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)).

## 1.1: The Article Statement is a falsifiable claim of fact.

Against this backdrop, the Court was called upon to ascertain the defamatory meaning of the Article Statement, that "He [Jinx Strange] soon left the group, then was leaked material about … 'Accounts of sexual abuse being covered up in ways that were more than anecdotal.'" 56.1 ¶ 9; ECF No. 27, at 13. This presents an actionable mixed opinion because it leads "a reasonable listener to infer that the speaker knows certain facts, unknown to the audience, which support the opinion and are detrimental toward the person toward whom the communication is directed." *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153 (1993). Particularly, the Article Statement leaves to the reader's imagination what "leaked material" exists which shows sexual abuse and cover up. Under the republishing rule, it is no defense that Newsweek simply passed on a rumor. *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) ("It is well settled that Defendants cannot escape liability simply because they are conveying someone else's defamatory statements without adopting those viewpoints as their own"); see also 1 *Law of Defamation* § 5:29 (2d ed.) ("In the eyes of the law, tale-bearers are as bad as the tale-makers") (cleaned up).

Under New York law, the fact *vs.* opinion inquiry is made by the court and entails an examination of the challenged statement with a view toward:

(1) whether the specific language in issue has a precise meaning which is readily understood;

(2) whether the statements are capable of being proven true or false; and

(3) whether either the full context of the communication in which the statement

> appears or the broader social context and surrounding circumstances are such as
> to signal readers or listeners that what is being read or heard is likely to be opinion,
> not fact.

*Id.* (cleaned up). Each of these three elements are present.

### 1.1.1: "Sexual abuse" and "cover up" have precise meanings of criminality.

*First*, the phrase "sexual abuse" has a dictionary definition, one readily understood by any reasonable person to mean "the infliction of sexual contact upon a person by forcible compulsion." *Merriam-Webster Online Dictionary*, Sexual Abuse (available at https://www.merriam-webster.com/legal/sexual%20abuse) (last visited May 16, 2024). The accusation of sexual abuse entails an assertion of criminality. Id. ("the crime of engaging in or inflicting sexual abuse"). There is no genuine dispute of material fact on the criminality of "sexual abuse," because Newsweek's own editor in chief confirmed that during her deposition. 56.1 ¶ 60.

Likewise, "cover-up" also has a dictionary definition, one readily understood by any reasonable person to mean "a usually concerted effort to keep an illegal or unethical act or situation from being made public." *Merriam-Webster Online Dictionary*, Cover-up (available at https://www.merriam-webster.com/dictionary/cover-up) (last visited May 16, 2024). Here, too, there is no genuine dispute of material fact on the criminality of "cover-up" because Newsweek's editor in chief confirmed that during her deposition. 56.1 ¶ 59.

### 1.1.2: The statement is capable of being proven or disproven.

*Second*, the statement is capable of being proven or disproven. If there were any people being sexually abused, Newsweek could prove up this claim by electing the subpoena powers of the Court to take their sworn testimony about what happened. See FRCP 30. The

investigation would presumably start with whatever "material" Jinx Strange was "leaked" and would lead to a disclosure of potential witnesses with the discoverable knowledge. See FRCP 26(a). And, through discovery of the Temple's internal documents and records, Newsweek could find information tending to prove a "cover-up." See FRCP 34. The corollary is true to disprove the statement. The Temple can depose those identified by Newsweek as having discoverable knowledge on the topics of sexual abuse or cover-up, and can present its own testimony subject to cross-examination that there is no sexual abuse or cover-up.

### 1.1.3: The context of the statement presents a fact, not an opinion.

*Third*, the full context of the article shows that the statement is presented as a fact and not an opinion. This statement does not present a constitutionally protected rhetorical hyperbole or an accusation of criminality upon facts which are "fully and accurately set forth" and make "clear to the reasonable reader or listener that the accusation is merely a personal surmise built upon those facts." *Gross*, 82 N.Y.2d at 155. Rather, it presents as a fact that The Satanic Temple sexually abuses its membership and covers up the same. 56.1 ¶ 9. The article makes no effort to "fully and accurately set forth" any facts upon which this rumor is based, Duin didn't bother to ask "anyone on the face of the planet" what the statement means because she did not intend this article to be an investigation into sexual abuse. 56.1 ¶¶ 87-89. Thus, the Court should summarily find that the statement has a defamatory meaning. FRCP 56(g).

### 1.2: The Temple does not engage in sexual abuse or cover-up.

Applying the dictionary definition of the text, the article statement can only mean that the Temple inflicts upon its membership unwanted sexual contact through forcible compulsion and then keeps the same from being made public through a concerted effort. That statement

is false: the Temple does *not* engage in sexual abuse or cover-up. 56.1 ¶ 107. This general denial is sufficient on its own. 31A *C.J.S. Evidence* § 188 ("The negative averment is taken as true unless disproved.") The Temple has specific reporting and investigation requirements about any form of sexual misconduct. 56.1 ¶ 108. Far from "cover-up," one of the Temple's reporting requirements is to direct the complainant to make a police report. 56.1 ¶ 109. Another requirement is to prohibit any form of organizational retaliation against a complainant. 56.1 ¶ 110. These requirements predate the article by more than one year. 56.1 ¶ 111. In the rare instance that a member has been sexually harassed,[1] the offending perpetrator has either voluntarily stepped down or has been removed. 56.1 ¶ 112; see also ECF No. 93-1, at ¶ 68 ("[o]ver the years we received a handful of complaints that were sexual in nature *but not* 'sexual assault'") (emphasis added).

It is a complete mystery what Newsweek will say in response to this unassailable proof of falsity. Despite the Court's specific reminder to comply with its Individual Practice Rules (ECF No. 96), Newsweek never issued its response to the Temple's Rule 56.1 statement at the pre-motion stage. *Contra. Individual Rules of Practice in Civil Cases*, Rule 5(C) ("Pursuant to Local Civil Rule 56.1 … the opposing party *shall* respond") (emphasis added). The Court should deem uncontroverted each of the Temple's timely-noticed grounds to prove the material fact that there is no sexual abuse or cover-up and therefore should summarily find that the "falsity" element is established. FRCP 56(g).

---

[1] "Sexual harassment" is materially different from "sexual abuse." See *Merriam-Webster Online Dictionary*, Sexual harassment ("uninvited and unwelcome verbal or physical behavior of a sexual nature especially by a person in authority toward a subordinate") (https://www.merriam-webster.com/dictionary/sexual%20harassment) (last visited May 16, 2024). Sexual abuse adds forcible compulsion and, therefore, criminality. *See id.*, sexual abuse.

*1.3: Newsweek has no competent evidence to support a truth defense.*

Newsweek has availed itself of the opportunity to inspect the Temple's internal communications and reports, depose the Temple's witnesses, and find its own witnesses. Nothing within the Temple's internal communications and nothing within the depositions of the Temple's witnesses have any tendency to prove a claim of sexual abuse and cover up. See FRE 803(7) (absence of business records as proof of the negative). The best that Newsweek can muster are recitations of rumors about sexual *harassment* (again, not "sexual abuse") passed on by witnesses, each of whom categorically denied any personal knowledge of the tales they spun. Compare ECF No. 93-1 ¶¶ 61-65 (Strange, Johnson, and Sullivan) with 56.1 ¶¶ 75 and 96 (Strange has no personal knowledge of sexual abuse or cover-up), ¶ 97 (Johnson has no personal knowledge of sexual abuse or cover-up); ¶ 98 (Sullivan has no personal knowledge of sexual abuse or cover-up).

To generate a genuine issue of material fact, the non-movant must present "specific evidence," not some "metaphysical doubt." *E.g.*, *Johnson v. Wendy's Corp.*, No. 1:19-CV-8157-MKV, 2021 WL 243055, at *3 (S.D.N.Y. Jan. 25, 2021) (subsequent history omitted) (citing *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Hearsay does not make the cut. *Gil v. Pizzarotti, LLC*, No. 1:19-CV-03497-MKV, 2021 WL 1178027, at *7 n.3 (S.D.N.Y. Mar. 29, 2021) (citing *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999); *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)). The rumors Newsweek offers are rank hearsay because each were made by third parties outside a court setting and are being used to prove truth of the matter asserted. FRE 801 (definition of hearsay), FRE 802 (rule against hearsay). Newsweek has not located one witness who is willing to testify under penalty of perjury that they have personal knowledge of sexual abuse

or cover-up within the Temple. 56.1 ¶¶ 94-106. Because Newsweek cannot offer any *admissible* evidence to compete with the Temple's proof of falsity, the Court should summarily find that the falsity element is satisfied. FRCP 56(g).

## 2: The statement was made without privilege or authorization.

The second element of a defamation claim requires proof that the statement was made to a third party without privilege or authorization. Newsweek published the article statement to the "more than one in five Americans" who read the publication. 56.1 ¶ 4. Each of the readers are third parties, so the question turns to whether the statement was privileged or authorized.

The statement does not benefit from the fair report privilege. Newsweek bears the burden of proof to establish any privilege that it intends to offer. *See Scacchetti v. Gannett Co.*, 90 A.D.2d 985, 986 (N.Y. App. Div. 1982). To benefit from the privilege, the statement must be about the judicial proceeding. *Greenberg v. Spitzer*, 155 A.D.3d 27 (N.Y. App. Div. 2017); *see also Saleh v. New York Post*, 78 A.D.3d 1149, 1152-53 (N.Y. App. Div. 2010) (separate treatment for statements which were not privileged). The article statement is unprivileged because it is collateral to the *Johnson* case. 56.1 ¶¶ 90-92. Duin limited the story to the *Johnson* case, "mostly." 56.1 ¶ 90. She made an exception for some "delicious quotes … from members in other parts of the country." 56.1 ¶ 91. This statement falls within the exception. 56.1 ¶ 92.

And the statement was not authorized. *See Park v. Lewis*, 139 A.D.2d 961 (N.Y. App. Div. 1988) (plaintiff consented to alleged defamatory statements by authorizing his agents to obtain further comment when he had reason to anticipate that defendant's responses to inquiries might be defamatory). Julia Duin did not ask Lucien Greaves about the statement before republishing it. 56.1 ¶ 83. She did not ask *anyone* about the statement before republishing it.

56.1 ¶ 87. The Temple did not solicit this rumor, the Catholic News Agency offered it un-prompted. 56.1 ¶ 44. Thus, the Court should summarily find that the article statement is neither privileged nor authorized. FRCP 56(g).

## 3: Newsweek is at least negligent with respect to the claim.

The third element requires proof that the publisher made the statement with "fault," which requires at least negligence. The standard of care depends on whether the plaintiff is a public *vs.* private figure and whether the statement is on a matter of public *vs.* private concern. Each layer of the inquiry is one of law, for the Court to decide. *See Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966) (public *vs.* private figure); *Huggins v. Moore*, 94 N.Y.2d 296, 302-03 (1999) (public *vs.* private concern); *but see Krauss v. Globe Int'l, Inc.*, 251 A.D.2d 191, 192 (N.Y. App. Div. 1998) (the determination is properly made by a court where "the facts concerning this issue are not in dispute and are sufficiently set forth in the papers").

### 3.1: The Temple is a private figure.

The plaintiff's status sets the stage to determine the publisher's standard of care. *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 298 (N.Y. App. Div. 1981). A litigant may be a general public figure, a limited public figure, or a private figure. *See Contemp. Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988). By default, a plaintiff is a private figure, and it is the defendant's burden to prove otherwise. *Coleman v. Grand*, No. 18CV5663ENVRLM, 2021 WL 768167, at *5 (E.D.N.Y. Feb. 26, 2021). The standard of care is higher for private figures because they lack a forum to rebut the false statements and they are more deserving of recovery because they have not thrust themselves into the vortex of public controversy. *Chapadeau*

– 13 –

*v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 199 (1975).

### 3.1.1: The Temple is not a general public figure.

The Temple is not a general public figure. A general public figure is one who has achieved such renown that they are a household name across the nation. *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 627 (S.D.N.Y. 2022) ("Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life.") Newsweek has provided nothing which tends to show that the Temple has achieved the household name status. 56.1 ¶ 134. The proof is to the contrary: Nancy Cooper, whose role is to determine what is "newsworthy," denied so much as hearing of the Temple prior to Duin's pitch of the article. 56.1 ¶¶ 27, 136. As the arbiter of newsworthiness, Cooper's ignorance about the Temple proves that the Temple is not a topic of general conversations. Thus, the Court should summarily find that the Temple is not a general public figure.

### 3.1.2: The Temple is not a limited public figure as to sexual abuse or cover-up.

Nor is the Temple a public figure as to sexual abuse or cover-up. For a plaintiff to be a limited purpose public figure, "[a] defendant must show the plaintiff has: (1) successfully invited public attention to [its] views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected [itself] into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media." *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136-37 (2d Cir. 1984). In order to be considered a public controversy for this purpose, the subject matter must be more than simply newsworthy. *Krauss*, 251 A.D.2d 191, at

192. The public controversy subject of the cause "must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 298 (N.Y. App. Div. 1981). And it must have "received attention *because* its ramifications will be felt by persons who are not direct participants." *Id.* at 298. (emphasis added).

To illustrate the requirement of a close connection between the subject of the defamatory statement and the public controversy in which the plaintiff voluntarily injected itself, *see Naantaanbuu v. Abernathy*, 816 F. Supp. 218 (S.D.N.Y. 1993). The statement under scrutiny there was an assertion that the plaintiff had an extramarital affair with Dr. Martin Luther King, Jr. on the night before his assassination. *Id.*, at 221. The plaintiff was a private figure notwithstanding that she was "well known within her community," "achieved much in her 38 years as a civil rights leader," had "run for elected office," "brought a lawsuit to integrate public parks in Memphis," and "was at one time on the Board of Directors of the SCLC [a civil rights organization closely associated with Dr. King.]" *Id.* at 224-25. Despite all this, she was a private figure because the controversy in the case was not her role in the civil rights movement, but "the question of the events that took place on the last night of King's life" or "at its broadest, the question of King's involvement with women outside of his marriage." *Id.*, at 225. The case would have been different if she had sought out the press or issued statements "about what had happened that night," or if the subject statement were "about the nature of her conduct as a civil rights activist." *Id.*; *but see* 1 *Law of Defamation* § 2:26 (2d ed.) ("the controversy should pre-date the defamatory publication").

Application of the standard, particularly as illustrated by *Naantaanbuu*, requires a finding that Newsweek cannot meet its burden to prove the Temple is a limited public figure. See

– 15 –

ECF No. 93-1 ¶¶ 82-88. Newsweek proffers that the Temple "publishes press releases" without addressing the topics discussed therein and, similarly, that Greaves "has done multiple [television] interviews … to discuss The Satanic Temple." Id. ¶¶ 82, 88. Even if one were to assume that these public statements "successfully" invited public attention to the Temple's views, this proffer fails to account for the elemental requirement that the Temple's views be "related to the subject of the litigation;" here, sexual abuse and cover-up. Likewise, no part of the proffer touches on the third element, that the Temple "assumed a position of prominence in the public controversy." When people talk about sexual abuse and cover up, the Catholic Church is top of mind, not The Satanic Temple. 56.1 ¶ 126.

If the defamatory statement at bar pertained to Church/State separation or a conscience-based right to abortion, Newsweek might have a colorable point. But the article statement lies outside those "specific political or specific initiatives which we promote." See id. ¶ 85. Even then, "individual churches frequently take strong positions on public issues including … vigorous advocacy of legal or constitutional positions." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 670 (1970). The Temple has an equal right to participate in these conversations as similarly situated "secular bodies and private citizens." *Id.* No less so than for a wealthy divorce litigant, litigation does not automatically convert the Temple into a public figure. *Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976) ("resort to the judicial process is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court") (cleaned up). For this reason, it is inadequate for Newsweek to point out that the Temple "relies on the public knowing about The Satanic Temple's activities, *including lawsuits it files*, in order to generate donations." Id. ¶ 86 (emphasis added). In our society, religious organizations are to be supported only by voluntary contributions. *See*, generally, James

Madison, *Memorial and Remonstrance Against Religious Assessments* (available at *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 63–72 (1947)). That requires the public to know who the Temple is and what the Temple does. Newsweek's contention, as the Court already held, would "effectively render all religions (and many non-profits) *per se* public figures." ECF No. 27, at 9.

Without conceding on the first and fourth elements, Newsweek's proof is particularly deficient because there is no "close connection" between the Temple's voluntary actions and this rumor of sexual abuse and cover up, nor is there any showing that the Temple has any special role of prominence on that subject. The Court should summarily find that the Temple is not a limited public figure for purposes of this action. FRCP 56(g).

## 3.2: At issue is a matter of private concern.

To determine a defendant's standard of care, the Court must also ascertain whether the article statement pertains to a "public" or a "private" concern. The question is whether it lies "arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition." *Chapadeau*, 38 N.Y.2d at 199. A matter is of private concern when the statement falls "into the realm of mere gossip and prurient interest." *Huggins v. Moore*, 94 N.Y.2d 296, 302 (1999). Likewise, the matter is of private concern when it is "directed only to a limited, private audience." *Id.* at 303. This analysis is closely related to the limited public figure question of whether the attention acquired by a plaintiff pertains to a "public controversy," the subject of the defamation. *Krauss*, 251 A.D.2d at 193–94. There, the same considerations that compelled a finding that the plaintiff's sex life is not a public controversy also required a determination that the story was not "of legitimate public concern." *Id.*

The defamatory statement at bar is "mere gossip," which is not a public controversy

regardless of how many clicks were baited. *Huggins*, 94 N.Y.2d at 303 ("the fact that the article has been published in a newspaper is not conclusive that its subject matter warrants public exposition"); *see also Firestone*, 424 U.S. at 454 ("Dissolution of a marriage through judicial proceedings is not the sort of "public controversy" referred to in *Gertz*, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public.") There can be no genuine dispute of fact on this point, Newsweek's own 56.1 statement contends that the "focus" of this article was the Washington lawsuit, not some scandalous claims about the Temple. ECF No. 97-1 ¶ 41. Duin included the article statement, not because it had any passing relationship to the issues presented in the Washington lawsuit, but because it was a "delicious quote." 56.1 ¶¶ 90-91. The Court should summarily find that the article statement is a matter of private concern because it falls squarely within the "realm of mere gossip and prurient interest." FRCP 56(g).

### 3.3: The objective indicia give rise to an inference of actual malice.

Because the Temple is a private figure and the statement is on a matter of private concern, the applicable standard of care is negligence. *Krauss*, 251 A.D.2d at 194. This is a lesser standard than actual malice, which requires a showing of at least recklessness. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). The difference being that negligence asks whether the publisher used "reasonable care under the circumstances to verify its accuracy," whereas recklessness asks if the publisher made the statement "with a high degree of awareness that it was probably false." See N.Y. Pattern Jury Instr.--Civil 3:28B (negligence); N.Y. Pattern Jury Instr.--Civil 3:28 (actual malice). But this case presents the need for only a single yardstick, the Editorial Guidelines, because those establish both the objective standard of care and Newsweek's own subjective standard of care. *See Khan v. New York Times Co.*, 269 A.D.2d 74,

77 (N.Y. App. Div. 2000) (objective standard for negligence, subjective standard for actual malice). Because the author of Newsweek's standard of care both edited and contributed to this article, Newsweek was "negligent" for the same reasons it had "actual malice."

Like any other inquiry into a defendant's state of mind, actual malice must be inferred from objective facts. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence"); *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015). ("a court typically will infer actual malice from objective facts" because a defamation defendant "will rarely admit … actual malice"). The objective facts must be interpreted in the aggregate, "for it is a rare case in which any one fact, standing alone, is enough of a 'smoking gun' to meet the constitutional standard." 1 *Law of Defamation* § 3:45 (2d ed.).

On these facts, three common threads create a *prima facie* case that Newsweek published the article statement with actual malice: (1) despite the Editorial Guidelines' requirement that the article statement be both specific and fact-checked, Newsweek did nothing to ensure that it was true; (2) despite the Editorial Guidelines' requirement that the Temple be given an opportunity to respond, Newsweek meticulously avoided the subject in discussions with Greaves; and (3) despite the Editorial Guidelines' requirement that only credible sources be used, Newsweek intentionally relied only on those with known hostility to the Temple. The Court could summarily deem these facts uncontroverted because Newsweek did not bother to respond to the Temple's 56.1 statement at the premotion stage, despite a specific reminder.

### 3.3.1: The statement was neither specific nor fact-checked.

The Editorial Guidelines require that a charge of criminal wrongdoing be both "specific" and "complete." 56.1 ¶ 58. Nancy Cooper, Newsweek's author of the Editorial Guidelines,

admitted that sexual abuse and cover up connote criminality. 56.1 ¶¶ 56, 59-60. Yet the article statement is neither specific nor complete: Nancy Cooper admitted that she had no idea who was sexually abused, what the sexual abuse entailed, who engaged in the cover-up, or what the cover-up entailed. See 56.1 ¶¶ 61-64. Of course, these immediate questions have no answer because there was neither sexual abuse nor cover-up. 56.1 ¶ 107. Newsweek's requirement to be specific exists to ensure questionable accusations are actually questioned.

Likewise, the Editorial Guidelines require that an accusation of covered-up sexual abuse be fact-checked. 56.1 ¶ 66. This requirement has a close relationship to preexisting caselaw that actual malice may be found when the statement is "based wholly on an unverified anonymous telephone call." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). Yet Duin did not take the slightest effort to fact-check the rumor. She did not ask any follow-up questions about who was "sexually abused" or what was entailed in the "cover up." 56.1 ¶ 80. She did not talk to anyone who claimed to have been subjected to sexual abuse or cover-up. 56.1 ¶ 88. She did not ask Lucien Greaves about the rumor, although she followed up with him about different topics. 56.1 ¶¶ 81-83. Nor did she ask the author of a book-length study on the Temple, who she deemed the "unofficial biographer," anything about it. 56.1 ¶¶ 85-86. She did not ask "anyone on the face of the planet what sexual abuse and cover-up means" in context of the rumor. 56.1 ¶ 87. She deliberately chose not to accept Strange's offer to provide substantiating information. 56.1 ¶ 77.

Her conscious avoidance of investigating this criminal allegation is not borne out of ignorance. Had the rumor been that the Temple engages in child murder, Duin admitted it would have occurred to her to inquire further. 56.1 ¶ 93. Duin did not inquire into the truth of the rumor because, in her view, the article was not an "investigation into sexual abuse." 56.1 ¶

– 20 –

89. But, as the Supreme Court of Nebraska just held, a defendant may not consciously avoid the truth only to later plead ignorance. *See Palmtag v. Republican Party of Nebraska*, 315 Neb. 679, 704 (2024). The Editorial Guidelines did not give Duin an option to publish this criminal allegation without first fact-checking it. Instead, she consciously avoided anything which would tend to disprove it. This shows that she entertained subjective doubt as to the truth of the rumor. *Sweeney v. Prisoners' Legal Servs. of New York, Inc.*, 84 N.Y.2d 786, 793 (1995) (actual malice can be shown when defendants' 'inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity' of the published statement").

And Newsweek cannot escape liability by claiming it took a hands-off approach to Duin. 56.1 ¶ 67, 120. The author of the Editorial Guidelines, who sets the standard for the organization, served as the editor of this article. 56.1 ¶¶ 12,14-16, 26,52, 56. Yet there was no oversight into Duin's investigation. 56.1 ¶¶ 116-118. Blind faith does not protect a defendant's decision to deliberately avoid inconvenient facts. *Sweeney*, 84 N.Y.2d at 793.

### 3.3.2: There was no opportunity to respond.

The Editorial Guidelines also require an opportunity to respond, especially when "we are accusing a person or company of wrongdoing." 56.1 ¶ 57. Duin not only subjectively understood this basic proposition, but she also instilled it in her pupils. 56.1 ¶ 34. Yet she did not ask Greaves about it, although she followed up with him about other topics. 56.1 ¶ 81-83. Duin went even further than simply avoiding the topic with Greaves, she "constructed" the article to make it appear as if he gave a general denial to this alleged misconduct. ECF No. 97-1, at ¶ 48. Actual malice may be found where the publisher juxtaposes denials "in reckless disregard[] of the false impression the collocation would produce." *Crane v. Arizona Republic*,

972 F.2d 1511, 1524 (9th Cir. 1992).

### 3.3.3: Newsweek intentionally relied on obviously hostile sources.

The Editorial Guidelines also require the use of "credible" sources. 56.1 ¶ 65. This require-ment is closely related to caselaw that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732. There is no room to dispute that there were obvious reasons to doubt the rumor. Beginning with the pitch of this article, Duin referred to her sources as "disgruntled former members." 56.1 ¶ 69; *accord.* 1 *Law of Defamation* § 3:59 (2d ed.) ("When a source harbors biases or hostilities against a plaintiff, and the defendant is aware of those biases or hostilities, that awareness is probative of the existence of actual malice.")

Nobody Duin talked to claimed to have personal knowledge of sexual abuse or cover-up. 56.1 ¶¶ 70, 74. Johnson's tale took place two to three years before he was even a member. ECF No. 97-1, ¶ 64. Worse than a rumor "based wholly on an unverified anonymous tele-phone call" (*St. Amant*, 390 U.S. at 732), Newsweek published a rumor based wholly on an unverified anonymous *internet* source. 56.1 ¶ 78. Duin took a pseudonymous email at face value that the underlying anonymous hearsay declarant must be telling the whole truth. 56.1 ¶ 80. There can be no genuine dispute that she entertained serious doubts about the rumor.

It'd be one thing if Duin simply happened across this "delicious quote" by happy accident. See 56.1 ¶ 91. But the evidence shows otherwise. From its very conception, this article was going to include a claim of covered up sexual abuse. 56.1 ¶¶ 46 ("allegations of TST leadership sexually exploiting members or failing to respond to harassment / sex assault allegations against chapter heads.") Duin took that unverified claim (56.1 ¶ 45) and presented it as a fact in her pitch to Newsweek's highest levels of management. 56.1 ¶ 50. It cannot be said that

– 22 –

Duin is merely ignorant of basic journalistic standards, she was a senior hire who has served as a professor of journalism at four colleges. 56.1 ¶¶ 31-33. Duin did not include this "delicious quote" in the article by happy accident, she included it because it was consistent with her pre-determined narrative. *Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) (pre-determined narrative as actual malice).

She included the article statement as part of a pattern of spreading rumors about sexual abuse and cover-up. In her Satanic Panic-era article entitled *Satanism in the United States: a phenomenon on the rise*, she wrote: "Sex is introduced early in the game, as adolescents are fascinated by sexuality and the occult offers plenty of it," further claiming "gang rapes" and purporting that this is all covered up by Satanists not hesitating to "kill defectors." See 56.1 ¶ 39. And, exactly as this article would be "Just in time for Halloween" (56.1 ¶ 48), she similarly wrote about Satanism on October 31, 1987 and October 28, 1989. See 56.1 ¶ 39. The article statement was nothing more than another rote sale of trash claims to society's lowest common denominator. *See Burnett v. Nat'l Enquirer, Inc.*, 144 Cal. App. 3d 991, 1020 (Cal. Ct. App. 1983) (Beach, A.J., concurring in part) (affirming a finding of actual malice where "[t]he defendant engages in a form of legalized pandering designed to appeal to the readers' morbid sense of curiosity") Duin's fearmongering about Satanism, generally, applies with equal force to her three prior writings about the Temple. 56.1 ¶¶ 42-43. In each, she complains of the Temple's very existence: whether because the Temple benefits from an equal right to have a physical presence (Exhibit 10) or from an equal right to tax-exempt status (Exhibit 12). These preexisting articles show that the subject article was authored by someone who willfully looked past her source's hostility because she shared the same sentiments. Again, this shows a pre-determined narrative. *Palin*, above.

Nor can Newsweek plead ignorance about the above thread of open hostility toward the Temple (56.1 ¶ 39-48) because Cooper, too, shared the bias. 56.1 ¶ 113-116. As shown there, Cooper, who swore that she had never previously heard of the Temple and did not engage in any form of fact investigation for it, insisted upon casting aspersions of the Temple's ritual activity. 56.1 ¶¶ 113-116, 136. Even Duin pushed back, unsuccessfully, on Cooper's editorialization. 56.1 ¶ 114. In this, we see yet another departure from the Editorial Guidelines: a prohibition against editorialization. Exhibit 16, at 2 (editorializing *vs.* reporting).

There is no escape from liability for Newsweek. All the above issues were ratified by Newsweek's highest management, with Cooper not only contributing to the article but giving it glowing praise. 56.1 ¶¶ 12, 15-16, 113-116, 121. 1 *Law of Defamation* § 3:117 (2d ed.) ("activity or acquiescence of executives, high officers, or principal managers" as ratification).

## 4: The statement is defamatory *per se* and caused special harm.

The final element is a showing that the statement is either defamatory *per se* or caused special harm. The article statement meets both aspects.

### 4.1: The statement is defamatory per se.

The statement is defamatory *per se*. A statement is defamatory per se when it levies a criminal charge. *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001). Likewise, it is defamatory *per se* to levy a charge of serious sexual misconduct. *Rejent v. Liberation Publications, Inc.*, 197 A.D.2d 240, 245 (N.Y. App. Div. 1994). The Court has already recognized that the statement levies a "serious accusation" and Nancy Cooper for Newsweek admitted that it connotes criminality. ECF no. 27, at 13; 56.1 ¶¶ 59-60. There can be no genuine issue of

material fact on this point, the article statement is defamatory *per se*.

## 4.2: The Temple suffered special damages.

The article statement also caused the Temple special damages. Remediation expenses are collectible as special damages. See N.Y. Pattern Jury Instr.--Civil 3:29A, *cmt.* ("Expenses incurred to counteract the injurious effect of the defamation" as special damages, citing *Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publ'g Ass'n*, 226 N.Y. 1 (1919)). Because of the article statement, the Temple has been unfavorably compared to the Catholic Church. 56.1 ¶ 126. Others canceled recurring donations. 56.1 ¶ 127. Still others pointed to the article as truth of the matters asserted within it. 56.1 ¶ 128. To counteract these negative effects, the Temple hired out public relations assistance, at a combined cost of $43,350. 56.1 ¶ 129-131. These costs are recoverable as special damages.

**WHEREFORE** the Court should find that there is no genuine issue of material fact and Plaintiff is entitled to a liability judgment as a matter of law; or should make summary findings on any material fact not in genuine dispute and treat it as established at trial.

Respectfully submitted on May 17, 2024,

By:   */s/ Matt Kezhaya*

Matt Kezhaya (# 0402193)
**KEZHAYA LAW PLC**
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:   (479) 431-6112
email:   matt@kezhaya.law

### CERTIFICATE OF SERVICE

**NOTICE IS GIVEN** that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on May 17, 2024, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*