# Exhibit 37

Excerpts of deposition of Nancy Cooper
(November 7, 2023)

**In the Matter Of:**

THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL

1:22-cv-01343-MKV

**NANCY COOPER**

*November 07, 2023*

*30b6*




800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

THE SATANIC TEMPLE, INC.,

Plaintiff,

-against- Case No. 1:22-cv-01343-MKV

NEWSWEEK DIGITAL, LLC,

Defendant.

-----------------------------------x

November 7, 2023
10:03 a.m.

Videotaped 30(b)(6) Deposition of Defendant by NANCY COOPER, and NANCY COOPER Individually, taken by Plaintiff, pursuant to Notice, held at 425 Madison Avenue, New York, New York, before Joseph R. Danyo, a Shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S :

KEZHAYA LAW PLC
Attorneys for Plaintiff and the Witness
150 S. Fifth Street
Suite 1850
Minneapolis, Minnesota 55401

By: MATT KEZHAYA, ESQ.
SONIA KEZHAYA, ESQ.

LAW OFFICES OF CAMERON STRACHER PLLC
Attorneys for Defendant and the Witness
51 Astor Place
9th Floor
New York, New York 10003

By: CAMERON STRACHER, ESQ.
SARA TESORIERO, ESQ. (Via Zoom)

Also Present:

LAURA HENRIQUE, ESQ., Newsweek (Via Zoom)

ELIZABETH GONZALEZ, Videographer

~oOo~

Cooper

THE VIDEOGRAPHER: Good morning. This is the beginning of media 1 of the deposition of Nancy Cooper in the matter of The Satanic Temple, Incorporated versus Newsweek Digital, LLC, case number 1:22-cv-01343-MKV. Today's date is November 7, 2023, and the time on the monitor is 10:03. My name is Elizabeth Gonzalez, and I am the videographer. The court reporter is Joe Danyo.

Would counsel please introduce themselves for the record after which the court reporter will swear in the witness.

MR. KEZHAYA: This is Matt Kezhaya appearing on behalf of the Plaintiff. I am joined by Sonia Kezhaya.

MR. STRACHER: Cameron Stracher on behalf of the defendant and the witness, and with us by Zoom is Sara Tesoriero from my office and Laura Henrique from Newsweek. She is in-house counsel at Newsweek.

N A N C Y C O O P E R, having been first duly sworn by Joseph R. Danyo, a Notary Public, was

10:03
10:03
10:04
10:04
10:04

Cooper

called as a witness and testified as follows:

EXAMINATION BY MR. KEZHAYA:

Q. Please state your name for the record. 10:04

A. Nancy Cooper.

Q. Nancy, have you ever been deposed before?

A. About six or seven years ago.

Q. Okay. What was that attendant to? 10:04

A. It was something in which we were not a direct something or another, We were a witness, and it was literally about some bracelets that we had written about.

Q. Okay. Was it a defamation lawsuit? 10:05

A. I don't remember.

Q. Okay. Have you ever been a witness or a defendant in a defamation lawsuit before?

A. No.

Q. Okay. What is your current role at Newsweek? 10:05

A. I'm the global editor-in-chief.

Q. What does that entail?

A. I set the standard for what Newsweek does or doesn't do. I'm in meetings to discuss, 10:05

Cooper

you know, very granular stuff what story today, but also like what are we going to do next year.

Q. You said what story today?

A. Yeah. 10:05

Q. What does that mean?

A. Like, you know, what's happening with Mike Johnson, what's happening in Congress, what's happening with the economy.

Q. What are the newsworthy events then of the day? 10:05

A. Yeah.

Q. Okay. What qualifications are required for that role?

MR. STRACHER: I object to the form. 10:05

You can answer.

A. You know, it's whatever, different sets of qualifications. I'm a very experienced editor, so I would say that's the qualification.

Q. What did you do before Newsweek, immediately before? 10:06

A. Immediately before I was at IB Times. International Business Times, IBT, different publications, and before that, MSNBC, and before that, New York Public Radio, and before that, 10:06

Cooper

Q. So the 60 number encompasses editors, writers?

A. It's a guess. It's an estimate.

Q. 60-ish? 10:12

A. Yes.

Q. Editors, writers, pretty much everyone. Do you run Newsweek? Are you functionally the CEO of Newsweek?

A. No. There is a CEO. 10:12

Q. Okay. So then you have people above you. Is that correct?

A. Yes.

Q. Okay. How many layers is it from you to the CEO? 10:12

A. One.

Q. So who do you report to?

A. Dev Pragad. Dev, new word P-r-a-g-a-d.

Q. What is Dev's title? 10:13

A. He's the CEO and president.

Q. Okay. So you are immediately below the CEO and president. Is that correct?

A. Yes.

Q. Does Dev have an active role in the 10:13

Cooper

A. No, I don't say to Google it.

Q. Okay. Do you require them, specifically we're talking about the desk, to engage in any level of fact-checking efforts? 10:41

A. Yes.

Q. Okay. What are those fact-checking efforts that they shall engage in?

A. It's a spectrum. There's straightforward stuff where you can see that this 10:42 is a mistake. This is a typo. This is just a transcription error, and then there are larger questions, and their job is to make sure that our stories are accurate and fair. I don't dictate you have to Google the words. 10:42

Q. How does one delineate whether a fact question is big enough that it should be looked into?

A. Experience.

Q. In your experience, would an 10:42 accusation of covered-up sexual abuse qualify as one of these big questions that should be fact-checked?

MR. STRACHER: Objection to the form.

A. Yes. 10:42

Cooper

there's different reputations I guess is what I'm trying to say.

Q. Well, I'm specifically asking about reputation for honest, fair reporting. 11:05

A. I can't speak to that. We made -- I felt strongly that we should not be saying trust us. That it was our job to say we make every effort to be trustworthy.

Q. In the industry, has there been a big 3 nomenclature? 11:05

A. More than ten years ago. Maybe 15, 20 years ago.

Q. What was the big 3?

A. Time, Newsweek and U.S. News. 11:05

Q. So Newsweek was among the big 3?

A. Yes.

Q. And the big 3, what did that refer to? Not just the organizations obviously.

A. Just a news mag. I mean I don't know how to say. The news magazines, the key, the biggest news magazines. 11:05

Q. Would it be fair to say most credible?

A. Yes. 11:06

Cooper

Q. Is it true that "More than one in five Americans read us"?

MR. STRACHER: Objection to form. Who is "us"? 11:06

MR. KEZHAYA: Newsweek.

A. I believe that's the number. You know, I believe that to be the number.

Q. Is that a yes then?

A. It is as far as I know. I don't know exactly. As far as I know, yes, that is correct. 11:06

Q. Are you familiar with the media kit that was attached to the complaint as an exhibit?

A. No.

Q. Does Newsweek have a media kit? 11:07

A. As far as I know, yes.

Q. What is a media kit?

A. Pardon me?

Q. What is a media kit?

A. What they go to market with, but I have nothing to do with that side of the business. 11:07

Q. You say they go to the market?

A. Yeah.

Q. What does it mean -- first of all, 11:07

Cooper

Q. Do you remember approximately when that was?

A. No.

Q. Relative to her first article on Newsweek, do you have any estimate about when that would have been? 11:20

A. I really don't. I'm sorry. It was all phone relationship, and it's all, I don't remember any dates. 11:20

Q. Did you offer Duin a job as an employee at Newsweek?

A. I don't know.

Q. Do you recall whether the job negotiations -- strike that. Tell me as best as you can recall the story from how she became an independent contractor of Newsweek? 11:20

A. I think that we had posted the job for a religion reporter, and she had applied, and I interviewed her along with another editor, and we hired her. 11:21

Q. Was the decision to hire her solely -- I say solely -- dually between the two of you?

A. Yes. 11:21

Cooper

Q. Did you meet with Duin on any regular cadence?

A. I think we talked once a week, but I don't remember for sure. She and Juliana and I it would have been. 11:22

Q. Did you meet with -- strike that. Are there levels of reporter at Newsweek?

A. Yes.

Q. How did Duin rank in that? 11:22

A. I don't remember her title, but she was one of the senior-ish people. I mean she wasn't expected to do, you know, breaking news stories all day. She was a subject matter expert. 11:23

Q. Okay. This time frame that you posted the RFP, for lack of a better word, request for proposal, the job.

A. Yes.

Q. Strike that. Let's start over. You posted a job? 11:23

A. I believe so. I don't know for sure.

Q. Do you remember about when that was posted?

A. No. 11:23

Cooper

A. Yes.

Q. Do you sit on all discussions of all articles, or is that managed by lower employees?

A. No. I don't sit in on every discussion. 11:57

Q. Okay. What delineates the discussions that you do versus don't?

A. Timing, importance of the story, questions about the story. 11:57

Q. Earlier you mentioned that you met with Duin on a weekly basis. Is that correct?

A. As I remember.

Q. Did you meet with all reporters on a weekly basis? 11:57

A. No, not all. I believe there were others that Juliana and I spoke with once a week, but I don't remember.

Q. Was Juliana in charge of Duin because of the seniority of Duin? 11:58

A. It was just the topic I think. It was that she was a U.S. reporter, and Juliana was the U.S. editor.

Q. Okay. Under what circumstances might a dispute get escalated to you as to whether or 11:58

Cooper

that she published is dated January 1 of 2023.

A. She probably had, yeah, written that, if it's dated January 1st, she had written it, so it would have been the end of 2022. 12:55

MR. KEZHAYA: I pass the witness.

MR. STRACHER: Thank you.

EXAMINATION BY MR. STRACHER:

Q. Just a couple of follow-up questions. Was the publishing desk in existence in the spring of 2021? 12:55

A. No. I don't believe so.

Q. Was there a -- were there independent -- withdrawn. Were there people whose job it was to fact-check articles in the spring of 2021? 12:56

A. I don't believe so. No.

Q. Were there people whose job it was to copy-edit articles in the spring of 2021?

A. I believe there were, yes, but we've had a copy desk, got rid of a copy desk, rebuilt the copy desk, so I don't remember the dates. 12:56

Q. Oh, apologies. I'm reminded that the article was in the fall of 2021. So was there, was the publishing desk in existence in the fall 12:56

Cooper

Q. I'll rephrase the question.

A. Yes.

Q. Julia Duin wrote articles for Newsweek, correct? 01:05

A. Yes.

Q. Did you fact-check anything in the articles?

A. No. I raised questions to her, but I didn't personally fact-check things. 01:05

Q. Did Juliana fact-check anything?

A. I don't believe so.

Q. And we're not talking just this article. We're talking overall.

A. As I recall, yes, to what you're saying. 01:05

Q. Did anyone else over Julia Duin's entire career at Newsweek fact-check any of her articles?

A. I don't believe so. 01:05

Q. Okay. So you relied, you Newsweek, relied on Julia Duin to fact-check her articles, correct?

A. Yes.

Q. And if something slipped through the 01:05

Cooper

it got in, correct?

A. If.

MR. STRACHER: Same objection.

Q. Correct. It's all under if. Yes. You can still answer the question. 01:06

A. It could explain it.

Q. Okay, and as the global editor in chief, you are the best positioned person to ascertain whether a factually accurate or inaccurate statement has been made in a Newsweek published statement before it goes out, correct? 01:07

MR. STRACHER: Objection to the form of the question. 01:07

Q. Correct or incorrect?

A. Incorrect.

Q. Okay. Does Newsweek have any more particular policies, standards, customs or practices to teach someone how to go about fact-checking? 01:07

A. There's onboarding. You know, there's orientation lectures, which I believe explain, you know, how we do things, what our policies are, what our practices are. 01:07

Cooper

Afternoon Session

1:47 p.m.

THE VIDEOGRAPHER: We are back on the record. The time is 1:47 p.m. 01:47

N A N C Y C O O P E R, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued)

BY MR. KEZHAYA:

Q. Please state your name for the record.

A. Oh. It's Nancy Cooper.

MR. KEZHAYA: Actually can we go off the record. 01:47

THE VIDEOGRAPHER: We are off the record. The time is 1:47 p.m.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record at 1:48 p.m. 01:48

BY MR. KEZHAYA:

Q. What did you know about TST before Duin pitched this particular article?

A. Nothing.

Q. Did you know about TST? 01:48

Cooper

A. No.

Q. Were you aware of TST's existence in the first place?

A. No. 01:49

Q. Do you remember when Duin pitched the article?

A. I don't remember, but I saw the e-mail where it was among the stories she pitched. 01:49

Q. Were those the first stories that she pitched?

A. I'm not sure. I don't know.

Q. Prior to that e-mail, was there a meeting between you and Duin about this article? 01:49

A. No.

Q. After the e-mail, was there a meeting of the participants including you and Duin about this article?

A. A meeting? No. No. 01:49

Q. Okay.

A. I mean --

Q. Let's draw your attention to the confidential Exhibit Cooper 52, which we are marking as Plaintiff's 9. 01:49

Cooper

A. Right.
Q. Did you receive this e-mail?
A. I believe so, yes.
Q. Did anyone else receive this e-mail? 01:51
A. I can't tell from this one.
Q. Okay. Returning back to our front page, we see the cc line. You e-mailed Julia at 1:04 p.m., and there are two people on the cc line. Do you see that? 01:51
A. No.
MR. STRACHER: On the first page.
Q. At the very top.
A. Oh, yes. Got you.
Q. And I recall you mentioned this person earlier, but I don't recall their role. Who is the first person that is cc'd on this? 01:51
A. Dayan is the chief strategy and content officer.
Q. So you were the chief editor? 01:51
A. Yes.
Q. He is the chief strategy officer. It's from you to Julia, and also cc'd is Juliana.
A. Yes.
Q. Is that correct? 01:52

Cooper

A. Yes.

Q. And remind me who Juliana is?

A. She would be Julia's manager.

Q. Okay. So Julia directly reports to Juliana? 01:52

A. Yes.

Q. Who in turn reports to you, is that correct?

A. Yes. 01:52

Q. And then, in terms of the organizational chart, you and --

A. Dayan.

Q. Dayan.

A. Report to Dev. Yes. 01:52

Q. Meaning you don't report to Dayan, and Dayan does not report to you, correct?

A. Correct.

Q. Okay. Turning your attention back to this October 25 e-mail on page 2, Julia writes, "Are we meeting today at 2 your time, 11 my time?" Do you see that? 01:52

A. Yes.

Q. Do you have any reason to believe that Dayan and Juliana were not copied on this 01:52

Cooper

e-mail?

A. I have no reason to believe one way or another.

Q. Okay, and the next more recent e-mail is Juliana writing to Julia. Do you see that on page 1? 01:52

A. On page 1?

Q. Correct.

A. Yes. 01:53

Q. That's correct, right?

A. Yes.

Q. And then after Juliana writes, you write, "I look forward to our meeting at your convenience." Do you see that? 01:53

A. Yes.

Q. Okay. Was Dayan at that meeting?

A. No, I don't know. I don't think so, but I don't know.

Q. Was Juliana at that meeting? 01:53

A. I think so, but I don't know.

Q. Were you at that meeting?

A. Yes.

Q. Was there a meeting?

A. I believe so. 01:53

Cooper

that question?

MR. KEZHAYA: It's a predicate question to my next question.

MR. STRACHER: Okay. 01:56

A. They were story suggestions.

Q. That's what I was going to ask. Okay. So, returning back to the first page, these other story suggestions are not something that you commented on, is that correct? 01:56

A. I don't appear to have. I didn't look into whether we did or didn't do them.

Q. In your earlier testimony, it was on October 25, 2021, prior to receiving this e-mail on Cooper 52, you had never heard of The Satanic 01:56 Temple, correct?

A. Correct.

Q. What was it about this article that drew your attention to The Satanic Temple article as distinguished from the other pitches? 01:56

A. Because it's, if you read her pitch there, at the bottom, just in time for Halloween. As she says, it's quite a story, and we have something called a -- that calls itself a Satanic Temple and that then says it's being defamed and 01:56

Cooper

has a lawsuit. That's just a good story.

Q. And your testimony here is that you had never heard of The Satanic Temple before this date, correct? 01:57

A. Correct.

Q. As you sit here today, can you testify whether or not Newsweek has ever written about The Satanic Temple before October 25, 2021?

A. Can I testify about that? 01:57

Q. Yeah, do you recall, or are you familiar with?

A. No. I don't know of any, but I certainly didn't do -- I didn't search the archive. I don't know. 01:57

Q. To clarify my understanding of your testimony, you do not know whether Newsweek published any stories about The Satanic Temple before October 25, 2021, correct?

A. Correct. 01:57

Q. On Cooper 52, Julia Duin described her contacts as disgruntled members. Do you see that? Correct?

A. Yes.

Q. What is your understanding of that 01:58

Cooper

yourself or, you know, your reporter spots something. You say that's a great idea, or you listen to your reporter, and you go I don't think this is a great idea, but this other thing you said is a great idea, and you talk to them about how you would shape the story and how you see the story, and, you know, these are sometimes split into different jobs, but overall then you read it and you think about it and talk to the reporter and you suggest fixes, and sometimes you overrule people and make fixes, and then it gets published.

Q. What are the nature of the fixes that you would make?

A. Would make?

Q. Um-hum, as an editor.

A. It could be anything from a typo to like, no, the person is not a suspect. They're a person of interest, you know, catching something like that.

Q. Okay. Why wasn't Juliana the editor on this particular article?

A. Because I'm a much more experienced editor, and she was probably swamped with her

02:02
02:02
02:02
02:02
02:02

Cooper

sources used in the article prior to it being published?

A. No.

Q. Did you review any of the communications between Julia Duin and Lucien Greaves prior to the article being published? 02:04

A. I don't believe so. No.

Q. What was the purpose of you editing this article? 02:04

A. Everybody needs an editor.

Q. Why is that?

A. Because you can't see your own mistakes, because you can't catch your own typos, because you can't, you're so close to the story sometimes, you're not a good judge of what is confusing to the reader, what is boring to the reader. You always need an outside person. 02:04

Q. Did you have any telephone conversations with Duin about this article? 02:04

A. I don't believe so.

Q. What about this meeting on October 25th?

A. That's where we were on the phone. We were never in person I don't think ever. 02:05

Cooper

That's where we were on the phone, and I guess I said great story. Let's do it.

Q. Did you say that on the phone?

A. I don't recall, but judging from the e-mails at some point I said maybe, you know. Yeah. 02:05

Q. How involved were you in the drafting and editing of this article?

MR. STRACHER: Objection to the form. 02:05

I mean you can answer.

Q. To the best of your ability. If you don't understand a particular aspect of the question.

A. No, you know, I looked back at the e-mails, and then I had some questions. I asked her questions. 02:05

Q. Which e-mails did you look back to?

A. The e-mails in the document pile. Whatever you call this. 02:05

Q. When you say you looked at the e-mails, when did you look at these e-mails?

MR. STRACHER: You can answer.

A. Yesterday.

Q. Okay. Drawing your attention back to 02:06

Cooper

Q. Correct or incorrect?
A. No.
Q. Please help me understand where you are coming from then in resolving that The Satanic Temple does not actually have -- 02:09
A. You did --
MR. STRACHER: I object to form. Let him ask his question. Go.
Q. The statement here, "They don't actually have an abortion ritual," you see that statement from your in box, correct? 02:09
A. Um-hum.
Q. You wrote that statement, correct?
A. Um-hum. 02:10
Q. You did no fact-checking as to whether The Satanic Temple has an abortion ritual, correct?
A. Um-hum.
Q. You did no interviews of witnesses? 02:10
A. Um-hum.
Q. Correct?
A. Um-hum.
MR. STRACHER: You have to speak your answer. 02:10

Cooper

Q. Would you agree with me that the assertion that there are accounts of sexual abuse being covered up in ways that are more than anecdotal is an accusation of wrongdoing? 02:41

A. Yes.

Q. So, throughout these e-mails, we see that you included language in this article. Do you remember including language in the article?

A. Not particularly. 02:41

Q. Do you remember whether you included language in the article?

A. No.

Q. Do you recall the e-mail in which you said that the blue insertions are yours? 02:42

A. I see the line. I see the e-mail, but do I remember it? No.

Q. I draw your attention to Plaintiff's 13.

(Plaintiff's Exhibit 13, Document Bates stamped Cooper 31 and Cooper 32, was so marked for identification, as of this date.) 02:42

Q. Would you agree with me that covering up sexual abuse would be a criminal act? 02:42

Cooper

MR. STRACHER: I object to the form of the question. Speculative.

Q. For purposes of the editorial guidelines -- 02:43

A. Yes.

Q. -- would you agree with me that this is an accusation of a criminal act?

MR. STRACHER: I object to the form.

A. Of a possibly criminal act. 02:43

Q. What about the sexual abuse in the first place?

MR. STRACHER: Objection to form. What's the question? Your question is "What about the sexual abuse in the first place?" 02:43

A. What's the question?

Q. My preceding statement was, within the meaning of the editorial guidelines, is covering up sexual abuse a criminal act to which you respond yes. 02:43

A. Yes.

Q. Follow-up. What about the sexual abuse in the first place, within the meaning of the editorial guidelines, is accusing someone of 02:43

Cooper

having a systemic sexual abuse problem --

A. Yes.

Q. -- would that not also be a criminal act? 02:43

A. It could be.

MR. STRACHER: Objection to the form of the question.

Q. I believe the witness said yes, correct? 02:44

MR. STRACHER: No, I thought she said, I believe she said it could be.

A. It could be.

MR. STRACHER: This is why you should wait until the question is finished so I 02:44 can object and so that you can answer.

THE WITNESS: Okay. I'm sorry. I'm sorry.

MR. STRACHER: That's okay.

Q. When is sexual abuse of a systemic 02:44 nature not potentially criminal?

MR. STRACHER: We're getting far afield here now from like what the article actually says.

So, if you want to get into this 02:44

Cooper

area, I'm going to object, but I'm not going to prevent the witness from answering, but let me just note we're getting pretty far afield. 02:44

MR. KEZHAYA: I'm delineating the difference as pertains to the editorial guidelines as to the difference between criminal sexual abuse and non-criminal sexual abuse. She said it could be. 02:44

MR. STRACHER: Okay.

MR. KEZHAYA: I would like you to answer the delineating question.

MR. STRACHER: But the word you used was "systemic sexual abuse." Where do you find that phrase? 02:45

Q. Nancy, you edited this article, correct?

A. Yeah.

Q. Was this article not about TST as an organization? 02:45

A. It was about a lawsuit about TST.

Q. Was the subject of this article TST?

A. The subject of the article was this lawsuit. We didn't just like say here's the 02:45

Cooper

thing, TST. We said here is this interesting suit. That's a different story.

Q. Your testimony today is that your understanding of this article was that it's about the lawsuit, not about the organization, correct? 02:45

A. Yes.

Q. Please read the first line of the article.

A. "Can you defame a religion, especially one that doesn't believe in God, Satan or the supernatural?" 02:45

Q. Is this what's known as a lead in the industry?

A. Yeah. 02:46

Q. What is a lead?

A. It's how you get into a story, the top, the first sentence of this paragraph.

Q. Who wrote the lead?

A. Probably she did. It's possible that I did. 02:46

Q. Is it your best recollection today that she wrote the lead?

A. I don't know.

Q. You must have knowledge as to your 02:46

Cooper

best recollection?

A. No, I don't.

Q. Try.

MR. STRACHER: I object to the form. You don't have to try anything that you don't recall. 02:46

A. I don't recall.

MR. STRACHER: Just say you don't recall. 02:46

MR. KEZHAYA: I object to the coaching. She didn't say "I don't recall."

MR. STRACHER: I'm not coaching her. I'm just telling her that she doesn't have to like invent an answer. 02:46

A. I don't know. That's the answer.

Q. Who came up with the headline for this article?

A. I believe I did. 02:46

Q. Is it normal for Newsweek to have its global editor in chief drafting leads and headlines for articles?

A. For some articles, yes.

Q. What made this article special? 02:47

Cooper

A. Because she's one of our senior reporters, as I said.

Q. Did you write headlines and leads for all of the senior reporters? 02:47

A. For many of them. I didn't write heads and leads for every one of her stories either, I don't think. It's just.

Q. Your earlier testimony is that this article is about the litigation. 02:47

A. Yes.

Q. And your earlier testimony also was the lead is how you go about introducing the concept of the article, correct?

A. Um-hum. 02:47

Q. Please help me understand how this lead ties to the litigation when it makes no reference to the litigation?

A. The litigation is about defaming a religion. So it's exactly about that. 02:47

Q. Please say that again.

A. The lead is about can you defame a religion. So it's about the lawsuit.

Q. Did you ever look at the complaint in this case? 02:48

Cooper

A. The complaint meaning what? The original lawsuit?

Q. Correct. The Johnson lawsuit.

A. I don't believe so. 02:48

Q. Did Julia Duin ever look at the complaint?

A. I'm sure she did.

Q. Do you have any personal knowledge whether she did? 02:48

A. I think she quotes from it in her e-mails or in the story.

Q. Is that why you are sure?

A. Yes.

Q. Turning your attention to our earlier bullet point, "Reach out for comment and give parties time to respond," how much time is reasonable for a response? 02:49

A. Again, it depends on the story. If it's just saying Mike Johnson got elected, and his priority will be this, you know, you don't have to wait forever for a response. 02:49

If you say, Mike Johnson, you know, beat his previous wife, you have to wait for a response. 02:49

Cooper

BY MR. KEZHAYA:

Q. I draw your attention back to Exhibit 5. Earlier you testified that it's normal for Newsweek to make use of anonymous sources. Do you remember that? 03:14

A. Yes.

Q. I want to draw your attention more particularly to page 3, first full bullet point. Please read that into the record. 03:14

A. "Newsweek reporters should use anonymous sources only rarely, in consultation with their editors, at least one of whom must know the identity of the source."

Q. Do you know the true identity of the source Jinx Strange? 03:14

A. No.

Q. Do you have Jinx Strange's phone number?

A. No. 03:14

Q. Do you have Jinx Strange's residential address?

A. No.

Q. Do you have Jinx Strange's work address? 03:14

Cooper

A. No.

Q. Did you have any communication of any sort with Jinx Strange?

A. Not that I know of. 03:14

Q. Did Julia Duin know the true identity of Jinx Strange?

A. I don't know. I believe so, but I don't know.

Q. You personally wrote these? The editorial guidelines, you personally either wrote or oversaw them, correct? 03:15

A. Yes.

Q. Did Julia Duin indicate to you at any point whether she knew the true identity of Jinx Strange? 03:15

A. Not that I recall.

Q. I want to turn your attention to the same page, second to last bullet point above Questions of Taste. Please read the first full sentence. 03:15

MR. STRACHER: Page? Sorry.

Q. Page 3, second to last bullet point above Questions of Taste.

A. "When writing about criminal charges 03:15

Cooper

or allegations, be specific and complete."

Q. Is it your opinion as Newsweek's editor in chief that the article statement is both specific and complete? 03:16

MR. STRACHER: Objection to the form of the question.

A. Yes.

Q. Okay. Please describe the specifics.

A. That there were allegations of sexual abuse and that they had not been dealt with. 03:16

Q. Okay. Who was sexually abused?

A. We don't know. Members.

Q. Okay. What was entailed in the coverup? 03:16

A. I don't know.

Q. And it's your testimony today that these are -- withdrawn. Who engaged in the sexual abuse?

A. I don't know. 03:16

Q. Who engaged in the coverup?

A. I don't know. Officials of the church, but I don't know.

Q. You are presuming, correct?

A. Yes. 03:16

Cooper

Q. What was the sexual abuse?
A. I don't know. Sorry.
Q. What was the coverup?
A. Again, I don't know. 03:17
Q. And, once again, it's your testimony as the person in charge of enforcing these guidelines and the person --
MR. STRACHER: I object to the form. She did not say enforcing. Right? She didn't use the word "enforcing." 03:17
Q. Were you in charge of enforcing these guidelines?
A. Yes.
Q. Okay. As the person who was in charge of enforcing these guidelines, as the global editor in chief, and as the person who edited this particular article, it's your testimony that this statement is complete, correct? 03:17 03:17
A. Yes.
Q. And specific as well, correct?
A. Yes.
Q. Please read the last sentence in the same bullet point. 03:17

Cooper

this is an investigative story and this isn't. I'm just saying in my mind this was a pretty straightforward story.

Q. How would you describe the story if not an investigative piece? 03:54

A. It's a reported piece. A report.

Q. What would an investigation look like in an investigative piece?

A. I'm trying to think of an example. If you look at what The New York Times did about Harvey Weinstein. They traced back all the cases. They talked to a million people. They uncovered things that had been covered up. They didn't just write about, oh, there's this suit, which is what ours could be. 03:54 03:55

Q. And is it your understanding that the Johnson lawsuit involved allegations in which The Satanic Temple sexually abused and then covered up its membership? 03:55

MR. STRACHER: I object to the form.

Q. Is that your understanding?

A. No, I don't have an understanding of what the Johnson lawsuit is. That's the suit here in the case? 03:55

Cooper

Q. It's my understanding of your testimony that the article is about the Johnson lawsuit.

A. Oh, I just think of it as a lawsuit. Yeah. 03:55

Q. So is that a yes?

A. Yes.

Q. That is your testimony?

A. Yeah. 03:55

Q. What is the basis of this belief?

MR. STRACHER: I'm sorry. What is the question? What is the basis of this belief?

MR. KEZHAYA: She just testified, yes, it is my belief that this statement is about the Johnson, an allegation. 03:55

MR. STRACHER: No. No, it is not. Your question was, "It is my understanding that your testimony is that the article is about the Johnson lawsuit." 03:56

A. Right.

Q. Correct.

MR. STRACHER: And then you said, "What is the basis of that belief?" 03:56

Cooper

of the statement.

Q. Yes or no?

A. I have faith in Julia's reporting, yes. 04:04

Q. You have faith in that, correct?

A. Yes.

MR. KEZHAYA: I pass the witness.

MR. STRACHER: No questions.

MR. KEZHAYA: Okay. 04:05

THE WITNESS: Are we done?

MR. KEZHAYA: We are done.

THE WITNESS: Okay. Thank you.

THE VIDEOGRAPHER: This is the end of the deposition of Nancy Cooper. The time is 4:05 p.m. Thank you. 04:05

THE WITNESS: Thank you.

MR. STRACHER: Thank you.

(Time noted: 4:05 p.m.)

______________________

Subscribed and sworn to
before me this____day of______, 2023.

____________________

C E R T I F I C A T I O N

I, JOSEPH R. DANYO, a Shorthand Reporter and Notary Public, within and for the State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of November, 2023.

JOSEPH R. DANYO
STATE OF NEW YORK
My Commission Expires 2/20/2027