# Exhibit 38

Excerpts of deposition of Julia Duin
(November 16, 2023)

**In the Matter Of:**

THE SATANIC TEMPLE

vs

NEWSWEEK DIGITAL

---

# JULIA DUIN

November 16, 2023

---



**Moburg Reporting**

33400 9th Ave. South, Suite 207

Federal Way, WA 98003

(206) 622-3110

www.MoburgReporting.com

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF NEW YORK

 3   ---------------------------------------------------
                                          )
 4   THE SATANIC TEMPLE, INC.,            )
                                          )
 5            Plaintiff,                  )
                                          )
 6        vs.                             )NO. 1:22-CV-01343-MKV
                                          )
 7   NEWSWEEK DIGITAL, LLC,               )         COPY
                                          )
 8            Defendant.                  )
                                          )
 9   ---------------------------------------------------

10      Videotaped Deposition Upon Oral Examination

11                        of

12                    JULIA DUIN

13   ---------------------------------------------------

14              Thursday, November 16, 2023

15                    9:37 a.m.

16            7900 Southeast 28th Street

17             Mercer Island, Washington

18

19

20

21

22

23

24   Cheryl Macdonald, CRR, RMR
     Court Reporter
25   License No. 2498
```

THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                    Julia Duin

```
 1                 A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4                   MATT KEZHAYA
                     SONIA KEZHAYA
 5                   Attorneys at Law
                     KEZHAYA LAW PLC
 6                   150 South Fifth Street
                     Suite 1850
 7                   Minneapolis, Minnesota 55402
                     matt@kezhaya.law
 8                   sonia@kezhaya.law

 9

10    FOR THE DEFENDANT and THE WITNESS:

11                   SARA TESORIERO
                     CAMERON STRACHER (via Zoom)
12                   Attorneys at Law
                     STRACHER LAW
13                   51 Astor Place
                     9th Floor
14                   New York, New York 10003
                     sara@stracherlaw.com
15                   cam@stracherlaw.com

16

17    THE COURT REPORTER and VIDEOGRAPHER:

18                   CHERYL MACDONALD
                     KALIA HENDRICKS
19                   MOBURG REPORTING
                     33400 9th Avenue South
20                   Suite 207
                     Federal Way, Washington 98003
21                   info@moburgreporting.com

22

23    ALSO PRESENT:  LUCIAN GREAVES (via Zoom)

24

25
```

Page 3

```
 1                       I N D E X

 2

 3    EXAMINATION                                      PAGE

 4    BY MR. KEZHAYA:   .........................      5

 5

 6    EXHIBITS MARKED                                  PAGE
```

```
 7    No. 1          Bates-stamped Newsweek 025...    34

 8    No. 2          Bates-stamped Newsweek 015,
                     16 and 17...................      59
 9
      No. 3          Boston Globe "puff piece"...     74
10
      No. 4          GetReligion podcast 2018....     75
11
      No. 5          GetReligion podcast 2022....     75
12
      No. 6          GetReligion podcast
13                   referring to Boston Globe...     79

14    No. 7          Editorial guidelines........     80

15    No. 8          Newsweek article re orgies,
                     harassment, et cetera.......    100
16
      No. 9          E-mail string Bates-stamped
17                   Duin04-001 - 003............    112

18    No. 10         E-mail string Bates-stamped
                     Duin48-001 - 005............    117
19
      No. 11         E-mail string Bates-stamped
20                   Newsweek 032................    136

21    No. 12         E-mail string Bates-stamped
                     Newsweek 065 - 66...........    136
22
      No. 13         E-mail string Bates-stamped
23                   Cooper 51 - 53..............    177
```

```
24    Conference before Magistrate Judge Sarah L. Cave:

25    Pages 60 - 66
```

Page 4

```
 1                 THE VIDEOGRAPHER:  Good morning.  We are
 2   now on the record.  This is a Zoom -- this is an
 3   in-person deposition of Julia Duin.  My name is Kalia
 4   Hendricks.  I'm the videographer for Moburg Reporting,
 5   located at 33400 9th Avenue South, Suite 207, Federal
 6   Way, Washington 98003.  The court reporter today is
 7   Cheryl Macdonald from Moburg Reporting.
 8                 This deposition is being recorded this 16th
 9   day of November 2023, and the time is now 9:37 a.m.
10   We are in the law offices of Lybeck, Pedreira &
11   Justus, located at 7900 Southeast 28th Street, Suite
12   500, in Mercer Island, Washington.
13                 This deposition is being recorded in the
14   matter of The Satanic Temple, Incorporated, vs.
15   Newsweek Digital, LLC, No. 1:22-CV-01343-MKV, in the
16   United States District Court for the Southern District
17   of New York.  This deposition was noticed by Matthew
18   Kezhaya.  Counsel and all present, please identify
19   yourselves for the record, and then the witness may be
20   sworn.
21                 MR. KEZHAYA:  Matt Kezhaya, appearing on
22   behalf of plaintiff.  I'm joined by Sonia Kezhaya.
23                 MS. TESORIERO:  Sara Tesoriero, appearing
24   on behalf of the witness and on behalf of the
25   defendant, Newsweek, and appearing remotely with me is
```

Page 5

```
 1   Cameron Stracher.

 2             THE VIDEOGRAPHER:  The court reporter may

 3   now swear in the witness.

 4             THE WITNESS:  I'm Julia Duin.

 5   JULIA DUIN,   the witness herein, having been
                   placed under oath by the
 6                 Certified Court Reporter,
                   deposed and said as follows:

 7

 8             MS. TESORIERO:  Matt, before we start, can

 9   I ask that if I make an objection to form that it be

10   considered preserved for the defendant as well as the

11   witness so we don't mess up the record?

12             MR. KEZHAYA:  So stipulated.

13             MS. TESORIERO:  Thank you.

14

15                       EXAMINATION

16   BY MR. KEZHAYA:

17        Q.    Please state your full name for the record.

18        A.    Julia Duin.

19        Q.    Have you ever been deposed before?

20        A.    No.

21        Q.    What did you do in preparation for today's

22   deposition?

23        A.    I consulted with counsel.

24        Q.    And when did that happen?

25        A.    This week.
```

1    the state of America's clergy.  Let's see.  I think

2    the next one was 2015, about a Lutheran clergy woman.

3    And then there was the 2018 award that I talk about on

4    this blog.

5         **Q.    I see also that you've published seven**

6    **books; is that correct?**

7         A.    Mm-hmm.  Yes, there would be seven.  That

8    should be listed on my blog.

9         **Q.    The text of the blog states you've**

10   **published seven books, the latest being "Finding Joy:**

11   A Mongolian Woman's Journey to Christ," the biography

12   -- well, a biography.  Before that you've published

13   "In the house of the Serpent Handler:  A Story of

14   Faith and Fleeting Fame in the Age of Social Media."

15        These are two books that you've written; is

16   that correct?

17        A.    Mm-hmm.

18        **Q.    You've written five other books, I deduced,**

19   **from the text.  Were they all about religion?**

20        A.    One was not all.  One was a collection of

21   Victorian fairy-tales.

22        **Q.    Okay.  And I see that you have served as a**

23   **visiting journalism professor at the University of**

24   **Alaska at Fairbanks; is that correct?**

25        A.    Mm-hmm.

1      Q.     Have you served as professor at any other

2    universities?

3      A.     I was at Union University in Jackson,

4    Tennessee.

5      Q.     Any others?

6      A.     I was an adjunct professor for one semester

7    at University of Maryland.  Also an adjunct -- oh, my

8    goodness.  What's the name of the place?  Patrick

9    Henry University in -- oh, my -- it's in Virginia,

10   Purcellville, Virginia.  P-U-R-C-E-L-L-V-I-L-L-E,

11   Purcellville, Virginia.

12     Q.     Have you served as professor or teacher of

13   journalism anywhere else?

14     A.     No.  This is my only -- those are the only

15   four places.

16     Q.     Excellent.  For how long did you serve as a

17   professor, cumulatively?

18     A.     Let's see.  Well, let's see.  Well, if you

19   count up, I guess, the adjunct, two and a half years.

20   I guess if you count up the adjunct and the full-time

21   experiences, about two and a half years.

22     Q.     Okay.  And in your role as professor, were

23   these all journalism professor roles or --

24     A.     Yes.

25     Q.     In the course of your teaching as

 1    professor, were these basic classes or more advanced?

 2         A.    First one was basic.  The second one was

 3    specialty -- religion reporting specialty class.

 4    Third one was more basic journalism.  Several feature

 5    writing, basic journalism classes.  Overseeing school

 6    yearbook-type and school newspaper classes.  And the

 7    fourth one were religion reporting and political

 8    reporting.

 9         Q.    What is the -- what are some of the

10    distinctions between religion reporting and other

11    reporting?

12         A.    Religion reporting is reporting on a

13    specific religious group.  People who believe in a --

14    who have defined beliefs, usually in some kind of --

15    usually a supreme being of some sort, religious dogma.

16         Q.    I'm asking more about the techniques.  Are

17    there special techniques?

18         A.    How I teach it?

19         Q.    Correct.

20         A.    I would have -- I would tell students the

21    basis of each religious group.  I would have a

22    practitioner of that religion come in and often tell

23    them from their point of view.  I thought it was best

24    to hear from the actual person rather than just me.  I

25    would also have them visit a house of worship

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 25

1      knowledgeable reporting about certain groups.  So we

2      can -- we can have an educated opinion to the general

3      public.

4          **Q.    And more particularly, is it true that the**

5      **general public needs these fairly stated pieces**

6      **because that's a large part of how they perceive the**

7      **particular religion?**

8                  MS. TESORIERO:  Objection to form.

9          A.    The general public needs objective and

10     knowledgeable pieces about religion.  Okay?  I'll

11     state it that way.

12         **Q.    Why?**

13                 MS. TESORIERO:  Objection to form.

14         A.    Well, that's going to be my -- that's my

15     answer.

16         **Q.    I understand that's your answer.  I'm**

17     **asking a different question, which is, why?**

18                 MS. TESORIERO:  Objection to form.

19         A.    Religion is really the -- it's really at

20     the base of our civilization, and it is important that

21     people understand it.

22         **Q.    When did you begin work at Newsweek?**

23         A.    September 2021.

24         **Q.    Early or late?**

25         A.    Sorry?

1       Q.      Early September or late September?

2       A.      September 1st.

3       Q.      When was the hiring process?

4       A.      Just before that.

5       Q.      How long?

6       A.      A few weeks.

7       Q.      The hiring process was a few weeks before

8    September 1st?

9       A.      Mm-hmm.

10      Q.      How did you come to apply for the job at

11   Newsweek?

12      A.      I heard they were looking for someone.

13      Q.      How did you hear that?

14      A.      Through a mutual friend.

15      Q.      Whose?  Wait.  Mutual with --

16      A.      Someone who knew that there was an opening.

17      Q.      Okay, but who was that?

18              MS. TESORIERO:  Objection to form.

19      A.      Just a friend.  I don't have to reveal his

20   name.

21      Q.      I'm not asking for the name.  I'm asking

22   for the connection.

23      A.      A friend who knew one of the editors.

24      Q.      Okay.  Which editor did he know?

25      A.      He knew Dayan.

1        Q.    You said that Dayan was an editor?

2        A.    Oh, yeah.  Dayan is the same person that I

3    mentioned his name before.  Dayan is the same person

4    that -- yeah, Dayan Candappa.

5        Q.    That was one of your supervisors; correct?

6        A.    Yes, that's right.

7        Q.    Do you recognize the name Nancy Cooper?

8        A.    Yes.

9        Q.    Was Nancy Cooper one of your supervisors?

10       A.    Yes.

11       Q.    Was this mutual friend a friend of Nancy

12   Cooper's?

13       A.    I have no idea.

14       Q.    So this mutual friend of yours was mutual

15   between you and Dayan; correct?

16       A.    Yes.

17       Q.    Was this a publicly posted job opportunity?

18             MS. TESORIERO:  Objection.  Calls for

19   speculation.

20       A.    I don't know.

21       Q.    Well, did you -- how did you go about

22   applying?

23       A.    I contacted Dayan.

24       Q.    So this mutual friend of yours gave you

25   Dayan's information directly; is that correct?

1       A.      Mm-hmm, mm-hmm.

2       Q.      And this was when?

3       A.      Let's see.  It was summer of 2021.

4       Q.      Was it in August of 2021?

5       A.      I'm trying to remember.  Might have been.

6  I think I -- when did I contact Dayan?  If I remember,

7  July.  It might have been July.

8       Q.      When did you hear about the job posting

9  relative to you contacting Dayan?

10      A.      I think it was -- I might have heard it in

11  -- when did I hear?  June maybe.  Might have heard in

12  June.

13      Q.      So you heard about this job opportunity and

14  then a month later reached out to Dayan?

15      A.      I think so.

16      Q.      And then that was approximately July that

17  you reached out to Dayan; is that correct?

18      A.      I believe so.

19      Q.      And then the interview process began in

20  August; is that correct?

21      A.      I don't remember the exact date when it

22  began.

23      Q.      I'm not asking --

24      A.      It was July/August sometime.

25      Q.      Was there a lengthy delay between the

1      A.    [As read] "A major rift in an organization

2   called The Satanic Temple:  Defamation lawsuits,

3   anti-Semitic stuff, mismanagement of funds, NDAs being

4   used to hide wrongdoing, sexual harassment, shell

5   corporations, harassment of internal critics.  Sounds

6   like quite a brew.  Am diving into it to see if I can

7   glean anything new of how much of the story this is.

8   More to come."

9      **Q.    Was this the first pitch for the subject**

10  **article that you wrote?**

11     A.    I believe so.

12     **Q.    When did you begin working on this article?**

13     A.    Well, it would have been at the beginning

14  of October.

15     **Q.    I see that the date would be September**

16  **30th, so you clearly formulated the idea of the**

17  **article at some point before September 30th; correct?**

18     A.    Let's see.  Well, remember, I have to pitch

19  it first to make sure they approve it before I start

20  major work on a piece.

21     **Q.    I understand that that might be before you**

22  **start major work.  My question posed is when did you**

23  **start working on it, including minor work.**

24     A.    I don't remember.

25     **Q.    Was it before September 1st, 2020?**



1    Correct or incorrect?

2              MS. TESORIERO:  Objection to form.

3        A.    This pitch was the -- this would have been,

4    really, the beginning of my work on this article.

5        Q.    This pitch was the very beginning of your

6    work on this article; correct?

7              MS. TESORIERO:  Objection.

8        A.    I would say yes.

9        Q.    That's your testimony?

10             MS. TESORIERO:  Objection.

11       A.    Just a moment.  It depends on what you call

12   "work."

13       Q.    What was entailed in drafting this pitch?

14       A.    I had gotten -- I had gotten an idea for

15   this article and I drafted the pitch.

16       Q.    Where did the idea come from?

17       A.    I had -- someone suggested it to me.

18       Q.    Who suggested it to you?

19       A.    I had a -- another journalist.

20       Q.    Another journalist suggested it to you?

21       A.    Mm-hmm.

22       Q.    Who was this journalist?

23       A.    His name is Kevin.

24       Q.    What is Kevin's last name?

25       A.    Trying to remember.  My mind is blank right

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

```
 1    now.  I can't remember.
 2         Q.    How did you know Kevin?
 3         A.    Actually, I really didn't know him.
 4    Somehow he had heard of me.  I really didn't -- I
 5    really hardly knew the man.  I mean, I really didn't
 6    know him, actually.
 7         Q.    How did Kevin convey this idea for this
 8    article?
 9         A.    E-mail.
10         Q.    Did he write this pitch for you?
11         A.    Did he write the pitch?
12         Q.    Correct.
13         A.    I wrote the pitch.  He had some -- some of
14    this is -- some of this is pitch is taken from what he
15    wrote me.
16         Q.    When did he write you that?  Before or
17    after September 1st, 2021?
18         A.    When did he send me that e-mail?  Let's
19    see.  I'm trying to remember.  I know I had gotten an
20    e-mail, and I'm just trying to remember when.  Trying
21    to remember when he sent it to me.  And I -- I don't
22    remember.  I don't remember.  I really don't remember
23    when he sent it to me.
24         Q.    Did you provide your counsel approximately
25    26 pages of e-mails in the course of preparing for
```

 1   with religion.

 2       Q.   Your job title was "Contributing Editor."

 3       A.   Yes.

 4       Q.   Is that correct?

 5       A.   That was the title they gave me.

 6       Q.   What is a contributing editor?

 7       A.   I was -- how would you explain?  That was

 8   their choice of title, not mine.

 9       Q.   I'm asking for a job description.

10       A.   I know.  I mean, it's the same as a --

11   basically, it's the same thing as a religion reporter,

12   in my mind.

13       Q.   How would you describe religion reporter in

14   terms of job description?

15       A.   This is -- let's see.  I would say covering

16   different religious groups.  I was not usually -- not

17   -- let's see.  Phrase.  Sometimes Supreme Court

18   decisions on various religious groups, trends.

19   Usually not breaking news.  Do you know what I mean by

20   "breaking news"?

21       Q.   Not really.

22       A.   Okay.  There were -- breaking news is

23   something that happened right away that I would have

24   to jump on within the hour.  I usually didn't do that

25   because I lived on the West Coast.  It's too much

1      Q.     What I'm trying to get at is did you pitch

2    this article because it sounded like it was within the

3    contours of what they were looking for?

4      A.     Well, the major reason I pitched it is

5    because Halloween was coming.

6      Q.     I don't understand the connection.

7      A.     Halloween.

8      Q.     I know what Halloween is.

9      A.     Satanism, you know, Halloween.  Satanism

10   has a lot to do with Halloween.

11     Q.     It does?

12     A.     Yeah.

13     Q.     Please expand.

14     A.     Halloween is a Satanic holiday.

15     Q.     Let's back up a little bit.  You are

16   studied in religion; correct?

17     A.     Yeah.

18     Q.     It's my understanding that Halloween comes

19   from a Celtic tradition; is that correct?  Samhain?

20     A.     Allhallows Eve.  The actual name is from

21   Allhallows Eve.

22     Q.     What is Allhallows Eve?

23     A.     Allhallows Eve came before All Saints' Day.

24   The first holiday was All Saints' Day; Allhallows Eve

25   was the one before that.  Allhallows Eve is when the

```
 1    an actual -- more of a belief system, and a -- so with

 2    -- TST was different.  When you're asking my

 3    understanding of Satanism, so there was before I met

 4    TST, TST, and then after I met TST.

 5         Q.    When you say you met TST, when did you

 6    first meet TST?

 7         A.    Well, when I -- when I began researching

 8    this article I was not familiar with TST.

 9         Q.    In terms of month and year, when was that?

10         A.    You know, so I would say October of 2021.

11         Q.    So your research into this article began in

12    October of 2021?

13         A.    Right.

14         Q.    And it's my understanding of your testimony

15    that you were not familiar with The Satanic Temple

16    before October of 2021; is that correct?

17         A.    Exactly, yes.

18         Q.    Had you ever written about TST before this

19    article?

20         A.    No, I had not.

21         Q.    You had never written about TST before this

22    article?

23         A.    Except I had in passing for some

24    GetReligion pieces.

25         Q.    How many times had you written about The
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 74

```
 1    Satanic Temple before this article?

 2        A.    I had mentioned them in a 2016 GetReligion

 3    piece, in another -- I think 2018, but I'm not --

 4    2016, there was another one after that.  I think those

 5    were the only two times I had mentioned them before

 6    2021.

 7        Q.    What about after the subject article?

 8        A.    And then there was a 2022 GetReligion

 9    piece.

10        Q.    Let's mark -- you said 2016?

11        A.    I think the first one was 2016.

12              MR. KEZHAYA:  Okay.  Let's mark this as

13    Exhibit 3, please.  Puff piece, Satanic Temple puff

14    piece, that's going to be No. 3.

15              MS. TESORIERO:  The satanic Temple comes to

16    Boston?

17              MR. KEZHAYA:  I believe so, correct.  These

18    appear to be three different ones.

19              MS. TESORIERO:  And for the record, are

20    these highlights your own?

21              MR. KEZHAYA:  Correct.

22              (Exhibit No. 3 was marked for

23              identification.)

24        Q.    Okay.  Please review what we have marked as

25    Exhibit 3.  Is that the 2016 piece that you were
```

 1   referring to?

 2        A.    Yes.

 3        Q.    And there was a 2018 piece you mentioned as

 4   well?

 5        A.    I think it was 2018.  It was the Florida

 6   one?

 7              MR. KEZHAYA:  Let's see here.  We're going

 8   to mark this as Exhibit 4.

 9              (Exhibit No. 4 was marked for

10              identification.)

11              MS. TESORIERO:  Exhibit 5?

12              MR. KEZHAYA:  Yes.  That's going to be 5.

13              (Exhibit No. 5 was marked for

14              identification.)

15        Q.    Is that the approximately 2018 piece that

16   you had mentioned earlier?

17        A.    I think so.  Is that the one in Florida?

18        Q.    I believe so.

19        A.    Yeah.

20        Q.    And we have Exhibit 5.  I believe this is

21   your 2022 piece that you mentioned as well.  And that

22   would be your -- Julia?

23        A.    Mm-hmm?

24        Q.    This Exhibit 5, could you please review it

25   and confirm that that's your 2022 piece you mentioned

 1    earlier as well.

 2         A.    Yes.

 3         Q.    Okay.  So those two pieces in 2016 and 2018

 4    predate the article at issue.

 5               Did you tell anyone at Newsweek that you

 6    had written about The Satanic Temple before?

 7               MS. TESORIERO:  Objection to form.

 8         A.    These weren't -- okay.  I did not consider

 9    these about The Satanic Temple.

10         Q.    What would you consider them?

11         A.    These are media critique pieces.

12         Q.    Could you please read the title of the 2016

13    piece?

14         A.    "The Satanic Temple comes to Salem and the

15    Boston Globe Does a Puff Piece."

16         Q.    And it's your testimony that this is not

17    about The Satanic Temple?

18         A.    It's about the Boston Globe.

19         Q.    Are you still at Newsweek?

20         A.    No.

21         Q.    Why not?

22               MS. TESORIERO:  Objection to form.

23         A.    Excuse me?

24         Q.    Why are you still not employed by

25    Newsweek?

Page 80

```
 1        Q.    Does it say tag?  There should be a list of

 2   tags on there.

 3        A.    Oh, tags?

 4        Q.    Yes.

 5        A.    Oh, okay.  Tags.

 6        Q.    Thank you.  Going back to your hiring

 7   process at Newsweek, were you ever trained on

 8   editorial guidelines?

 9        A.    No.

10        Q.    Were you ever provided a copy of what we're

11   marking as Exhibit 7?

12              (Exhibit No. 7 was marked for

13              identification.)

14        A.    No.

15        Q.    You were never provided that?

16        A.    No.

17        Q.    And you were never trained on that?

18        A.    No.

19        Q.    Did anyone ever tell you that your pieces

20   were subject to the editorial guidelines?

21        A.    No.

22        Q.    Have you, prior to today, ever even heard

23   of these editorial guidelines?

24              MS. TESORIERO:  Objection to form.

25        A.    Yes.
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                    Julia Duin

Page 92

1      Q.    How long after that pitch did you get the

2   green light to start pursuing this article?

3      A.    Well, let me think.  I'm trying to

4   remember.  I can't remember.  I don't think it was

5   long after that.  However -- I don't think it was long

6   after that.

7      Q.    In terms of days?  Weeks?

8      A.    Probably within a week.

9      Q.    And to clarify, that was when you got the

10   green light to pursue the article; correct?

11      A.    Sure.  However -- yeah, I would say within

12   a week.

13      Q.    Okay.  And then how long after the green

14   light did you talk to the QueerSatanic?

15      A.    Well, I had to find them first.  Let's see.

16   It took some -- yeah.  I had to find them.  Talk them

17   into doing the interview.  That took a little while.

18   So that was at least another week.

19      Q.    You had to talk them into doing an

20   interview?

21      A.    Well, yeah.

22      Q.    What did that entail?

23      A.    Numerous -- a lot of messaging back and

24   forth.

25      Q.    There was a lot of messaging back and

1   forth?

2        A.    Well, yeah.

3        Q.    How did these messages take place?

4        A.    We messaged -- let's see.  Messaged each

5   other on Twitter.

6        Q.    Is that all of the messaging that took

7   place --

8        A.    Yes.

9        Q.    -- which constituted talking them into

10  doing the interview?

11       A.    Mm-hmm, mm-hmm.

12       Q.    During what time period did you have these

13  discussions?

14       A.    It would have been early to mid October, up

15  until the time we met.

16       Q.    Did you interface with personal Twitter

17  accounts or the QueerSatanic account?

18       A.    I think QueerSatanic.  I believe it was

19  QueerSatanic.

20       Q.    Was it only QueerSatanic, or did you also

21  interface with personal accounts?

22       A.    I think it was only QueerSatanic -- I'm

23  trying to remember.  I don't remember.

24       Q.    Would it refresh your --

25       A.    I'm trying -- I just cannot.  What were you

1    photos.

2         A.    All right.  No.  That was -- no, I did not.

3         Q.    Did Jinx Strange ever give you any names of

4    individuals who have allegedly been sexually abused by

5    anyone in the course of TST services and then covered

6    up?

7              MS. TESORIERO:  Objection to form.

8         A.    He said he was willing to, but I didn't ask

9    him.

10        Q.    You did not ask him.  Why didn't you ask

11   him?

12        A.    Because the article was mainly on the

13   lawsuit, and it was not on the -- it was not an

14   investigation into the sexual abuse or the finances or

15   the alt-right figures.  It wasn't on these various

16   permutations.  The article was on the QueerSatanic

17   people.

18        Q.    Well, I mean, the article was about the

19   sexual abuse and cover-up plan, was it not?

20             MS. TESORIERO:  Objection to form.

21        A.    No.  The article was on the lawsuit.

22        Q.    Then why did you include the statement?

23        A.    I included a lot of statements.

24        Q.    Why didn't you include the subject

25   statement for which we are here today?

1    know, is TST a religion?  Can you criticize it?

2    That's in the middle.  I quote "you" talking about the

3    defendants.  Then quote Johnson talking about the

4    background.  And so, okay, so what are people saying

5    about The Satanic Temple.  So, okay, what are people

6    saying.

7            So then I start asking other people, okay,

8    what are people saying.  I talked to the unofficial

9    biographer, Mr. Laycock.  Talked to him.  Talked to

10   Mr. Strange.  Talked to Ms. DeMeur.  Talked to Scott

11   Malphas.  These are the other two -- you know, we have

12   -- are not their true names, I know that.  Talked to

13   you.  Of course talked to Lucien.  And by that time it

14   was -- the article is running long enough.

15           So I wanted to kind of give a general

16   picture of what was more of a -- I wanted to give more

17   of a background of what was going on with The Satanic

18   Temple.  Kind of how it started.  The whole

19   mocumentary.  So I had to throw in a bit more details

20   about The Satanic Temple other than the lawsuit.  So

21   does that answer your question?

22        **Q.    How did you ascertain who you would talk to**

23   **and what degree of fact checking you were going to get**

24   **into?**

25               MS. TESORIERO:  Objection to form.

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1            MS. TESORIERO:  Can we go back off the

2    record for a second?

3            MR. KEZHAYA:  Yes.

4            THE VIDEOGRAPHER:  We are now going off the

5    record.  The time is now 1:25 p.m.

6            (Recess.)

7            THE VIDEOGRAPHER:  We are now back on the

8    record.  The time is now 1:26 p.m.

9       **Q.   Did all of your communications with regard**

10   **to this article take place through your Newsweek**

11   **e-mail address?**

12       A.   The interviews with you and with Lucien

13   were on the phone.  Some of the -- well, they were

14   e-mail and on the phone.  I mean, the other ones were

15   e-mail interviews.  I mean -- yeah.  I did not -- I

16   was not on the phone.  I did not talk to the

17   Jinx/Scott/Salome on the phone.

18       **Q.   Let's back up a little bit.  You did not**

19   **talk to Scott Malphas on the phone; correct?**

20       A.   No.

21       **Q.   You did not talk to Jinx Strange on the**

22   **phone; correct?**

23       A.   No.

24       **Q.   You did not talk to Salome DeMeur on the**

25   **phone; correct?**

1        A.     No.

2        Q.     You did talk to Lucien Greaves on the

3    phone; correct?

4        A.     Yes.

5        Q.     You did talk to me on the phone; correct?

6        A.     Right.

7        Q.     You did talk in person with the

8    QueerSatanic group; correct?

9        A.     Yes.  And I talked with Mr. Laycock on the

10   phone.

11       Q.     Did you talk to anyone else on the phone?

12       A.     I'm trying to think who I talked with.  I

13   don't recall anyone else.

14       Q.     Of the e-mail interviews, were they all

15   done through your Newsweek e-mail address?

16       A.     Yes, they were.

17       Q.     Did you receive this complaint through your

18   Newsweek e-mail address?

19       A.     When you say "this complaint" --

20       Q.     The Scott Malphas complaint that you

21   (inaudible) --

22       A.     Yes.  It would have been through -- yes.  I

23   just thought if it's not in the documents that --

24   again, in the huge amount of documents submitted for

25   this case, then I -- then my memory is erroneous.  I

Page 123

1              In terms of there were -- I knew there were

2    complaints about finances.  Even Doug Laycock -- we're

3    talking about the sentence afterwards.  Doug Laycock

4    went into that for his book.  So, you know, Jinx had

5    given kind of a general -- it was a general read of

6    The Satanic Temple.  And it was his -- it was how he

7    saw the state of the religion.  And from my other

8    interviews with people, I found it plausible he was

9    correct.

10         Q.    Did you ask Lucien Greaves about coerced

11    sexual activity and cover-up within The Satanic

12    Temple?

13         A.    I asked him -- I certainly asked him in

14    connection with the orgies, yes.

15         Q.    Not in connection with the orgies.  Did you

16    ask him specifically about Jinx Strange's comment?

17         A.    No.  I did not ask him about Jinx Strange's

18    comment.

19         Q.    Why not?

20         A.    Why not?  I didn't -- I felt I had asked

21    Lucien plenty of questions.  And right below that, I

22    had a quote from Lucien that basically denied all

23    these accusations.

24         Q.    Did you confront Lucien Greaves with the

25    allegation that there are accounts of sexual abuse and

 1    cover-up within The Satanic Temple?

 2             MS. TESORIERO:  Objection.  Asked and

 3    answered.

 4       A.    Did I confront him?  Did I confront him?

 5    Trying to remember.  I don't believe I did.

 6       Q.    So Lucien Greaves's comment in his e-mails

 7    could not possibly have related to something that you

 8    did not confront him with.  You would agree with me

 9    there; correct?

10             MS. TESORIERO:  Objection to form.

11       A.    I disagree.

12       Q.    You disagree?

13       A.    I disagree.

14       Q.    Please explain your basis for disagreeing.

15       A.    His quote here -- his quote underneath, it

16    covered the -- all of Jinx's accusations.  He says,

17    "We are accused of all sorts of nefarious things."  I

18    covered it.  I covered what Jinx was saying.

19       Q.    Did you ever even mention the word Jinx

20    Strange -- the name "Jinx Strange" to Lucien Greaves?

21       A.    I believe I talked to -- I may have talked

22    to Jinx maybe after I talked to Lucien.

23       Q.    So you didn't even talk to Jinx Strange and

24    then talk to Lucien, and yet you're telling me that

25    Lucien's comment pertains to Jinx Strange's

 1      Strange or the allegations to Lucien Greaves, I find

 2      it very difficult to understand how Lucien Greaves's

 3      comment could have any pertinence to Jinx Strange's

 4      allegations.

 5          A.    I don't see how --

 6                THE REPORTER:  Please.  I need to hear the

 7      end of the question.

 8                MR. KEZHAYA:  Jinx Strange or Jinx

 9      Strange's allegation.

10                MS. TESORIERO:  Are you asking her a

11      question?

12                MR. KEZHAYA:  I'm asking her to explain

13      what she's -- where she's coming from with her

14      testimony.

15                MS. TESORIERO:  Objection.  Asked and

16      answered.

17          A.    The way -- the way I constructed the

18      article is that the -- okay.  Jinx gave -- Jinx had

19      several things to say about the organization, the

20      alt-right, the sexual abuse, the finances.  And I had

21      Lucien giving a general denial about -- a general

22      denial.  I did not feel he -- Lucien's general

23      statement had to address every single thing

24      specifically.

25          Q.    Why did you have him address anything in

 1   TST was engaging in criminal activity?

 2       **Q.    As a matter of fact, you did.  You wrote**

 3   **the article, did you not?**

 4           MS. TESORIERO:  Objection.

 5   Mischaracterizes the article statement.

 6       A.    I did not say that.

 7       **Q.    Oh, you did not write the article?**

 8           MS. TESORIERO:  Objection.

 9       A.    I did write the article.

10       **Q.    You didn't include the quote in the**

11   **article?**

12           MS. TESORIERO:  Objection to form.  Give me

13   a second to object and then you can answer.

14       **Q.    The subject quote.**

15           MR. KEZHAYA:  You can just say "Object to

16   form" and it's taken subject to that.

17           MS. TESORIERO:  I understand, but even

18   "object to form" was getting it mixed in between.  I

19   just want to let the court reporter get "objection to

20   form."

21           I believe the last question was did -- you

22   state the last question.

23       **Q.    Please go to page 8.**

24       A.    Okay.

25       **Q.    First line, "He wrote," quote -- read the**

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

 1   question.

 **2**        **Q.     Julia, I know things are getting heated,**

 **3**   **but you need to led me finish the question.**

 4            MS. TESORIERO:  You need to let her finish

 5   her answers, too.

 6            MR. KEZHAYA:  Fair.

 7        A.   Did I ask anyone?  Anyone to be 7 billion

 8   people?  I mean --

 **9**        **Q.     Well, did you ask anyone on the face of the**

 **10**   **planet what sexual abuse and cover-up means in the**

 **11**   **context of this here quote?**

 12            MS. TESORIERO:  Objection to form.

 13       A.   Okay.  I'll say no to that one.  All right?

 **14**       **Q.     Thank you.**

 15            (Exhibit Nos. 11 and 12 were marked for

 16            identification.)

 17       A.   There's two here.

 **18**       **Q.     There's two, Exhibit 11 and Exhibit 12.**

 19       A.   Is one of them 10?

 **20**       **Q.     I believe 10 was previously introduced.**

 21            MS. TESORIERO:  I think 10 might have been

 22   just sitting in front of you.

 23            THE WITNESS:  All right.

 **24**       **Q.     Do you have Exhibit 11 in front of you?**

 25       A.   Yes, I do.

```
 1        Q.    But you don't recall when you used it

 2   otherwise.  That's your testimony; right?

 3              MS. TESORIERO:  Objection to form.

 4        A.    God in heaven.  No.  I don't recall.  I

 5   mean, I rarely used it.  And I told you, it was like

 6   -- I mean, no.  I'm just going to say I don't recall.

 7   I'm sick and tired of this.  I mean, it is harassing

 8   me.

 9        Q.    This is not harassment.

10        A.    Yes, it is.

11        Q.    You-all can take it to the judge if you

12   think this is harassment, but when you I definitely

13   did not and also "I don't recall," I'm just telling

14   you right now this is (inaudible) --

15              MS. TESORIERO:  Please don't talk to my

16   witness.  Ask her a question and let's move on.

17              MR. KEZHAYA:  Fair.

18        Q.    Earlier you testified that you had how many

19   supervisors?

20        A.    Juliana was my direct supervisor at the

21   time.

22        Q.    How many supervisors did you testify you

23   had before?

24        A.    Well, there was a direct one, and then

25   there was one over her and then one over him.  So
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

1    there was a direct one.  Add them all up, I guess.

2    You could call -- you know, there was one direct one.

3    There were three -- I guess you could say three were

4    involved with me.

5         **Q.    And those three were Nancy Cooper, Dayan,**

6    **and Juliana; correct?**

7         A.    Nancy, Dayan, and Juliana, right.

8         **Q.    Juliana was your direct supervisor;**

9    **correct?**

10        A.    Yes.

11        **Q.    Did she have any involvement in the writing**

12   **of this article?**

13        A.    She was listening -- no, not really.  No.

14   She was involved in the e-mails in the first week or

15   two, but then she did not do any of the editing.

16        **Q.    Was she involved in the pitching of this**

17   **article?**

18        A.    Well, yeah.  I mean, she received my pitch.

19        **Q.    Did she green light this article?**

20        A.    Let's see.  The article was discussed in a

21   meeting, and she would have been one of three people.

22   All three people would have green lighted it.  I'm

23   trying to remember.  I mean, it was a four-way

24   discussion.  I cannot remember what Juliana personally

25   said during those discussions.  She did not really say



1    much.

2        Q.    You had a weekly meeting with your three

3    supervisors --

4            Correct?

5        A.    Right.

6        Q.    -- about --

7        A.    Various things.

8        Q.    -- the course of your employment

9    activities; correct?

10       A.    Mm-hmm.

11       Q.    Juliana was in these meetings; correct?

12       A.    Right.

13       Q.    And these meetings were weekly; right?

14       A.    That's correct.

15       Q.    They were on Mondays, if I remember

16   correctly?

17       A.    Usually.

18       Q.    And when did those meetings start relative

19   to September 30?  Before or after?

20       A.    Let's see.  Because I was overseas up until

21   about -- let me think.  It took a little while to get

22   them started.  I mean, I don't have a calendar in

23   front of me.  I don't know.  Okay.  It was either the

24   first or second Monday in October.  It was whenever

25   that day was.  I think -- and I think you have one of

 1  asking me if I circled back after this hour-long --

 2  hour-and-a-half-long interview and asked them about

 3  something, this particular statement, who the "they"

 4  was?

 5      **Q.    I'm trying to ascertain if you performed**

 6  **any form of fact investigation on anything that these**

 7  **people had to say.**

 8          MS. TESORIERO:  Objection to form.

 9      A.    I performed -- look, yes, I did check out

10  stuff, but you're asking about one sentence.

11      **Q.    When you say you checked out stuff, did you**

12  **find any individuals who was actually sexually**

13  **harassed in TST?**

14          MS. TESORIERO:  Objection to form.

15      A.    Shall we say -- okay.  I found people who

16  said they knew people who were sexually harassed.  How

17  about that?

18      **Q.    No, not how about that.  Did you actually**

19  **talk to any individuals who were actually sexually**

20  **harassed by TST?**

21          MS. TESORIERO:  Objection to form.

22      **Q.    Yes or no.**

23      A.    Did I talk to -- no, I did not.

24      **Q.    Of the people who claim that they know**

25  **people who were sexually harassed by TST, did you ask**

Page 174

```
 1    even names or contact information who theoretically

 2    could be followed up with?

 3         A.    No.

 4         Q.    You have been a journalist for 45 years;

 5    correct?

 6         A.    Yes.

 7         Q.    You have been a professor of journalism for

 8    approximately two and a half years; correct?

 9         A.    Mm-hmm.

10         Q.    Do you consider yourself a serious

11    journalist?

12               MS. TESORIERO:  Objection to form.

13         A.    Yes, I do.

14         Q.    Did you consider this piece of work to be a

15    credible, serious, and fair statement about sexual

16    abuse and cover-up?

17         A.    My article was fair, yes.

18         Q.    I'm asking you about the statement.

19         A.    About your statement?

20         Q.    Your statement.  The one that you put in

21    the article.

22         A.    Yes, I did.  It was fair.  And, yes, if I

23    hadn't believed that there wasn't sexual abuse going

24    on, I would not have put that into the article.

25         Q.    And what was your basis to believe there
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 178

```
 1   the future article ideas we discussed.  And there's

 2   one story I am working on re The Satanic Temple that

 3   is really taking off.  I am having a ton of

 4   disgruntled members contact me, and what started out

 5   as a TST lawsuit against four former Seattle-based

 6   members has turned into a much bigger story.  More

 7   below."

 8        Q.    These are disgruntled former members who

 9   were your sole sources for the claim that there was

10   actually sexual abuse and cover-up.  Correct?

11              MS. TESORIERO:  Objection to form.

12        A.    That's what I call them here.

13        Q.    That's what you called them; correct?

14        A.    There.

15        Q.    And they are, in fact, disgruntled former

16   members; correct?

17              MS. TESORIERO:  Objection to form.

18        A.    Yes.

19        Q.    Do you feel you have an ethical obligation

20   to convey both sides of a serious allegation?

21        A.    I did.

22        Q.    Did you?

23        A.    Yes.

24        Q.    Where did you ask Lucien Greaves about

25   sexual abuse and cover-up?
```

 1    going to eventually have to answer the question.

 2              MS. KEZHAYA:  Well, we can move on from

 3    that.

 4              MR. KEZHAYA:  Moving on.  Withdrawn.

 5         Q.   **Julia, you've been a professor of religious**

 6    **journalism; correct?**

 7         A.   Journalism.  A journalism professor, not

 8    just religion.  Not just a -- I've taught general

 9    journalism and religion reporting.

10         Q.   **Okay.  You've been serving as a journalist**

11    **for 45 years; correct?**

12         A.   Right.

13         Q.   **You don't know your own ethical**

14    **obligations?**

15              MS. TESORIERO:  Objection to form.

16         A.   Of course I know my own ethical

17    obligations.

18         Q.   **Do your ethical obligations include a**

19    **requirement that you convey both sides of a serious**

20    **allegation?**

21              MS. TESORIERO:  Objection to form, but

22    answer.

23              THE WITNESS:  Right.

24         A.   I -- yes, of course.

25         Q.   **Would you have felt comfortable publishing**

1  a claim that TST kills children?

2          MS. TESORIERO:  Objection to form.

3     A.   No.

4     Q.   **Why not?**

5     A.   Why not?

6     Q.   **Mm-hmm.**

7          MS. TESORIERO:  Objection to form.

8     A.   Where do you start on this one?  Because

9  it's obviously not true.

10    Q.   **Okay.  What causes you to say it is**

11  **obviously not true?**

12    A.   Okay.  I don't know -- no one has told me

13  that TSt is killing children.

14    Q.   **Hypothetically, if the same sources told**

15  **you that TST kills children, would you have felt**

16  **comfortable publishing that claim?**

17          MS. TESORIERO:  Objection to form.

18    A.   I would have asked them to prove that.  I

19  would have asked them to offer some -- okay.  I would

20  have asked them to prove it.  Prove that TST was

21  killing children.

22    Q.   **And yet you didn't ask for any proof about**

23  **this serious allegation; correct?**

24          MS. TESORIERO:  Objection to form.

25    A.   Okay.  You're saying on the part of Jinx or

1    to believe it's not his true name.  He did not say it

2    was -- his name was a pseudonym.

3         Q.    Did you ask?

4         A.    No.

5         Q.    If you were to go about trying to find Jinx

6    Strange and he ignored your e-mail, how would you go

7    about finding him?

8         A.    Fly to Wisconsin and walk into his tea

9    shop.

10        Q.    I'm sorry.  What?

11        A.    He's got a tea shop, yeah.

12        Q.    What is the name of this tea shop?

13        A.    It's the -- you would ask.  Okay.  Go to

14   his Facebook page.  Okay.  It's like "The Dirge."  I

15   think it's called the -- wait a minute, because I know

16   you're trying to find him.  "The Dirge."

17        Q.    The Dirge?

18        A.    I think it's called -- look on his Facebook

19   page.

20        Q.    Well --

21        A.    Okay.  I think -- don't take me to court on

22   this.  I think it's called -- he has it on his actual

23   Facebook page.  It's part of his shop.

24        Q.    Did you look at his Facebook page?

25        A.    Yes, I did.

Page 200

```
 1                C E R T I F I C A T E

 2

 3    STATE OF WASHINGTON        )

 4                               ) ss.

 5    COUNTY OF KING             )

 6

 7         I, the undersigned Washington Certified Court

 8    Reporter, pursuant to RCW 5.28.010, authorized to

 9    administer oaths and affirmations in and for the State

10    of Washington, do hereby certify:

11         That the annexed and foregoing deposition

12    consisting of Page 1 through 199 was taken

13    stenographically before me and reduced to a typed

14    format under my direction;

15         I further certify that according to CR 30(e) the

16    witness was given the opportunity to examine, read and

17    sign after the same was transcribed, unless indicated

18    in the record that the review was waived;

19         I further certify that all objections made at the

20    time of said examination to my qualifications or the

21    manner of taking the deposition, or to the conduct of

22    any party, have been noted by me upon said deposition;

23         I further certify that I am not a relative or

24    employee of any such attorney or counsel, and that I

25    am not financially interested in said action or the
```

1    outcome thereof;

2        I further certify that the witness before

3    examination was by me duly sworn to testify to the

4    truth, the whole truth, and nothing but the truth;

5        I further certify that the deposition, as

6    transcribed, is a full, true and correct transcript of

7    the testimony, including questions and answers, and

8    all objections, motions, and exceptions of counsel

9    made and taken at the time of foregoing examination

10   and was prepared pursuant to Washington Administrative

11   Code 308-14-135, the transcript preparation format

12   guideline;

13       I further certify that I am sealing the

14   deposition in an envelope with the title of the above

15   cause and the name of the witness visible, and I am

16   delivering the same to the appropriate authority;

17

18       IN WITNESS WHEREOF, I have hereunto set my hand,

19   and affixed my official seal this 22nd day of

20   November 2023.

21                        _____

22                        Cheryl Macdonald, CCR

23                        Washington State Certified

24                        Court Reporter

25                        License No. 2498



```
 1                 D E C L A R A T I O N

 2

 3

 4

 5          I declare under penalty of perjury that I

 6    have read my within deposition, and the same is true

 7    and accurate, save and except for changes and/or

 8    corrections, if any, as indicated by me on the

 9    correction sheet hereof.

10

11

12                                 _____

13                                 JULIA DUIN

14

15

16

17

18

19          Dated this_____day of_____,

20    2023.

21

22

23

24

25    CHERYL MACDONALD, Court Reporter
```

Page 203

```
 1
     MOBURG REPORTING
 2   COURT REPORTERS & LEGAL VIDEO
     33400 9th Avenue South
 3   Suite 207
     Federal Way, WA 98003
 4   206-622-3110

 5   _____
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 6   SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS
     SHEET, SIGN THE ACCOMPANYING SIGNATURE SHEET AND
 7   RETURN AS PER INSTRUCTIONS IN COVER LETTER.

 8   _____
     PAGE         LINE              CORRECTION AND REASON
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                              _____
                                 (SIGNATURE)
24

25
     REPORTER: CHERYL MACDONALD
```

Page 204

```
 1
                          MOBURG REPORTING
 2                 Court Reporters & Legal Video
                33400 9th Avenue South, Suite 207
 3                     Federal Way, WA 98003
                  (206) 622-3110  FAX (206) 343-2272
 4                E-mail: info@moburgreporting.com


 5


 6    TO:   Sara Tesoriero              November 22, 2023
            51 Astor Place
 7          New York, New York 10003


 8
      IN RE:  The Satanic Temple v. Newsweek
 9
      DEPOSITION(S) OF: Julia Duin
10
      DATE OF DEPOSITION: November 16, 2023
11

12    A copy of the deposition transcript of the above-named
      is provided via E-transcript.  Please have the
13    deponent read the deposition, sign the correction
      sheet and declaration.  The signed correction sheet
14    and declaration should then, within 30 (thirty) days,
      be forwarded to:
15
                          CHERYL MACDONALD
16
                          33400 9th Ave. So.  #207
17
                          Federal Way, Washington 98003
18
      who will then enclose them in the original transcript,
19    seal it, and forward it to Mr. Kezhaya for retention
      until the time of trial.
20
           If you have any questions, feel free to contact
21    me at the number listed above.

22
      Sincerely,
23


24    CHERYL MACDONALD, CCR

25    CC: M. Kezhaya
```

Page 205

```
 1              Certification of Court Rule and WAC Compliance

 2                    The Satanic Temple v. Newsweek

 3
            I, VALERIE SEATON, am an authorized representative of
 4      MOBURG REPORTING and do hereby, under penalty of perjury,
        certify that Moburg Reporting and all court reporters
 5      providing services in the above-captioned case on MOBURG
        REPORTING'S behalf will fully comply with all applicable
 6      rules and regulations governing the provision of court
        reporting services, including, where applicable,
 7      Washington Superior Court Rule 28(c)-(e) and WAC
        308-14-130(1).*
 8
                                            11/22/23
 9      _____      _____
        Valerie L. Seaton                        Date
10      President
        Moburg Reporting
11

12          *28(c)  Disqualification for Interest.  No deposition
        shall be taken before a person who is a relative or
13      employee or attorney or counsel of any of the parties, or
        is a relative or employee of such attorney or counsel, or
14      is financially interested in the action.
        28(d)  Equal Terms Required.  Any arrangement concerning
15      court reporting services or fees in a case shall be
        offered to all parties on equal terms.  This rule applies
16      to any arrangement or agreement between the person before
        whom a deposition is taken or a court reporting firm,
17      consortium, or other organization providing a court
        reporter, and any party or any person arranging or paying
18      for court reporting services in the case, including any
        attorney, law firm, person or entity with a financial
19      interest in the outcome of the litigation, or person or
        entity paying for court reporting services in the case.
20      28(e)  Final Certification of the Transcript.  The court
        reporter reporting a deposition shall not certify the
21      deposition transcript until after he or she has reviewed
        the final version of the formatted transcript.  A court
22      reporting firm, consortium, or other organization
        transmitting a court reporter's certified transcript
23      shall not alter the format, layout, or content of the
        transcript after it has been certified.
24          *308-14-130(1)  Offer arrangements on a case
        concerning court reporting services or fees to all parties
25      on equal terms.
```

