UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Satanic Temple, Inc. *Plaintiff* *v.* Newsweek Digital LLC *Defendant.* | 1:22-cv-1343 (MKV) **RESPONSE IN OPPOSITION TO NEWSWEEK'S MOTION FOR SUMMARY JUDGMENT** |

Respectfully submitted on May 31, 2024,

By:   */s/ Matt Kezhaya*

Matt Kezhaya (# 0402193)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:   (479) 431-6112
email:   matt@kezhaya.law

# TABLE OF CONTENTS

# Contents

Table of contents ............................................................................................. ii

Table of authorities .......................................................................................... iii

Statement of facts ............................................................................................. 1

Argument .......................................................................................................... 5

   1: The article statement is substantially false. ........................................... 6

     1.1: At issue is whether the rumor is true, not whether it exists. .................. 6

     1.2: Newsweek's "proof" of substantial truth is all hearsay. ...................... 7

     1.3: There is no substantial truth to the claim of sexual abuse and cover-up. ............... 9

   2: Newsweek is at least negligent with respect to the claim. ......................... 15

     2.1: The article statement is of a private concern. ...................................... 15

     2.2: The objective indicia give rise to an inference of actual malice. ........... 18

     2.3: Newsweek's argument, like the article, ignores its own Editorial Guidelines. ....... 24

# TABLE OF AUTHORITIES

**Cases**

*Biro v. Conde Nast*,
   807 F.3d 541 (2d Cir. 2015) ...................................................................... 19

*Biro v. Conde Nast*,
   883 F. Supp. 2d 441 (S.D.N.Y. 2012)........................................................... 6

*Burnett v. Nat'l Enquirer, Inc.*,
   144 Cal. App. 3d 991 (Cal. Ct. App. 1983) ................................................ 23

*Carroll v. Trump*, 685 F. Supp. 3d 267 (S.D.N.Y.), aff'd in part,
   88 F.4th 418 (2d Cir. 2023)......................................................................... 9

*Chapadeau v. Utica Observer-Dispatch*,
   38 N.Y.2d 196 (1975) .......................................................................... 15, 18

*Coleman v. Grand*,
   523 F. Supp. 3d 244 (E.D.N.Y. 2021) ............................................. 15, 16, 17

*Crane v. Arizona Republic*,
   972 F.2d 1511 (9th Cir. 1992) ................................................................... 21

*Fairley v. Peekskill Star Corp.*,
   83 A.D.2d 294 (N.Y. App. Div. 1981) ............................................. 15, 16, 18

*Gil v. Pizzarotti, LLC*,
   No. 1:19-CV-03497-MKV, 2021 WL 1178027 (S.D.N.Y. Mar. 29, 2021) ..................... 7

*Goodman v. Bouzy*,
   No. 21CV10878ATJLC, 2023 WL 3296203 (S.D.N.Y. May 8, 2023) ........................... 6

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989).................................................................................. 19

*Huggins v. Moore*,
   94 N.Y.2d 296 (1999) ........................................................................ 15, 16, 18

*Khan v. New York Times Co.*,
   269 A.D.2d 74 (N.Y. App. Div. 2000) ............................................... 18, 25

*King v. Globe Newspaper Co.*,
   400 Mass. 705 (1987)................................................................................ 22

*Leidig v. BuzzFeed, Inc.*,
   371 F. Supp. 3d 134 (S.D.N.Y.), aff'd, 788 F. App'x 76 (2d Cir. 2019) ......................... 6

*Lindberg v. Dow Jones & Co., Inc.*,
   No. 20-CV-8231 (LAK), 2021 WL 3605621 (S.D.N.Y. Aug. 11, 2021) ...................... 15

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991) ............................................................................................ 9

*McKimm v. Ohio Elections Comm.*,
   89 Ohio St. 3d 139 (2000) ................................................................................. 25

*Palin v. New York Times Co.*,
   940 F.3d 804 (2d Cir. 2019) ........................................................................ 23, 24

*Palmtag v. Republican Party of Nebraska*,
   315 Neb. 679 (2024) ......................................................................................... 20

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ..................................................................................... 20, 22

*Stern v. Cosby*,
   645 F. Supp. 2d 258 (S.D.N.Y. 2009) .......................................................... 22, 25

*Sweeney v. Prisoners' Legal Servs. of New York, Inc.*,
   84 N.Y.2d 786 (1995) ....................................................................................... 21

*United Fed'n of Churches, LLC v. Johnson*,
   598 F. Supp. 3d 1084 (W.D. Wash. 2022) ......................................................... 12

*Watson v. NY Doe 1*,
   2023 WL 6540662 (S.D.N.Y. Oct. 6, 2023) ....................................................... 17

*Weiner v. Doubleday & Co.*,
   74 N.Y.2d 586 (1989) ......................................................................................... 6

**Statutes**

CPLR § 76a ............................................................................................................ 15

42 USC § 2000e-2 .................................................................................................. 17

42 USC § 2000e-5 .................................................................................................. 17

**Other Authorities**

*Merriam-Webster Online Dictionary*, Cover-up .................................................... 10

*Merriam-Webster Online Dictionary*, Sexual Abuse ................................................................ 9

*Merriam-Webster Online Dictionary*, Sexual harassment ........................................................ 9

**Rules**

FRCP 26 ................................................................................................................................ 8

FRCP 37 ................................................................................................................................ 8

FRE 801 ................................................................................................................................ 8

FRE 802 ................................................................................................................................ 8

**Treatises**

1 *Law of Defamation* § 3:117 (2d ed.) .............................................................................. 24

1 *Law of Defamation* § 3:45 (2d ed.) ................................................................................ 19

1 *Law of Defamation* § 3:59 (2d ed.) ................................................................................ 22

30B *Fed. Prac. & Proc. Evid.* § 6718 (2024 ed.) .............................................................. 8

## STATEMENT OF FACTS

At issue is a single count of defamation arising from a rumor that Plaintiff The Satanic Temple engages in sexual abuse and cover-up in ways that are more than anecdotal. ECF No. 104 ¶ 9. The rumor connotes criminality. ECF No. 104 ¶¶ 59-60. The rumor is false. ECF No. 104 ¶ 107.

Defendant Newsweek published the rumor to its readership of "more than one in five Americans." ECF No. 104 ¶¶ 4, 7. Around 10-15 years ago, Newsweek enjoyed a reputation as one of the "Big Three," the biggest and most credible names in the news industry. ECF No. 104 ¶¶ 5-6.

Julia Duin wrote the article. ECF No. 104 ¶ 11. Duin is a religion reporter who was hired through ties to its chief strategy and content officer. ECF No. 104 ¶¶ 18-23. Duin has been in the journalism business since at least 1987 and has taught at four separate colleges. ECF No. 104 ¶¶ 31-36. She subjectively understands that claims about a religion should be heard from the religion firsthand. ECF No. 104 ¶ 34. She also subjectively understands that charges of criminality should be questioned. ECF No. 104 ¶ 93. While at Newsweek, Duin regularly met with the highest levels of Newsweek's management, including Global Editor in Chief Nancy Cooper. ECF No. 104 ¶¶ 20-30.

Prior to this article, Duin has written about Satanism a total of seven times, four of which were at the height of the Satanic Panic. ECF No. 104 ¶¶ 35-43. Of her prior anti-Satanic writings, two fixated on the Temple: one decried the Temple's equal access to zoning rights and the other decried the Temple's equal access to tax-exempt status. ECF No. 104 ¶¶ 42-43.

Nancy Cooper edited and contributed to the article. ECF No. 104 ¶¶ 12, 15-16, 113-115. She also wrote Newsweek's Editorial Guidelines, sets the standard for Newsweek's

organizational practices, and determines for Newsweek what is "newsworthy." ECF No. 104 ¶¶ 26-27, 56. Cooper reports directly to Newsweek's CEO. ECF No. 104 ¶ 24. The Editorial Guidelines set the "highest professional standards" for all Newsweek reporters. ECF No. 104 ¶ 55. Four requirements from the Editorial Guidelines are salient to this litigation. First, a charge of criminal wrongdoing be both "specific" and "complete." ECF No. 104 ¶ 58. Second, there must be an opportunity to respond, especially when "we are accusing a person or company of wrongdoing." ECF No. 104 ¶ 57. Third, reporters must use only "credible" sources. ECF No. 104 ¶ 65. Fourth, a claim of sexual abuse and cover-up must be fact-checked before publishing. ECF No. 104 ¶ 66.

About one month before publishing, the idea for this article was first provided to Duin by a reporter for the Catholic News Agency. ECF No. 104 ¶ 7, 44-46. The Catholic News Agency's reporter passed on an unverified claim that there were "some allegations of TST leadership sexually exploiting members or failing to respond to harassment / sex assault allegations against chapter heads." ECF No. 104 ¶ 46.

The next day, Duin pitched the article as one that would entail "NDAs being used to hide wrongdoing" and "sexual harassment." ECF No. 104 ¶¶ 47, 50. These claims were sourced from "disgruntled former members." ECF No. 104 ¶ 69. As pitched, the article would arrive "Just in time for Halloween." ECF No. 104 ¶ 48. Duin considers Halloween to be a Satanic holiday. ECF No. 104 ¶ 49. Two of her prior anti-Satanism articles, written during the height of the Satanic Panic, were published around Halloween. ECF No. 104 ¶¶ 35-38. Cooper took special interest in Duin's pitch. ECF No. 104 ¶ 52. Although Duin ordinarily reported to U.S. Editor Juliana Pignataro (ECF No. 104 ¶¶ 28-29), Duin worked with Cooper for this one. ECF No. 104 ¶ 12-14. Within one week of the pitch, all three of Newsweek's top management

greenlit the article. ECF No. 104 ¶¶ 53-54.

Shortly later, Duin met with two of the "disgruntled former members:" David Alan Johnson and Nathan Sullivan. ECF No. 104 ¶¶ 68-69. Neither claimed to have any personal knowledge that the Temple engages in sexual abuse and cover-up. ECF No. 104 ¶ 70. Under oath, both affirmatively denied having any personal knowledge of these claims. ECF No. 104 ¶¶ 97-98. After the meeting, Sullivan provided Duin with contact information for Jinx Strange. ECF No. 104 ¶ 71. Jinx Strange is a pseudonym. ECF No. 104 ¶ 72.

Five days before publishing, upon Duin's inquiry, Strange wrote a three-page email with his comments about the Temple. ECF No. 104 ¶ 73. Midway into page two is the article statement. Id. His email does not suggest that he has personal knowledge of sexual abuse or cover-up. Id. But he opens with an offer to Duin of "information, receipts, screenshots, etc., of things that range from probably-illegal malfeasance to covering up and protecting men accused of sexual misconduct." Id. Duin asked no follow-up questions and didn't accept his offer. ECF No. 104 ¶ 80.

Four days before publishing, Duin talked to Lucien Greaves. ECF No. 104 ¶ 81. The next day, she asked Greaves follow-up questions on other topics. ECF No. 104 ¶ 82. She never asked him about Strange's rumor. ECF No. 104 ¶ 83. Two days before publishing, Duin talked to Dr. Joe Laycock, who she considered to be the "unofficial biographer" of the Temple. ECF No. 104 ¶¶ 84-85. She did not ask Dr. Laycock about Strange's rumor. ECF No. 104 ¶ 86. She never talked to anyone who claimed to have been subjected to sexual abuse or cover-up. ECF No. 104 ¶ 88. She did not ask "anyone on the face of the planet what sexual abuse or cover-up means" in context of the article statement. ECF No. 104 ¶ 87. This is because, to her, the article was not an investigation into sexual abuse. ECF No. 104 ¶ 89. She

included Strange's rumor because it was a "delicious quote." ECF No. 104 ¶ 91.

Prior to this article, Cooper was unaware of the Temple. ECF No. 104 ¶ 136. Cooper did not perform any investigation and did not inquire into Duin's investigation into the article. ECF No. 104 ¶¶ 116-118. But she still insisted on editorializing in an assertion that the Temple falsifies its religious practices over Duin's objection that Newsweek had no basis to make the claim. ECF No. 104 ¶¶ 113-115. Cooper approved of the article for publishing and praised it three times. ECF No. 104 ¶ 121. Duin reported to the Catholic News Agency that "The Newsweek folks love it." ECF No. 104 ¶ 122.

Upon publishing, Greaves immediately took issue with the article statement. ECF No. 104 ¶ 123. The next day, undersigned counsel issued a demand for retraction which asserted that the article statement was false. ECF No. 104 ¶ 124. Newsweek never issued a retraction. ECF No. 104 ¶ 125.

The article's comment section immediately drew unfavorable comparisons between the Catholic Church and the Temple. ECF No. 104 ¶ 126. People canceled their recurring donations because of the article. ECF No. 104 ¶ 127. Others pointed to the article as proof of the truth of the matters asserted within it. ECF No. 104 ¶ 128. As a result, the Temple hired out public relations assistance. ECF No. 104 ¶¶ 129-130. The Temple expended a sum of $43,350 in remediation costs. ECF No. 104 ¶ 131.

# ARGUMENT

Newsweek's first ground for summary judgment is that the article statement is substantially true. At issue is the rumor that leaked material shows, in ways that are more than anecdotal, that the Temple engages in sexual abuse and covers up the same. There are three fundamental flaws in Newsweek's motion. *First*, it misdirects from the issue at hand because it contends that the inquiry is into whether the rumor exists. This defies the republishing rule. *Second*, it insincerely contends that its proof of the rumors is not used for the truth of the matters asserted, only to do an about face in the last half-page of its discussion on the relevant inquiry. This defies the rule against hearsay. *Third*, even when taking the hearsay at face value, none of the proffered materials show "sexual abuse" being "covered up in ways that were more than anecdotal." Newsweek's "proof" only further supports a finding that the rumor is substantially false, especially when it is viewed in the light most favorable to the Temple. The Court should deny Newsweek's motion on this ground.

Newsweek's second ground for summary judgment is that there is no proof of actual malice. *First*, actual malice does not attach to the article statement because it is "mere gossip" on a matter of "prurient interest." *Second*, actual malice is shown by the failure to adhere to Newsweek's own Editorial Guidelines, which were drafted and otherwise enforced by Cooper who edited this very article. Caselaw has already rejected Newsweek's and Duin's self-serving professions of innocence; the inquiry is into the objective facts. And Newsweek cannot evade liability by pinning all blame on Duin because Cooper herself insisted on injecting a claim for which she had no basis to believe.

The Court should deny Newsweek's motion in full.

# 1: The article statement is substantially false.

## 1.1: At issue is whether the rumor is true, not whether it exists.

Newsweek correctly states that the substantial truth inquiry is into "the substance, the gist, or the sting" of the statement. ECF No. 99, at 18; *Leidig v. BuzzFeed, Inc.*, 371 F. Supp. 3d 134, 143 (S.D.N.Y.), *aff'd*, 788 F. App'x 76 (2d Cir. 2019). However, Newsweek overlooks the substance of the article statement and focuses on its form. In Newsweek's view, a statement cannot be defamatory if it accurately quotes a third party, here Jinx Strange. ECF No. 99, at 18-19. But this argument overlooks the republication rule, under which "It is well settled that Defendants cannot escape liability simply because they are conveying someone else's defamatory statements without adopting those viewpoints as their own." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) (citing *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60–61 (2d Cir.1980)); *see also Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 594 (1989) (rejecting a "privilege to repeat the statements of third parties so long as no endorsement was given.") Despite that the Temple gave Newsweek advanced warning of this point, ECF No. 97 at 2, Newsweek's motion makes no mention of the republication rule.

To further its argument, Newsweek singularly relies on *Goodman v. Bouzy*, No. 21CV10878ATJLC, 2023 WL 3296203 (S.D.N.Y. May 8, 2023) (subsequent history omitted). *Goodman* is distinguishable. There, "Bouzy did not allege that Goodman raped someone; Bouzy stated only that he was aware of allegations that Goodman had raped someone." *Id.*, at *10 (emphasis in original). Here, the article statement falsely implies the existence of "leaked material" which shows sexual abuse and cover-up. *Biro*, 883 F. Supp. 2d at 462 (applying the republication rule where "the statements imply the existence of undisclosed facts on which those opinions were based"). Yet even the most cursory review of

Newsweek's exhibits reveals no "leaked material," no "sexual abuse," and no "cover-up." To prove the contrary, all Newsweek provides is rank internet hearsay, the truth of which it vociferously denies relying upon. ECF No. 99, at 19-20 n. 4 and 24 n. 7 (twice disclaiming the truth of the matters asserted within the rumors it provides).

The litigation proceeded to discovery upon a finding that "Plaintiff flatly denies that any sexual abuse has occurred or that any abuse has been covered up." ECF No. 27, at 13. This finding resulted from an inquiry into the underlying truth of the rumor, not into whether the article accurately quoted Jinx Strange. Given the republication rule and the Court's order, Newsweek's defenses that (1) it accurately quoted Strange and (2) the rumors actually exist are both entirely without merit. Thus, the Court should deny Newsweek's motion for summary judgment to the extent it simply points to the existence of rumors without advancing the truth of the matter asserted.

## 1.2: Newsweek's "proof" of substantial truth is all hearsay.

Immediately after denying that it is advancing rank hearsay for the truth of the matters asserted, Newsweek does an about face and contends that the rumors are true. ECF No. 99, at 20-21 (relying on the truth of the matters asserted within the rumors). An order for summary judgment must be predicated upon competent evidence, and hearsay does not make the cut. *Gil v. Pizzarotti, LLC*, No. 1:19-CV-03497-MKV, 2021 WL 1178027, at *7 n.3 (S.D.N.Y. Mar. 29, 2021) (citing *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999); *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)).

Newsweek issued notice that it will rely on precisely six witnesses to address sexual abuse and cover-up. Response ¶ 106-107. All six witnesses deny any personal knowledge of sexual abuse or cover-up. Response ¶¶ 108-113. Newsweek instead proffers some hearsay claims.

Response ¶¶ 71-78 and ¶¶ 80-87. The Court should decline to consider any of Newsweek's hearsay. The fact of the claim is irrelevant under the republishing rule. 30B *Fed. Prac. & Proc. Evid.* § 6718 (2024 ed.) ("The non-hearsay purpose for which the out-of-court statement is offered must be relevant to the issues in the case if it is to provide a viable route around the hearsay prohibition.") And the truth of the matters asserted within the rumors is barred by the rule against hearsay. FRE 801, 802.

Newsweek's relied-upon claims were also uttered by declarants not disclosed as potential witnesses. FRCP 26(a)(1)(A)(i) (requiring "without awaiting a discovery request" disclosure of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses). Some of the hearsay documents Newsweek relies upon weren't even produced during discovery. Response ¶ 87 (Newsweek's Exhibits 18-20). FRCP 26(a)(1)(A)(ii) (same for documents the disclosing party may rely upon). The failure to provide discovery as required under Rule 26(a) results in automatic exclusion. FRCP 37(c)(1).

Thus, the Court should exclude Newsweek's Exhibits 6 (neither of the unidentified conversing parties are witnesses), 9 (Scott Malphas is not a witness), 15 (Jex Blackmore is not a witness), 16 (double hearsay, quoting Jex Blackmore who is not a witness), 18 ("Rumor Solanine" is not a witness), 19 ("D.E.M." is not a witness), 20 ("tossatanicacc" is not a witness), and 21 (double hearsay, quoting an unidentified alleged member who is not a witness). The Court should further exclude all of Newsweek's references to the unverified rumors. Response ¶¶ 71-78 and ¶¶ 80-87.

Newsweek's Exhibit 20 highlights the importance of the minimum fairness to opposing parties in developing a case for an orderly presentation to the Court. That document is printed after the close of discovery, is an undated, unauthenticated, unverified reddit post by an

unidentified declarant which, on its face, shows unwanted sexual contact at a Temple event. Response ¶ 87. It is also an obvious fabrication, designed to pluck the emotional strings of a credulous reader for the sole purpose of tarnishing the Temple's reputation. Id. This hearsay is not even fit for a *Newsweek* article, it is well beneath the peace and dignity of this Court.

Because Newsweek solely offers hearsay as "proof" of the substantial truth of the article statement, the Court should find that it has failed to meet its *prima facie* burden for summary judgment and deny its motion.

### 1.3: There is no substantial truth to the claim of sexual abuse and cover-up.

Even if Newsweek's proffered hearsay were taken at face value, it still fails to present any substantial truth. Context is key to a substantial truth argument. The standard is whether the statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). A reasonable reader will apply the dictionary definition of the words Newsweek chose to publish when forming an opinion about the Temple. *See Carroll v. Trump*, 685 F. Supp. 3d 267, 277 (S.D.N.Y.), *aff'd in part*, 88 F.4th 418 (2d Cir. 2023) (applying the dictionary definition of the allegedly defamatory words to weigh "substantial truth").

Newsweek's motion relies on its circular argument that a charge of "sexual abuse" is not different in kind from a charge of "sexual harassment." ECF No. 99, at 20-21. But there is a world of difference, one with criminal implications, between "sexual abuse" and "sexual harassment." Compare *Merriam-Webster Online Dictionary*, Sexual Abuse ("the infliction of sexual contact upon a person by forcible compulsion") with *Merriam-Webster Online Dictionary*, Sexual harassment (the "uninvited and unwelcome verbal or physical behavior of a sexual

nature especially by a person in authority toward a subordinate").1 "Sexual abuse" adds forcible compulsion and, therefore, criminality. *Ibid.*; see also ECF No. 104 ¶¶ 58-60.

Likewise, Newsweek's motion relies on conflating a charge of "cover-up" with a charge of taking four weeks to investigate or ousting disruptive narcissists. ECF No. 99, at 21. But a "cover-up" entails concerted efforts to keep the information from becoming public. *See Merriam-Webster Online Dictionary*, Cover-up (available at https://www.merriam-webster.com/dictionary/cover-up) (last visited May 16, 2024).

To avoid the natural consequence of binding caselaw, indisputable fact, and the plain text definition of the words it chose to publish, Newsweek falsifies the record. The Temple has *not* "admitted that there have been several accusations of sexual abuse." ECF No. 100, at 16. Quite the contrary, the Temple's representative testified that "[o]ver the years we received a handful of complaints that were sexual in nature *but not* 'sexual assault.'" ECF No. 100 ¶ 79 (emphasis added). As addressed, "sexual harassment" is not "sexual abuse," and no amount of *post hoc* mental gymnastics will change the dictionary definition of the words published. On this ground, a reasonable reader would have a material difference of opinion when comparing the words used ("sexual abuse" and "cover[] up") with the hearsay proffered. To-wit:

### 1.3.1: The San Jose Chapter complaint was neither sexual abuse nor cover-up.

*First*, Newsweek relies on the "San Jose" complaint. ECF No. 99, at 20-21. On December 11, 2017, a member of the San Jose Chapter complained of unwanted flirting and an undesired reference to a genital piercing by the chapter head. Response ¶¶ 80-82. The same

---

1 Respectively available at https://www.merriam-webster.com/legal/sexual%20abuse and https://www.merriam-webster.com/dictionary/sexual%20harassment (last visited May 30, 2024).

complaint raises various other perceived slights. Response ¶ 101 ("being part of ANTIFA, sharing offensive memes, guilting people into giving money, and farting in someone's face"). But no part of the complaint involves sexual contact or forcible compulsion. Id. ("This is an interpersonal dispute, not a 'sexual assault' complaint.") The complaint also exonerates the Temple from any wrongdoing. Response ¶ 102 ("The Temple itself is not the problem"). But the Temple's investigation took too long for the member's preference, which resulted in the member impatiently and aggressively demanding immediate action. Response ¶ 82. ("what are you going to do about it … repeatedly and very quickly.") By January 6, 2018 – just under four weeks after the complaint – the offending chapter head was ousted and, there being no successor, the chapter disbanded. Id.

A *reasonable* reader would draw materially different opinions between offensive commentary (the truth) *vs.* forced sexual contact (the article statement). A *reasonable* reader would find that a serial whiner's impatience over a four-week investigative delay is not a "cover-up" by any stretch of the imagination. This hearsay complaint has no tendency to show sexual abuse or cover-up, even if it is considered for the truth of the matter asserted.

### 1.3.2: The Austin complaint was directed to the police.

*Second*, Newsweek relies on the "Austin" complaint. ECF No. 99, at 21. In April 2020, a member of the Austin Chapter raised an allegation of sexual assault by the chapter head against a third party. ECF No. 99, at 21 (citing Response ¶ 88, at 2). Sexual assault concededly meets the definition of sexual abuse, but Newsweek conveniently omits that the Temple directed the complainant to make a police report. Response ¶ 88, at 2 (the Temple's "initial response was to encourage [the alleged victim] to file a police report.") "She refused." Id. Three months later, the member filed a police report on behalf of the third party alleged

victim. Id. In the interim, the chapter head voluntarily stepped down from chapter leadership. Id. He cooperated with the police, and upon the police department's professional investigation, they declined to press charges. Id.; see also Response ¶ 100.

A *reasonable* reader would know that directing the alleged victim to make a police report is the exact opposite of a "cover-up." The Temple's directive to file a police report invited public scrutiny rather than concealed it. This is so, even though the Austin Chapter ousted the third party for "constantly turning attention to themselves" and making it "impossible for them to have meetings." Response ¶¶ 86, 99. Assuming the Court considers this third-party's hearsay complaint for the truth of the matter asserted, it still fails to make a *prima facie* case for a summary judgment because it shows the opposite of a "cover-up."

### 1.3.3: Sullivan wasn't expelled for being copied on an email.

*Third*, Newsweek relies on Nathan Sullivan's testimony that it was a "cover-up" when he was expelled from the Washington Chapter for being a "witness to a sexual harassment complaint." ECF No. 99, at 21. *First*, Sullivan wasn't a "witness" to anything. He specifically denied any firsthand knowledge of sexual abuse or cover-up. Response ¶ 110. When he uses the word "witness," he disingenuously refers to being copied on an email about sexual harassment two or three years after-the-fact. Response ¶ 72. *Second*, he wasn't expelled for being copied on that email. Response ¶ 75. He was expelled because he participated in a conspiracy to steal the Temple's property. *See United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084 (W.D. Wash. 2022). *Third*, "sexual harassment" is materially different from "sexual abuse." *Fourth*, there is no concerted effort to keep the information from becoming public, he doesn't even have the first notion of what allegedly happened, when it allegedly happened, to whom it allegedly happened, or where the alleged victim can be found.

Response ¶ 72.2 No *reasonable* reader informed of the facts would begin to think that Sullivan's ouster from the Temple was a "cover-up."

### 1.3.4: The Temple had an <u>informal</u> process of reporting complaints before 2020.

*Last*, Newsweek contends that the absence of a formal process before 2020 means the Temple "could not possibly determine whether and how complaints of sexual abuse were handled prior to that time." ECF No. 99, at 21. Evidently, Newsweek did not read its own exhibits. See Response ¶ 88. The very first entry on this exhibit addresses the "Process" for "responding to complaints" from "December 2015 – August 2020," which was conducted by "National Council (NC), later rebranded as International Council (IC)," and entailed:

- ○ Anyone could use email or a form to submit a complaint to NC (when the issue could not be resolved locally or involved local leadership)

- ○ NC reviewed the complaint and accompanying documentation, identified key allegations, reached out to the submitter for clarification if needed, reached out to other parties for corroboration if appropriate, collectively assessed the complaint and decided on remedy or consequences (if any).

- ○ Consequences could range from warning, to removal from leadership, to removal from the organization.

Response ¶ 88, at 2. As far back as December 2015, there has been a process to raise complaints, including those of sexual misconduct. Id. (addressing complaints of sexual misconduct dated July 2018, August 2019, and April 2020, all before implementation of the Suryan Council in September 2020). Both of the alleged victims of unwanted sexual contact

---

[2] It appears that the email Sullivan was copied on pertained to a Seattle member who had been summarily removed by the chapter upon a finding of "sexual assault and harassment of members and non-members, as well as embezzlement (not from us)," without any complaints made to the Temple's central decisionmakers. See ECF 101-17, at 2.

were directed to the police. Response ¶ 88 (April 2020 and May 2023, respectively). In all events, the offending member was either forcibly removed or voluntarily left. ECF No. 104 ¶ 112. Contrary to Newsweek's motion, the hearsay does not show "sexual abuse" and shows the exact opposite of "cover-up." The Court should deny Newsweek's motion on the ground of "substantial truth."

### 1.3.5: Jex Blackmore was removed for threatening to kill the President.

Although nowhere to be found in its discussion as to substantial truth of the rumors, Newsweek references Jex Blackmore five times in its memorandum. Curiously omitted is any reference to the fact that Jex Blackmore published her Medium piece on the heels of her removal for threatening to kill the United States President. Response ¶ 103. Yet her piece opens with the false claim that she left voluntarily. Response ¶ 104. Prior to her ouster, "Blackmore had stepped down as head of the Detroit chapter and had little engagement with TST leadership." ECF No. 101-16, at 2. Then "the NC was established and approval for actions became mandatory;" but Blackmore was "very antagonistic" to those by, *e.g.*, conducting activities in Texas without any proposal or communication which upset the Texas groups. Id.; Stevens Depo. 132:17-24 (ECF No. 101-2, at 27). Shortly prior to her *we're going to assassinate the President* fiasco, she resurfaced "to maximize her own exposure utilizing the documentary [*Hail Satan?* (Magnolia Films, 2019)]." Response ¶ 76.

A *reasonable* reader would not conclude that there is a culture of sex abuse and cover up within the Temple, even after reading Blackmore's nondescript claim, because she had no qualms about publicly lying. A *reasonable* reader would not think that the Temple has an obligation to scour the internet for every hint of misgiving, and to investigate every nebulous anonymous claim asserted, on pain of being labeled complicit in sexual abuse and cover-up.

– 14 –

## 2: Newsweek is at least negligent with respect to the claim.

### 2.1: The article statement is of a private concern.

Newsweek's motion relies on the circular argument that the article statement addresses a matter of "public interest." ECF No. 99, at 22. The statute defines an issue of "public interest" as something "other than a purely private matter." CPLR § 76-a(d). Courts have since applied the familiar New York law standards for public *vs.* private concern to this statutory text. *Lindberg v. Dow Jones & Co., Inc.*, No. 20-CV-8231 (LAK), 2021 WL 3605621, at *7 (S.D.N.Y. Aug. 11, 2021); *Coleman v. Grand*, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021). The question is thus whether the statement lies "arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition." *Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 199 (1975). A matter is of private concern when the statement falls "into the realm of mere gossip and prurient interest." *Huggins v. Moore*, 94 N.Y.2d 296, 302 (1999). Likewise, the matter is of private concern when it is "directed only to a limited, private audience." *Id.* at 303. This analysis is closely related to the limited public figure question of whether the attention acquired by a plaintiff pertains to a "public controversy," the subject of the defamation. *Krauss v. Glove Int'l, Inc.*, 251 A.D.2d 191, 193–94 (N.Y. App. Div. 1998). There, the same considerations that compelled a finding that the plaintiff's sex life is not a "public controversy" also required a determination that the story was of private concern. *Id.* A "public controversy" is something more than simply newsworthy. *Id.*, at 192. The public controversy subject of the cause "must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 298 (N.Y. App. Div. 1981). And it must have "received attention *because* its ramifications will be felt by persons who are not direct

participants." *Id.* at 298. (emphasis added). On this point, Newsweek circularly argues that the Temple is a public figure. ECF No. 99, at 21 n. 5. Newsweek bears the burden of persuasion on that claim. *Coleman*, 523 F. Supp. 3d at 255. In full, the discussion reads: "The Satanic Temple is a public figure," followed by a recitation of the elements for public figure. ECF No. 99, at 21 n. 5. There is no effort to tie any evidence to the elements, so the Court should reject the argument summarily.[3]

The defamatory statement at bar is "mere gossip," which is not a public controversy regardless of how many clicks were baited. *Huggins*, 94 N.Y.2d at 303 ("the fact that the article has been published in a newspaper is not conclusive that its subject matter warrants public exposition"); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976) ("Dissolution of a marriage through judicial proceedings is not the sort of "public controversy" referred to in *Gertz*, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public.") Newsweek's motion fails to make a *prima facie* showing for summary judgment because its own 56.1 statement contends that the "focus" of this article was the Washington lawsuit, not sex abuse and cover-up. ECF No. 100 ¶¶ 48, 52. Duin included the article statement, not because it had anything to do with the Washington lawsuit, but because it was a "delicious quote." ECF No. 104 ¶¶ 90-91.

Of course, Newsweek does not discuss any of the public concern or the public controversy standards in its memorandum. ECF No. 99, at 22. Instead, it contends with a clever use of brackets that "sexual impropriety and power dynamics in [*a given*] industry, as in others, were indisputably an issue of public interest." Id. (emphasis added) (citing *Coleman*, 523 F. Supp. 3d, at 259). *Coleman* is distinguishable. There, it was the *music* industry at issue, the allegedly

---

[3] For discussion on why the Temple is not a limited public figure, see ECF No. 103 at 13-17.

defamatory statement was part of the "rising tide of public concern over workplace sexual harassment known as the #MeToo movement," and the plaintiff was a "prominent musician of interest to the jazz community." *Coleman*, 523 F. Supp. 3d at 259-260. Those findings "set the litigation battlefield," to which Newsweek's relied-upon statute applied. *Id.*, at 260. But this case does not involve the music industry, the article statement is not part of the #MeToo movement, there is no workplace sexual harassment involved in this case, and the Temple most certainly is not a prominent musician. *Coleman* did not change the defamation landscape such that every accusation of sexual impropriety is a "public concern," it repetitiously limited its holding to the *music* industry five times.

Newsweek's only other cited case in its two-sentence argument as to "public concern" is *Watson v. NY Doe 1*, 2023 WL 6540662, at *3 (S.D.N.Y. Oct. 6, 2023). The #MeToo movement makes an encore performance there, this time as pertains to the advertising industry. *Id.* The word "advertising" appears ten times in that opinion, each in context of the workplace. Again, the article statement makes no reference to the #MeToo movement and the rumor at issue does not pertain to the workplace.

Neither of Newsweek's cited cases support the proposition that all accusations about sexual misconduct are of "public concern." Rather, both more particularly pertain to accusations within the workplace, a place which has historically been so permeated with sex discrimination that Congress had to modify the freedom of contract to curb it. See 42 USC § 2000e-2 (prohibition on sex discrimination), 42 USC § 2000e-5 (enforcement mechanism). Sexual harassment within the workplace carries with it an element of economic coercion which is entirely lacking in a volunteer-based association like the Temple. That element of economic coercion creates a sensitive power dynamic which, given the widespread economic

reality of needing to work, creates "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Fairley*, 83 A.D.2d at 298.

That element of economic necessity is missing for the Temple's membership. Members are free to come and go as they please. Rather than being "arguably within the sphere of legitimate public concern," the article statement is instead directed at the Temple's "limited, private audience." *Chapadeau*, 38 N.Y.2d at 199; *Huggins*, 94 N.Y.2d at 303. And, in context of the article, the article statement is presented not as part of a genuine discourse on the power dynamics of this relatively unknown group. See ECF No. 100 ¶ 59 (Newsweek's arbiter of newsworthiness did not know "anything" about the Temple prior to the pitch). Rather, it is presented as "mere gossip," part of a "prurient interest" hit piece featured alongside scandalous tales of orgies, harassment, and fraud. *Huggins*, 94 N.Y.2d at 302; ECF No. 104 ¶ 91 (the article statement is included, not to prompt discourse, but as a "delicious quote"). For the foregoing reasons, the article statement pertains to a "private concern" which falls outside the statutory definition of "public interest." The Court should find that the applicable standard of fault is negligence, not actual malice.

## 2.2: *The objective indicia give rise to an inference of actual malice.*

Even if the Court finds that the Temple must show actual malice, the evidence supports that finding. This case presents the need for only a single yardstick, the Editorial Guidelines, because those establish both the objective standard of care and Newsweek's own subjective standard of care. *See Khan v. New York Times Co.*, 269 A.D.2d 74, 77 (N.Y. App. Div. 2000) (objective standard for negligence, subjective standard for actual malice). Because the author of Newsweek's standard of care both edited and contributed to this article, Newsweek was "negligent" for the same reasons it had "actual malice."

Like any other inquiry into a defendant's state of mind, actual malice must be inferred from objective facts. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence"); *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015). ("a court typically will infer actual malice from objective facts" because a defamation defendant "will rarely admit … actual malice"). The objective facts must be interpreted in the aggregate, "for it is a rare case in which any one fact, standing alone, is enough of a 'smoking gun' to meet the constitutional standard." 1 *Law of Defamation* § 3:45 (2d ed.).

On these facts, three common threads create a *prima facie* case that Newsweek published the article statement with actual malice: (1) despite the Editorial Guidelines' requirement that the article statement be both specific and fact-checked, Newsweek did nothing to ensure that it was true; (2) despite the Editorial Guidelines' requirement that the Temple be given an opportunity to respond, Newsweek meticulously avoided the subject in discussions with Greaves; and (3) despite the Editorial Guidelines' requirement that only credible sources be used, Newsweek intentionally relied only on those with known hostility to the Temple.

### 2.2.1: The statement was neither specific nor fact-checked.

The Editorial Guidelines require that a charge of criminal wrongdoing be both "specific" and "complete." ECF No. 104 ¶ 58. Nancy Cooper, Newsweek's author of the Editorial Guidelines, admitted that sexual abuse and cover up connote criminality. ECF No. 104 ¶¶ 56, 59-60. Yet the article statement is neither specific nor complete: Nancy Cooper admitted that she had no idea who was sexually abused, what the sexual abuse entailed, who engaged in the cover-up, or what the cover-up entailed. See ECF No. 104 ¶¶ 61-64. Of course, these immediate questions have no answer because there was neither sexual abuse nor cover-up.

ECF No. 104 ¶ 107. Newsweek's requirement to be specific exists to ensure questionable accusations are actually questioned.

Likewise, the Editorial Guidelines require that an accusation of covered-up sexual abuse be fact-checked. ECF No. 104 ¶ 66. This requirement has a close relationship to preexisting caselaw that actual malice may be found when the statement is "based wholly on an unverified anonymous telephone call." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). Yet Duin did not take the slightest effort to fact-check the rumor. She did not ask any follow-up questions about who was "sexually abused" or what was entailed in the "cover up." ECF No. 104 ¶ 80. She did not talk to anyone who claimed to have been subjected to sexual abuse or cover-up. ECF No. 104 ¶ 88. She did not ask Lucien Greaves about the rumor, although she followed up with him about different topics. ECF No. 104 ¶¶ 81-83. Nor did she ask the author of a book-length study on the Temple, who she deemed the "unofficial biographer," anything about it. ECF No. 104 ¶¶ 85-86. She did not ask "anyone on the face of the planet what sexual abuse and cover-up means" in context of the rumor. ECF No. 104 ¶ 87. She deliberately chose not to accept Strange's offer to provide substantiating information. ECF No. 104 ¶ 77.

Her conscious avoidance of investigating this criminal allegation is not borne out of ignorance. Had the rumor been that the Temple engages in child murder, Duin admitted it would have occurred to her to inquire further. ECF No. 104 ¶ 93. Duin did not inquire into the truth of the rumor because, in her view, the article was not an "investigation into sexual abuse." ECF No. 104 ¶ 89. But, as the Supreme Court of Nebraska just held, a defendant may not consciously avoid the truth only to later plead ignorance. *See Palmtag v. Republican Party of Nebraska*, 315 Neb. 679, 704 (2024). The Editorial Guidelines did not give Duin an option to publish this criminal allegation without first fact-checking it. But she consciously avoided

anything which would tend to disprove it. This shows that she entertained subjective doubt as to the truth of the rumor. *Sweeney v. Prisoners' Legal Servs. Of New York, Inc.*, 84 N.Y.2d 786, 793 (1995) (actual malice can be shown when defendants' "'inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity' of the published statement").

And Newsweek cannot escape liability by claiming it took a hands-off approach to Duin. ECF No. 104 ¶ 67, 120. The author of the Editorial Guidelines, who sets the standard for the organization, served as the editor of this article. ECF No. 104 ¶¶ 12,14-16, 26, 52, 56. Yet there was no oversight into Duin's investigation. ECF No. 104 ¶¶ 116-118. Blind faith does not protect a defendant's decision to deliberately avoid inconvenient facts. *Id.*

### 2.2.2: There was no opportunity to respond.

The Editorial Guidelines also require an opportunity to respond, especially when "we are accusing a person or company of wrongdoing." ECF No. 104 ¶ 57. Duin not only subjectively understood this basic proposition, but she also instilled it in her pupils. ECF No. 104 ¶ 34. Yet she did not ask Greaves about the article statement, although she followed up with him about other topics. ECF No. 104 ¶ 81-83. Duin went even further than simply avoiding the topic with Greaves, she "constructed" the article to make it appear as if he gave a general denial to this alleged misconduct. Response ¶¶ 41, 44. Actual malice may be found where the publisher juxtaposes denials "in reckless disregard[] of the false impression the collocation would produce." *Crane v. Arizona Republic*, 972 F.2d 1511, 1524 (9th Cir. 1992).

### 2.2.3: Newsweek intentionally relied on obviously hostile sources.

The Editorial Guidelines also require the use of "credible" sources. ECF No. 104 ¶ 65.

This requirement is closely related to caselaw that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732; *see also Stern v. Cosby*, 645 F. Supp. 2d 258, 284 (S.D.N.Y. 2009) ("obvious reasons to doubt the truthfulness" of a biased source as actual malice). There is no room to dispute that there were obvious reasons to doubt Strange's transmission of the rumor. Beginning with the pitch of this article, Duin referred to her sources as "disgruntled former members." ECF No. 104 ¶ 69; *accord.* 1 *Law of Defamation* § 3:59 (2d ed.) ("When a source harbors biases or hostilities against a plaintiff, and the defendant is aware of those biases or hostilities, that awareness is probative of the existence of actual malice.")

Nobody Duin talked to claimed to have personal knowledge of sexual abuse or cover-up. ECF No. 104 ¶¶ 70, 74; *accord. King v. Globe Newspaper Co.*, 400 Mass. 705, 721–22 (1987) (sole reliance on "hearsay perhaps multi-level" where the underlying declarant was "neither disclosed … nor vouched for" as actual malice). Johnson's tale took place two to three years before he was even a member. Response ¶ 72. Worse than a rumor "based wholly on an unverified anonymous telephone call" (*St. Amant*, 390 U.S. at 732), Newsweek published a rumor based wholly on an unverified anonymous *internet* source. ECF No. 104 ¶ 78. Duin took a pseudonymous email at face value that the underlying anonymous hearsay declarant must be telling the whole truth. ECF No. 104 ¶ 80. There can be no genuine dispute that she entertained serious doubts about the rumor.

It'd be one thing if Duin simply happened across this "delicious quote" by happy accident. ECF No. 104 ¶ 91. But the evidence shows otherwise. From its very conception, this article was going to include a claim of covered up sexual abuse. ECF No. 104 ¶ 46 ("allegations of TST leadership sexually exploiting members or failing to respond to harassment / sex assault

allegations against chapter heads.") Duin took that unverified claim (ECF No. 104 ¶ 45) and presented it as a fact in her pitch to Newsweek's highest levels of management. ECF No. 104 ¶ 50. It cannot be said that Duin is merely ignorant of basic journalistic standards, she was a senior hire who has served as a professor of journalism at four colleges. ECF No. 104 ¶¶ 31-33. Duin did not include this "delicious quote" in the article by happy accident, she included it because it was consistent with her pre-determined narrative. *Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) (pre-determined narrative as actual malice).

She included the article statement as part of a pattern of spreading rumors about sexual abuse and cover-up. In her Satanic Panic-era article entitled *Satanism in the United States: a phenomenon on the rise*, she wrote: "Sex is introduced early in the game, as adolescents are fascinated by sexuality and the occult offers plenty of it," further claiming "gang rapes" and purporting that this is all covered up by Satanists not hesitating to "kill defectors." See ECF No. 104 ¶ 39. And, exactly as this article would be "Just in time for Halloween" (ECF No. 104 ¶ 48), she similarly wrote about Satanism on October 31, 1987 and October 28, 1989. See ECF No. 104 ¶ 39. The article statement was nothing more than another rote sale of trash claims to society's lowest common denominator. *See Burnett v. Nat'l Enquirer, Inc.*, 144 Cal. App. 3d 991, 1020 (Cal. Ct. App. 1983) (Beach, A.J., concurring in part) (affirming a finding of actual malice where "[t]he defendant engages in a form of legalized pandering designed to appeal to the readers' morbid sense of curiosity") Duin's fearmongering about Satanism, generally, applies with equal force to her three prior writings about the Temple, specifically. ECF No. 104 ¶¶ 42-43. In each, she complains of the Temple's very existence: whether because the Temple benefits from an equal right to have a physical presence (ECF No. 105-10) or from an equal right to tax-exempt status (ECF No. 105-12). These preexisting articles

show that the subject article was authored by someone who willfully looked past her source's obvious bias against the Temple because she shared the same sentiments. Again, this shows a pre-determined narrative. *Palin*, above.

Nor can Newsweek plead ignorance about the above thread of open hostility toward the Temple (ECF No. 104 ¶ 39-48) because Cooper, too, shared Duin's bias. ECF No. 104 ¶ 113-116. As shown there, Cooper, who swore that she had never previously heard of the Temple and who swore she engaged in no fact investigation for it, insisted upon casting aspersions of the Temple's ritual activity. ECF No. 104 ¶¶ 113-116, 136. Even Duin pushed back, unsuccessfully, on Cooper's editorialization. ECF No. 104 ¶ 114. In this, we see yet another departure from the Editorial Guidelines: a prohibition against editorialization. ECF No. 101-16, at 2 (editorializing *vs.* reporting).

There is no escape from liability for Newsweek. All the above issues were ratified by Newsweek's highest management, with Cooper not only contributing to the article but giving it glowing praise immediately after the fact. ECF No. 104 ¶¶ 12, 15-16, 113-116, 121. 1 *Law of Defamation* § 3:117 (2d ed.) ("activity or acquiescence of executives, high officers, or principal managers" as ratification).

## 2.3: Newsweek's argument, like the article, ignores its own Editorial Guidelines.

At no point has Newsweek engaged with the argument that its own subjective standard of care, which the editor of this very article crafted and otherwise enforced, explicitly prohibited publishing an anonymous internet rumor as told by a source with a stated bias against the Temple, without fact-checking, and without the opportunity to respond. Instead, Newsweek argues that it is entitled to summary judgment based on self-serving assertions of naivete by both the author and the editor/publisher. ECF No. 99, at 19-20. This point is defeated by the

fact that defendants will "rarely" admit actual malice, that is why courts look to the objective facts rather than self-serving denials. *Biro*, 807 F.3d at 545; *see also St. Amant*, 390 U.S. at 732 (a defendant cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true," the jury must determine whether the "publication was indeed made in good faith.")

Newsweek next tries to pass off all the blame to its month-long relationship with Duin, the purported "independent contractor," Newsweek emplaced blind faith in. ECF No. 99, at 19-20; see also Response ¶¶ 16, 18, 60. But Newsweek overlooks that Cooper insisted on editorializing in a claim, overruling her "trusted" reporter's objection that they had no basis to believe it was true, about an organization of which she disclaimed knowing "anything" about. Response ¶ 59. The paper trail reveals in real time that Newsweek's highest management insisted on publishing a fact claim it had no basis to believe it was true. *See McKimm v. Ohio Elections Comm.*, 89 Ohio St. 3d 139, 148 (2000) (publishing an accusation for which there is "no basis to believe" it as actual malice).

Newsweek also errantly relies on *Stern*, 645 F. Supp. 2d at 284-86. There, it is held three times that a *book* publisher has no independent duty to investigate an author's story without actual, subjective doubts as to its accuracy. *See id.* ("To require a book publisher to check … every potentially defamatory reference might raise the price of non-fiction works beyond the resources of the average man.") But the article isn't a book and Newsweek isn't a book publisher. Newsweek is a *news* organization, one held to the lowest possible standard of adhering to its own subjective standard of care. *Khan*, 269 A.D.2d at 77. Because it comprehensively failed to meet that standard, the inference of actual malice is drawn.

**WHEREFORE** the Court should deny Newsweek's motion in full.

Respectfully submitted on May 31, 2024,

By:   */s/ Matt Kezhaya*
Matt Kezhaya (# 0402193)
Kezhaya Law PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:   (479) 431-6112
email:   matt@kezhaya.law

### CERTIFICATE OF SERVICE

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on May 31, 2024, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*