# Exhibit 47

Redacted excerpts of deposition of Julia Duin
(November 16, 2023)

**In the Matter Of:**

THE SATANIC TEMPLE

vs

NEWSWEEK DIGITAL

---

JULIA DUIN

November 16, 2023

---



**Moburg Reporting**

33400 9th Ave. South, Suite 207

Federal Way, WA 98003

(206) 622-3110

www.MoburgReporting.com

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3    -------------------------------------------------
                                        )
 4    THE SATANIC TEMPLE, INC.,         )
                                        )
 5              Plaintiff,              )
                                        )
 6         vs.                          )NO. 1:22-CV-01343-MKV
                                        )
 7    NEWSWEEK DIGITAL, LLC,            )
                                        )
 8              Defendant.              )
                                        )
 9    -------------------------------------------------

10        Videotaped Deposition Upon Oral Examination

11                        of

12                    JULIA DUIN

13    -------------------------------------------------

14            Thursday, November 16, 2023

15                    9:37 a.m.

16            7900 Southeast 28th Street

17            Mercer Island, Washington

18

19

20

21

22

23

24    Cheryl Macdonald, CRR, RMR
      Court Reporter
25    License No. 2498
```

COPY

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Page 2

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4                    MATT KEZHAYA
                      SONIA KEZHAYA
 5                    Attorneys at Law
                      KEZHAYA LAW PLC
 6                    150 South Fifth Street
                      Suite 1850
 7                    Minneapolis, Minnesota 55402
                      matt@kezhaya.law
 8                    sonia@kezhaya.law

 9

10    FOR THE DEFENDANT and THE WITNESS:

11                    SARA TESORIERO
                      CAMERON STRACHER (via Zoom)
12                    Attorneys at Law
                      STRACHER LAW
13                    51 Astor Place
                      9th Floor
14                    New York, New York 10003
                      sara@stracherlaw.com
15                    cam@stracherlaw.com

16

17    THE COURT REPORTER and VIDEOGRAPHER:

18                    CHERYL MACDONALD
                      KALIA HENDRICKS
19                    MOBURG REPORTING
                      33400 9th Avenue South
20                    Suite 207
                      Federal Way, Washington 98003
21                    info@moburgreporting.com

22

23    ALSO PRESENT:  LUCIAN GREAVES (via Zoom)

24

25
```

```
 1                        I N D E X

 2

 3    EXAMINATION                                      PAGE

 4    BY MR. KEZHAYA:  .........................      5

 5

 6    EXHIBITS MARKED                                  PAGE

 7    No. 1          Bates-stamped Newsweek 025...    34

 8    No. 2          Bates-stamped Newsweek 015,
                     16 and 17...................      59
 9
      No. 3          Boston Globe "puff piece"...     74
10
      No. 4          GetReligion podcast 2018....     75
11
      No. 5          GetReligion podcast 2022....     75
12
      No. 6          GetReligion podcast
13                   referring to Boston Globe...     79

14    No. 7          Editorial guidelines........     80

15    No. 8          Newsweek article re orgies,
                     harassment, et cetera.......    100
16
      No. 9          E-mail string Bates-stamped
17                   Duin04-001 - 003............    112

18    No. 10         E-mail string Bates-stamped
                     Duin48-001 - 005............    117
19
      No. 11         E-mail string Bates-stamped
20                   Newsweek 032................    136

21    No. 12         E-mail string Bates-stamped
                     Newsweek 065 - 66...........    136
22
      No. 13         E-mail string Bates-stamped
23                   Cooper 51 - 53..............    177

24    Conference before Magistrate Judge Sarah L. Cave:

25    Pages 60 - 66
```



 1    interview process and your start date?

 2              MS. TESORIERO:  Objection to form.

 3       A.    Not really.  I mean, we agreed on a start

 4    date, I mean, as of September 1st.

 5       Q.    Was your role full-time or part-time?

 6       A.    I was full-time.

 7       Q.    Were you paid -- how were you paid?  To

 8    expand on the question, were you paid salary?  Were

 9    you paid piece rate?

10       A.    Salary.  I'm salary.

11       Q.    What was the cadence with which you were

12    paid?

13       A.    Cadence?

14       Q.    Were you paid monthly?

15       A.    Monthly, monthly.

16       Q.    How much were you paid per month?

17       A.    I don't have to say that.

18       Q.    Yes, you do.

19              MS. TESORIERO:  Actually, I'm going to

20    object.

21       A.    No.  I don't have to say that.

22              MS. TESORIERO:  Hang on one second.  That

23    is not relevant to the case.

24              MR. KEZHAYA:  I disagree.

25              THE WITNESS:  No.

1      A.     [As read] "A major rift in an organization

2    called The Satanic Temple:  Defamation lawsuits,

3    anti-Semitic stuff, mismanagement of funds, NDAs being

4    used to hide wrongdoing, sexual harassment, shell

5    corporations, harassment of internal critics.  Sounds

6    like quite a brew.  Am diving into it to see if I can

7    glean anything new of how much of the story this is.

8    More to come."

9      **Q.     Was this the first pitch for the subject**

10   **article that you wrote?**

11     A.     I believe so.

12     **Q.     When did you begin working on this article?**

13     A.     Well, it would have been at the beginning

14   of October.

15     **Q.     I see that the date would be September**

16   **30th, so you clearly formulated the idea of the**

17   **article at some point before September 30th; correct?**

18     A.     Let's see.  Well, remember, I have to pitch

19   it first to make sure they approve it before I start

20   major work on a piece.

21     **Q.     I understand that that might be before you**

22   **start major work.  My question posed is when did you**

23   **start working on it, including minor work.**

24     A.     I don't remember.

25     **Q.     Was it before September 1st, 2020?**

1       A.    Before September 1st?

2       Q.    Correct.

3       A.    No.

4       Q.    Sorry.  September 1st, 2021.

5       A.    Before September 1st?

6       Q.    Correct.

7       A.    No.

8       Q.    So during the month of September 2021, you

9    began work on this article; correct?

10      A.    No.  I wasn't working during the month of

11   September.  I was overseas most of that month, or part

12   of that month.  So, no.

13      Q.    Your earlier testimony is that you began

14   working full-time at Newsweek in September of 2021; is

15   that correct?

16      A.    Yeah.  And I was also -- well, never mind.

17      Q.    You were overseas, correct?

18      A.    Doing articles for Newsweek, yes.

19      Q.    And this pitch is part of your work on this

20   article; correct?

21            MS. TESORIERO:  Objection to form.

22      A.    Not sure where you're going.

23      Q.    You don't have to know where I'm going.  My

24   question posed is whether this pitch was part of your

25   work for Newsweek creating the subject article.

 1    Correct or incorrect?

 2            MS. TESORIERO:  Objection to form.

 3    A.    This pitch was the -- this would have been,

 4    really, the beginning of my work on this article.

 5    Q.    **This pitch was the very beginning of your**

 6    **work on this article; correct?**

 7            MS. TESORIERO:  Objection.

 8    A.    I would say yes.

 9    Q.    **That's your testimony?**

10            MS. TESORIERO:  Objection.

11    A.    Just a moment.  It depends on what you call

12    "work."

13    Q.    **What was entailed in drafting this pitch?**

14    A.    I had gotten -- I had gotten an idea for

15    this article and I drafted the pitch.

16    Q.    **Where did the idea come from?**

17    A.    I had -- someone suggested it to me.

18    Q.    **Who suggested it to you?**

19    A.    I had a -- another journalist.

20    Q.    **Another journalist suggested it to you?**

21    A.    Mm-hmm.

22    Q.    **Who was this journalist?**

23    A.    His name is Kevin.

24    Q.    **What is Kevin's last name?**

25    A.    Trying to remember.  My mind is blank right

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

November 16, 2023

THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    Julia Duin

Page 38

 1    now.  I can't remember.

 2         Q.    How did you know Kevin?

 3         A.    Actually, I really didn't know him.

 4    Somehow he had heard of me.  I really didn't -- I

 5    really hardly knew the man.  I mean, I really didn't

 6    know him, actually.

 7         Q.    How did Kevin convey this idea for this

 8    article?

 9         A.    E-mail.

10         Q.    Did he write this pitch for you?

11         A.    Did he write the pitch?

12         Q.    Correct.

13         A.    I wrote the pitch.  He had some -- some of

14    this is -- some of this is pitch is taken from what he

15    wrote me.

16         Q.    When did he write you that?  Before or

17    after September 1st, 2021?

18         A.    When did he send me that e-mail?  Let's

19    see.  I'm trying to remember.  I know I had gotten an

20    e-mail, and I'm just trying to remember when.  Trying

21    to remember when he sent it to me.  And I -- I don't

22    remember.  I don't remember.  I really don't remember

23    when he sent it to me.

24         Q.    Did you provide your counsel approximately

25    26 pages of e-mails in the course of preparing for

Page 68

```
 1        Q.    Did you negotiate an annual salary?

 2        A.    Yes.

 3        Q.    Okay.  And was that annual salary divided

 4   by 12 to constitute a monthly payment?

 5              MS. TESORIERO:  Objection.  The judge just

 6   said you can ask her what she was paid in October of

 7   2021.  She has answered that question.

 8              MR. KEZHAYA:  She has not.  She has said

 9   it's something more than ███████ and her preference

10   would be to round it at ███████   However, we don't

11   really know if that's the answer.  So I'm trying to

12   get to the answer with specificity.

13        A.    You lost me.

14              MS. TESORIERO:  Would you repeat the

15   question?

16        Q.    That was a colloquy between counsel.  Did

17   you negotiate an annual salary?

18        A.    Yes.  I negotiated an annual salary.

19        Q.    Was that annual salary to be paid monthly?

20        A.    Yes.

21        Q.    What was the annual salary?

22              THE WITNESS:  Do I have to answer that

23   question?

24              MS. TESORIERO:  She's given you an estimate

25   for the month.  That was the judge's order.  If you
```

```
 1    wanted the annual salary, why didn't you bring it up

 2    when we just had the judge on the phone?

 3              MR. KEZHAYA:  Because I expected she would

 4    give me a specific answer, not a rounded answer.  I

 5    want to know the specific answer.

 6        A.    I mean, what is it?  $▮▮▮▮.  I mean, you

 7    know, multiply by 12.

 8              MR. KEZHAYA:  Hold on.  There is a lawyer

 9    colloquy going on here.  The question posed is, "How

10    much were you paid per month?"  That was authorized.

11    She could not give me a specific answer.  I want a

12    specific answer.  I don't want an estimated answer.  I

13    want the answer.  Hold on.  And since Newsweek has not

14    provided the document that could have answered this

15    question, I have to get it from her.

16              MS. TESORIERO:  Well, you brought it up

17    again in a deposition.  We had an ongoing dispute

18    about this that we could've brought up without the

19    judge for documents.  Now that the judge has ruled

20    this way, we will provide you the document with the

21    exact number.

22              MR. KEZHAYA:  That will do.

23        Q.    Was this monthly payment the same every

24    month?

25        A.    I'm trying to remember.  There might have
```

MOBURG
REPORTING

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    Julia Duin

Page 70

 1    been a penny or two difference.

 2         Q.    Okay.  But --

 3         A.    Yeah, pretty much.

 4         Q.    In terms of whether it was front loaded or

 5    back loaded or anything, October 2021 would have been

 6    the same as September of 2021?

 7         A.    Yeah.

 8         Q.    What about bonuses?  Were you paid a bonus

 9    for this article?

10         A.    No, no.

11         Q.    Did Newsweek have a bonus structure at the

12    time that you wrote this article?

13              MS. TESORIERO:  Objection to form.

14    Objection to form.

15         A.    I mean, I don't -- I don't know what they

16    did with other reporters.

17         Q.    So in the course of your negotiations with

18    Newsweek, was bonuses a contemplated aspect of payment

19    that you might receive?

20         A.    There was no discussion of bonuses.

21              MR. KEZHAYA:  Okay.  And as addressed while

22    the video was off, we're going to find out the timing

23    that Kevin sent you the article idea at our next

24    break.

25              MS. TESORIERO:  Yes.  And we'll revisit

Page 78

1      Q.    And you said that they laid you off because

2    of finances?

3      A.    Yes.

4      Q.    Could you please expand?

5      A.    That's all I was told.

6      Q.    Who told you that?

7      A.    It was Dayan.

8      Q.    And when did that conversation take place?

9      A.    November of 2022.

10     Q.    Was it effective immediately or effective

11   at some future date?

12     A.    Future date.

13     Q.    What was the future date?

14     A.    February 2023.

15     Q.    So you were paid through February of 2023?

16     A.    Trying to remember.  Yes.

17     Q.    Your last article is dated January 1, 2023.

18     A.    Mm-hmm.

19     Q.    So you were paid for both January and

20   February of 2023 even though you didn't write any more

21   articles for Newsweek?

22           MS. TESORIERO:  Objection to form.

23     A.    Yes, sir.

24     Q.    Did you perform any services for Newsweek

25   in January or February of 2023?

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                      Julia Duin

Page 99

 1    photos.

 2         A.    All right.  No.  That was -- no, I did not.

 3         Q.    Did Jinx Strange ever give you any names of

 4    individuals who have allegedly been sexually abused by

 5    anyone in the course of TST services and then covered

 6    up?

 7              MS. TESORIERO:  Objection to form.

 8         A.    He said he was willing to, but I didn't ask

 9    him.

10         Q.    You did not ask him.  Why didn't you ask

11    him?

12         A.    Because the article was mainly on the

13    lawsuit, and it was not on the -- it was not an

14    investigation into the sexual abuse or the finances or

15    the alt-right figures.  It wasn't on these various

16    permutations.  The article was on the QueerSatanic

17    people.

18         Q.    Well, I mean, the article was about the

19    sexual abuse and cover-up plan, was it not?

20              MS. TESORIERO:  Objection to form.

21         A.    No.  The article was on the lawsuit.

22         Q.    Then why did you include the statement?

23         A.    I included a lot of statements.

24         Q.    Why didn't you include the subject

25    statement for which we are here today?

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                    Julia Duin

Page 123

1           In terms of there were -- I knew there were

2    complaints about finances.  Even Doug Laycock -- we're

3    talking about the sentence afterwards.  Doug Laycock

4    went into that for his book.  So, you know, Jinx had

5    given kind of a general -- it was a general read of

6    The Satanic Temple.  And it was his -- it was how he

7    saw the state of the religion.  And from my other

8    interviews with people, I found it plausible he was

9    correct.

10        Q.    Did you ask Lucien Greaves about coerced

11   sexual activity and cover-up within The Satanic

12   Temple?

13        A.    I asked him -- I certainly asked him in

14   connection with the orgies, yes.

15        Q.    Not in connection with the orgies.  Did you

16   ask him specifically about Jinx Strange's comment?

17        A.    No.  I did not ask him about Jinx Strange's

18   comment.

19        Q.    Why not?

20        A.    Why not?  I didn't -- I felt I had asked

21   Lucien plenty of questions.  And right below that, I

22   had a quote from Lucien that basically denied all

23   these accusations.

24        Q.    Did you confront Lucien Greaves with the

25   allegation that there are accounts of sexual abuse and

 1    cover-up within The Satanic Temple?

 2              MS. TESORIERO:  Objection.  Asked and

 3    answered.

 4        A.    Did I confront him?  Did I confront him?

 5    Trying to remember.  I don't believe I did.

 6        Q.    So Lucien Greaves's comment in his e-mails

 7    could not possibly have related to something that you

 8    did not confront him with.  You would agree with me

 9    there; correct?

10              MS. TESORIERO:  Objection to form.

11        A.    I disagree.

12        Q.    You disagree?

13        A.    I disagree.

14        Q.    Please explain your basis for disagreeing.

15        A.    His quote here -- his quote underneath, it

16    covered the -- all of Jinx's accusations.  He says,

17    "We are accused of all sorts of nefarious things."  I

18    covered it.  I covered what Jinx was saying.

19        Q.    Did you ever even mention the word Jinx

20    Strange -- the name "Jinx Strange" to Lucien Greaves?

21        A.    I believe I talked to -- I may have talked

22    to Jinx maybe after I talked to Lucien.

23        Q.    So you didn't even talk to Jinx Strange and

24    then talk to Lucien, and yet you're telling me that

25    Lucien's comment pertains to Jinx Strange's

1   Strange or the allegations to Lucien Greaves, I find

2   it very difficult to understand how Lucien Greaves's

3   comment could have any pertinence to Jinx Strange's

4   allegations.

5          A.    I don't see how --

6                THE REPORTER:  Please.  I need to hear the

7   end of the question.

8                MR. KEZHAYA:  Jinx Strange or Jinx

9   Strange's allegation.

10                MS. TESORIERO:  Are you asking her a

11  question?

12                MR. KEZHAYA:  I'm asking her to explain

13  what she's -- where she's coming from with her

14  testimony.

15                MS. TESORIERO:  Objection.  Asked and

16  answered.

17          A.    The way -- the way I constructed the

18  article is that the -- okay.  Jinx gave -- Jinx had

19  several things to say about the organization, the

20  alt-right, the sexual abuse, the finances.  And I had

21  Lucien giving a general denial about -- a general

22  denial.  I did not feel he -- Lucien's general

23  statement had to address every single thing

24  specifically.

25          Q.    Why did you have him address anything in

```
 1   talked to person B right afterwards.  You can have --

 2   you know, you can have them from separate

 3   conversations at different times.  So if I have a

 4   quote from Lucien that applies to various accusations

 5   that people make to The Satanic Temple, I have the

 6   right to put that in under a Jinx quote no matter when

 7   Lucien said it.

 8       Q.     Would you agree with me that the accusation

 9   that TST engages in sexual abuse and cover-up is

10   serious?

11              MS. TESORIERO:  Objection to form.

12       A.     Well, sure.  That's what kind of got the

13   Seattle people in trouble; right?

14       Q.     Would you agree with me that writing an

15   article that states TST engages in sexual abuse and

16   cover-up is a criminal allegation?

17              MS. TESORIERO:  Objection to form.  That

18   misrepresents the article and calls for a legal

19   conclusion.

20       A.     Okay.  Can you please restate that.

21       Q.     Is sex abuse a crime?

22       A.     I believe so.

23       Q.     Is covering up sex abuse also a crime?

24              MS. TESORIERO:  Objection.  Form.  She's

25   not a lawyer.
```

```
 1        A.     So what question do I have to answer?
 2        Q.     All of them, until you are instructed not
 3   to.
 4               MS. TESORIERO:  Repeat the question.
 5        A.     Yeah.  One second.
 6               MS. TESORIERO:  Let's get the pending
 7   question on the record.  Would you please repeat the
 8   question.
 9        Q.     Is covering up sexual abuse a crime?
10               MS. TESORIERO:  Objection.  Calls for a
11   legal conclusion.
12               You can answer.
13        A.     Is it a crime?  Is covering up sexual abuse
14   a crime?
15        Q.     Correct.
16        A.     I don't know.
17        Q.     But sex abuse is definitely a crime?
18        A.     Sex abuse is a crime.  Covering up, I don't
19   know.
20        Q.     So making the allegation that TST engages
21   in criminal activity is serious.  You agree with that;
22   correct?
23               MS. TESORIERO:  Objection to form.
24   Mischaracterizes prior testimony.
25        A.     Okay.  I do not -- where do I -- did I say
```

 1    question.

 2        Q.    Julia, I know things are getting heated,

 3    but you need to led me finish the question.

 4             MS. TESORIERO:  You need to let her finish

 5    her answers, too.

 6             MR. KEZHAYA:  Fair.

 7        A.    Did I ask anyone?  Anyone to be 7 billion

 8    people?  I mean --

 9        Q.    Well, did you ask anyone on the face of the

10    planet what sexual abuse and cover-up means in the

11    context of this here quote?

12             MS. TESORIERO:  Objection to form.

13        A.    Okay.  I'll say no to that one.  All right?

14        Q.    Thank you.

15             (Exhibit Nos. 11 and 12 were marked for

16             identification.)

17        A.    There's two here.

18        Q.    There's two, Exhibit 11 and Exhibit 12.

19        A.    Is one of them 10?

20        Q.    I believe 10 was previously introduced.

21             MS. TESORIERO:  I think 10 might have been

22    just sitting in front of you.

23             THE WITNESS:  All right.

24        Q.    Do you have Exhibit 11 in front of you?

25        A.    Yes, I do.

Page 150

1      Q.    But you don't recall when you used it

2    otherwise.   That's your testimony; right?

3            MS. TESORIERO:   Objection to form.

4      A.    God in heaven.  No.  I don't recall.  I

5    mean, I rarely used it.  And I told you, it was like

6    -- I mean, no.  I'm just going to say I don't recall.

7    I'm sick and tired of this.  I mean, it is harassing

8    me.

9      Q.    This is not harassment.

10     A.    Yes, it is.

11     Q.    You-all can take it to the judge if you

12   think this is harassment, but when you I definitely

13   did not and also "I don't recall," I'm just telling

14   you right now this is (inaudible) --

15           MS. TESORIERO:   Please don't talk to my

16   witness.  Ask her a question and let's move on.

17           MR. KEZHAYA:   Fair.

18     Q.    Earlier you testified that you had how many

19   supervisors?

20     A.    Juliana was my direct supervisor at the

21   time.

22     Q.    How many supervisors did you testify you

23   had before?

24     A.    Well, there was a direct one, and then

25   there was one over her and then one over him.  So

 1    there was a direct one.  Add them all up, I guess.

 2    You could call -- you know, there was one direct one.

 3    There were three -- I guess you could say three were

 4    involved with me.

 5         **Q.    And those three were Nancy Cooper, Dayan,**

 6    **and Juliana; correct?**

 7         A.    Nancy, Dayan, and Juliana, right.

 8         **Q.    Juliana was your direct supervisor;**

 9    **correct?**

10         A.    Yes.

11         **Q.    Did she have any involvement in the writing**

12    **of this article?**

13         A.    She was listening -- no, not really.  No.

14    She was involved in the e-mails in the first week or

15    two, but then she did not do any of the editing.

16         **Q.    Was she involved in the pitching of this**

17    **article?**

18         A.    Well, yeah.  I mean, she received my pitch.

19         **Q.    Did she green light this article?**

20         A.    Let's see.  The article was discussed in a

21    meeting, and she would have been one of three people.

22    All three people would have green lighted it.  I'm

23    trying to remember.  I mean, it was a four-way

24    discussion.  I cannot remember what Juliana personally

25    said during those discussions.  She did not really say

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                    Julia Duin

Page 173

1   asking me if I circled back after this hour-long --

2   hour-and-a-half-long interview and asked them about

3   something, this particular statement, who the "they"

4   was?

5       Q.    I'm trying to ascertain if you performed

6   any form of fact investigation on anything that these

7   people had to say.

8            MS. TESORIERO:  Objection to form.

9       A.    I performed -- look, yes, I did check out

10  stuff, but you're asking about one sentence.

11      Q.    When you say you checked out stuff, did you

12  find any individuals who was actually sexually

13  harassed in TST?

14           MS. TESORIERO:  Objection to form.

15      A.    Shall we say -- okay.  I found people who

16  said they knew people who were sexually harassed.  How

17  about that?

18      Q.    No, not how about that.  Did you actually

19  talk to any individuals who were actually sexually

20  harassed by TST?

21           MS. TESORIERO:  Objection to form.

22      Q.    Yes or no.

23      A.    Did I talk to -- no, I did not.

24      Q.    Of the people who claim that they know

25  people who were sexually harassed by TST, did you ask

```
 1    even names or contact information who theoretically

 2    could be followed up with?

 3         A.    No.

 4         Q.    You have been a journalist for 45 years;

 5    correct?

 6         A.    Yes.

 7         Q.    You have been a professor of journalism for

 8    approximately two and a half years; correct?

 9         A.    Mm-hmm.

10         Q.    Do you consider yourself a serious

11    journalist?

12               MS. TESORIERO:  Objection to form.

13         A.    Yes, I do.

14         Q.    Did you consider this piece of work to be a

15    credible, serious, and fair statement about sexual

16    abuse and cover-up?

17         A.    My article was fair, yes.

18         Q.    I'm asking you about the statement.

19         A.    About your statement?

20         Q.    Your statement.  The one that you put in

21    the article.

22         A.    Yes, I did.  It was fair.  And, yes, if I

23    hadn't believed that there wasn't sexual abuse going

24    on, I would not have put that into the article.

25         Q.    And what was your basis to believe there
```

Page 178

```
 1    the future article ideas we discussed.  And there's

 2    one story I am working on re The Satanic Temple that

 3    is really taking off.  I am having a ton of

 4    disgruntled members contact me, and what started out

 5    as a TST lawsuit against four former Seattle-based

 6    members has turned into a much bigger story.  More

 7    below."

 8         Q.    These are disgruntled former members who

 9    were your sole sources for the claim that there was

10    actually sexual abuse and cover-up.  Correct?

11               MS. TESORIERO:  Objection to form.

12         A.    That's what I call them here.

13         Q.    That's what you called them; correct?

14         A.    There.

15         Q.    And they are, in fact, disgruntled former

16    members; correct?

17               MS. TESORIERO:  Objection to form.

18         A.    Yes.

19         Q.    Do you feel you have an ethical obligation

20    to convey both sides of a serious allegation?

21         A.    I did.

22         Q.    Did you?

23         A.    Yes.

24         Q.    Where did you ask Lucien Greaves about

25    sexual abuse and cover-up?
```

Page 200

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF WASHINGTON        )

 4                               ) ss.

 5    COUNTY OF KING             )

 6

 7         I, the undersigned Washington Certified Court

 8    Reporter, pursuant to RCW 5.28.010, authorized to

 9    administer oaths and affirmations in and for the State

10    of Washington, do hereby certify:

11         That the annexed and foregoing deposition

12    consisting of Page 1 through 199 was taken

13    stenographically before me and reduced to a typed

14    format under my direction;

15         I further certify that according to CR 30(e) the

16    witness was given the opportunity to examine, read and

17    sign after the same was transcribed, unless indicated

18    in the record that the review was waived;

19         I further certify that all objections made at the

20    time of said examination to my qualifications or the

21    manner of taking the deposition, or to the conduct of

22    any party, have been noted by me upon said deposition;

23         I further certify that I am not a relative or

24    employee of any such attorney or counsel, and that I

25    am not financially interested in said action or the
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    Julia Duin

Page 201

1    outcome thereof;

2        I further certify that the witness before

3    examination was by me duly sworn to testify to the

4    truth, the whole truth, and nothing but the truth;

5        I further certify that the deposition, as

6    transcribed, is a full, true and correct transcript of

7    the testimony, including questions and answers, and

8    all objections, motions, and exceptions of counsel

9    made and taken at the time of foregoing examination

10   and was prepared pursuant to Washington Administrative

11   Code 308-14-135, the transcript preparation format

12   guideline;

13       I further certify that I am sealing the

14   deposition in an envelope with the title of the above

15   cause and the name of the witness visible, and I am

16   delivering the same to the appropriate authority;

17

18       IN WITNESS WHEREOF, I have hereunto set my hand,

19   and affixed my official seal this 22nd day of

20   November 2023.

21                              _____

22                              Cheryl Macdonald, CCR

23                              Washington State Certified

24                              Court Reporter

25                              License No. 2498

Page 202

```
 1                D E C L A R A T I O N

 2

 3

 4

 5         I declare under penalty of perjury that I

 6   have read my within deposition, and the same is true

 7   and accurate, save and except for changes and/or

 8   corrections, if any, as indicated by me on the

 9   correction sheet hereof.

10

11

12                                 _____

13                                 JULIA DUIN

14

15

16

17

18

19         Dated this_____day of_____,

20   2023.

21

22

23

24

25   CHERYL MACDONALD, Court Reporter
```



```
 1
     MOBURG REPORTING
 2   COURT REPORTERS & LEGAL VIDEO
     33400 9th Avenue South
 3   Suite 207
     Federal Way, WA 98003
 4   206-622-3110

 5   _____
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 6   SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS
     SHEET, SIGN THE ACCOMPANYING SIGNATURE SHEET AND
 7   RETURN AS PER INSTRUCTIONS IN COVER LETTER.

 8   _____
     PAGE         LINE            CORRECTION AND REASON
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                            _____
                              (SIGNATURE)
24

25
     REPORTER: CHERYL MACDONALD
```



Page 204

```
 1                        MOBURG REPORTING
 2                 Court Reporters & Legal Video
                  33400 9th Avenue South, Suite 207
 3                      Federal Way, WA 98003
                   (206) 622-3110  FAX (206) 343-2272
 4                E-mail: info@moburgreporting.com


 5


 6    TO:   Sara Tesoriero              November 22, 2023
            51 Astor Place
 7          New York, New York 10003


 8
      IN RE:  The Satanic Temple v. Newsweek
 9
      DEPOSITION(S) OF: Julia Duin
10
      DATE OF DEPOSITION: November 16, 2023
11

12    A copy of the deposition transcript of the above-named
      is provided via E-transcript.  Please have the
13    deponent read the deposition, sign the correction
      sheet and declaration.  The signed correction sheet
14    and declaration should then, within 30 (thirty) days,
      be forwarded to:
15
                            CHERYL MACDONALD
16
                            33400 9th Ave. So.  #207
17
                            Federal Way, Washington 98003
18
      who will then enclose them in the original transcript,
19    seal it, and forward it to Mr. Kezhaya for retention
      until the time of trial.
20
           If you have any questions, feel free to contact
21    me at the number listed above.

22
      Sincerely,
23

24    CHERYL MACDONALD, CCR

25    CC: M. Kezhaya
```

Page 205

```
 1              Certification of Court Rule and WAC Compliance

 2                   The Satanic Temple v. Newsweek

 3
       I, VALERIE SEATON, am an authorized representative of
 4  MOBURG REPORTING and do hereby, under penalty of perjury,
    certify that Moburg Reporting and all court reporters
 5  providing services in the above-captioned case on MOBURG
    REPORTING'S behalf will fully comply with all applicable
 6  rules and regulations governing the provision of court
    reporting services, including, where applicable,
 7  Washington Superior Court Rule 28(c)-(e) and WAC
    308-14-130(1).*
 8
                                        11/22/23
 9  _____     _____
    Valerie L. Seaton                       Date
10  President
    Moburg Reporting
11

12       *28(c)  Disqualification for Interest.  No deposition
    shall be taken before a person who is a relative or
13  employee or attorney or counsel of any of the parties, or
    is a relative or employee of such attorney or counsel, or
14  is financially interested in the action.
    28(d)  Equal Terms Required.  Any arrangement concerning
15  court reporting services or fees in a case shall be
    offered to all parties on equal terms.  This rule applies
16  to any arrangement or agreement between the person before
    whom a deposition is taken or a court reporting firm,
17  consortium, or other organization providing a court
    reporter, and any party or any person arranging or paying
18  for court reporting services in the case, including any
    attorney, law firm, person or entity with a financial
19  interest in the outcome of the litigation, or person or
    entity paying for court reporting services in the case.
20  28(e)  Final Certification of the Transcript.  The court
    reporter reporting a deposition shall not certify the
21  deposition transcript until after he or she has reviewed
    the final version of the formatted transcript.  A court
22  reporting firm, consortium, or other organization
    transmitting a court reporter's certified transcript
23  shall not alter the format, layout, or content of the
    transcript after it has been certified.
24       *308-14-130(1)  Offer arrangements on a case
    concerning court reporting services or fees to all parties
25  on equal terms.
```

